# Exhibit A

AMERICAN ARBITRATION ASSOCIATION
MULTIEMPLOYER PENSION PLAN
WITHDRAWAL LIABILITY ARBITRATION

CENTRA, INC. and
DETROIT INTERNATIONAL
BRIDGE COMPANY,
        Petitioners,

        and                                    AAA Case No. 51 621 00068 99
                                               Assessment No. 1388250-WL981053-01
CENTRAL STATES, SOUTHEAST
AND SOUTHWEST AREAS
PENSION FUND,
        Respondent,

Hearings Held October 9, 10, 11, 12, 13,
16, 17, 18, 19, 20, 23, 24, 25, 2006

Before Richard I. Bloch, Esq.

PETITIONERS

Mark Casciari, Esq.                    Edward R. Mackiewicz, Esq.
Ronald J. Kramer, Esq.                 Eric G. Serron, Esq.
William R. Seikaly, Esq.               Patrick S. Menasco, Esq.
Jeffrey T. Stewart, Esq.               Roscoe C. Howard, Jr., Esq.
Mark E. Nagle, Esq.

RESPONDENTS

James P. Condon, Esq.                  Thomas S. Gigot, Esq.
Thomas M. Weithers, Esq.               August A. Imholtz III

OPINION

Facts

Respondent Central States, Southeast and Southwest Areas Pension Fund (hereinafter also referred to as "Central States" or "The Fund") is a multiemployer pension plan and trust maintained pursuant to a trust agreement between unions affiliated with the International of Brotherhood of Teamsters ("Teamsters" or "IBT") and representatives of employers that have signed labor agreements with Teamster-affiliated unions.[1] On June 5, 1998, the Fund served the Petitioners, CenTra, Inc., and its subsidiary, Detroit International Bridge Company (DIBC), with its demand for payment of $14,761,082.66 in withdrawal liability.  Petitioners appear in this forum to have the arbitrator rescind the assessment and to replace it with a new assessment for $587,610.00.[2] The balance of the monies, it is claimed, should be refunded, together with statutory interest.

The parties to this proceeding agree the matter is properly before this arbitrator pursuant to the dispute resolution provisions of the Multiemployer Pension Plan Amendments Act of 1980 (hereinafter "MPPAA").[3] Hearings were conducted between October 9 and 25th, 2006, at which time evidence and

---

[1] According to the Joint Stipulations of Facts, there are some three thousand contributing employers.
[2] See Petitioners Exhibit (PE, hereinafter) 392, at 5-6 (¶ 6).  See also Joint Exhibit (JE) 37.
[3] 29 U.S.C. § 381, *et seq.* (2000).

testimony was submitted, witnesses were presented and made available for full cross examination, and a verbatim transcript was made.

In the overall, the Fund claims that, notwithstanding a variety of legal maneuvers surrounding the organization and reorganization of CenTra-related companies, CenTra and the DIBC should remain liable for the withdrawal liability monies at issue.

One turns first to the contested gymnastics. The Fund accurately identifies the focal issue in this case as determining which employer has responsibility for the millions of dollars in unfunded vested benefits ("UVBs") attributable to the long-standing participation in the Fund of Central Cartage Inc. ("Central Cartage" or, occasionally "Cartage") and Central Transport, Inc. ("Central Transport" or "Transport"), two motor freight subsidiaries of CenTra, Inc. that merged into CenTra, effective December 31, 1995. Throughout this discussion, Central Cartage and Central Transport will be shorthanded, from time to time, as the "Old Subsidiaries" or the even shorter-handed, "Old Subs").

The pension contribution histories of the Old Subsidiaries form the basis for the assessment of withdrawal liability in the event the enterprise goes out of business or ceases its pension contributions. Relevant to this, as well, is the "controlled group" rule in 29 U.S.C. §1301(b)(1), which requires that all businesses under common control be treated as a single employer for withdrawal liability purposes.[4] Thus, even if Cartage and Transport closed, CenTra would be

---

[4] An "employer" subject to withdrawal liability is defined by ERISA §4001 (b) (1) to include all trades or businesses under common control as defined by tax regulations. Generally,

liable for withdrawal liability based on their contribution histories, assuming they remained in the CenTra controlled group at that time.

ERISA §4211, taken together with the Fund's Withdrawal Liability Rules, establishes a two-step process for determining liability. First, the withdrawing employer's share of the unfunded liabilities is calculated by dividing the last ten years of contribution made by the employee's controlled group, as of the withdrawal date, into the total contributions from all contributing employers during that same time. Then, the total unfunded vested benefits of the Fund as of the last full year <u>prior</u> to the withdrawal year is multiplied by the percentage gained from the first step.

In this case, the Fund looks to the contribution histories of Cartage and Transport for all years preceding 1996, as of November 23, 1999, the date it says CenTra should be seen as incurring the withdrawal liability.[5]  CenTra however, say it divested itself of any responsibility for the UVBs by means of a 1995 reorganization that worked as follows. CenTra (1) merged the Old Subsidiaries (and thus, their contribution histories), into Centra, then (2) simultaneously transferred the Old Subs' employees and some assets (and, thus, their

---

this means companies are under common control if at least 80% of each company is owned, directly or indirectly, by a parent holding company or by a group of five or fewer individuals. The result of the controlled group rule is that each company in an employer's controlled group is jointly and severally liable for the employer's withdrawal, regardless of whether that company itself ever contributed to the plan. A complete withdrawal generally does not occur until all contributing members of the employer's controlled group have dropped out of the multiemployer pension plan. At the time of a complete withdrawal, the employer's withdrawal liability is calculated based on the entire group's *pro rata* share of the plan's contribution base.

5 See PE 265

contribution histories) to a pair of New Subsidiaries. Finally, (3) Centra sold the New Subs (including the contribution histories) to a firm that ended up outside the Centra controlled group. As a result, when, in 1998, the Fund issued its Notice and Demand to CenTra for withdrawal liability payment[6] (a wholly-owned subsidiary had permanently ceased contributing), the Old Subs' contribution histories were long gone, it is claimed, and should not have been included in the calculations.

The Fund cries foul. It claims the 1995 reorganization was legally deficient for a number of reasons to be examined below. The critical contribution histories, it says, never made it out of the CenTra group, according to ERISA §§4618 and 4069(b). Even if they did, a major purpose behind these moves was to evade or avoid withdrawal liability and, as such, they violated ERISA §4212. ERISA requires, under that Section, that the reorganization be ignored. What follows is a more detailed description and discussion of the corporate changes at issue.

CenTra Inc. was formed in 1970 to exist as a holding company for Central Cartage, Central Transport, and GLS Lease Co.[7] Cartage performed local pick-up and delivery services in more than twenty cities in the Midwest, employing both local pick-up and delivery drivers and dockmen. Transport engaged in intercity line hauling functions as a common and contract carrier, utilizing "owner-operator" employees who owned their own tractors and leased them to the

---

[6] JE 37.
[7] Joint Stipulation of Facts, p. 2. The reference to this document will hereinafter be designated as "Facts".

company. While these companies were independent entities, they worked together to provide shippers and consignees with door-to-door services.[8]

Dockmen and local drivers employed by Central Cartage, and the over-the-road drivers employed by Central Transport were represented by local unions affiliated with the Teamsters, and were covered by separate labor agreements negotiated between the companies and Teamster-affiliated local unions. Central Transport and Central Cartage were signatory to participation agreements[9] with, and were contributing employers to, the Fund.

In 1979, Central Cartage purchased the Detroit International Bridge Company (DIBC) for about $30 million. DIBC owns and operates the Ambassador Bridge, which links Detroit, Michigan with Windsor, Ontario. DIBC, too, was signatory to a Central States participation agreement, dated April 1. 1993.[10] Central Transport also wholly-owned a subsidiary, Crown Enterprises, a firm that owns and leases real estate. Both DIBC and Crown were highly profitable enterprises.

Also relevant to the 1995 reorganization plan is the U.S. Truck Company, Inc. ("U.S. Truck"), a unionized sister corporation of CenTra purchased in 1982 by McKinlay Transport, Inc. U.S. Truck, also (at the time) a member of the CenTra controlled group, was a contributor to the Fund.

---

[8] Id.
[9] See, e.g. JE 3, a participation agreement for Central Transport, Inc.
[10] JE 4.

Tufick (T. J.) Moroun originally took control of Central Cartage in 1946 [11] and later formed CenTra, Inc. Moroun had one son, Manuel (hereinafter, to avoid confusion, "Matty") and three daughters, Agnes Anne Moroun (Anne), Florence McBrian, and Victoria Baks.[12] Shortly after its purchase, U.S. Truck went into bankruptcy, emerging in 1985. In 1987, McKinlay merged into U.S. Truck. Thus, as of 1987, the various entities described above were organized as follows:



---

[11] Facts, p. 2.
[12] Facts, p. 4.

Beginning in the mid-1980's, as will be discussed below, CenTra began to explore possible reorganization plans that would include a merger of Central Transport and Central Cartage into CenTra.

In 1987, CenTra requested[13] and received[14] a favorable ruling from the Internal Revenue Service concerning a proposed corporate reorganization. As will be noted in detail below, it was some eight years before the reorganization was finally consummated. In December of 1995, Fred Calderone, CenTra's Vice President-Corporate Planning, wrote to Price Waterhouse concerning the plan:

> Our plan involves a statutory merger of the existing Central Transport, Inc. ("Old Transport") and the existing Central Cartage Co., Inc. ("Old Cartage") into their mutual parent. CenTra, Inc. immediately after the merger, CenTra will drop down the operating assets and related liabilities of Old Transport into a new Central Transport, Inc. ("New Transport"). CenTra will also simultaneously drop down the operating assets and related liabilities of Old Cartage into a New Central Cartage, Co. ("New Cartage"). Shortly after New Transport and New Cartage are formed, Centra will sell all of its stock in these two corporations to U.S. Truck, Inc., a sister corporation. [15]

For purposes of completing this transaction, two new subsidiaries were formed -- Central Transport of Michigan, Inc. and Central Cartage of Michigan, Inc. (These companies will be referred to, from time to time, as "New Transport" and "New Cartage", respectively, as well as the "New Subsidiaries" or, occasionally, "New Subs").

---

[13] JE 14.
[14] JE 15.
[15] JE 16, December 19,1995 letter from Fred Calderone to Greg Fowler.



On December 26, 1995, the CenTra Board of Directors voted to merge Old Transport and Old Cartage into CenTra, effective December 31, 1995.[16] Thereafter, CenTra changed the names of the New Subsidiaries, (removing the "... of Michigan" extension) resulting in "Central Cartage Company" and "Central Transport, Inc.," which became direct subsidiaries of CenTra.[17] Then, effective December 31, 1995, Old Transport and Old Cartage officially merged into their parent, CenTra. Coincident with the merger, CenTra contributed ("dropped down") certain assets and liabilities that had traveled "upstream" from the Old

---

[16] JE 21.
[17] Facts, p. 10.

Subs.  According to a Duff & Phelps Valuation Report, "(i) terminal operations, including related personnel and fixed assets, became Central Cartage; [and] (ii) drivers and fixed assets related to the line haul operations became Central Transport." [18]

Thus did Old Central Cartage and Old Central Transport cease their existence.  As a result, DIBC and Crown Enterprises Inc. were converted into first tier subsidiaries of CenTra Inc.; the New Subsidiaries replaced the Old Subsidiaries on that same tier.  The organizational chart of the operation then looked like this:



After December 31, 1995, the New Subsidiaries continued contributing to the Fund, using the Old Subsidiaries' reporting numbers.[19]

---

[18] PE 5, at p. 2.
[19] See August 9, 1999 Affidavit of Peter Priede, Funds' group Mgr., ¶ 14.

The reorganization discussed above set the stage for the next series of transactions, whereby CenTra divested itself of the New Subs, selling the stock of Central Transport, on February 29, 1996, to U.S. Truck Company, Inc.[20] On August 9, 1996, CenTra sold U.S. Truck the stock of Central Cartage. Ten days later, Matty and Anne Moroun entered into an agreement designed to remove any common ownership of CenTra and U.S. Truck and, significant to this case, thereby removed U.S. Truck Company from CenTra's controlled group.[21]

After the stock sales, each of the New Subsidiaries shut down. Central Transport ceased operations in March of 1997 and was merged into U.S. Truck in May of 1997. In November of that year, U.S. Truck changed its name to U.S. Truck Company Holdings, Inc. On or about December 31, 1997, Cartage was merged into U.S. Truck Holdings Inc.[22]

Bargaining unit employees at New Transport were offered jobs at a non-union CenTra subsidiary -- CC Midwest. Employees who accepted the offer continued to do the same work as they had before. However, CC Midwest had no collective bargaining agreement and, therefore, was not obligated to contribute

---

[20] See JE 27 and 28.

[21] Anne A. Maroun, owner and President of U.S. Truck Company stock, is the sister of Manuel J. Maroun, shareholder and President of CenTra. By the 1996 Agreement, Anne Maroun reacquired all rights to U.S. Truck Co. shares that were, to that date, subject to an option agreement in favor of her brother.

[22] The Fund terminated U.S. Truck Company's participation, effective July 30, 1998. U.S. Truck Co. Holdings Company and its subsidiaries filed for bankruptcy on December 23, 1999, prior to the closing of U.S. Truck Holdings Company's last two cartage operations. Subsequent to these actions, the fund filed two claims for withdrawal liability in the U.S. Truck bankruptcy proceeding. (See JE 33 and 34.)

further to the Fund on the employees' behalf. U.S. Truck split New Cartage into some thirteen companies, some of which subsequently shut down.[23]

When the dust settled, CenTra retained only one business unit that still participated in the Fund-- the DIBC toll booth operations on the Ambassador Bridge. In November of 1997, DIBC's labor agreement expired. In the negotiations that followed for a successor agreement, DIBC and the local union agreed that, under a new CBA, effective for some three and a half years from November 1997, DIBC would continue contributing, but only until January 1 of 1998. After that time, the covered unit employees would be withdrawn from the Fund and covered under an alternative plan. That action was viewed by the Fund as violating its "split term" rule (employers must remain participants during the entire term of the CBA). As a result, the Fund, in 1998, retroactively terminated DIBC's participation, making it effective in 1997, and assessed withdrawal liability against CenTra's controlled group.[24] CenTra submitted a Request For Review Of Withdrawal Liability Demand on September 1, 1998[25] and the Fund Trustees responded by letter of December 22, 1998.[26] On February 10, 1999, CenTra filed the Demand For Arbitration that ultimately led to this case.[27]

---

[23] See Cummings Affidavit, ¶6, Pried Affidavit, ¶13.

[24] JE 37. Under ERISA §4001(b)(1), all businesses under "common control" with a contributing company are jointly and separately liable for the withdrawal; the amount of withdrawal liability is calculated with reference to the operations of all business units within a controlled group. *Robbins v. Pepsi Cola Metro Bottling Company*, 636 F. Supp. 641 (N.D. Ill. 1986)

[25] See JE 38.

[26] See JE 39.

[27] See JE 40.

There is no question the CenTra controlled group completely withdrew from the Fund at the point DIBC stopped contributing, (although the parties differ as to the proper date), and that withdrawal liability attaches. But the parties differ as to the Fund's calculations, including the question of whether the substantial contribution histories of the Old Subs remained in the CenTra group.

PETITIONERS' POSITION

CenTra claims the Fund Trustees erred by including the Old Subsidiaries' pre-merger required contributions as part of the basis for determining the CenTra group's *pro rata* share of the Fund's UVBs. CenTra maintains the December, 1995 reorganization fully complied with ERISA, which it says prevents changes in corporate form from triggering withdrawal liability that might otherwise attach in a case where an employer ceases to legally exist.

CenTra contends the contribution histories of Old Cartage and Transport traveled "upstream" to CenTra but, (and here is where they part ways with the Respondents), those same histories subsequently (immediately, they claim) traveled "downstream" to the New Subsidiaries. The New Subsidiaries, by means of these processes, says CenTra, became the legal "original employers" for withdrawal liability purposes. Later, when the new companies left the CenTra controlled group, they took the histories with them. If so, the Fund's assessment is overstated and should be set aside and re-calculated.

CenTra also says the Fund overstated the withdrawal liability (and exceeded its authority) by retroactively terminating DIBC's participation in the Fund, effective back to November of 1997. [28]  The triggering of withdrawal liability, claim the Petitioners, should be considered to have occurred when DIBC withdrew in January, 1998 (the date established by the collective bargaining agreement between DIBC and the Teamsters).  The assessment would be lower if the withdrawal date is determined to be 1998.[29]  If, as the Fund claims, DIBC and the union violated the split term rule, the Petitioners contend the Fund was, under the circumstances, obligated to give notice to the parties, together with reasonable time to cure the problem.  This, it is claimed, didn't happen.

Petitioners also assert the actuarial determination of Central States UVBs is incorrect because it undervalues the Fund's assets.  Involved in this contention is CenTra's claim that the Fund (1) wrongly excluded from its asset valuation a substantial account receivable from UPS and (2) erred by using one "smoothing" technique for determining withdrawal liability, but another for minimum funding requirements.  Specifically, it is claimed, the method used for determining minimum funding yielded a higher asset value than that used for withdrawal liability.[30]

---

[28] Petitioner's Post-Hearing Brief, p. 6.
[29] The choice of date has substantial economic consequences.  Allocable UVBs are calculated as of the end of the year preceding an employer's withdrawal.  1997 had been a good year for the Fund, thereby reducing the *pro rata* share of UVBS for which a withdrawing employer would be liable. It is of significant financial advantage to CenTra to claim 1998 as its trigger year and thus enjoy, by reducing its obligation, the Fund's 1997 relative prosperity.
[30] Petitioners' Post Hearing Brief,, p. 7.

FUND POSITION

The Fund says it properly included the Old Subsidiaries' 1987-1995 required contributions in computing CenTra's withdrawal liability. By becoming the successor to the Old Subsidiaries by means of the upstream merger, it says CenTra inherited all their assets and liabilities, including their pension contribution histories, for ERISA purposes. Contrary to CenTra's claim, the pre-merger required contributions did not travel to the New Subsidiaries. That result is compelled by reading §§4218 and 4069 in the context of generally accepted corporate law principles.

The Fund also contends, however, that even if ERISA §4218 should be read as allowing CenTra to transfer the Old Subsidiaries' contributions history, the calculations should be sustained on an alternative "evade or avoid" basis contemplated by ERISA §4212. Thus, even assuming the various 1995 and 1996 transactions resulted in sequestering the Old Subsidiaries' contribution histories from CenTra's ERISA controlled group, those moves should be disregarded because, say the Respondents, one of CenTra's principal purposes was to evade or avoid withdrawal liability.

CenTra was, at all times, concerned about withdrawal liability. It could not have "stumbled blindly across a complicated path that, in retrospect, just happened to shift that risk outside of CenTra ERISA controlled group. That claim surpasses credibility", argues the Fund.[31] Indeed, but for the withdrawal liability

---

[31] Fund Post-hearing brief pp. 49-50.

consideration, CenTra's unionized operations would have been liquidated.[32] Instead, CenTra engaged in precisely the kind of "opportunistic risk-shifting among contributing employers" that the federal pension statute's evade-or-avoid rules seek to erase.[33]

The New Subsidiaries were, by any measure, troubled companies at significant risk of failure. Central States claims CenTra sealed their fate by depriving the New Subsidiaries of the transportation contacts and customer relationships enjoyed by the Old Subsidiaries, reducing them to dependence on a single customer , Central Transport International, Inc. (CTII). [34]

"The most striking proof of an evasive purpose.", says the Fund, was the August 19, 1996 Settlement Agreement between Matty and Anne Moroun. That Agreement, to be described below, served to break the ERISA controlled group link between CenTra and the New Subsidiaries. According to the Fund, however, the Settlement Agreement is suspicious on a number of counts, and, in the overall, had no business purpose other than avoiding the withdrawal liability.[35] For all these reasons, the Fund contends the arbitrator should enter a final award affirming the Trustees' determination of Petitioners' withdrawal liability, as rendered June 5, 1998.

## ANALYSIS

---

[32] *Id,* pg. 53.
[33] *Id,* pg. 57.
[34] *Id,* pg. 62
[35] *Id.,* p. 63.

One turns first to the question of whether the 1995 reorganization passes muster under §§4218 and 4069(b). Withdrawal from a pension plan occurs, and the financial liabilities attending such withdrawal attach, at the point an employer has no more obligation to contribute to the pension plan.[36] However, §4218 makes it clear certain changes in business form will not be considered withdrawals from a plan and will not, therefore, trigger withdrawal liability. Thus, there are situations where corporations will terminate their contribution obligations by changing their corporate form in circumstances whereby a successor company is considered the "original employer." The relevant portion of the statute reads as follows:

SEC 4218. WITHDRAWAL NOT TO OCCUR MERELY BECAUSE OF CHANGE IN BUSINESS FORM OR SUSPENSION OF CONTRIBUTIONS DURING LABOR DISPUTE.

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because--

> (1) an employer ceases to exist by reason of--

>> (A)a change in corporate structure described in § 4069(b),  or

>> (B)a change to an unincorporated form of business enterprise,

>> if the change causes no interruption in employer contributions or obligations to contribute under the plan, or

> (2) an employer suspends contributions under the plan during a labor dispute involving its employees.

---

[36] ERISA §4209, 29 U.S.C. § 1383 (2000) .

> For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.[37]

As stated, the law recognizes an employer will not be considered to have withdrawn if it "ceases to exist" (more about this phrase later) by reason of, among other things, "a change in corporate structure described in §4069(b)" so long as the change "causes no interruption in employer contributions or obligations to contribute under the plan...." Assuming those standards are met, the entity resulting from such structural change "shall be considered the original employer."

Section 4069, referenced above, describes the types of reorganizations that qualify for §4218 treatment:

> ...(b) Effect of Corporate Reorganization. - For purposes of this subtitle, the following rules apply in the case of certain corporate reorganizations:
>
> (1) Change of identity, form, etc. - If a person ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the person to whom this subtitle applies.
>
> (2) If a person ceases to exist by reason of liquidation into a parent corporation, the parent corporation shall be treated as the person to whom this subtitle applies.
>
> (3) Merger, consolidation, or division. - If a person ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies.[38]

---

[37]  29 U.S.C. §1398.
[38]  29 U.S.C. §1369.

Section 4069(b), incorporated by reference in §4218, lists some changes that are apparently of a limited nature ("mere" changes in identity, form or place) and some that are of a broader scope ("merger, consolidation, or division"). Subsection (b)(3), "Merger, consolidation or division" is central to this portion of the parties' legal dispute.

CenTra says the reorganization of December 31, 1995 was intended to, and did, transfer all responsibilities for the pension contribution histories of the Old Subsidiaries, (Central Cartage and Central Transport), to the New Subsidiaries, (Central Cartage of Michigan, Inc., and Central Transport of Michigan, Inc.) by a flurry of instantaneous maneuvers that accomplished, simultaneously, the following events: (1) Old Subs merged with the CenTra holding company. Much of Old Subs' assets were divided among CenTra and the New Subs. (2) Trucking operations were turned over to the New Subs together with the Old Subs' collective bargaining agreements ("CBAs"). As a result, there was, in fact, no interruption in either actual contributions to the Fund or in the obligation to contribute. Moreover, at no time during this reorganization were any assets removed from the CenTra controlled group. This process of upstream "merger" and downstream "division", says CenTra, was in strict compliance with the terms of §4069(b)(3). And, by this mechanism, the contribution histories of the Old Subs traveled to the New Subs.

At its core, then, the dispute in this case is over the question of where the contribution histories ended up. There is no question they left the Old

Subsidiaries and traveled to CenTra by means of the merger. The question is whether they stayed there. The Fund says CenTra inherited the contribution histories the way a corporation inherits any other liabilities and, being in existence at the time withdrawal actually occurred, it should stand behind those obligations. It claims that common law principles require the conclusion that, after the Old Subs' upstream merger into CenTra, CenTra became, and remains, the surviving corporate entity.

The standard of review is established by statute. ERISA §4221(a)(3) (A)[39], provides that the arbitrator has jurisdiction to review the Fund's liability determination, stating that "[A]ny determination made by the plan's sponsor ... is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was reasonable or clearly erroneous." As will be noted, the finding here is not that the Fund erred in its factual assumptions; rather, one differs with the conclusions it drew.

The Fund says CenTra discovered a ruse to allow it to avoid paying its otherwise *pro rata* share of the UVBs that would be allocable to the premerger Central Transport and Central Cartage. Through careful corporate maneuvers, says the Fund, CenTra has been able to offload its share of the allocation fraction to other employers by the "simple expedient of reshuffling its corporate deck a little bit."[40] In the process, it is claimed, the Company took Old Subsidiaries that

---

[39] 29 U.S.C. Section 1401 (a) (3) (A) (2000).
[40] Tr., pg. 115.

were hemorrhaging cash, stripped them of their holdings in truly profitable enterprises (The Detroit International Bridge and Crown Enterprises), eliminated valuable receivables, and ultimately endowed New Subsidiaries with minimum assets, selling them to U.S. Truck, which later shut down the New Subs and ultimately declared bankruptcy.

These are complex and remarkable transactions, worthy of careful scrutiny under those provisions of ERISA dealing with the intent to evade or avoid. Sections 4218 and 4069, however, say nothing about dodging obligations under the statute, nor do they discuss limitations on diminution of assets or establish tests as to whether the result of the reorganization will leave a successor financially solvent. To be sure, companies are not free to run from their statutory funding obligations. Section 4212 establishes that, if "a principal purpose" of restructuring is to evade liability,(and this, clearly, is where the broader inquiries are appropriate), then the restructuring will be effectively ignored in terms of assessing and imposing withdrawal liability.[41] That inquiry, which examines the intent behind the maneuvers, is reserved for review under §4212, to be discussed below.

The immediate question is whether, as Central States contends, §4218, read in the context of general corporate law tenets, dictates that CenTra itself, not the New Subsidiaries, should be viewed as the successor to the Old Subsidiaries.

---

[41] 29 U.S.C.S § 1392- Obligation to contribute-states, in relevant part: "(c) transactions to evade or avoid liability. If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."

For the following reasons, the finding is that the Fund's reliance on corporate law is not compelling; application of those principles is, at best, an imprecise fit. ERISA, which preempts such law in this inquiry,[42] requires the conclusion that the New Subsidiaries did, in fact, inherit the contribution histories of the Old Subsidiaries.

ACCRUAL OF LIABILITY

In substantial part, Central States' case is premised on the theory that, at all times prior to the reorganization, the Old Subs were accruing withdrawal liabilities, and that these accruals never left the CenTra controlled group. CenTra, as the surviving corporation, should be seen as receiving all the liabilities of the merged corporations, along with their assets, it is claimed.[43] The evidence and arguments in this case, however, fail to persuade one that contribution histories are, or should be, treated as liabilities.

Withdrawal liability attaches when there is a withdrawal event. Before that, there is no liability to be carried either as a liability on the

---

[42] ERISA §514(a), 29 U.S.C. §1144(a), specifies that "except as provided in subsection (b) of this section, the provisions of this Title and Title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in Section 4 (a) and not exempt under Section 4 (b).

[43] In support of this principle, Central States cites *Chauveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424-25 (7th Cir. 1993); *Truck Drivers Union v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). This includes contingent liabilities. *Ryan v. Tad's Enterprises, Inc.*, 709 A. 2d 682, 697 (Court of Chancery, Del. 1996). In this way, the merged firm is treated as "a continuation of its predecessor." *Central States Pension Fund v. Central Cartage Co.*, 69 F.3d at 1315.

employer's books or as an asset by the Fund.[44] The MPPAA statute says as much in its definition of withdrawal liability: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, *then* the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."[45] One may accept the Fund's claim that assignment to a transferee corporation of some liabilities of a transferor will not let the assignor off the hook.[46] But that does not devitalize the reality that the withdrawal liability obligation under ERISA does not arise until a withdrawal event. There simply has been no showing that such obligation accrues before that.[47]

---

[44] See Tr. 1931: 20-1932: 5 (Testimony of Mark Angerame) and Tr. 1925: 8-1926-12. Fred Lorenz testifies there was no entry on the Central Transport balance sheet at the time of reorganization for withdrawal liability. "It is simply not an accounting obligation at all," he testified. "It is not fixed or determinable at this date." Tr. III, p.481. See also PE 43.

See *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 310 (5th Cir. 1988) wherein the Court stated "If we construe [29 U.S.C. Section 1381 (a)] according to its most natural reading, then we must conclude that withdrawal liability does not exist until an employer actually withdraws from a multiemployer pension plan.") See also *Teamsters Pension Trust Fund v. Cent. Michigan Trucking, Inc.*, 857 F.2d 1107 (6th Cir. 1988); *Teamsters Pension Trust Fund v. Headley's Express & Storage Co.*, No. 92-5688, 1993 U. S. Dist. LEXIS 7245, at *13-16 (E.D. Pa. June 3, 1993); *Teamsters Pension Trust Fund v. Federal Express Corp.*, Civ. Act. Nos. 86-304, et al. 1995 U.S. Dist LEXIS 19980, at *22-26 (D. Del. Dec. 27, 1995.)

[45] 29 U.S.C.§1381(a). (Emphasis added.) See *Trustees of Teamsters Pension Trust Fund of Philadelphia v. Federal Express Corp.*, 1995 U.S. Dist. LEXIS 19980 (1995).

[46] Fund Post-hearing Brief, p.26, citing *Chaveriat v. Williams Pipeline Company*, 11 F.3d at 1424-25.

[47] *Central States Pension Fund v. Central Cartage Company*, 69 F.3d, 1312 (7th Cir. 1995,) cited by the Fund, requires no contrary conclusion. There, the Court held that pre-merger contribution obligations of a predecessor company would continue. But that case involves a question of whether an employer was required to make pension and welfare contributions for a certain class of drivers. Withdrawal liability, as distinguished from contribution obligations, was not at issue. For the same reason, the Fund's citation of *Central States Pension Fund v. Central Cartage Co.*, 1998 WL 270889, is inapposite, involving, as it did, delinquent pension contributions, not withdrawal liabilities. Section 1392- Obligation to contribute – defines the obligation (1) as arising under one or more collective bargaining agreements and (2) as not including obligations to pay withdrawal liability or delinquent contributions. This adds weight to CenTra's argument that the contribution history should

The Fund also contends that, because there was no "substantial

identity" between the Old and the New Subsidiaries, CenTra cannot avoid

the conclusion that, despite its efforts to transport the contribution histories

between the entities, they stalled at CenTra, failing to complete the journey.

Here, too, "substantial identity" is not a requirement that appears in

§4218.[48] That Section says nothing about requiring a successor corporation

---

not be considered a liability, since those histories only reflect the obligation to contribute, without regard to any questions of ultimate withdrawal liability.

[48] There is, in evidence, a PBGC advisory opinion -- PBGC Op. Letter 83-18 (August 5, 1983), *available at* 1983 PBGC LEXIS 7, which, it is true, speaks of a "substantial identity" between a predecessor and successor employer. But that involved a change in corporate form from a sole proprietorship to a corporation, a change covered by §4069 (b) (1) which, as indicated above, speaks to a *mere* change in identity, form or place of organization." (Italics added) The PBGC opinion may well have been using the "substantial identity" reference to highlight the restricted nature of the change. But, as indicated above, that restrictive adjective appears nowhere else in the statutory subsections that deal with, among other things, mergers or divisions. Nor is it clear or even suggested, in the letter, that "substantial identity" requires a substantial economic identity. In that letter, the General Counsel stated, in referring to § 4062 (d) (1) (*not* 4062 (d) (3)):

> If an employer ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place or organization, however effected, a successor corporation resulting from such reorganization shall be treated as the employer to whom this Section applies.
> It is our view that when there is no interruption in employer contributions or the obligation to contribute, incorporation of a previously unincorporated employer (e.g., a sole proprietorship or a partnership) may constitute a covered reorganization if there is substantial identity between the predecessor and the successor employers. But see Section 4212(c) or ERISA. A dispute over such a determination regarding the occurrence of a withdrawal would be subject to the arbitration provision of Title IV.

> Read in its entirety, the Letter clearly uses the concept of "substantial identity" in the context of the limited change referenced in §4062(d)(1).

In its Memorandum on Substantial Identity and ERISA §4218, the Fund also directs the arbitrator's attention to *Park South Hotel Corp. v. New York Hotel Trades Council.*, 851 F.2d 578 (2d Cir. 1988) The Fund says:

> ERISA §4218 is intended to deal with "mere changes in the form or structure of an employer that do not alter the employer's basic relationship with, participation in , or obligation to, the plan or change to nature of the employer's operations (Citing *Park South Hotel.*)

to have any "substantial identity" to its predecessor. Indeed, §4069 posits, in subsection (b)(1), a reorganization characterized by a "mere" change in identity, form or location as distinguished from subsection (b)(3), which speaks, simply, of a "merger, consolidation, or division". Arguably, then, this part of the statute not only does not restrict changes to those involving "substantial identity", it accommodates more complex modifications such as those at issue here.

The Fund claims there is no analytical path that can lead to the New Subs being treated as stand-ins for the Old Subs. It acknowledges that the Old Subs "ceased to exist" as a result of the 1995 reorganization. But that, it argues, occurred solely because of the upstream merger, not by any of the events described in §4218(1)(A) or §4069(b).[49] Accordingly, the only successor corporation "resulting from any change" was CenTra itself.[50] The asset drop down (to the New Subs) cannot be considered the type of "division" contemplated by §§4218 and 4069. That term, argues the Fund, is commonly understood to mean a "spin-off, "split-up" or "split-off" transaction by which shareholders of a parent corporation receive a distribution of stock of subsidiaries.[51] The term,

---

The quoted section, however, is dicta (the Court noted that the statutory provision did not directly cover the case it was adjudicating) and the discussion centered around a fact situation involving two essentially similar predecessor and successor entities. Surely, one cannot read the case as supporting the proposition that §4218 is intended to deal only with these kinds of restricted changes. Nor, therefore, can one conclude that the plain language of ERISA, §4218 confirms that the Old subsidiaries pre-1996 required contributions stay with CenTra as a result of the Upstream Merger."

[49] Fund Post-hearing Brief, p.30.
[50] *Id.*
[51] *Id.*, at 31 *et seq.*, citing *Redding v. Commissioner*, 630 F.2d 1169, 1173 (7th Cir. 1980).

was intended to be applied in its technical context as utilized in §§ 55 and 368 of the Internal Revenue Code.

However, there is no reference in the ERISA statute that leads to the conclusion that "division" was intended as a term of art designed to conjure up state corporate or federal tax law. It is, as Judge Easterbrook has noted,[52] an "undefined term." But it is by no means a stretch to find it reasonably applicable to the current case, which involved transfer of trucking assets "down" to new entities simultaneous to the merger up. There is merit, too, to CenTra's contention that the sale of the new entities stock to U.S. Truck was a division causing the contribution histories to pass under §4218.[53]

In the overall, the question as to how far the contribution histories traveled is best resolved by stepping back and viewing the 1995 reorganization in its entirety. The arcane legal maneuvers of that day in December, 1995 ended the existence of the Old Subsidiaries and created new corporations that had the same ownership, management, covered personnel, name, equipment and customers. The Fund argues CenTra did not "cease to exist"; it was in business at the time of the withdrawal event. But CenTra was not, in terms of §4218, the "employer"

---

[52] *Central States v. The Sherwin Williams Co., 71 F.3d 1338(1995.)*
[53] "Section 1369(b)(3) deals only with corporate "division", wrote Judge Easterbrook (see n.52, *supra*), "and although "division" is an undefined term the sale of a subsidiary's stock is a form of corporate "division."

   See also *Teamsters Pension Trust Fund of Phila. v. Central Michigan Trucking, Inc.,*857 F.2d 1107(1988), where the Sixth Circuit observed: "MPPAA expressly incorporates the Internal Revenue Code's control-group provisions only to the extent they define a control group of corporations. 29 U.S.C.§1301(b)(1). If Congress had intended to engraft onto the pension statute the tax provisions regarding successorship following the termination of common control, it could have expressly done so. (At 1111.) Here, too, if the legislative drafters had intended the term "division" to be controlled by, or limited to, corporate tax concepts, they could readily have so provided.

referred to therein. CenTra at no time conducted any trucking operations, made contributions or assumed any obligations to contribute under the governing documents that create those obligations -- the collective bargaining agreements.[54]

Those responsibilities, governed by those documents, were assumed by the Old Subsidiaries immediately prior to the reorganization and by the New Subsidiaries immediately following it. It suffices for purposes of this examination to note that the requisites of §4218 were met: The Old Subsidiaries ceased to exist and the reorganization caused no interruption in employer contributions or the obligation to contribute under the Cartage and Transport CBAs.

The Fund suggests that, because §4069(b)(3) refers to "the successor corporation *or corporations*", the contribution histories should be allocated among surviving companies, even if the §4218 transaction are to be upheld. It would allocate all pre-1996 history to CenTra and post-1996 to the New Subs. This, however, is antithetical to the essence of §4218, which requires that a successor corporation that jumped through the statutory hoops of that provision "shall be considered the original employer." The New Subsidiaries, therefore, were properly considered the "original employer" under §4218 and they thereby inherited the Old Subsidiaries' contribution histories.

SECTION 4212-EVADE OR AVOID

---

[54] New Participation Agreements were not necessary. The obligation to contribute to an ERISA plan stems from the CBA. The lack of such agreement was in no way fatal to continuation of the contribution obligations.

Even concluding, as one does, that the reorganization transactions discussed above satisfied §4218, one may disregard the reorganization if, in terms of §4212, "a principal purpose" was to evade or avoid withdrawal liability. The statute says, in relevant part:

> ...If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

The parties differ as to whether this alternative determination is properly before the arbitrator. Petitioners argue this claim was an afterthought neither reflected in the original assessments served on them nor serving as a basis for the assessment. That being the case, it contends, the issue cannot properly be before the arbitrator.

For the reasons to be discussed below, the finding is that the evidence does not sustain an "evade or avoid" purpose. The arbitrator deems it appropriate, in this particular case, to discuss the rationale underlying that conclusion. One need not, and therefore does not, address the procedural arbitrability issue.

Noting that parties are held to have intended the natural and probable consequences of their actions,[55] the Fund argues that one of the most significant such consequences of the 1995-1996 transactions was "avoidance by CenTra of a huge withdrawal liability problem that it knew to be imminent."[56] From this, the

---

[55]   Citing *U.S. v. Irwin*, 149 F.3rd 565, 572 (7th Cir.1998).
[56]   Respondent's Post-Hearing Brief, p.50.

Fund concludes "CenTra and its owners intended the consequences that Petitioners now so vigorously argue they achieved."[57].

The time consuming and costly legal and logistical maneuvering in this case was bound, in the best of circumstances, to raise eyebrows and inspire confrontation from some corner. Given that the acknowledged goal of these gymnastics is generally to mitigate or avoid *something,* (taxes, control problems, etc.) there is ample reason to conjecture that avoidance of substantial withdrawal fees might be high on that list. The question recognized by the statutes' terms ("a principal purpose") is: How high on that list? Where, as here, these parties have had a markedly antagonistic relationship over the years, and where both are fully capable and willing to play the hardest of hardball with each other, it is appropriate to scrutinize the transaction very carefully.

As noted earlier, the ERISA statutory scheme seeks to prevent shell games by specifying, in §4212 (c) that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."[58] As worded, an intent to evade or avoid need not be the exclusive, or even the single primary purpose. It suffices that such evasion be found to be *one* of the principal purposes.[59] The 7th Circuit Court of Appeals, in *Santa Fe Pacific Corporation v. Central States Southeast and Southwest Areas Pension Fund*[60] provided

---

[57] *Id.*
[58] 29 U.S.C. § 1392 (c).
[59] See *Santa Fe Pacific Corp v. Central States Pension Fund,* 22 F.3d at 727.
[60] 22 F.3rd 725 (1994)

meaningful guidance concerning standards at issue in the "evade and avoid"
context. "The imposition of withdrawal liability," said the Court, "in a sale of
business situation requires only that a principal purpose of the sale be to escape
withdrawal liability."[61] Writing for the Court, Judge Posner continued:

> It needn't be the only purpose; it need only have been one of the factors
> that weighed heavily in the seller's thinking. We can find no decisions
> discussing situations in which there is more than one principal (major,
> weighty, salient, important) purpose, but we would be doing violence to
> the language and the purpose of the statute if we read "a principal" as "the
> principal." The clear import of "a principal" is to let the employer off the
> hook even if one of his purposes was to beat withdrawal liability, provided
> however that it was a minor, subordinate purpose, as distinct from a major
> purpose. To let the employer off even if avoiding such liability was a major
> purpose would ill serve the statute's goal of preventing one employer from
> unloading his pension obligations onto the other employers in a
> multiemployer plan.[62]

In that case, the Santa Fe Company, wishing to divest itself of a trucking
subsidiary, the Santa Fe Trails Transportation Company (SSTT), opted to do so
by way of a stock, rather than an asset, sale. An asset sale would have generated
more money. A stock sale, on the other hand, would have enabled the company
to avoid millions of dollars in withdrawal liability. Thus, notwithstanding the
sale of assets would have brought the higher price, the company engaged in the
stock sale. Said the Court:

> In this situation the inference that withdrawal liability figured heavily in
> the company's decision to sell the stock is well-nigh irresistible. Obviously
> a purpose for the sale of stock is "principal" if, were it absent, the sale
> would not have taken place. It follows that a principal purpose of the sale
> of SFTT's stock must have been to avoid withdrawal liability unless,
> somehow, the other considerations favoring a sale of stock over a sale of
> assets were so compelling that they reduced the avoidance of withdrawal

---

[61] *Id.* at 727.
[62] *Id.*

> liability to a minor consideration because the sale of stock would have taken place even if the MPPAA had never been passed. Certainly if SFTT had had much greater value as a going concern than on the auction block, and if a sale of stock as in a leveraged buyout was a much more feasible method of preserving the subsidiary as an intact concern than a cash sale of the assets or a merger (which is a form of asset acquisition), it might be reasonable to infer that withdrawal liability was only a minor factor in Santa Fe's thinking. But on the contrary, the subsidiary was worth considerably more as a conglomeration of assets than as a going concern.[63]

In that case, the Court observed the purpose for the stock sale could reasonably (indeed, "obviously") be considered "principal" if, in the absence of the withdrawal liability issue, the sale would not have taken place. That conclusion, the Court observed, was unavoidable unless other considerations surrounding the stock sale option were so compelling as to reduce the pension withdrawal liability to a "minor consideration." The Court hypothesized that if SFTT had been worth more as a going concern than as a collection of saleable assets and if, therefore, a stock sale, which could preserve the firm intact, was resorted to, one might regard that withdrawal liability as only a "minor factor" in the decision making process. But, the Court found SFTT was worth considerably more as a "conglomeration of assets than as a going concern."[64] The conclusion, therefore, that withdrawal liability "figure[d] heavily" in the decision to sell the stock was "irresistible". [65]

This is a useful approach in the current case since, as will be apparent, there can be no question CenTra had reasons independent of withdrawal liability

---

[63] *Id.,* p.729
[64] *Id.*
[65] *Id.* At 727

to engage in the 1995 reorganization. [66] The critical question remains whether, even acknowledging the existence of some other reasons, avoiding withdrawal liability was among them as "*a principal*" motivating purpose. It is with these precepts in mind that one evaluates the testimony and evidence surrounding CenTra's decision making process.

CenTra was well aware Old Transport and Old Cartage were, in 1995, unprofitable and costing CenTra millions each year to stay afloat. CenTra, the Fund says, was looking for ways to divest itself of these companies, while retaining the valuable assets, including DIBC, Crown enterprises, and certain trucking-related assets, for itself. This, they did as part of the reorganization. But, says the Fund, CenTra did not complete the liquidation, the transfer of assets, and the shutdown of the two facilities, while it still owned those companies because, it is claimed, to do so would have caused CenTra to trigger the withdrawal liabilities. Thus, after stripping the New Subs of major assets, CenTra sold them to a sister company, U.S. Truck, (owned by Matty's sister, Anne) under suspicious circumstances. Then, on August 19, 1996, Matty Moroun surrendered any remaining interest in the stock of U.S. Truck to Anne, in a

---

[66] In the context of the *Santa Fe* case, the 7th Circuit deemed the question of whether such independent reasons existed as "irrelevant." Most of the arbitrator's opinion in that case was, in the Court's words, devoted to irrelevant questions, such as whether Santa Fe had reasons independent of withdrawal liability to divest itself of SFTT and whether it knew that the purchaser of SFTT was likely to flop." Said the Court:

> The issue is not whether Santa Fe had compelling reasons independent of withdrawal liability to divest itself of SFTT; that is a given. The issue is the form the divestiture took--a sale of stock rather than of assets. The statutory criterion is not whether the transaction is a sham, having no purpose other than to defeat the goals of the Multiemployer Pension Plan Amendments Act by leaving the other employers in the multiemployer pension plan holding the bag. It is whether the avoidance of withdrawal liability by the seller (not necessarily by the purchaser as well) is one of the principal purposes of the transaction. (*Id.*, p.729-730)

Settlement Agreement that served to split off U.S. Truck (together with its New Subsidiaries), away from the CenTra controlled group and into a separate withdrawal liability group.[67] In this manner, CenTra sought to insulate itself from any ERISA withdrawal liability. The price for the companies, $250,000 each, was not a reasonable reflection of a "going concern"[68] and, in the overall, the New Subsidiaries were, essentially, set up to fail.

The Fund also points to continuing entangling alliances between CenTra and U.S. Truck: Anne Moroun, U.S. Truck's owner, was also an officer of CenTra, and her employment contract[69] with CenTra supposedly prevented her from operating a trucking company in competition with CenTra. U.S. Truck and Anne Moroun, it contends, were never really independent of CenTra.

Underlying CenTra's purported justification for selling the new subsidiaries to U.S. Truck was the hope the Teamsters would grant wage concessions to the New Subsidiaries. But this, says the Fund, was never going to happen, and CenTra knew it. Thus, the New Subs were at significant risk of failure both before and after the sale; the transportation contracts and customer relationships that were part of Old Subsidiaries were retained by CenTra and the New Subsidiaries were reliant on a single customer, Central Transport

---

[67] The Settlement Agreement which severed the controlled group relationship between CenTra and US Truck, is a relatively vague instrument. Some of the issues purportedly settled therein (a supermajority requirement, for example), had been rescinded earlier. But the document did serve to, in its terms, to "terminate any interest in U.S. Truck shares held by MJM in favor of AAM and recognized her claim to be the controlling shareholder of U.S. Truck." PE 276.
[68] Fund opening statement, p 15.
[69] In 1995, Anne Maroun requested, and received, an employment agreement with CenTra, as Vice President of the company, for which she received an annual salary of $300,000.

International, Inc. ("CTII"), a new firm formed to oversee all LTL (Less-Than-

Truckload) operations within CenTra. The Fund sums it up as follows:

> Therefore, by means of the "reorganization" (and specifically the sales in
> U.S. Truck and the breach of the controlled group relationship between
> CenTra and U.S. Truck), CenTra shifted the obvious and significant risk
> that the New Subsidiaries might encounter a business failure (and thereby
> cause CenTra itself to incur withdrawal liability). Under the new
> ownership structure created by CenTra (at least under CenTra's
> interpretation of the legal consequences of the "reorganization" as a
> whole), CenTra could completely escape the withdrawal liability that
> would result if the fledgling New Subsidiaries failed - as they ultimately
> did shortly after the stock sales and CenTra's exit from the New
> Subsidiaries' controlled group.[70]

Surely, there is cause for concern. CenTra cannot propose, with a straight

face, that it was unaware of the potential withdrawal liability impact of

restructuring and financial shuffling that left the withdrawal risk outside

CenTra's ERISA controlled group. There has been too much history, too much

withdrawal litigation[71] and abundant bad blood between these parties to accept

that conclusion. Indeed, in June of 1995, the Fund voiced its concern that CenTra

was engaging in "adverse selection" – shunting off new hires to its non-union

operations and thereby depriving the Fund of new income. It is a practice that

can lead to cutting off an employer's participation rights, which would, in turn,

lead to a withdrawal liability problem. CenTra was well aware of this challenge in

1995, and the Fund claims it meaningfully influenced its decision to reorganize.

---

[70] Fund Pre-hearing Brief, p. 17.
[71] See PE 281, concerning a $72 million assessment levied on the Mason-Dixon Co., a CenTra
firm, in the 1980's

The Fund's concerns are not frivolous. Neither, however, have they been proven by the record in this case, for the reasons that follow. The circumstances surrounding CenTra, involving real and substantial business pressures and palpable family greed, distrust and litigation present a viable scenario that ultimately compels the conclusion the reorganization would have occurred even in the absence of withdrawal liability concerns.

CenTra faced a series of very real problems. Significantly, they were matters that could realistically be dealt with through reorganization. Reorganization, according to the record, was not a new idea. It had surfaced as early as the mid- to late 80's. Testifying for the company, Fred Calderone[72] described the variety of issues confronting CenTra. Deregulation, which became a factor by way of the 1980 Motor Carrier Act, increased competition in dramatic and often devastating fashion.[73] CenTra was profitable during the mid 80's, but the seismic changes[74] of deregulation changed that, and it responded with a number of approaches, including attempting to renegotiate its labor contracts with the Teamsters Union. CenTra had begun non-union operations in the early

---

[72] Vice President of Corporate Planning with CenTra, Calderone started with the company in 1984. (Tr. II, p.425)

[73] Cartage and Transport were working with full scale union contracts, but competing with many "white paper" agreements that permitted lower wage scales. In the first 12 years following deregulation, some 50% of Class I carriers had stopped doing business. (PE 191.) 132 general motor freight carriers under the National Master Freight Agreement had terminated their operations. This accounted for some 47% of all workers employed by all Class I & II I.C.C regulated general freight carriers

[74] This is Judge Posner's adjective. See 22 F.3d 725, at 728.

80's[75], using independent contractors and, over time, it expanded those non-union enterprises.[76] Predictably, this was vigorously opposed by the Teamsters.

Thomas Christ, Vice President of Corporate Development for CenTra, described deregulation, at the state level, as having had a "massive negative effect"[77] on Cartage and Transport.[78] By 1992, according to the testimony, CenTra began to open nonunion subsidiaries. Other trucking firms were taking similar routes and, in response, the Teamsters Union took action to combat this double breasting. The 94-98 National Master Freight Agreement, for example, contained language in Appendix A that made relief from standard union rates available, but only to firms that promised no double breasting.[79] Splitting off the companies to a separate, fully unionized operation would help ease that problem.

Insurance was also an issue; Cartage, at the time, owned DIBC, a valuable asset that was, by virtue of its relationship to Cartage, at risk in the event of an

---

[75] Tr. II, p. 281. Calderone recalls that CenTra had started a non-union firm, AmCan, as early as 1982 or '83, utilizing independent contractors.

[76] Id, at 282.

[77] Tr. X, p. 1972.

[78] State deregulation, which hit the trucking company hardest, came into effect in December of 1994, effective January of 1995. Through a variety of "white papers" (special negotiated arrangements) as well as application of the addendums to the NMFA, Union Carriers were succeeding in negotiating rates below the National Master Freight agreement standards. As a result, Christ participated in the negotiation of a Letter of Understanding between the Teamster National Freight Industry Negotiating Committee (TNFINC), Mason Dixon Trucking lines (a CenTra company) and U.S. Truck company. By the terms of this agreement, U.S. Truck would purchase Mason Dixon's assets, the Mason Dixon employees would be transferred to US Truck and those workers would qualify for coverage under the more favorable Truckload and Steel Supplement. Significantly, the agreement also provided that future employees who arrived at U.S. Truck "either by new hire, transfer, or acquisition" would be entitled to the terms of the more favorable contract. It turns out, however, when Transport was sold to US Truck, following the reorganization, and Kirk Cummings attempted to bring them in under the agreement, the Teamsters balked, contending that a "change of operations" clause and its related procedures would have to be implemented. See n.120, infra.

[79] See testimony of Thomas Christ, Tr. X, pp. 2000 et seq. Article 32 of the NMFA was anti-subcontracting language that also served as work preservation language.

accident at Cartage.  Moreover, says Matty Moroun, the wealthy bridge and real

estate operations were viewed by the Union, during negotiations,  as deep pocket

supporters of the struggling Old Subs.  The split off would help quell that

perception, as well.

In 1986, a corporate reorganization plan was discussed with the Moroun

sisters and submitted for their approval.  The plan involved spinning off  Cartage

and Transport as separate Subchapter S corporations that would be owned by

CenTra family shareholders.[80]  Calderone describes the benefits as including tax

minimization, cost control of liability insurance, protection of DIBC from truck-

related liability risks, more advantageous financing, the addressing of Canadian

concerns over ownership by a trucking company of Canada's part of the bridge, as

well as estate planning for certain shareholders.[81]

Anne Moroun responded in a 1986 letter, noting general agreement

among the sisters that this was a "good business move." [82]  She also shared some

concerns, including protection against IRS deficiencies, but, in a foreshadowing

of things to come, she voiced the sisters' fears that Matty might "wish the entire

company" and told him they had "spoken to a gentleman who is a well respected

attorney."

In 1987, the reorganization plan was submitted for, and received a

favorable private letter ruling from the IRS.[83]  In January of 1989, Matty wrote

---

[80] Tr. II, p.285 *et seq.*
[81] *Id.*, p. 281-285.
[82] PE 750.
[83] JE 15.

his sisters, again addressing the spin off of Old Cartage and Old Transport from
CenTra, the recapitalizing of Cartage and the election by Transport of Subchapter
S status.[84] The memo reiterated, briefly, the reasons for the transaction --
reduction of insurance costs and "other liability reasons."[85] But this plan was
fiercely resisted by Matty's sisters. In response to Moroun's request that he be
advised as soon as possible if the plan was of interest, the sisters retained counsel
who, in a letter of February 2, 1989[86] told Moroun, in no uncertain terms, that
they "have not approved and will not approve any plans regarding any
restructuring of the Company's interest or assets, any shuffling of those assets,
the creation or merger of any subsidiaries or any other similar actions until such
time as they have had an opportunity to learn of and consider the plans and the
ramifications of the plans and to approve the plans...."[87]    That letter was,
according to Calderone, representative of the stalemate the family had reached,
one that preceded substantial litigation. Anne testifies to the plan's having been
welcome to her, at least, but greeted with skepticism by her sisters.

> "A trucking company should not own a bridge. And we were being
> cremated [sic] with all the taxes in each state. The real estate became a
> problem. Insurance was out of this world. So, Matty and I talked. We
> knew we had to have reorganization. My sisters were against it simply

---

[84] In addition to other benefits, the 1986 Tax Reform Act made it increasingly desirable to be an S,
instead of a C, corporation. That could not happen, however, with the attached subsidiaries,
Calderone testified. Each company had to be owned directly; that, too, added to the luster of
spinning them off. (Tr. II, p. 301.)

[85] The operations of Central Cartage and Central Transport will be spun-off from CenTra, Inc.
into two separate corporations owned by each of us in the same proportions in which we currently
own our common stock of CenTra. This portion of the plan was the subject of an IRS ruling. The
purposes for this transaction include a significant reduction in the company's insurance costs and
other liability reason. (PE 751.)

[86] PE 743.

[87] Id, p. 2.

because the unknown's going to frighten anyone I think, and they thought they might get short shrift."[88]

The retention of the outside attorney led to extraordinary divisiveness and litigation within the family. As related by Anne, her two sisters were working to liquidate their interest in the company[89].

In 1990, the sisters' attorney drafted an attack plan designed to enable the sisters to liquidate CenTra.[90]  Contributing substantially to the intra-family warfare was a 1970 Stock Restriction Agreement (SRA) executed in large part because Matty was in ill health at the time and his sisters were concerned that a marriage by him might cause the loss of family ownership and control of the business. The Agreement allotted a right of first refusal on the part of the company in the event of a voluntary sale or death of a stockholder. If the company chose not to exercise its options, other family members had the right to purchase the shares. However, the purchase price was determined by a formula that would yield substantially less than the actual market value. According to the record, the sisters determined to thwart the SRA mechanism by forcing Matty to buy them out at premium rates.  The memo highlighted plans to exercise control upon the elder Moroun's death and, to the end of gaining what they regarded as a reasonable price upon liquidation, the sisters were advised to prepare for "conflict and confrontation with Matty."[91]

---

[88] Id, p. 1119.
[89] Tr. VI, pp. 129-132.
[90] PE 336.
[91] Id.,at p.4.

In June of 1992, the sisters, believing themselves the victims of "shabby treatment" by Matty[92], voted approval of a $6 million cash dividend, including the remarkable mandate that the corporation "shall obtain the funds necessary to pay the foregoing dividends by any appropriate means available to it, including without limitation by liquidating assets owned by the corporation, borrowing funds from its subsidiaries, causing its subsidiaries to liquidate assets and/or causing to pay dividends upstream to the Corporation."[93] Ultimately, the dividend was not paid. The acrimony accelerated upon the father's death in November of 1992.[94]

There was no clear high road in this battle, as reflected in a 1992 injunction from an Oakland County Circuit Court that placed a pox on both houses: the sisters were enjoined from attempting to remove Matty and other directors or officers from CenTra. Matty, for his part, was prohibited from entering into "any transaction with CenTra, Inc. or any of its subsidiaries, directly or indirectly, in which Defendants would personally benefit" unless the Board was fully informed and in favor.[95]

By late 1995, the external forces that had inspired the earlier reorganization decision had, if anything, intensified. Cartage and Transport were in perilous condition. Union/management relations were strained; concerns over the potential vulnerability of DIBC had not been resolved.

---

[92] PE 338, at p.3.

[93] PE 338, at p.4. The Directors also authorized Virginia Baks, the corporate treasurer, to remove or replace officers of the Corporation or its subsidiaries. (*Id.*)

[94] Tr. VI,p.138

[95] PE 341.

From a financial standpoint, Transport and Cartage were suffering. A 1994 gain to Transport of some $200,000.00 was a relative anomaly. [96] In 1992, the company lost more than $5 million and in 1993, almost $4 million. In 1995, the loss from motor carrier operations was $9,875,327.00 and over the five year period from 1991 thru 1995, there was an average annual loss of just under $6 million.[97] This, Michael Lorenz, former President of CTII, testified, was a "bad situation"[98] that represented a serious drain on the CenTra group enterprises, including the profitable companies, like Crown Enterprises. At the same time, he considered market conditions for pricing " treacherous", particularly when combined with the fact that costs, particularly labor costs, were high and inflexible. This led to a company determination to try and obtain wage concessions from the union, but these efforts were unavailing.

Central Cartage, too, suffered operating losses for the years between 1991 and 1995, averaging more than $7.7 million annually.[99] The Fund concedes CenTra had a problem with the Old Subsidiaries before the restructuring. Deregulation in the trucking industry hit the unionized Central Transport and Central Cartage companies hard. In the overall, they incurred losses through much of the 1980's and 1990's, including "staggering losses"[100] in 1995.

---

[96] See RE 51, a worksheet summarizing the eight years following 1988 for Central Transport's Motor Carrier division.
[97] *Id*, see also Tr. III, pp. 468-470.
[98] *Id*, p. 471.
[99] PE 53.
[100] Tr. I, pg. 147.

The decision of Roadway Trucking, in 1995, to discontinue operations of a double-breasted operation impressed Moroun, says Calderone. [101] Moroun instructed him to devise a transaction that would separate Cartage and Transport from CenTra quickly.[102] In response, Calderone contracted the Company's tax advisors at Price Waterhouse, describing the corporate structure of CenTra and its relationship to the Old Subsidiaries, noting the desire to sell them to U.S. Truck while retaining the stock of DIBC and Crown within CenTra, and inquiring how this could be done without triggering tax liabilities attributable in large part to the substantial appreciation of the bridge.[103] The ultimate result was the plan, described earlier, that was implemented, beginning with the December reorganization.

Thomas Christ testifies that plans for the reorganization, which were in meaningful discussions during the Fall of 1995, included both the reorganization

---

[101] In the Fall of 1995, Roadway Company announced it was spinning off Roadway Express, its union firm, effectively dividing its union and non union LTL companies into separate corporations. This freed Roadway to apply for the wage rate deduction available under Appendix A of the labor agreement.

[102] Calderone quotes Maroun as saying: "I want you to go back and attempt to come up with a transaction whereby we can separate Cartage and Transport quickly without - don't give me, 'it's going to take six to ten months to get an IRS,' or anything like that. Figure out a way we can separate those operations and get them ready to sell." (Tr. II, p. 314.)

[103] See PE 11, Calderone's handwritten note to Greg Fowler of Price Waterhouse. See also PE 12, a December 19, 1995 memo from Calderone to Fowler, which states, in relevant part:

Based on the above described facts and assuming that CenTra has a bona fide business purpose for the mergers of Old Transport and Old Cartage into CenTra, which is well documented, I understand your view to be that the statutory mergers described above would be respected as tax free reorganizations by the Internal Revenue Service. Accordingly, the above described series of transactions should not result in "taxable liquidation" treatment being accorded the mergers of Old Transport and Old Cartage into CenTra. Since the mergers should not be treated as taxable liquidations, no currently taxable income or deferred intercompany taxes (DITS) with respect to possible appreciation in Crown and DIBC stock value will be created when the merger transactions take place. Since no DITS with respect to the appreciation in Crown and DIBC stock should be created under the above assumed facts when the mergers take place, then no triggering of any such gains into currently taxable income should occur when CenTra sells the stock of New Transport and New Cartage to U.S. Truck.

of CenTra and the plan that Cartage and Transport would go to U.S. Truck. The plan behind the 1995 reorganization, then, was to create independent subsidiaries, move them out of the CenTra group, and attempt to negotiate wage and benefit concessions from the Teamsters with the new subsidiaries. By transferring the subsidiaries to Anne Moroun, she would stand the chance of having profitable companies and CenTra would escape the burden of what it believed to be uneconomical union contracts. In its view, then, the reorganization would improve both neighborhoods.

The Fund characterizes it differently: The Old Subs had little or no chance of surviving, and CenTra stripped them prior to divesting itself of them. The sale to U.S. Truck was a thinly-veiled cover, says the Fund, for the real evade and avoid motive. In the overall, the goal, according to Central States, was to postpone the shutdown of Central Transport and Central Cartage while CenTra still owned the companies, and to ensure that any shutdown occurred after they had left the CenTra-controlled group.

At the time of the 1996 sales, Transport and Cartage were losing money. That much is undisputed. Mr. Calderone testifies they were not dying, but in retrospect, his conclusion is belied by their having expired shortly thereafter. For the ten months following the purchase, Transport lost $171,438.00.[104] Cartage, which came in somewhat later, lost $283,000.00. Losses continued for each of the subsidiaries in 1997.[105]

---

[104] PE 371.
[105] PE 372.

The 1997 Duff and Phelps report[106] notes that sales and marketing

staff as well as maintenance of customer relationship and communications,

became the responsibilities of CTII. While concluding that the fair market

value of Central Cartage, as of August 9, 1996, was about $306,000.00 and

the fair market value of Central Transport, as of February 29, 1996, was

approximately $266,000.00 (both of these represented the book values as

of December 31, 1995) the firm also cast the futures of these subsidiaries in a

relatively dim light: Noting the "poor operating performance of each

company"[107], the analysis yielded a negative net present value for the firms

because the projected operations would require further investment for

further cost reductions.[108]"It is unlikely," according to the report, that "any

investor would purchase either company without some prospect or

expectation of a turnaround."[109] The report continued:

> Based on our DCF [Discounted Cash Flow] analyses we would
> conclude it unlikely that the there is any significant value to the
> Companies as measured on a going concern basis.  Further, there is a
> significant chance that the Companies would require large additional
> investments or face bankruptcy.  However, on the liquidation basis, the
> Companies do retain their net asset value as determined by the net
> realizable value of their respective balance sheets at the time of each
> transaction.[110]

---

[106] PE 5.
[107] *Id.*, at p. 4.
[108] *Id.*
[109] *Id*, at p. 5.
[110] *Id.*

It is true CenTra retained substantial assets of the Old Subs in the course

of reorganization. CenTra kept certain Cartage trade receivables.[111] Petitioner's

Exhibit 39 shows a total of some $24 Million of Transport receivables retained by

CenTra in the reorganization (as well as $52 Million in liabilities). According to

Michael Lorenz, former president of CTII, this was in order to adjust the assets

and liabilities for non-operating items in order to arrive at the $250,000 value,

for sales purposes, prior to the sale to U.S. Truck.[112] And, while trucking

operations themselves were unaffected with respect to the New Subs, CenTra

formed Central Transport International, Inc. (CTII) to handle LTL operations

within the CenTra group. Some of the marketing and sales departments from the

Old Subsidiaries were transferred to CTII. According to the record, this was in

response to a changing industry, with CTII being seen as a central expediting

company capable of responding to a variety of transportation services. The

function of CTII was comprehensively described by Michael Lorenz as follows:

> CTTI would go to customers and arrange to move -- to contract to move
> their LTL freight, primarily manufacturing and retail, very few individuals,

---

[111] Tr. II,pp. 366-67.

[112] This was because of the buyout features of the SRA. The existence of the SRA meant the sisters were wary of any assets that would be removed from CenTra for whatever reason. The injunction, referred to above (see text accompanying n.95 *supra*), coupled with the sister's sensitivity led, in Calderone's words, "to concern that any transaction that we did to separate the union and the nonunion operations wouldn't run afoul of this order... and wouldn't result in [the sisters] claiming that we cheated CenTra [by reducing] CenTra's assets that were there for the stock Restriction Agreement to apply to - the formula - to apply to." ( Tr.II,pp.320-321.) While there is no question CenTra retained significant assets, along with liabilities, of the Old Subsidiaries, the evidence on this point is not always helpful. While the Fund characterizes Old Transport as entering the reorganization with $124,000,000 in assets and leaving it with 6.7 million (RE: 361, Table XIV) the "before" figure appears, from the evidence, to have been erroneously calculated by totaling the consolidated assets of Central Transport, together with its subsidiaries, while the "after" segment reflects the Transport motor carrier operations alone. CenTra accurately characterizes this as an "apples to oranges" comparison. (Tr. III, p.499)

and they would enter into agreements. We would set up a pricing
agreement and then we would contract with service providers to move the
freight, which basically means go up and pick up a package from the
customer's point of origin, take it to a terminal, have the freight
consolidated, run line haul to a distribution terminal, where it was put on
an individual vehicle for delivery.

We would bill the customer. We would collect from the customer. We
would handle the tracing and routing questions. We'd deal with freight
claims if there were any. Those were all the responsibilities of Central
Transport International.[113] (Tr. III,p. 453)

The event that completed the plan, says the Fund, occurred August 19,

1996 when Matty surrendered any interest in U.S. Truck stock to his sister, Anne

Moroun, in a Settlement Agreement[114]. By this, U.S. Truck, together with its new

acquisitions, were placed in a withdrawal liability controlled group that was

separate from CenTra. As a result, when DIBC ceased contributing to the Fund,

and CenTra incurred withdrawal liability, CenTra was able to take the position,

proffered here, that it had no responsibility for contribution histories of Old

Central Transport and Old Central Cartage.

Was this a sham? Clearly, the Old Subs would require subsidization and a

new operating environment if they were to prevail. There were those, however,

who believed this could happen. Anne Moroun, owner of U.S. Truck, believed

---

[113] PE 5, p.5.
[114] PE 276. By its terms Anne returned the consideration paid by Matty for U.S. Truck stock and it
was agreed that any interest held by Matty in U.S. Truck would cease. The Settlement Agreement,
which severed the controlled group relationship between CenTra and U.S. Truck, is a relatively
vague instrument. Some of the issues purportedly settled therein (a supermajority requirement,
for example, had been rescinded earlier). But the document did serve , in its terms, to terminate
any interest in U.S. Truck share held by MJM in favor of AAM and recognized her claim to be ther
controlling shareholder of U.S. Truck.

that purchasing New Transport and New Cartage would work.[115] Aware they'd

been losing money,[116] she also put stock in the fact that U.S. Truck owned

equipment and terminals.[117] And, she had received a sizeable buyout from

CenTra that was available to subsidize the new businesses as they started.[118]

Moreover, the potential of combining the new workers with the U.S. Truck

drivers to gain the coverage of the Teamster Truckload and Steel Agreement

would have resulted in twenty percent lower labor costs. She (and, as will be

noted, Kirk Cummings, the new President of U.S. Truck,) believed they had an

agreement with the IBT on that score.[119]

Kirk Cummings became President of U.S. Truck in 1996. He did not

consider the firms "denuded" or unable to make it.[120] While it is true that payroll,

data processing and other infrastructure items did not accompany the transfer of

the Old Subsidiaries, U.S. Truck entered into a series of six or seven agreements

for support services with CenTra, including a dispute resolution agreement and

---

[115] She testified: " In talking to Kirk, I figured I could make a go of it, combined the workers, the drivers with U.S. Truck's drivers and get that iron and steel agreement, 20% lower labor cost. I thought, for sure, we wouldn't be the next Conway or some big trucking company, but we could make so money, some serious money." (Tr.VI, p.1177).

[116] Tr. VIII, p.1176.

[117] *Id.*, p.1177.

[118] *Id.*

[119] *Id.*,p.1178.  In October of 1995, TNFINC, Mason Dixon Lines and U.S. Truck had entered into a letter of Understanding concerning the acquisition of Mason Dixon by U.S. Truck. (PE 79). The Letter provided, among other things, that incoming members would be transferred to Local unions in Detroit, Canton and Gary, which would sign the 1994-1998 MCLAC NMFA/Truckload and Steel Supplement "which will be substituted for all agreements" between those union locals and U.S. Truck. And, the Letter provided "It is agreed that any future employees in the classifications of the National Master Freight Agreement of U.S. Truck Company, Inc. either by new hire, transfer, or acquisition will be represented" by those locals.  It is unnecessary to opine on whether, as CenTra claims, this bound TNFINC to extend the supplement to U.S. Truck. It suffices to note the agreement could reasonably have been so construed by Maroun and Cummings.

[120] *Id*, p. 1376.

other items.[121] His plan, which he had discussed with Anne, was to get out from under the more costly wage scales of the National Master Freight Agreement and to concentrate on securing for Central Transport the more favorable conditions of the Teamster Truckload and Steel Supplement.

Following acquisition of Central Transport, U.S. Truck advised the Teamsters National Freight Industry Negotiating Committee (TNFINC) it intended to apply the terms and conditions of the Truckload and Steel Supplemental Agreement to Transport.[122] The Teamsters objected, a meeting was held to attempt to resolve the differences in April 1996. The union believed the company could not merely opt to take advantage of the Supplement; in its view, a "change of operations" procedure would have to be initiated. Thus, Transport would have to apply for such treatment before the appropriate committee. Ultimately, after the parties were unable to reach a compromise, Cummings finalized his decision to close Central Transport.[123]

Was this a well-orchestrated plan to skin the old firms and ship them out to a predictable demise? A case can be made for that; the Funds' claims are not frivolous. Neither, however, are they supported by a preponderance of the evidence. CenTra was well aware the 1995 reorganization could result in the successful shifting and consequent avoidance of potentially expensive withdrawal

---

[121] *Id*, pp. 1377-1380.
[122] PE 75 is a letter from Cummings to Skelton of TNFINC notifying them of U.S. Truck's intent to merge the operations of Central Transport into U.S. Truck Company, effective January 19, 1997 and to apply the terms of the supplement.
[123] Anne, too, decided U.S. Truck, Cartage and Transport couldn't make it. She testifies she couldn't send contributions to the pension fund, the work force was leaving for other companies and she concluded it was time to pull out. (Tr. VI, p.1179)

liability. But §4212 does not condition liability on the existence of such a result

or even knowledge of its potential. If liability is to attach under this portion of

the MPPAA statute, the Fund must demonstrate that achieving that result was a

principal purpose behind the move. If it was, liability will attach, and the

protective scheme of the statute will still have been satisfied. But in such a case,

fairness demands that such motivation be a principal driving actor, and that it be

clearly demonstrated.

That burden has not been met in this case. Significant to these findings,

among other things, is the fact that CenTra had been both interested and active,

early on, in attempting to reconfigure CenTra. Almost without exception, the

sources of its concerns -- deregulation of the trucking industry, insurance issues

surrounding DIBC, double breasting issues, bargaining leverage in an industry

that had undergone "seismic" change, all these pointed toward the same solution.

There is sufficient evidence for one to find, on the facts presented, that the

decision to reorganize was supported by elements well beyond avoidance of

withdrawal fees, and that the 1995 reorganization would have occurred even

absent the withdrawal liability concerns.


DATE OF WITHDRAWAL DISPUTE

29 U.S.C §1383(e) pinpoints the employer's complete withdrawal as the

date on which it permanently ceases to have an obligation to contribute to the

multi-employer plan. As noted earlier, the employer's withdrawal liability is a

*pro rata* share of the Fund's UVBs, calculated as of the last day of the plan year preceding the withdrawal year. [124] CenTra says the date should be 1998. The Fund argues for 1997.[125]

CenTra hangs its hat on three hooks with respect to the 1998 withdrawal date. First, it says the "last collective bargaining obligating DIBC to contribute to the Fund, the 1997-2001 Agreement, required contributions through January 3, 1998."[126] It also observes that the term "collective bargaining (or related) agreements" under 29 U.S.C. §1392 (a) includes not only the basic CBA but also any participation agreement.[127] Measured by the 1993 Participation Agreement, says CenTra, it withdrew no earlier then September 1998. That agreement[128] required DIBC to continue its contributions to the Fund until DIBC notified the Fund its obligation to contribute had ceased. Finally, CenTra cites federal labor law as obligating DIBC to continue contributing after expiration of the collective bargaining agreement and during the time the parties were attempting to negotiate a new one.[129] DIBC and Local 299, it is claimed, did not finish negotiations and execute the 1997-2001 CBA until August 1998 and therefore, says CenTra, DIBC withdrew no earlier than August.

---

[124] See 29 U.S.C.§138c(2)(C)(i)(I).
[125] Time clearly was of the essence for both parties. A DIBC withdrawal in 1997 would result in about a $7 Million increase in withdrawal liability.. Liability calculations are made on the basis of the end of the preceding calendar year. The Fund had done considerably better in 1997 than in 1996. Thus, a 1997 withdrawal would be manifestly more expensive for CenTra, since the Fund was substantially more under-funded during '96.
[126] CenTra Post Hearing brief, p. 46.
[127] See *Cent. States, SE. & SW. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148 1153-54 (7th Cir. 1989) (en banc); *Cent. States, SE. & SW Areas Pension Fund v. Schilli Corp.*, 420 F. 3d 663 (7th Cir. 2005)
[128] See JE 4.
[129] CenTra Post Hearing Brief, p. 47.

The Fund, for its part, says CenTra's controlled group completely

withdrew in 1997. November 23, 1997, it says, was the expiration date of the last

of DIBC's collective bargaining agreements that *complied with Fund*

*participation rules.* The new 1997-2001 collective bargaining agreement, by its

terms, violated the "Split Term Rule". Thus, Central States was within its rights

in claiming CenTra's participation ended in 1997.

For several reasons, the finding is that the 1997 date is the proper one.

The Trustees retain substantial discretion to accept or reject CBA's they conclude

are non-conforming or somehow harmful to the Plan. Surely that is an

appropriate aspect of their fiduciary duty. And, the case law is clear in

establishing that review of the Trustees' decision to reject CBA's is meaningfully

narrow.[130]

It is true both that the old CBA expired in 1997 and that the proposed

replacement (1997-2001) was flawed--it flunked the "split term" rule.[131] Section

3.01(a)(5) of the Plan provides that "(a) a Collective Bargaining Agreement shall

---

[130] See *Central Hardware Company v. Central States Pension Fund*, 770 F. 2nd 106, 109 (8th Cir.
1985), holding that the review of the propriety of the Trustees actions in such cases is limited to a
determination of whether the decision is arbitrary, capricious, or an abuse of discretion. (At 109.)
[131] According to the Manual, a collective bargaining agreement may not allow an employer to
"bargain out" of the Pension Fund during the period covered by the collective bargaining
agreement. The manual establishes an exception applicable to a reopener that would permit a
subsequent mutual agreement concerning continued participation in the Fund or a provision for
mutual between the parties with respect to bargaining out. However, the contract may not
establish a set date, nor may it allow the employer to unilaterally opt out. In that case the Manual
advises the staff to "advise the parties that the agreement is inconsistent with Fund policy and
must be corrected. " (PE 161, at Bates L00564.) The matter must then be referred to the Contracts
Subcommittee meeting, and the subcommittee is advice to reject the CBA and "if after a
reasonable period of time the agreement is not corrected, [then] terminate the group's
participation <u>retroactive</u> to the expiration date of the prior collective bargaining agreement.
(Emphasis in the original.) In this case, the collective bargaining agreement reviewed by the
Fund was tentative, not final.

be acceptable only if such agreement requires a Contributing Employer to make Employer Contributions. . . (5) for the entire term of such agreement." [132] In contrast, the Tentative Agreement proposed by Local 299 and DIBC required employer contributions for less than two months of the four year agreement.[133] Specifically, it is called for the old CBA to end on November 23, 1997, and for a new 4-year contract to commence and continue through 2001. [134] But, the new CBA called for contributions to the Fund only until January 1, 1998.

The arbitrator rejects CenTra's proposal to the effect that, so long as its obligation to contribute continues, it may somehow opt to continue to do so under any and all circumstances. That CenTra is obliged to continue contributions cannot be construed as trumping the Trustees' rights under the statute and in accordance with the various plan documents [135] to reject payments for breaches of the applicable rules. Moreover, the new agreement was not an agreement at all. It is unsigned, entitled "Tentative,"[136] and was subject to review by the IBT, who could have rejected any part of the tentative agreement and sent the parties back to the bargaining table.

CenTra says the Trustees erred by rushing to judgment. In this case, after learning the terms of the tentative agreement, the Fund proceeded to terminate, almost immediately, with no opportunity for DIBC or the union to cure the split

---

[132] JE 2, §3.01(a)(5); see also Smith Dep. Tr., p.37, lines 12-24 (testifying to knowledge of rule).
[133] JE, 36; RE 123
[134] *Id.*
[135] The governing plan documents include the Central States Policies and Procedure Manual Trust Agreement, and 1993 Participation Agreement.
[136] See JE36.

term problem. This, says CenTra, shows the pretextual nature of the action: The Fund simply wanted them out.[137] But the Fund's action, while hurried, was not fatal to the Respondents' case on this point. The Petitioners had, in 1997, no conforming document to shield itself from the Trustees' actions. Even accepting CenTra's assertion of a certain scrambling by the Trustees and, recognizing there was no love lost between those perennial adversaries, the claim that the Fund's failure to proffer the more standard notice-and-cure opportunity is dispositive of the issue is not compelling. Among other things, even were it dispositive, the remedy likely would be to give CenTra and the local union the opportunity to do what they say they were deprived of — the chance to amend the agreement to remove the offending provisions. But this, it is abundantly clear, was not going to happen, nor has that option been sought, then or now, by the Petitioners.[138] The agreement included a midterm drop-out because both parties wanted out. CenTra says Local 299 was so inclined because its members were concerned with the Fund's financial health and because the Fund had rejected the local's March 1997 request for a benefit increase. The January 1, 1998 termination date was chosen, claims CenTra, not because of withdrawal liability concerns, but because the date was "administratively convenient and ensured that DIBC employees

---

[137] CenTra says "the Fund may have properly determined that the new CBA valued the split-term (I.E., bargained out) rule; however the evidence is overwhelming that the Fund *applied* that rule as a pretext for kicking DIBC out of the Fund and triggering withdrawal liability that the Fund knew to be enormous." CenTra Reply brief, p.16.
[138] On page 18 of its Reply Brief, CenTra says "the union and DIBC were legitimately engaged in a bargaining and finalization process that made application of the notice and continued contributions provision... of the participation agreement thoroughly appropriate." That being the case, however, they could, at some point, have indicated to the Fund their immediate intention to cure the defect. But no such indication ever appeared.

would earn a full year of pension credits, in the event they had not already done so."[139] For the reasons set forth above, however, the finding is that the 1997 date is proper.[140]  If the Fund was playing hard ball, it was a game to which both parties have become well accustomed.  The Funds' actions did not amount, in these particular circumstance, to the type of impermissible gerrymandering here charged by CenTra.


ASSET VALUATION

In this case, beginning in 1995, the Fund's actuary used a two-year smoothing method to value plan assets for withdrawal liability purposes, but a five-year smoothing to value plan assets for minimum funding purposes.

The asset evaluation method used by the Fund to determine UVB's as of December 31, 1996 was different from that used a year later. Since the goal of both minimum funding and UVB determination is the same -- to assess the ability of the plan to pay the benefits in the future -- the asset valuation performed in the context of each of those determinations is for the same purpose; and thus, CenTra argues, use of different asset smoothing methods for minimum

---

[139] CenTra Post Hearing Brief, p. 51.
[140] Cases cited by Petitioners are not compelling. In *Malden Mills v. ILGWU National Retirement Fund*, 766 F. Supp. 202 (1991), the court affirmed parties' rights to select the withdrawal date via collective bargaining. The question, one of public policy, was whether they could subsequently adjust the date retroactively, in potential derogation of actuarial expectations. The court in *Supervalu v. Trustees of the SW Pennsylvania Pension Fund*, 442 F. Supp. 2d 252 (2006) held that an arbitrator could not condition the parties' choices of withdrawal dates on whether the plan was currently financially sound. And, in *Central States Fund v. Madison*, 1999 U.S. Dist. LEXIS 17168 (1999) the court enforced the plain language of the existing CBA, interpreting it to sustain the employer's claimed withdrawal date. Those cases are no help where, as here, the agreement was tentative only and the claim is that it had been precipitously rejected.

funding, as distinguished from UVB determinations, is unreasonable.[141] The purpose of the two evaluations, testified Thomas Vicente, was "similar enough in terms of the horizon for investment purposes, that the same investment for an asset-actuarial value of asset methodology should be used."[142]

Yet, according to the record, there are different schools of thought within the actuarial profession. One group considers withdrawal liability a one-time summing up that justifies the use of a market value of assets. The other views withdrawal liability in the same light as ongoing contributions, and as therefore accommodating the five-year smoothing approach to investment gains and losses. Here, the Fund actuary adopted the two-year smoothing approach for its withdrawal liability valuations of Central States. According to its actuary, Nancy Milliman, it did this so that assumptions on asset values would more closely track market values.[143]

ERISA § 4221 (a) (3) (B) establishes that the actuarial determination of Central States' UVBs is to be presumed correct unless they may be shown to have been in the aggregate, unreasonable.[144] In this case, the record is clear that either of the evaluation techniques is reasonable and routinely utilized in the industry. There is no evidence in this record that would require a conclusion that the

---

[141] Testimony of Thomas Vicente, Tr. V, p. 845.
[142] *Id.* p. 845. See also p. 871.
[143] PE 143 at AR 1553.
[144] The § states, in relevant part:
      (I) the actuarial assumption and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations,...)

Fund's approach was unreasonable. [145]   Petitioners' complaint as to this lacks merit.

SUMMARY

Whether the Fund's assessment of June 5, 1998 is accurate depends on whether CenTra's corporate reorganization of December 31, 1995 qualified under ERISA §4218 as a merger/division, so as to make New Cartage and New Transport successor companies for withdrawal liability purposes. If they are successors, they must be found to have inherited the contribution histories of Old Cartage and Old Transport. If not, those histories would remain in CenTra. Section 4218 is not based on intent. The question under this provision is whether the transaction meets the objective requirements of the statute. Issues concerning intent to evade or avoid withdrawal liability are treated under §4212(c).

The finding here is that, contrary to Respondent's contentions, the contribution histories did not remain with CenTra. At the time of the reorganization, they continued on to the New Subsidiaries in a process that fit well enough within the statutorily-undefined concept of "division" set forth in §4069(b)(3). By the corporate maneuvers of December 31, 1995, the Old Subsidiaries ceased to exist and the new ones became successors and, in terms of

---

[145] CenTra also maintains the Fund erred in ignoring a substantial account receivable asset attributable to UPS contributions. Even were this so, it would only be relevant in the event of a 1998 withdrawal. The finding being that the 1997 date is correct, it is unnecessary to resolve this portion of the dispute.

§4218, the original employers. State law cited by Respondents as precluding this result is preempted by ERISA. There is no support for the Fund's claim that withdrawal liability somehow accrued to the Old Subsidiaries and subsequently became imbedded in CenTra. The finding here is consistent with existing case law[146] uniformly holding that withdrawal liability does not arise until withdrawal.

Section 4212 exists to respond to scenarios that, while satisfying §4218, were perpetrated in bad faith or with intent to evade or avoid the withdrawal liability obligations. Aspects of CenTra's behavior could, and did, raise warning flags and, as noted earlier, are worthy of careful scrutiny. The "evade and avoid" issue is a close one. CenTra characterizes the Fund's case as initially promising but ultimately without substance. [147] That assessment underestimates the existence of a variety of troublesome factors, including not only the spector of selling companies out of the controlled group that were troubled at the time and whose continue vitality was chancy at best, but also a string of dealings that were uncomfortably cozy, taken together with transactions, particularly those surrounding the sale to Anne Moroun, that were accurately described by the Fund[148] as "riddled with peculiarities." The arbitrator has considered these elements. However, the external events surrounding the Old Subsidiaries, the onset of deregulation, the family feud of monstrous propositions and the

---

[146] See, for example, *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306 (5th Cir.1988); *Trustees of Teamsters Pension Trust Fund of Phila. v. Federal Express*, 1995 U.S. Dist. LEXIS 19980, at 22-26 (D.)(Del. Dec.27, 1995); *Teamsters Pension Trust Fund v. Central Michigan Trucking, Inc.* 857 F.2d 1107 (6th Cir. 1088).
[147] ...[L]ike a sprinter caught in a marathon; dazzling at the beginning, but unable to go the distance. Petitioner closing brief, p. 5.
[148] Respondent brief, p. 12.

continuing agreements and disagreements with the Teamsters Union lead to the conclusion that, on balance, the case for evasion or avoidance under the statute has not been made.

In the overall, the evidence compels the conclusion that the reorganization was an event waiting to happen, since at least the mid 1980's, for reasons wholly unrelated to withdrawal concerns and, significantly, that would have occurred even absent the allure of substantially mitigating such liability. There is no reason to conclude CenTra was unaware of the salutary aspects of the reorganization, with respect to withdrawal liability. The finding here, for the reasons stated earlier, is that evade/avoid considerations were not "a principal purpose" in effecting the reorganization.

The Fund properly concluded that DIBC withdrew in 1997, not, as CenTra contends, 1998. Fund rules require, among other things, that contributing employers continue to make contributions for the entire term of the agreement. The contract at issue mandated otherwise. The Fund could properly review that contract anomaly and respond by denying further participation. If, as is apparent, the Trustees lost no time in hustling DIBC out the door, neither is there evidence that DIBC protested either on the basis that the decision was premature (because the CBA was merely tentative) or that they stood ready to cure the defect. To the contrary, the evidence is clear that the parties to that labor agreement wanted to leave the Fund, but just a bit later.

Finally, there was no error in applying the separate smoothing techniques under the circumstances set forth here. The evidence is clear that some *bona fide* diversity of opinion exists among qualified actuaries. There is no cause to find that the Fund's approach was unreasonable. Rather, the difference falls squarely within an area where reasonable professionals can differ.

## AWARD

Petitioners' grievance is granted in part and denied in part, in accordance with the above-findings. The matter is remanded to the parties for purposes of recalculating the withdrawal liability assessment. The arbitrator will retain jurisdiction to resolve disputes arising in the course of implementing this Award.

RICHARD I. BLOCH, ESQ.