IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRA, INC. and | ) | |
| DETROIT INTERNATIONAL | ) | |
| BRIDGE COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Nos. 07 CV 6312 |
| | ) | 07 CV 6348 |
| CENTRAL STATES, SOUTHEAST AND | ) | |
| SOUTHWEST AREAS PENSION FUND, | ) | Judge William T. Hart |
| | ) | |
| Defendant. | ) | Magistrate Judge Schenkier |

---

**DEFENDANT AND COUNTER-CLAIMANT CENTRAL STATES'
MEMORANDUM IN SUPPORT OF ITS MOTION TO VACATE OR MODIFY
THE ARBITRATION AWARD**

---

Richard L. Fenton
Frank P. VanderPloeg
Geoffrey J. Repo
Sonnenschein Nath & Rosenthal LLP
Sears Tower
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606
Tel: 312-876-8000
Fax: 312-876-7934

James P. Condon (ARDC 03126986)
Thomas M. Weithers (ARDC 06193004)
Legal Department
Central States, Southeast and Southwest
Areas Pension Fund
9377 West Higgins Road
Rosemont, IL 60018-4938
Tel: 847-518-9800
Fax: 847-518-9797

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND STANDARD OF REVIEW…………………………     1

II.   STATEMENT OF FACTS………………………………………………….     4

      A.    Parties/CenTra's Business Units…………………………………….     4

      B.    The 1980's and early 1990's: CenTra's Experience with
            Withdrawal Liability and Efforts to Spin-Off
            Non-Competitive Union Operations………………………………….     5

      C.    Planning and Execution of the 1995-96 Reorganization…………………     6

      D.    Fate of the New Subs and the CenTra/DIBC Withdrawal in 1997……….     8

III.  ARGUMENT………………………………………………………….....     8

      A.    The Fund Properly Included the Old Subs' Contribution Histories……….     8

            1.    CenTra Became Responsible for the Old Subs'
                  Contribution Histories as a Result of the Merger…………………     8

            2.    29 U.S.C. §1398 Does Not Impact CenTra's Withdrawal……......     14

      B.    A Principal Purpose of the Corporate and Shareholder
            Transactions was to Evade or Avoid Withdrawal Liability………………     17

            1.    The Arbitrator Mis-Applied Section 29 U.S.C. § 1392(c)……….     18

            2.    The Arbitrator Improperly Placed the Burden of
                  Proof on Central States……………………………………     24

# TABLE OF AUTHORITIES

**Pages**

**CASES**

*Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ..................................................................24

*Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800 (2d Cir. 1994) ............................................15

*Central Hardware, Co. v. Central States Pension Fund*, 770 F.2d 106 (8th Cir. 1985)................6

*Central States Pension Fund v. Central Cartage Co.*, 1998 WL 270889 (App. at 7)..................12

*Central States Pension Fund v. Central Cartage Co.*, 69 F.3d 1312 (7th Cir. 1995) ............4, 5, 6, 8, 12, 13

*Central States Pension Fund v. El Paso CGP Corp.*, 2006 U.S. Dist. LEXIS 82430 (N.D. Ill. Sep. 29, 2006)..........10

*Central States Pension Fund v. Sherwin-Williams Co.*, 71 F.3d 1338 (7th Cir. 1995)........................14, 16

*Central States Pension Fund v. Slotky*, 956 F.2d 1369 (7th Cir. 1992) ........................................9

*Central States Pension Fund v. Nitehawk Express, Inc.*,
    223 F.3d 483 (7th Cir. 2000)...........................................................................................1, 2, 11

*Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420 (7th Cir. 1993)............................................9

*Concrete Pipe and Products v. Construction Laborer's Pension Trust*, 508 U.S. 602, 622, 113 S.Ct. 2264, 2279
    (1993).........................................................................................................................24, 25

*Park South Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578 (2d Cir. 1988) ......................17

*Redding v. Commissioner*, 630 F. 2d 1169, 1173 (7th Cir.1980)................................................16

*Robbins v. Pepsi-Cola Metro. Bottling Co.*, 636 F. Supp. 641, 655 (N.D. Ill. 1986)....................9

*Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 682, 697 (Del. Chancery 1996)................................13

*Santa Fe Pacific v. Central States Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994)..........18, 19, 20, 23, 24

*Schlitz Brewing Co. v. Milwaukee Brewery Worker's Plan*, 3 F.3d 994, 999 (7th Cir. 1993) .......................1

*Supervalu, Inc. v. Bd. of Trustees of Southwestern Pa. and Maryland Teamsters Pension Fund*, 500 F.3d 334, 343
    (3rd Cir. 2007) ..............................................................................................................19

*Teamsters Pension Trust Fund of Philadelphia & Vicinity v. Central Michigan Trucking, Inc.*, 857 F.2d 1107 (6th
    Cir. 1988) .....................................................................................................................13

*Teamsters Pension Trust v. Custom Cartage Co.*, 1991 WL 160966 (E.D. Pa. 1991) ........................15

**STATUTES**

29 U.S.C. § 1301(b)(1) ...................................................................................................9

29 U.S.C. § 1369(b)...............................................................................................3, 14, 15, 16

29 U.S.C. § 1369(b)(3).........................................................................................3, 15, 16

29 U.S.C. § 1384 ..............................................................................................2, 10, 11, 12, 13

29 U.S.C. § 1391(c)(2)(C)(iii) ...........................................................................................9

29 U.S.C. § 1392(c).....................................................................................................3, 17, 18

29 U.S.C. § 1398........................................................................................3, 14, 15, 16, 17, 21

29 U.S.C. § 1401 ..........................................................................................................24

**REGULATIONS**

26 C.F.R. § 1.414(c)-2.....................................................................................................9

29 C.F.R. § 4001.3.........................................................................................................9

Central States, Southeast and Southwest Areas Pension Fund ("Central States") hereby submits this Memorandum in Support of Its Motion to Vacate or Modify the Arbitration Award.

## I.    <u>INTRODUCTION AND STANDARD OF REVIEW.</u>

The Arbitrator found that a series of corporate maneuvers, none of which were arm's length and none of which individually would have relieved the employer of its pension obligations, nonetheless resulted in the employer avoiding almost all of the $14.7 million in withdrawal liability at issue in this case.  This result is wholly at odds with the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), which was designed precisely to prevent multiemployer plan employers from walking away from unfunded vested benefit obligations and leaving the other employers "holding the bag." *Central States Pension Fund v. Nitehawk Express, Inc.,* 223 F.3d 483, 487 (7th Cir. 2000).

In an appeal of a withdrawal liability arbitration, the arbitrator's factual determinations are reviewed under the "clearly erroneous" standard, while the arbitrator's legal conclusions are subject to *de novo* review. *Schlitz Brewing Co. v. Milwaukee Brewery Worker's Plan*, 3 F.3d 994, 999 (7th Cir. 1993). The Arbitrator committed legal error here in holding that the following transactions virtually eliminated the pension liabilities of the employer, CenTra, Inc. ("CenTra"):

> Step 1: Two old trucking subsidiaries of CenTra that had long participated in Central States *merged* into CenTra itself.

> Step 2: CenTra then transferred a tiny fraction of the *assets* of the old subsidiaries, including the bargaining unit employees, to two new subsidiaries.

> Step 3: The stock of the new subsidiaries was then sold to an affiliate, U.S. Truck Co., Inc. for a stated price of $500,000, but with an informal arrangement whereby CenTra would continue to subsidize the operations of the new subsidiaries in a far greater amount for a short period.

> Step 4: Ownership of U.S. Truck was then transferred to a CenTra executive and officer who also was the sister of CenTra's CEO.

1

None of these transactions, standing alone, could have resulted in the elimination of the subsidiaries' pension liabilities. Indeed, the Arbitrator conceded that "by means of the merger" (Step 1 above), the pension obligations of the old subsidiaries flowed directly into CenTra. Arbitration Opinion and Award attached at Appendix Tab 1 at 19-20 (hereinafter "Op. at ___"). But the Arbitrator then attempted to justify a further movement of pension obligations *away from CenTra* by holding that these multi-million dollar obligations somehow were not "liabilities" at all and that the transfer of certain minimal assets formerly belonging to the old subsidiaries transferred the pension obligations as well.[1] Op. at 22. As a result of that flawed logic, the Arbitrator absolved CenTra of liability and foisted the unfunded pension obligations of CenTra and its affiliates onto the other contributing employers.

The Arbitrator reached this result even though it was uncontested that, in connection with Step 2 above, CenTra did not even attempt to comply with of 29 U.S.C. § 1384, which allows a seller of corporate assets to be released from future pension liabilities, *provided* that the parties comply with certain secondary liability and bonding requirements for a 5-year term. Absent compliance with § 1384, a transferor of corporate assets, like CenTra here, is not relieved from withdrawal liability. *Nitehawk Express, supra,* 223 F.3d at 492 (7th Cir. 2000)(under neither corporate law nor MPPAA does a *transfer of assets* relieve seller of withdrawal liability absent compliance with 29 U.S.C. § 1384). The Arbitrator's failure to so hold here is a clear error of law.

---

[1] The finding that the pension obligations were not "liabilities" drew the Arbitrator into intractable contradictions, because he also held that CenTra's MPPAA obligations eventually leaked out of CenTra and were "inherited" by the insolvent new subsidiaries that collapsed soon after they were spun off to the elderly sister of CenTra's principal shareholder. Op. at 27. If the pension obligations assumed by CenTra in the merger were not "liabilities" at all (as the Arbitrator believed), the new shell subsidiaries could not have "inherited" them. And if one cannot call them "liabilities," it is difficult to understand precisely what they are to be called: they certainly are not "assets."

The Arbitrator purported to rely instead upon ERISA § 4218, 29 U.S.C. § 1398, which is wholly inapplicable. Section 1398 provides only that withdrawal liability will not be triggered if an employer entity "ceases to exist" as a result of certain kinds of "changes in corporate structure." However, no one contended that the intercompany/interfamily transactions here triggered withdrawal liability. Withdrawal occurred a few years later when CenTra's last remaining subsidiary contributing to the Central States Plan withdrew from the Plan. Op. at 13. Moreover, the Arbitrator gave no effect to § 1398's cross-reference to 29 U.S.C. § 1369(b)(3), which specifically provides that obligations for withdrawal liability will continue in corporate successors after a merger, consolidation or division. CenTra was unquestionably the successor corporation to the old subsidiaries *as a result of merger*, so the liability for the old subsidiaries' unfunded pension obligations continued as a matter of law in CenTra under § 1398, and the Arbitrator's reliance on that section was wholly misplaced.

In addition, the Arbitrator made further legal and factual errors in his determination that avoidance of withdrawal liability was not a principal purpose of the transactions within the meaning of 29 U.S.C. § 1392(c). The transactions described above were clearly and carefully structured to facilitate an argument that the pension liabilities had been transferred out of the CenTra controlled group. The record discloses a nearly decade-long effort by CenTra and its affiliates to find a way out of their pension liabilities, a series of related-party transactions that were plainly intended to move the liabilities into new, insolvent shell entities that could be spun-off from CenTra's ERISA liability "controlled group," and a complex structuring of the transaction that could only be attributed to a desire to avoid withdrawal liability.

For all these reasons, as more fully set forth below, Central States requests that the Award be vacated and that Central States' assessment of $14.7 million in withdrawal liability be confirmed.

3

## II.     STATEMENT OF FACTS.

### A.     Parties/CenTra's Business Units.

Central States is a multiemployer pension plan and trust. Op. at 2. CenTra is a Detroit area trucking conglomerate owned principally by Manuel ("Matty") Moroun, with minority interests held by other Moroun family members, including his sister, Agnes Anne Moroun ("Anne"). JE5, JE6.[2]

A number of CenTra's unionized trucking affiliates, including Central Cartage Co., and Central Transport, Inc. ("Central Cartage" and "Central Transport," respectively, and collectively the "Old Subs")) had historically contributed to Central States under their respective labor agreements. Central Transport in turn had historically owned Crown Enterprises, Inc., which held millions of dollars in real estate. Op. at 7; Tr. 101106 at 534-35; Tr. 102406 at 2660-61.

Detroit International Bridge Co. (DIBC) (which operates the Detroit-Windsor toll bridge) remained a direct, wholly-owned subsidiary of Central Cartage until December 31, 1995, when a merger moved DIBC to its current position as a direct and wholly-owned subsidiary of CenTra itself. Op. at 6. DIBC had also participated in Central States prior to 1997. *Id.*

U.S. Truck Co., Inc. ("U.S. Truck," another unionized trucking company), although never a direct subsidiary of CenTra, was owned by the CenTra shareholders and was part of the same ERISA "controlled group" as CenTra until August 19, 1996. *Id.* On that date, U.S. Truck was spun off from the CenTra controlled group and acquired by Anne Moroun under a purported "Settlement Agreement" with her brother Matty (the principal shareholder and CEO of CenTra). Anne paid fairly nominal consideration -- $90,000 -- to Matty for his U.S. Truck stock in this transaction. JE31 (App.

---

[2] Unless otherwise indicated, all citations to the record shall refer to documents contained in the DVD Record (Docket No. 40) in the folder Principal Record on Appeal. Citations to RE# or PE# shall refer to exhibits included in sub-folder "07 Admitted Exhibits". Citations to JE# shall refer to exhibits included in DVD Record sub-folder "03 Joint Exhibits". Citations to Tr.# at __ shall refer to the volume of the transcript of hearing bearing the indicated date number in the sub-folder "06 Hearing Transcripts."

Tab 2), at 2. In January 1995, before agreeing to take control of U.S. Truck in this fashion, Anne Moroun had secured a lucrative long-term employment contract with CenTra with compensation of approximately $300,000 per year.  Tr. 101606 at 1161.

   **B.    The 1980's and early 1990's: CenTra's Experience with Withdrawal Liability and Efforts to Spin-Off Non-Competitive Union Operations.**

   CenTra's unionized trucking affiliates faired poorly in the wake of trucking industry deregulation in the early 1980's. Op. at 35. From 1987 through 1995, Central Cartage and Central Transport posted combined operating losses totaling more than $68 million. RE51, PE53, Tr. 101106 at 467-475. The Arbitrator himself described the losses as "staggering." – particularly during 1995, when the combined losses for the Old Subs reached $27 million. *Id.*, Op. at 41. CenTra continued to absorb these losses because shutting down operations would trigger even bigger problems – particularly ERISA liabilities.  As CenTra's Vice President of Corporate Planning, Fred Calderone, put it:

>    The losses from being required to operate non-competitively in a very competitive environment had to be absorbed to prevent the greater harm in the form of the *very substantial shut down related costs under both labor contracts and the federal ERISA statutes*.  CenTra would have incurred these shut down costs directly had it caused Cartage and Transport to cease operations….

PE282 (App Tab 3) at 2 (emphasis added).

   Accordingly, CenTra began looking at restructuring options that might arguably be used to free CenTra from its pension obligations. In 1987, for example, CenTra proposed to separate Central Cartage and Central Transport (*i.e.*, the Old Subs) from itself through a spin-off of the stock of those subsidiaries that would have broken Central Cartage's ERISA controlled group link to CenTra. JE14. However, CenTra's principal shareholder, Matty Moroun, was unable to obtain the requisite

shareholder approval for the 1987 spin-off from his sisters, who also held a substantial interest in the Company. Op. at 38.

    C.     **Planning and Execution of the 1995-96 Reorganization.**

By letters dated June 20, 1995, Central States advised both Central Transport and U.S. Truck that they faced likely termination of their participation, and resulting massive withdrawal liability, due to "adverse selection" (*e.g.*, "shunting off new hires to [CenTra's] non-union operations and thereby depriving the Fund of new income"). Op. at 34; *See, e.g., Central Hardware, Co. v. Central States Pension Fund*, 770 F.2d 106, 110-111 (8th Cir. 1985). In response, CenTra then promptly requested and received an estimate showing that it would owe approximately $30 million dollars in withdrawal liability if the CenTra group were to withdraw in 1995. RE556; Tr. 102006 at 2132-33.

As a result, commencing on December 31, 1995, CenTra and its shareholders entered into the following series of transactions that CenTra now claims vastly reduced its exposure to withdrawal liability:

Step 1: a December 31, 1995 *merger* of the Old Subs into CenTra, which moved the Old Subs' valuable assets directly to CenTra itself;

Step 2: a transfer *from CenTra* of the Old Subs' bargaining unit employees (and a small fraction of the Old Subs' *assets*) to two newly-formed corporations (new Central Transport, Inc. and new Central Cartage Co., collectively, the "New Subs");

Step 3: a pair of written agreements (completed by August 9, 1996) whereby CenTra sold *the stock* of the New Subs' to U.S. Truck for a stated price of roughly $500,000, but subject to an unwritten "cost plus" arrangement (Tr. 101106 at 548-49) under which CenTra continued to subsidize the New Subs' losses and to keep the operations afloat for the near term.

Step 4: an August 19, 1996 "Settlement Agreement" between Anne and Matty Moroun that severed U.S. Truck and the New Subs from CenTra's ERISA controlled group.

Op. at 9–11.

The Arbitrator found, and CenTra did not dispute, that the New Subs were "troubled [companies]...whose continued vitality was chancy at best...." Op. at 57. The Arbitrator also acknowledged that the stock transactions whereby CenTra dumped the New Subs on U.S. Truck and then jettisoned U.S. Truck (Steps 3 and 4 above) from the CenTra controlled group were "`riddled with peculiarities.'" *Id*. Not the least of these peculiarities was the so-called "Settlement Agreement," (App. Tab 2) under which Anne Moroun acquired U.S. Truck for nominal consideration after Anne had secured a lucrative long term employment contract as vice-president of CenTra. The only "design" or purpose of the "Settlement Agreement" (Step 4) identified by the Arbitrator was to sequester U.S. Truck and the "troubled" New Subs it had just acquired into an ERISA liability "controlled group" separate from CenTra's. *See* Op. at 11, 33 n. 67, 46 n. 114.

Indeed, CenTra sent the Old Subs' bargaining unit employees to the New Subs but kept for itself substantially all of the other tangible and intangible assets. Most significantly, CenTra kept the stock of DIBC and Crown that had belonged to the Old Subs. Op. at 10. The Old Subs relied upon income from DIBC and Crown to offset the losses from their freight operations. Tr. 102506 at 2681. If the New Subs had retained DIBC and Crown, they would have been able to pay their withdrawal liability in full. Tr. 102406 at 2661–62. But CenTra also kept $90 million in operational trucking assets that had resided with the Old Subs. PE39, PE45. These included contracts with freight shippers, which were transferred *en masse* to a new CenTra subsidiary, Central Transport International, Inc. ("CTII"), some time in early 1996 without any further documentation or consideration. Op. at 45-46, PE5 at 2. CenTra also kept millions of dollars in freight receivables belonging to the Old Subs, plus valuable real estate and equipment used in the Old Subs' trucking operations. PE39, PE45. Indeed, the New Subs would have consumed their entire total combined book values (about $500,000) in a matter of weeks if CenTra had not propped them up under the

informal (and as it turned out, short-lived) cost-plus subsidy arrangement. Tr. 102506 at 2681–82; Tr. 101106 at 548–49.  In October 1996, Matty Moroun reported to CenTra's Board of Directors that the New Subs had been "denuded" of assets, and only had the "minimal assets"[3] that "we [CenTra] wanted them to have." RE392 at 83-84, 90-91 (App. Tab 4). At the same time, members of the New Subs' pricing department were telling customers that the new company formed by CenTra to receive Old Central Transport's freight contracts – *i.e.*, *CTII* – was in fact the same company as Old Central Transport but the *name* had simply been changed. RE215, RE216, RE217.

### D.  Fate of the New Subs and the CenTra/DIBC Withdrawal in 1997.

Within a year after taking new Central Transport's stock, U.S. Truck announced that it was shutting the company down, effective March 1997. Op. at 11, RE404. Later that year, CenTra's only remaining business unit still contributing to Central States – DIBC – left the Fund, triggering the disputed $14.7 million withdrawal liability assessment at issue in this case. Op. at 12-13, 54. U.S. Truck filed for bankruptcy at the end of 1999 and subsequently was liquidated, and New Central Cartage ceased operations at about the same time. RE87, Op. at 11, n.22.

## III.  ARGUMENT.

### A.  The Fund Properly Included the Old Subs' Contribution Histories.

#### 1.  CenTra Became Responsible for the Old Subs' Contribution Histories as a Result of the Merger.

Under MPPAA, each employer's share of a multiemployer plan's unfunded vested benefits ("UVB") is based on an allocation fraction. The numerator of the fraction is the total amount required to be contributed to Central States by the employer for the last 10 plan years preceding the

---

[3] To achieve a pre-determined target of approximately $250,000 in net worth for each New Sub, CenTra's financial staff was still trying to juggle numbers and decide as late as February 1996 exactly what assets were supposed to "belong" to the New Subs. Youngert Dep. 18-19, 21- 22. All deposition designations are found on the DVD Record in the folder "Principal Record on Appeal" in the sub-folder

withdrawal, and the denominator is the total amount contributed by *all* employers. 29 U.S.C. § 1391(c)(2)(C)(iii). Thus, each employer's *contribution history* forms the measure of its share of responsibility for the UVB.

The "employer" subject to withdrawal liability is defined under ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1), to include all trades or businesses that are "under common control" as defined in tax regulations. 29 C.F.R. § 4001.3; JE2 (App E, § 1). *See* 26 C.F.R. § 1.414(c)-2 (80% common ownership test for common control). *See also Central States Pension Fund v. Slotky,* 956 F.2d 1369, 1371 (7th Cir. 1992) (joint and several liability for each ERISA "controlled group" company). Accordingly, a complete withdrawal does not occur until all contributing members of the employer's controlled group have dropped out of the multiemployer pension plan. *Robbins v. Pepsi-Cola Metro. Bottling Co*., 636 F. Supp. 641, 655 (N.D. Ill. 1986).

In this case, the issue is whether in calculating CenTra's liability for its 1997 withdrawal from Central States, the CenTra's controlled group's *pro rata* portion of the UVB should include the contribution histories of the Old Subs that were merged into it, or whether those liabilities must be absorbed by the other contributing employers.

Under its merger with the Old Subs, and as reported in CenTra's corporate records and tax filings, CenTra, as the surviving corporation, acquired all of the Old Subs' assets and assumed all their liabilities. JE25 at CO1668-1675 (App. Tab 5). Central States likewise treated CenTra as the sole successor to the Old Subs and attributed the Old Subs' pre-merger pension contribution history to CenTra. It is fundamental that when one corporation disappears by merging into another, the surviving corporation retains the combined assets and liabilities of its predecessor constituent corporations. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420,1424-25 (7th Cir. 1993); *Central*

---

"08 Deposition designations."

*States Pension Fund v. El Paso CGP Corp.*, 2006 U.S. Dist. LEXIS 82430, *4-8 (N.D. Ill. Sep. 29, 2006) (the surviving corporation in a merger became responsible for pre-merger contribution histories of parties to the merger) (App. Tab 6).

The Arbitrator, however, found these well settled principles inapplicable. Under the Arbitrator's analysis, withdrawal liability was not really a true liability at the time of the merger because it had not yet been triggered. Op. at 22-23. The Arbitrator reasoned that although the Old Subs' contribution histories "traveled to CenTra by means of the merger," they ultimately came to reside in the New Subs (and U.S. Truck) as a result of the subsequent transfer of the union employees and minimal assets to the New Subs. Op. at 19-20; 22-23, 27.

That reasoning makes no sense. After the merger, CenTra was the successor in interest to the Old Subs for all purposes. That included contingent liabilities such as MPPAA liability for a withdrawal. The fact that the ***amount*** of this liability would be calculated based on the past contribution history of the Old Subs did not mean that the liability itself changed hands with the transfer of the trucking operations and minimal assets, or that CenTra could avoid the liability simply by that kind of intercompany/interfamily transaction.

After the merger, any withdrawal liability attributable to the Old Subs was assumed by CenTra, as the surviving corporation. When CenTra subsequently transferred certain of the Old Subs' *assets* to U.S. Truck, the only way that CenTra could be relieved of withdrawal liability was by complying with the asset sale exemption requirements of 29 U.S.C. §1384, which requires, among other things, (1) the posting of bond to protect the affected pension plan, (2) the imposition of secondary liability on the asset seller for five years after sale, and (3) that the sale be to an unrelated company. The obvious purpose of §1384 is to protect multiemployer plans by strictly limiting and conditioning the circumstances in which an employer may be relieved of withdrawal liability in the

event of a transfer of assets. Yet the Arbitrator here gave CenTra a complete pass, holding that CenTra's related party transaction could relieve it of withdrawal liability, even though the same transaction with an unrelated party would have required the posting of a bond to protect the Plan and CenTra's continuing liability for 5 years after the transaction took place.

That ruling turns the law on its head, and is wholly inconsistent with the established case law in this Circuit. In *Central States v. Nitehawk, supra*, the Seventh Circuit analyzed a sale of assets to determine whether the withdrawal liability remained with the seller. It held:

> Under neither corporate law nor the MPPAA did [the asset seller's] *liabilities – in particular, its contribution history* – automatically shift to the purchaser. The MPPAA and the PBGC's interpretations of it clearly indicate that *unless the purchaser of assets assumes withdrawal liability by taking the prescribed steps [*under 29 U.S.C. §1384], *the contribution history and associated withdrawal liability stay with the seller*.

*Nitehawk*, 223 F.3d at 492 (emph. added). This passage makes clear that the Seventh Circuit, contrary to the Arbitrator's holding (Op. at 22-23), views *pre*-withdrawal contribution histories as a "*liability*" for purposes of determining which party retains withdrawal liability. And in the absence of compliance with § 1384, "the contribution history and associated withdrawal liability stay with the seller," *i.e.*, with CenTra.

The Arbitrator has introduced a new, dangerous and confusing rule under which asset purchasers -- without going through the § 1394 process -- will "inherit" the pension contribution histories (and attendant potential withdrawal liability) from asset sellers. Op. at 27, 56-57. This rule is clearly contrary to MPPAA and undermines pension funding by sanctioning the separation of pension liabilities from the corporate assets needed to pay them. Not only does the Arbitrator's novel rule allow asset sellers to slough off pension liabilities, as CenTra claims here, it exposes asset purchasers to massive unanticipated obligations that they never voluntarily assumed through the § 1384 process.

11

The Arbitrator's ruling conflicts with two prior Seventh Circuit cases involving Central States and CenTra. In *Central States Pension Fund v. Central Cartage Co.*, 69 F.3d 1312, 1315 (7th Cir. 1995)("Central Cartage I"), the Seventh Circuit held [Old] Central Transport liable for the pre-merger ERISA pension contribution obligations of another company, General Highway Express, that had *merged* with Old Central Transport. And in *Central States Pension Fund v. Central Cartage Co.*, 1998 WL 270889 (7th Cir. 1998) (App. Tab 7)("Central Cartage II"), the Seventh Circuit had occasion to evaluate the precise transactions at issue here when New Central Cartage attempted to appeal an adverse ruling against Old Central Cartage for delinquent pension contributions. That appeal was dismissed because the Court found that the successor in interest to Old Central Cartage was CenTra, ***not*** New Central Cartage:

> Either Old Cartage (which no longer exists) or CenTra, Inc. (the company into which Old Cartage merged) is liable on the [premerger ERISA] obligation to pay into the Fund.

1998 WL 270889 at *4 (App. Tab 7).[4]

The Arbitrator dismissively distinguished these cases on the ground that they involved liability for pension contributions, not withdrawal liability. Op. at 23-24, n.47. But the Arbitrator provided no meaningful analysis as to how CenTra could be a successor for pension contribution purposes but not for withdrawal liability purposes. As the surviving corporation in the merger, CenTra was the successor in interest to *all* the Old Subs' ERISA obligations, which included withdrawal liability if triggered. The asset transfer to the New Subs did not relieve CenTra of that

---

[4] The *Central Cartage* cases both involved contribution obligations that, like the withdrawal liability here, were subject to ERISA. But contrary to the Arbitrator's interpretation, the Court in *Central Cartage II* applied traditional state law corporate succession principles to its analysis of whether New Cartage had standing to appeal. There is no indication in the *Central Cartage* cases that ERISA was intended to completely eviscerate the field of corporate law.

liability, because it was not in compliance with the asset sale exemption requirements of 29 U.S.C. §1384.

True enough, the Old Subs' delinquent pre-merger pension contribution obligations at issue in *Central Cartage I and II*, were fully accrued, liquidated ERISA liabilities, whereas withdrawal liability was a contingent future obligation relating to the same statutory and contractual obligations. But that is a distinction without a difference. Both actual and contingent liabilities are assumed by the survivor of a merger. *Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 682, 697 (Del. Chancery 1996). The Arbitrator's ruling that the withdrawal liability does not rest with CenTra is completely at odds with the Seventh Circuit's rulings in *Central Cartage I* and *II*.

The Arbitrator also claimed that his result was consistent with cases rejecting the notion that withdrawal liability "accrues" to a non-contributing parent corporation during the period it owns a contributing subsidiary. Op. at 57. *Teamsters Pension Trust Fund of Philadelphia & Vicinity v. Central Michigan Trucking, Inc.*, 857 F.2d 1107, 1109-10 (6th Cir. 1988), and two similar cases cited by the Arbitrator, held only that liability for withdrawal attaches at the time of withdrawal. It does not "accrue" as contributions are historically made and cannot be assessed against non-contributing companies who were prior contributors but who were no longer part of the controlled group at the time of withdrawal. Here, however, CenTra's liability does not depend on any theory of "accrual" liability. CenTra was part of the controlled group that withdrew in 1997. Op. at 12. And the obligations of the Old Subs were assumed by CenTra as the surviving corporation in a merger, and were not released or impaired as a result of the asset transfer to the New Subs. Accordingly, those obligations remained with CenTra at the time of withdrawal in 1997. The assessment of withdrawal liability against CenTra was proper.

2.      **29 U.S.C. §1398 Does Not Impact CenTra's Withdrawal**.

ERISA § 4218, 29 U.S.C. § 1398 has no application to this case and the Arbitrator erred in thinking it did. Section 1398 provides only that a withdrawal shall not be deemed to have occurred when:

· an employer "ceases to exist"

· "by reason of . . . a change in corporate structure described in" 29 U.S.C. § 1369(b) – which includes "mergers, consolidations or divisions"

· if *that* change "causes no interruption in employer contributions or obligations to contribute."

29 U.S.C. § 1398. Additionally, the last sentence of § 1398 simply states that any "successor or parent corporation or other entity resulting from any *such* change shall be considered the original employer."[5] Here, CenTra was the successor resulting from the change in corporate structure (*i.e.*, the merger) and is to be considered the "original employer." *Id.*

Section 1398 operates as "a savings clause, a proviso that comes into play only if some other step causes the participant to vanish." *Central States Pension Fund v. Sherwin-Williams Co.*, 71 F.3d 1338, 1342 (7th Cir. 1995). The rule addresses situations where "the original participant in the pension plan vanishes under standard doctrines of corporate law, but the business continues." *Id.* Thus, the only possible impact of §1398 here is that no withdrawal would be deemed to have occurred as a result of the merger of the Old Subs into CenTra, because CenTra was the successor corporation and would be considered the "original employer." But Central States never contended otherwise. In fact, Central States did not assess withdrawal liability on account of the merger. It

---

[5] The statute's specific reference to a "successor … or other entity resulting from any such change" in itself suggests that Congress did not intend to disrupt or supplant state law regarding successor liability or corporate mergers and acquisitions. That is, the statute presumes the operation of ordinary corporate/state law principles relating to mergers.

14

assessed withdrawal liability nearly two years later, when DIBC, the last member of the employer controlled group, ceased participation in the plan. Op. at 12. Therefore, Central States did not assess withdrawal liability *because* of the merger or any other "change in corporate structure," and this reason standing alone is sufficient to show that § 1398 simply is inapplicable to this case.

But the Arbitrator's analysis of § 1398 erred in other ways. For example, a transfer of *assets or employees* is simply not "a change in corporate structure," much less one covered by § 1369(b). *See Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 805-07 (2d Cir. 1994) ("division" in §§ 1398 and 1369(b) refers to "a transaction whereby the *stock* of a new corporation is divided away from its controlled group…or distributed to new owners;" holding that a transfer of employees and operations from two unrelated corporations to a joint venture established by those same corporations is not an event covered by §§ 1398 and 1369(b)); *Teamsters Pension Trust v. Custom Cartage Co.*, 1991 WL 160966 (E.D. Pa. 1991) (reversing arbitrator's legal conclusion that transfer of employees from one member of a controlled group to another is covered by § 1398), *aff'd mem*. 961 F.2d 1568 (3d Cir. 1992)(App. Tab 11).

Notwithstanding this clear authority, the Arbitrator sought to characterize the combined effect of the upstream merger and asset drop-down as a "division" of the kind potentially covered by §§ 1398 and 1369(b)(3).  Op. at 26 ("[I]t is by no means a stretch to find [the term 'division'] reasonably applicable to the current case, which involved" a merger and a transfer of assets.). [6] But the transfer of loss-generating assets to the New Subs was not a corporate "division." *See Bowers*, 27

---

[6] The Arbitrator suggested, without any citation to the record, that the merger and the "asset drop down" were "simultaneous." Op. at 26. Whether the two transactions were simultaneous or not is irrelevant because they were separate transactions and the combined effect of the two transactions could not somehow be magically greater than the individual effect of each transaction. But in fact, the undisputed evidence shows that the merger and asset drop down were not simultaneous, and that CenTra transferred assets over a period of more than one month *after* the December 31, 1995 merger. *See* p. 8, n.3, *supra*.

F.3d at 805-06 ("division" refers to a *stock* transaction); *Redding v. Commissioner,* 630 F. 2d 1169,

1173 (7th Cir.1980) ("division" refers to a spin-off, split-off or split-up of *stock).* The "drop down" of

assets from CenTra to the New Subs was not a change in the "structure" of the corporations; it

simply moved assets from one corporation to another. And the Arbitrator's suggestion that "the sale

of the [New Subs'] stock to U.S. Truck was a division" covered by § 1398 and its cross-reference to

§ 1369(b) (Op. at 26) is flatly contradicted by the 7th Circuit's holding in *Sherwin-Williams*, 71 F.3d

at 1342.

Moreover, even if the asset transfer could be considered a "division," the Old Subs did not

"cease to exist … *by reason of"* the so called "division." 29 U.S.C. §1398(emph. added). The Old

Subs "ceased to exist" because they were *merged* into CenTra, which as the surviving corporation

became the successor and is considered the original employer under the MPPAA. *Id.*; App. Tab 5.

Thus, §1398, far from supporting the Arbitrator's decision here, cuts precisely the other way. [7]

CenTra was no mere "technical" survivor of the merger with the Olds Subs.  CenTra

acquired and retained the bulk of the Old Subs' assets and operational value. CenTra took not only

the Old Subs' multimillion dollar investments in DIBC and Crown, but it also stripped the Old Subs

of their customer base and freight contracts as well as the "Central Transport" logo and gave them to

a newly formed CenTra marketing entity – CTII. The skinnied down trucking operations sent to the

---

[7] Even if some "division" had taken place, § 1398 specifically states that a successor or parent corporation resulting from the change shall be considered the original employer. Thus, *each* of the multiple corporations emerging from the purported division would constitute a "successor" to the Old Subs and to their pension obligations. *See* 29 U.S.C. § 1369(b)(3)(any successor "corporation*s*" (plural) shall be treated as the original employer); *see also* 29 U.S.C. § 1398 (final sentence). CenTra itself – the entity that survived the merger and pocketed the lion's share of the underlying assets of the Old Subs – plainly would have to be among that set of "successor" corporations, even under the Arbitrator's misreading of §§ 1398 and 1369(b)(3). *If* the combination of the merger and the "asset drop" constituted a "division," as the Arbitrator believed, then he should have acknowledged that in this "division" the Old Subs were "divided" into two sets of successors: CenTra and the New Subs. But the Arbitrator arbitrarily disregarded the statute, and failed to follow his own (faulty) premise to its logical conclusion, by refusing to acknowledge CenTra as a successor to the "division" he thought had occurred.

New Subs were also stripped of the millions of dollars in freight receivables and trucking-related real estate and equipment that had belonged to the Old Subs. The New Subs would have collapsed immediately without the short-lived "cost-plus" subsidy installed by CenTra to place a decent interval between CenTra's "reorganization" and the New Subs' ultimate demise. As CenTra's CEO (Matty Moroun) candidly explained to his Board of Directors, the New Subs were "denuded" of assets. App. Tab 4.

Section 1398 applies to "mere changes in the form or structure of an employer that do not…change the nature of the employer's operations." *Park South Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578, 583-84 (2d Cir. 1988). But what happened here was a fundamental change in the nature of the employer's operations. The Arbitrator not only failed to follow the plain meaning of the text of § 1398, he also failed to explain how his interpretation of the statute furthers *any* rational policy goal of § 1398 or of MPPAA in general.

As a matter of law, then, the transactions at issue resulted in CenTra, as the successor to the Old Subs, being liable for withdrawal liability based on the Old Subs' contribution histories. The asset transfer to the New Subs did not relieve CenTra of that liability, and 29 U.S.C. §1398 does not apply to the transactions at issue here. Accordingly, the Award must be vacated and an award entered confirming Central States' assessment of withdrawal liability of $14.7 million against CenTra.

### B.    A Principal Purpose of the Corporate and Shareholder Transactions was to Evade or Avoid Withdrawal Liability.

If this Court vacates the Arbitrator's decision under § 4218 of ERISA, 29, U.S.C. § 1398, then the remaining issue becomes moot. But Central States has also asserted an *alternative* theory of liability under ERISA § 4212(c), 29 U.S.C. § 1392(c), which provides that:

> If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

Under the "evade and avoid" theory, the transactions are disregarded in their entirety and CenTra's liability is $15.5 million taking into account CenTra's continuing liability for the Old Subs' contributions post-merger. [8]

It borders on the absurd for CenTra to claim that it did not intend to avoid almost $15 million in withdrawal liability, after arguing that its' admittedly "peculiar" transactional gymnastics had exactly that legal effect. The undisputed evidence shows that CenTra struggled for more than a decade to find a way of disposing of the Old Subs without having to pay the Old Subs' (CenTra's controlled group's) share of withdrawal liability to Central States. That CenTra may also have had other considerations -- even significant considerations -- is beside the point. The question is whether avoidance of withdrawal liability was among the principal considerations, and it clearly was. As a result, withdrawal liability must be assessed "without regard" to the merger/asset transfer transactions.

### 1.    The Arbitrator Mis-Applied Section 29 U.S.C. § 1392(c)

The Seventh Circuit has expressly rejected the idea that the test under § 1392(c) is whether the transaction was a "sham," and has held that liability avoidance "need only be *one* of the factors that weighed heavily in the seller's thinking." *Santa Fe Pacific v. Central States Pension Fund*, 22 F.3d 725, 727, 729-30 (7th Cir. 1994). *See also Supervalu, Inc. v. Bd. of Trustees of Southwestern*

---

[8] Under the Pension Fund's "evade or avoid" alternative theory, the withdrawal liability amount would become slightly larger -- $15.5 million as opposed to $14.7 million under Central States' principal theory. This is because more contribution history is included under the "evade or avoid" alternative. The effect of *disregarding* CenTra's reorganization transactions under the "evade or avoid" alternative is to put CenTra back into the same ERISA "controlled group" with U.S. Truck and the New Subs at the time those entities ultimately failed and completely withdrew from Central States in 1999. Therefore, the "evade or avoid" alternative claim assigns to the CenTra controlled group responsibility not only for the pre-merger contribution histories of the Old Subs, but also for the post-merger contribution histories of

*Pa. and Maryland Teamsters Pension Fund*, 500 F.3d 334, 343 (3rd Cir. 2007) *cert. denied,* 128 S.Ct. 1231 (2008) ("[t]he text in no way suggests that it only applies to sham or fraudulent transactions."). But the Arbitrator framed the issue by asking "Was it [CenTra's reorganization] a *sham*?" Op. at 46 (emph. added).

Under the Arbitrator's faulty analysis, an employer may thwart the "evade or avoid" statute simply by showing multiple purposes for a transaction. Op. at 49 ("[T]he decision to reorganize was supported by elements well beyond avoidance of withdrawal fees."). The Arbitrator in this case committed the same error as the arbitrator who was reversed in *Santa Fe;* he did no more than explore the irrelevant question of whether the seller "had reasons independent of withdrawal liability to divest itself of [a failing subsidiary]." *Santa Fe* at 729. He did exactly what *Santa Fe* prohibited - he refused to impose liability unless the intent to avoid liability was *the sole* primary purpose of the transaction. The Arbitrator mechanically recited the *Santa Fe* standard (Op. at 30), but in actual application he expressly formulated and used an impermissible fraud or "sham" standard. Op. at 46. *See also* Op. at 48 ("Was this a *well orchestrated scheme* to skin the [Old Subs]…?" (emph. added)).

It is undisputed that in late 1995 CenTra and its controlled group were facing an imminent and potentially crippling withdrawal liability. In June, 1995, Central States had alerted CenTra that the Old Subs faced termination of their participation in Central States, thus triggering massive withdrawal liability of as much as $30 million against CenTra itself, due to the Old Subs' practice of adverse actuarial selection against Central States ("*i.e.*, "shunting new hires into non-union CenTra operations"). Tr. 102006 at 2132-33; RE556. For nearly 10 years, CenTra had considered different ways to jettison its potential liability, but had taken no action. It strains credulity to conclude that the corporate machinations that followed Central States' 1995 liability warning were unrelated to this

---

the New Subs. JE34(App. Tab 8).

imminent risk of exposure. Thirty million dollars in withdrawal liability was the single biggest threat to CenTra's business in late 1995, and certainly the Arbitrator offers no basis to conclude that this threat was insignificant in comparison to other problems CenTra faced or did not command CenTra's attention in deciding whether to move forward with these transactions. [9]

The Arbitrator compounded this error by failing to see that the *form* of the transactions was clearly intended to "evade or avoid." In *Santa Fe* the transaction that had a principal purpose of evading withdrawal liability was not the inevitable disposition of a failing subsidiary - but the disposition of that subsidiary *in a stock sale.* The Seventh Circuit stated, "The issue is the *form* the divestiture took – a stock sale rather than a sale of assets." *Santa Fe* at 729 (emph. in original). As *Santa Fe* noted (and was certainly true in this case), a parent (*e.g.,* CenTra) *always* has strong motives to divest itself *in some manner* of failing subsidiaries (*e.g.,* the New Subs). *Santa Fe,* 22 F. 3d at 728-29.

Here, even accepting the Arbitrators' finding that "the reorganization would have occurred even in the absence of withdrawal liability concerns" (Op. at 35), there was no explanation for the sale of *stock* of the New Subs to U.S. Truck other than an attempt to avoid withdrawal liability. If the sole purpose of the transaction was for CenTra to divest losing operations, the New Subs (or the Old Subs, for that matter) could simply have sold their operating *assets* to U.S. Truck. That,

---

[9] The Arbitrator makes no mention of the testimony of Louis Kasischke, one of CenTra's attorneys and agents, who stated that during the late 1980's "*the only thing* anybody [in CenTra's management] ever talked about was the Teamsters and the multiemployer pension liabilities. Those were the biggies. Those were the big threats…." RE268 (emph. added)(App. Tab 9). In addition to the objectively significant economic threat that withdrawal liability posed to CenTra, Matty Moroun, CenTra's principal shareholder and CEO, had highly personal reasons to avoid paying withdrawal liability to Central States. Mr. Moroun testified that in prosecuting the arbitration he had "spent more than 15 million and I'll spend it tomorrow again," because he believed Central States was run by "crooks and cheats" who were engaged in "pure cheating." Tr. 101906 at 1775. Whether Mr. Moroun's estimate of the attorney fees and costs expended by CenTra was hyperbole or not, it is impossible to believe that Mr. Moroun could have put aside such deep-seated, personal opposition to Central States in planning the reorganization that he now asserts derailed Central States' withdrawal liability claim.

however, would not have relieved the Old Subs or CenTra of withdrawal liability, and selling the Old Subs in a stock sale would also have transferred the valuable subsidiaries of the Old Subs, DIBC and Crown (which had helped subsidize the Old Subs' losses). Instead, CenTra went through a series of admittedly "arcane legal maneuvers" that would permit it to separate valuable assets from stock and then sell "denuded" subsidiaries *in stock sales*. Op. at 26. In these stock sales, CenTra received $500,000 on paper, but then returned an even greater amount through a cost- plus subsidy needed to keep the New Subs afloat long enough to get them and U.S. Truck out of CenTra's controlled group. Despite the fact that *stock sale*s of the New Subs to U.S. Truck were necessary initial steps to claiming that the CenTra controlled group had no further liability, the Arbitrator never once discussed the purpose behind CenTra's decision *to sell stock rather than assets*.[10]

In addition, the Arbitrator did not analyze the key transaction. None of the transactions discussed by the Arbitrator as comprising the main components of CenTra's "reorganization" (the merger, the asset drop-down to the New Subs or the sale of stock of the New Subs to U.S. Truck) in themselves could have arguably avoided withdrawal liability – even under the Arbitrator's novel interpretation of § 1398 -- because none of those transactions would have removed CenTra from the withdrawal liability controlled group with the New Subs. So long as CenTra and the New Subs all remained part of the same group, CenTra would be liable for the New Subs' contribution histories when the 1997 withdrawal of the CenTra group finally occurred. The final transaction that, under

---

[10] Thomas Christ, a top CenTra executive, indicated that he preferred asset sales over stock sales when buying trucking entities in "financial straights (sic)" – a characterization that certainly applied to the New Subs. Tr. 102306 at 2173-76(App. Tab 10). And, of course, CenTra used an "asset drop down" in early 1996 in the post-merger transactions between itself and the New Subs. Indeed, in October 1995, while U.S. Truck was still under common control with CenTra, U.S. Truck purchased the *assets* of Mason & Dixon Lines, Inc., and thus took over Mason & Dixon's drivers and trucking operations *without the need for a stock sale*. JE10. CenTra offered no explanation for its preference for *stock* transactions in its sales of the New Subs to U.S. Truck; nor did the Arbitrator articulate any such explanation.

CenTra's theory, actually avoided withdrawal liability was the August 19, 1996 shareholder "Settlement Agreement" between Matty Moroun and his sister, Anne, which split CenTra's ERISA controlled group into two separate controlled groups.

The Arbitrator acknowledged that the transactions involving Anne Moroun were "riddled with peculiarities" (Op. at 57), and he made no detailed findings concerning the *purpose* of the Matty-Anne Settlement Agreement. Indeed, Matty Moroun testified that he could not identify *anything* that the August 19, 1996 Settlement Agreement was actually supposed to "settle." Tr. 101906 at 1785-86. For this reason, the Arbitrator's analysis of the Settlement Agreement consisted of little more than the statement that the agreement was "relatively vague." Op. at 33, 46. The only clear finding he made was that the Agreement had been "*designed* to remove any common ownership of CenTra and U.S. Truck" and split "CenTra's controlled group" - which is exactly Central States' point. Op. at 11 (emph. added.) The only conceivable purpose of this agreement was to manipulate the ERISA controlled group so that the U.S. Truck Group would be separate from the CenTra Group and the withdrawal liability now arguably rested with the U.S. Truck Group. The Arbitrator never considered the clear legal implication of the *only* purpose of the Settlement Agreement which he identified. This was legal error.[11]

In considering whether the transactions were intended to evade or avoid liability, the Arbitrator also analyzed the motivation of the wrong party. In *Santa Fe* the Court held that "The

_____

[11] CenTra offered a new purpose for the "Settlement Agreement" at the hearing: that splitting ownership was necessary to attempt to obtain wage concessions from the union. Op. at 43. But CenTra and U.S. Truck never attempted to use the Agreement in labor negotiations. RE408. In fact, they told the union that the question of common ownership between CenTra and U.S. Truck had "no bearing on" the New Subs' (and U.S. Truck's) request for wage concessions. PE430, p. 4. Neither CenTra nor the Arbitrator offered any explanation why – if a break in the common ownership link between CenTra and U.S. Truck was viewed as a plus in labor negotiations – the union never was actually *told* that the break had occurred. A *secret* break in the ownership link surely could not have furthered the labor negotiations.

statutory criterion is...whether the avoidance of withdrawal liability *by the seller* (not necessarily by the purchaser as well) is one of the principal purposes of the transaction." 22 F. 3d at 730 (emph. added). Yet the Arbitrator relied heavily on the supposed motivations, not of the seller, but of Kirk Cummings [the *purchaser's* (U.S. Truck's) President], and noted that Cummings "did not consider the firms [the New Subs] '*denuded*'." Op at 47. Cummings' motivations are irrelevant. The ***seller's*** President and Chairman, Matty Moroun, told his Board of Trustees *that the New Subs had in fact been "denuded" of assets*. App. Tab 4 (emph. added.)

Moreover, to the extent the purchaser's motives are at issue, U.S. Truck ended up being owned and controlled by Anne Moroun, Matty Moroun's elderly sister, herself a well-paid officer of CenTra. Her initial investment in U.S. Truck was nominal and she had little at risk. And in January 1995, before agreeing to take full control of U.S. Truck, she secured a long term employment agreement as a Vice President of CenTra.  So Anne herself had ample motivation to participate in a transaction designed to help CenTra by transferring the withdrawal liability out of the CenTra controlled group and into U.S. Truck; she stood little to lose even if U.S. Truck went bankrupt, which it did. The $90,000 Anne had paid to her brother Matty for the U.S. Truck stock represented less than four months' salary ($300,000 per year) under her employment agreement with CenTra. The Arbitrator disregarded this highly incestuous relationship in concluding that the transactions were not intended to evade or avoid liability.

By focusing on whether the transactions were "sham," by looking to whether the avoidance was "the" principal purpose instead of "a" principal purpose, and by looking to the claimed knowledge motivations of the purchaser instead of those of the seller, the Arbitrator committed legal error. Beyond that, the Arbitrator's conclusion that an intent to evade or avoid liability was not a principal purpose behind the transactions is clearly erroneous and flies in the face of the manifest

weight of the evidence. On either basis, the Award should be vacated and an award of $15.5 million entered in favor of Central States.[12]

**2.**     **The Arbitrator Improperly Placed the Burden of Proof on Central States.**

The Arbitrator also committed legal error by misapplying the burden of proof. CenTra was the Petitioner in the Arbitration and MPPAA places the burden of proof on the employer. *See Concrete Pipe and Products v. Construction Laborer's Pension Trust*, 508 U.S. 602, 621, 113 S.Ct. 2264, 2279 (1993)("the presumption [under 29 U.S.C. § 1401] favoring determinations of the plan sponsor *shifts a burden of proof or persuasion to the employer*") (emph. added). But the Arbitrator placed the burden on Central States:

> If liability is to attach under [the "evade or avoid" provision], *the Fund must demonstrate* that ... was a principal purpose behind the motive. ... But in such a case, *fairness demands* that such a motivation be a principal driving actor, and that it be *clearly demonstrated*.
>
> That burden has not been met in this case.

Op. at 49 (emph. added). The Arbitrator substituted his private notion of "fairness" for the burden of proof allocated by ERISA. Moreover, he imposed an unjustified *standard* of proof that required

---

[12] The Arbitrator also committed clear error by completely ignoring *direct* evidence of CenTra's intent to avoid liability. The Arbitrator accepted CenTra's claim that the planning for the 1995 reorganization had begun in 1987 with the planning of an (unconsummated) reorganization. Op. at 8, 59 (the 1995-96 "reorganization was an event waiting to happen"). Yet he completely ignored the December 2000 affidavit of Fred Calderone, a top CenTra officer, describing the *purpose* of that aborted 1987 reorganization. Calderone stated that it long had been CenTra's desire to "divest itself" of unprofitable unionized trucking subsidiaries in a manner that prevented "the greater harm in the form of very substantial shutdown related costs under both labor contracts *and federal ERISA statutes."* App. Tab 3. As Mr. Calderone observed, by virtue of the ERISA controlled group rule, "CenTra would have incurred these shutdown costs *directly* had it caused Cartage and Transport to cease operations" (as opposed to "divesting itself" of those failing companies in *stock* sales). *Id.* (emph. added.) This direct evidence of CenTra's intent shows that a principal purpose of CenTra's "plan" from the beginning was to avoid withdrawal liability. It is clearly erroneous to favor a party's *post hoc* rationalizations over the party's prior written expressions of knowledge or intent. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). An arbitrator's award should be reversed where the employer's contemporaneous "documents that cannot be explained away" betray a clearly evasive intent. *Santa Fe*, 22 F.3d at 729.

24

Central States to prove intent by *clear and convincing evidence* (*i.e.*, he demanded that Central States "clearly demonstrate" that it should prevail on the "evade or avoid" issue). But *Concrete Pipe* gives the burden to the employer and the standard of proof requires a simple preponderance of the evidence, not clear and convincing evidence. *Concrete Pipe*, 508 U.S. at 629.

The Arbitrator stated that this was a "close case." Op. at 57. Therefore, the proper allocation of the burden of proof in this case is crucial. For example, as noted above, CenTra introduced no evidence as to why it chose to sell the *stock* of the New Subs to U.S. Truck, rather than simply sell the New Subs' *assets*. For this reason alone, Central States should have prevailed since CenTra showed no purpose for the stock sale other than liability avoidance. Similarly, the Arbitrator's express findings that the crucial August 19, 1996 Settlement Agreement that finally broke the controlled group (1) was "relatively vague" and (2) was in fact "designed" to break the controlled group. (Op. at 11; 33, n.67; 46, n. 114) means that CenTra completely failed in its burden to establish *any* purpose for the "Settlement Agreement" *other than* breaking the controlled group and therefore avoiding liability. Error of this magnitude requires reversal.

WHEREFORE, the portions of the Arbitrator's Award concerning the legal effect of the December 31, 1995 merger and the interpretation of ERISA § 4218 should be vacated, and Central States' original withdrawal liability assessment in the amount of $14,761,082.60 should be confirmed.

In the alternative, the Arbitrator's Opinion and Award with regard to the "evade or avoid" issue should be vacated, and the Court should confirm a withdrawal liability assessment against CenTra in the amount of $15,534,280.07, plus interest.

Respectfully submitted,


By:     /s/Richard L. Fenton
        Richard L. Fenton
        Frank P. VanderPloeg
        Geoffrey J. Repo
        Sonnenschein, Nath & Rosenthal LLP
        Sears Tower
        233 S. Wacker Drive, Suite 8000
        Chicago, IL 60606
        Tel: 312-876-8000
        Fax: 312-876-7934

        James P. Condon (ARDC 03126986)
        Thomas M. Weithers (ARDC 06193004)
        Central States, Southeast and Southwest
        Areas Pension Fund
        9377 W. Higgins Road
        Rosemont, IL 60018-4938
        Tel: 847-518-9800
        Fax: 847-518-9797

<u>**CERTIFICATE OF SERVICE**</u>

I, Thomas M. Weithers, one of the attorneys for the Central States, Southeast and Southwest Areas Pension Fund, certify that on April 25, 2008, I caused the foregoing Defendant and Counter-Claimant Central States' Memorandum in Support of Its Motion to Vacate or Modify the Arbitration Award to be filed electronically. This filing was served on all parties indicated on the electronic filing receipt via the Court's electronic filing system.

/s/Thomas M. Weithers
Thomas M. Weithers
One of Central States' Attorneys