IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRA, INC. and | ) | |
| DETROIT INTERNATIONAL | ) | |
| BRIDGE COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Nos. 07 CV 6312 |
| | ) | 07 CV 6348 |
| CENTRAL STATES, SOUTHEAST AND | ) | |
| SOUTHWEST AREAS PENSION FUND, | ) | Judge William T. Hart |
| | ) | |
| Defendant. | ) | Magistrate Judge Schenkier |

---

# APPENDIX

---

## Contents

1.    Arbitrator's Opinion – 10/10/07

2.    Matty-Agnes Settlement Agreement  (JE31)

3.    Affidavit to Fred Calderone  (PE282)

4.    Transcript of CenTra Board meeting – 10/11/96  (RE392)

5.    CenTra Corporate Income Tax Return 1995  (JE25)(excerpts)

6.    Central States Pension Fund v. El Paso CGP Corp.,
      2006 U.S. Dist. LEXIS 82430  (N.D. Ill. Sept. 29, 2006)

7.    Central States Pension Fund v. Central Cartage Co.,
      1998 WL 270889  (N.D. Ill. May 21, 1998)

8.    Contingent bankruptcy claim  (JE34)(excerpts)

9.    Transcript of deposition of Louis Kasischke  (RE268)(excerpts)

10.   Hearing testimony of Thomas Christ – 10/23/06 (excerpts)

11.   Teamsters Pension Fund of Philadelphia v. Custom Cartage Co., 1991 WL 160966
      (E.D.Pa.)

# Appendix 1

Arbitrator's Opinion - 10/10/07

AMERICAN ARBITRATION ASSOCIATION
MULTIEMPLOYER PENSION PLAN
WITHDRAWAL LIABILITY ARBITRATION

CENTRA, INC. and
DETROIT INTERNATIONAL
BRIDGE COMPANY,
       Petitioners,

    and                             AAA Case No. 51 621 00068 99
                                        Assessment No. 1388250-WL981053-01

CENTRAL STATES, SOUTHEAST
AND SOUTHWEST AREAS
PENSION FUND,
       Respondent,

Hearings Held October 9, 10, 11, 12, 13,
16, 17, 18, 19, 20, 23, 24, 25, 2006

Before Richard I. Bloch, Esq.

PETITIONERS

Mark Casciari, Esq.                       Edward R. Mackiewicz, Esq.
Ronald J. Kramer, Esq.                Eric G. Serron, Esq.
William R. Seikaly, Esq.              Patrick S. Menasco, Esq.
Jeffrey T. Stewart, Esq.              Roscoe C. Howard, Jr., Esq.
Mark E. Nagle, Esq.

RESPONDENTS

James P. Condon, Esq.                   Thomas S. Gigot, Esq.
Thomas M. Weithers, Esq.           August A. Imholtz III

OPINION

Facts

      Respondent Central States, Southeast and Southwest Areas Pension Fund (hereinafter also referred to as "Central States" or "The Fund") is a multiemployer pension plan and trust maintained pursuant to a trust agreement between unions affiliated with the International of Brotherhood of Teamsters ("Teamsters" or "IBT") and representatives of employers that have signed labor agreements with Teamster-affiliated unions.[1] On June 5, 1998, the Fund served the Petitioners, CenTra, Inc., and its subsidiary, Detroit International Bridge Company (DIBC), with its demand for payment of $14,761,082.66 in withdrawal liability. Petitioners appear in this forum to have the arbitrator rescind the assessment and to replace it with a new assessment for $587,610.00.[2] The balance of the monies, it is claimed, should be refunded, together with statutory interest.

      The parties to this proceeding agree the matter is properly before this arbitrator pursuant to the dispute resolution provisions of the Multiemployer Pension Plan Amendments Act of 1980 (hereinafter "MPPAA").[3] Hearings were conducted between October 9 and 25th, 2006, at which time evidence and

---

[1] According to the Joint Stipulations of Facts, there are some three thousand contributing employers.
[2] See Petitioners Exhibit (PE, hereinafter) 392, at 5-6 (¶ 6). See also Joint Exhibit (JE) 37.
[3] 29 U.S.C. § 381, *et seq.* (2000).

testimony was submitted, witnesses were presented and made available for full cross examination, and a verbatim transcript was made.

In the overall, the Fund claims that, notwithstanding a variety of legal maneuvers surrounding the organization and reorganization of CenTra-related companies, CenTra and the DIBC should remain liable for the withdrawal liability monies at issue.

One turns first to the contested gymnastics. The Fund accurately identifies the focal issue in this case as determining which employer has responsibility for the millions of dollars in unfunded vested benefits ("UVBs") attributable to the long-standing participation in the Fund of Central Cartage Inc. ("Central Cartage" or, occasionally "Cartage") and Central Transport, Inc. ("Central Transport" or "Transport"), two motor freight subsidiaries of CenTra, Inc. that merged into CenTra, effective December 31, 1995. Throughout this discussion, Central Cartage and Central Transport will be shorthanded, from time to time, as the "Old Subsidiaries" or the even shorter-handed, "Old Subs").

The pension contribution histories of the Old Subsidiaries form the basis for the assessment of withdrawal liability in the event the enterprise goes out of business or ceases its pension contributions. Relevant to this, as well, is the "controlled group" rule in 29 U.S.C. §1301(b)(1), which requires that all businesses under common control be treated as a single employer for withdrawal liability purposes.[4] Thus, even if Cartage and Transport closed, CenTra would be

---

[4] An "employer" subject to withdrawal liability is defined by ERISA §4001 (b) (1) to include all trades or businesses under common control as defined by tax regulations. Generally,

liable for withdrawal liability based on their contribution histories, assuming they remained in the CenTra controlled group at that time.

ERISA §4211, taken together with the Fund's Withdrawal Liability Rules, establishes a two-step process for determining liability. First, the withdrawing employer's share of the unfunded liabilities is calculated by dividing the last ten years of contribution made by the employee's controlled group, as of the withdrawal date, into the total contributions from all contributing employers during that same time. Then, the total unfunded vested benefits of the Fund as of the last full year prior to the withdrawal year is multiplied by the percentage gained from the first step.

In this case, the Fund looks to the contribution histories of Cartage and Transport for all years preceding 1996, as of November 23, 1999, the date it says CenTra should be seen as incurring the withdrawal liability.[5]  CenTra however, say it divested itself of any responsibility for the UVBs by means of a 1995 reorganization that worked as follows. CenTra (1) merged the Old Subsidiaries (and thus, their contribution histories), into Centra, then (2) simultaneously transferred the Old Subs' employees and some assets (and, thus, their

---

this means companies are under common control if at least 80% of each company is owned, directly or indirectly, by a parent holding company or by a group of five or fewer individuals. The result of the controlled group rule is that each company in an employer's controlled group is jointly and severally liable for the employer's withdrawal, regardless of whether that company itself ever contributed to the plan. A complete withdrawal generally does not occur until all contributing members of the employer's controlled group have dropped out of the multiemployer pension plan. At the time of a complete withdrawal, the employer's withdrawal liability is calculated based on the entire group's *pro rata* share of the plan's contribution base.

5 See PE 265

contribution histories) to a pair of New Subsidiaries. Finally, (3) Centra sold the New Subs (including the contribution histories) to a firm that ended up outside the Centra controlled group. As a result, when, in 1998, the Fund issued its Notice and Demand to CenTra for withdrawal liability payment[6] (a wholly-owned subsidiary had permanently ceased contributing), the Old Subs' contribution histories were long gone, it is claimed, and should not have been included in the calculations.

The Fund cries foul. It claims the 1995 reorganization was legally deficient for a number of reasons to be examined below. The critical contribution histories, it says, never made it out of the CenTra group, according to ERISA §§4618 and 4069(b). Even if they did, a major purpose behind these moves was to evade or avoid withdrawal liability and, as such, they violated ERISA §4212. ERISA requires, under that Section, that the reorganization be ignored. What follows is a more detailed description and discussion of the corporate changes at issue.

CenTra Inc. was formed in 1970 to exist as a holding company for Central Cartage, Central Transport, and GLS Lease Co.[7] Cartage performed local pick-up and delivery services in more than twenty cities in the Midwest, employing both local pick-up and delivery drivers and dockmen. Transport engaged in intercity line hauling functions as a common and contract carrier, utilizing "owner-operator" employees who owned their own tractors and leased them to the

---

[6] JE 37.
[7] Joint Stipulation of Facts, p. 2. The reference to this document will hereinafter be designated as "Facts".

company.  While these companies were independent entities, they worked together to provide shippers and consignees with door-to-door services.[8]

Dockmen and local drivers employed by Central Cartage, and the over-the-road drivers employed by Central Transport were represented by local unions affiliated with the Teamsters, and were covered by separate labor agreements negotiated between the companies and Teamster-affiliated local unions.  Central Transport and Central Cartage were signatory to participation agreements[9] with, and were contributing employers to, the Fund.

In 1979, Central Cartage purchased the Detroit International Bridge Company (DIBC) for about $30 million.  DIBC owns and operates the Ambassador Bridge, which links Detroit, Michigan with Windsor, Ontario.  DIBC, too, was signatory to a Central States participation agreement, dated April 1. 1993.[10]  Central Transport also wholly-owned a subsidiary, Crown Enterprises, a firm that owns and leases real estate.  Both DIBC and Crown were highly profitable enterprises.

Also relevant to the 1995 reorganization plan is the U.S. Truck Company, Inc. ("U.S. Truck"), a unionized sister corporation of CenTra purchased in 1982 by McKinlay Transport, Inc.  U.S. Truck, also (at the time) a member of the CenTra controlled group, was a contributor to the Fund.

---

[8] *Id.*
[9] See, e.g. JE 3, a participation agreement for Central Transport, Inc.
[10] JE 4.

Tufick (T. J.) Moroun originally took control of Central Cartage in 1946 [11] and later formed CenTra, Inc. Moroun had one son, Manuel (hereinafter, to avoid confusion, "Matty") and three daughters, Agnes Anne Moroun (Anne), Florence McBrian, and Victoria Baks.[12] Shortly after its purchase, U.S. Truck went into bankruptcy, emerging in 1985. In 1987, McKinlay merged into U.S. Truck. Thus, as of 1987, the various entities described above were organized as follows:



---

[11] Facts, p. 2.
[12] Facts, p. 4.

Beginning in the mid-1980's, as will be discussed below, CenTra began to explore possible reorganization plans that would include a merger of Central Transport and Central Cartage into CenTra.

In 1987, CenTra requested[13] and received[14] a favorable ruling from the Internal Revenue Service concerning a proposed corporate reorganization. As will be noted in detail below, it was some eight years before the reorganization was finally consummated.  In December of 1995, Fred Calderone, CenTra's Vice President-Corporate Planning, wrote to Price Waterhouse concerning the plan:

> Our plan involves a statutory merger of the existing Central Transport, Inc. ("Old Transport") and the existing Central Cartage Co., Inc. ("Old Cartage") into their mutual parent. CenTra, Inc. immediately after the merger, CenTra will drop down the operating assets and related liabilities of Old Transport into a new Central Transport, Inc. ("New Transport"). CenTra will also simultaneously drop down the operating assets and related liabilities of Old Cartage into a New Central Cartage, Co. ("New Cartage").  Shortly after New Transport and New Cartage are formed, Centra will sell all of its stock in these two corporations to U.S. Truck, Inc., a sister corporation. [15]

For purposes of completing this transaction, two new subsidiaries were formed -- Central Transport of Michigan, Inc. and Central Cartage of Michigan, Inc. (These companies will be referred to, from time to time, as "New Transport" and "New Cartage", respectively, as well as the "New Subsidiaries" or, occasionally, "New Subs").

---

[13] JE 14.
[14] JE 15.
[15] JE 16, December 19,1995 letter from Fred Calderone to Greg Fowler.



On December 26, 1995, the CenTra Board of Directors voted to merge Old Transport and Old Cartage into CenTra, effective December 31, 1995.[16] Thereafter, CenTra changed the names of the New Subsidiaries, (removing the "... of Michigan" extension) resulting in "Central Cartage Company" and "Central Transport, Inc.," which became direct subsidiaries of CenTra.[17]  Then, effective December 31, 1995, Old Transport and Old Cartage officially merged into their parent, CenTra.  Coincident with the merger, CenTra contributed ("dropped down") certain assets and liabilities that had traveled "upstream" from the Old

---

[16] JE 21.
[17] Facts, p. 10.

Subs.  According to a Duff & Phelps Valuation Report, "(i) terminal operations, including related personnel and fixed assets, became Central Cartage; [and] (ii) drivers and fixed assets related to the line haul operations became Central Transport." [18]

Thus did Old Central Cartage and Old Central Transport cease their existence.  As a result, DIBC and Crown Enterprises Inc. were converted into first tier subsidiaries of CenTra Inc.; the New Subsidiaries replaced the Old Subsidiaries on that same tier.  The organizational chart of the operation then looked like this:



After December 31, 1995, the New Subsidiaries continued contributing to the Fund, using the Old Subsidiaries' reporting numbers.[19]

---

[18] PE 5, at p. 2.
[19] See August 9, 1999 Affidavit of Peter Priede, Funds' group Mgr., ¶ 14.

The reorganization discussed above set the stage for the next series of transactions, whereby CenTra divested itself of the New Subs, selling the stock of Central Transport, on February 29, 1996, to U.S. Truck Company, Inc.[20]  On August 9, 1996, CenTra sold U.S. Truck the stock of Central Cartage.  Ten days later, Matty and Anne Moroun entered into an agreement designed to remove any common ownership of CenTra and U.S. Truck and, significant to this case, thereby removed U.S. Truck Company from CenTra's controlled group.[21]

After the stock sales, each of the New Subsidiaries shut down.  Central Transport ceased operations in March of 1997 and was merged into U.S. Truck in May of 1997.  In November of that year, U.S. Truck changed its name to U.S. Truck Company Holdings, Inc.  On or about December 31, 1997, Cartage was merged into U.S. Truck Holdings Inc. [22]

Bargaining unit employees at New Transport were offered jobs at a non-union CenTra subsidiary -- CC Midwest.  Employees who accepted the offer continued to do the same work as they had before.  However, CC Midwest had no collective bargaining agreement and, therefore, was not obligated to contribute

---

[20] See JE 27 and 28.
[21] Anne A. Maroun, owner and President of U.S. Truck Company stock, is the sister of Manuel J. Maroun, shareholder and President of CenTra.  By the 1996 Agreement, Anne Maroun reacquired all rights to U.S. Truck Co. shares that were, to that date, subject to an option agreement in favor of her brother.
[22] The Fund terminated U.S. Truck Company's participation, effective July 30, 1998.  U.S. Truck Co. Holdings Company and its subsidiaries filed for bankruptcy on December 23, 1999, prior to the closing of U.S. Truck Holdings Company's last two cartage operations.  Subsequent to these actions, the fund filed two claims for withdrawal liability in the U.S. Truck bankruptcy proceeding. (See JE 33 and 34.)

further to the Fund on the employees' behalf. U.S. Truck split New Cartage into some thirteen companies, some of which subsequently shut down.[23]

When the dust settled, CenTra retained only one business unit that still participated in the Fund-- the DIBC toll booth operations on the Ambassador Bridge. In November of 1997, DIBC's labor agreement expired. In the negotiations that followed for a successor agreement, DIBC and the local union agreed that, under a new CBA, effective for some three and a half years from November 1997, DIBC would continue contributing, but only until January 1 of 1998. After that time, the covered unit employees would be withdrawn from the Fund and covered under an alternative plan. That action was viewed by the Fund as violating its "split term" rule (employers must remain participants during the entire term of the CBA). As a result, the Fund, in 1998, retroactively terminated DIBC's participation, making it effective in 1997, and assessed withdrawal liability against CenTra's controlled group.[24] CenTra submitted a Request For Review Of Withdrawal Liability Demand on September 1, 1998[25] and the Fund Trustees responded by letter of December 22, 1998.[26] On February 10, 1999, CenTra filed the Demand For Arbitration that ultimately led to this case.[27]

---

[23] See Cummings Affidavit, ¶6, Pried Affidavit, ¶13.

[24] JE 37. Under ERISA §4001(b)(1), all businesses under "common control" with a contributing company are jointly and separately liable for the withdrawal; the amount of withdrawal liability is calculated with reference to the operations of all business units within a controlled group. *Robbins v. Pepsi Cola Metro Bottling Company*, 636 F. Supp. 641 (N.D. Ill. 1986)

[25] See JE 38.

[26] See JE 39.

[27] See JE 40.

There is no question the CenTra controlled group completely withdrew from the Fund at the point DIBC stopped contributing, (although the parties differ as to the proper date), and that withdrawal liability attaches. But the parties differ as to the Fund's calculations, including the question of whether the substantial contribution histories of the Old Subs remained in the CenTra group.

PETITIONERS' POSITION

CenTra claims the Fund Trustees erred by including the Old Subsidiaries' pre-merger required contributions as part of the basis for determining the CenTra group's *pro rata* share of the Fund's UVBs. CenTra maintains the December, 1995 reorganization fully complied with ERISA, which it says prevents changes in corporate form from triggering withdrawal liability that might otherwise attach in a case where an employer ceases to legally exist.

CenTra contends the contribution histories of Old Cartage and Transport traveled "upstream" to CenTra but, (and here is where they part ways with the Respondents), those same histories subsequently (immediately, they claim) traveled "downstream" to the New Subsidiaries. The New Subsidiaries, by means of these processes, says CenTra, became the legal "original employers" for withdrawal liability purposes. Later, when the new companies left the CenTra controlled group, they took the histories with them. If so, the Fund's assessment is overstated and should be set aside and re-calculated.

CenTra also says the Fund overstated the withdrawal liability (and exceeded its authority) by retroactively terminating DIBC's participation in the Fund, effective back to November of 1997. [28]  The triggering of withdrawal liability, claim the Petitioners, should be considered to have occurred when DIBC withdrew in January, 1998 (the date established by the collective bargaining agreement between DIBC and the Teamsters).  The assessment would be lower if the withdrawal date is determined to be 1998.[29]  If, as the Fund claims, DIBC and the union violated the split term rule, the Petitioners contend the Fund was, under the circumstances, obligated to give notice to the parties, together with reasonable time to cure the problem.  This, it is claimed, didn't happen.

Petitioners also assert the actuarial determination of Central States UVBs is incorrect because it undervalues the Fund's assets.  Involved in this contention is CenTra's claim that the Fund (1) wrongly excluded from its asset valuation a substantial account receivable from UPS and (2) erred by using one "smoothing" technique for determining withdrawal liability, but another for minimum funding requirements.  Specifically, it is claimed, the method used for determining minimum funding yielded a higher asset value than that used for withdrawal liability.[30]

---

[28] Petitioner's Post-Hearing Brief, p. 6.

[29] The choice of date has substantial economic consequences.  Allocable UVBs are calculated as of the end of the year preceding an employer's withdrawal.  1997 had been a good year for the Fund, thereby reducing the *pro rata* share of UVBS for which a withdrawing employer would be liable. It is of significant financial advantage to CenTra to claim 1998 as its trigger year and thus enjoy, by reducing its obligation, the Fund's 1997 relative prosperity.

[30] Petitioners' Post Hearing Brief,, p. 7.

FUND POSITION

The Fund says it properly included the Old Subsidiaries' 1987-1995 required contributions in computing CenTra's withdrawal liability. By becoming the successor to the Old Subsidiaries by means of the upstream merger, it says CenTra inherited all their assets and liabilities, including their pension contribution histories, for ERISA purposes. Contrary to CenTra's claim, the pre-merger required contributions did not travel to the New Subsidiaries. That result is compelled by reading §§4218 and 4069 in the context of generally accepted corporate law principles.

The Fund also contends, however, that even if ERISA §4218 should be read as allowing CenTra to transfer the Old Subsidiaries' contributions history, the calculations should be sustained on an alternative "evade or avoid" basis contemplated by ERISA §4212. Thus, even assuming the various 1995 and 1996 transactions resulted in sequestering the Old Subsidiaries' contribution histories from CenTra's ERISA controlled group, those moves should be disregarded because, say the Respondents, one of CenTra's principal purposes was to evade or avoid withdrawal liability.

CenTra was, at all times, concerned about withdrawal liability. It could not have "stumbled blindly across a complicated path that, in retrospect, just happened to shift that risk outside of CenTra ERISA controlled group. That claim surpasses credibility", argues the Fund.[31] Indeed, but for the withdrawal liability

---

[31] Fund Post-hearing brief pp. 49-50.

consideration, CenTra's unionized operations would have been liquidated.[32] Instead, CenTra engaged in precisely the kind of "opportunistic risk-shifting among contributing employers" that the federal pension statute's evade-or-avoid rules seek to erase.[33]

The New Subsidiaries were, by any measure, troubled companies at significant risk of failure. Central States claims CenTra sealed their fate by depriving the New Subsidiaries of the transportation contacts and customer relationships enjoyed by the Old Subsidiaries, reducing them to dependence on a single customer , Central Transport International, Inc. (CTII). [34]

"The most striking proof of an evasive purpose.", says the Fund, was the August 19, 1996 Settlement Agreement between Matty and Anne Moroun. That Agreement, to be described below, served to break the ERISA controlled group link between CenTra and the New Subsidiaries. According to the Fund, however, the Settlement Agreement is suspicious on a number of counts, and, in the overall, had no business purpose other than avoiding the withdrawal liability.[35] For all these reasons, the Fund contends the arbitrator should enter a final award affirming the Trustees' determination of Petitioners' withdrawal liability, as rendered  June 5, 1998.

ANALYSIS

---

[32] *Id,* pg. 53.
[33] *Id,* pg. 57.
[34] *Id,* pg. 62
[35] *Id.,* p. 63.

One turns first to the question of whether the 1995 reorganization passes muster under §§4218 and 4069(b).  Withdrawal from a pension plan occurs, and the financial liabilities attending such withdrawal attach, at the point an employer has no more obligation to contribute to the pension plan.[36] However, §4218 makes it clear certain changes in business form will not be considered withdrawals from a plan and will not, therefore, trigger withdrawal liability. Thus, there are situations where corporations will terminate their contribution obligations by changing their corporate form in circumstances whereby a successor company is considered the "original employer."  The relevant portion of the statute reads as follows:

SEC 4218. WITHDRAWAL NOT TO OCCUR MERELY BECAUSE OF CHANGE IN BUSINESS FORM OR SUSPENSION OF CONTRIBUTIONS DURING LABOR DISPUTE.

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because--

> (1) an employer ceases to exist by reason of--
>
>> (A)a change in corporate structure described in § 4069(b),  or
>>
>> (B)a change to an unincorporated form of business enterprise,
>
>> if the change causes no interruption in employer contributions or obligations to contribute under the plan, or
>
> (2) an employer suspends contributions under the plan during a labor dispute involving its employees.

---

[36] ERISA §4209, 29 U.S.C. § 1383 (2000) .

> For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.[37]

As stated, the law recognizes an employer will not be considered to have withdrawn if it "ceases to exist" (more about this phrase later) by reason of, among other things, "a change in corporate structure described in §4069(b)" so long as the change "causes no interruption in employer contributions or obligations to contribute under the plan...." Assuming those standards are met, the entity resulting from such structural change "shall be considered the original employer."

Section 4069, referenced above, describes the types of reorganizations that qualify for §4218 treatment:

> ...(b) Effect of Corporate Reorganization. - For purposes of this subtitle, the following rules apply in the case of certain corporate reorganizations:
>
> (1) Change of identity, form, etc. - If a person ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the person to whom this subtitle applies.
>
> (2) If a person ceases to exist by reason of liquidation into a parent corporation, the parent corporation shall be treated as the person to whom this subtitle applies.
>
> (3) Merger, consolidation, or division. - If a person ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies.[38]

---

[37] 29 U.S.C. §1398.
[38] 29 U.S.C. §1369.

Section 4069(b), incorporated by reference in §4218, lists some changes that are apparently of a limited nature ("mere" changes in identity, form or place) and some that are of a broader scope ("merger, consolidation, or division"). Subsection (b)(3), "Merger, consolidation or division" is central to this portion of the parties' legal dispute.

CenTra says the reorganization of December 31, 1995 was intended to, and did, transfer all responsibilities for the pension contribution histories of the Old Subsidiaries, (Central Cartage and Central Transport), to the New Subsidiaries, (Central Cartage of Michigan, Inc., and Central Transport of Michigan, Inc.) by a flurry of instantaneous maneuvers that accomplished, simultaneously, the following events: (1) Old Subs merged with the CenTra holding company. Much of Old Subs' assets were divided among CenTra and the New Subs. (2) Trucking operations were turned over to the New Subs together with the Old Subs' collective bargaining agreements ("CBAs"). As a result, there was, in fact, no interruption in either actual contributions to the Fund or in the obligation to contribute. Moreover, at no time during this reorganization were any assets removed from the CenTra controlled group. This process of upstream "merger" and downstream "division", says CenTra, was in strict compliance with the terms of §4069(b)(3). And, by this mechanism, the contribution histories of the Old Subs traveled to the New Subs.

At its core, then, the dispute in this case is over the question of where the contribution histories ended up. There is no question they left the Old

Subsidiaries and traveled to CenTra by means of the merger. The question is whether they stayed there. The Fund says CenTra inherited the contribution histories the way a corporation inherits any other liabilities and, being in existence at the time withdrawal actually occurred, it should stand behind those obligations. It claims that common law principles require the conclusion that, after the Old Subs' upstream merger into CenTra, CenTra became, and remains, the surviving corporate entity.

The standard of review is established by statute. ERISA §4221(a)(3)(A)[39], provides that the arbitrator has jurisdiction to review the Fund's liability determination, stating that "[A]ny determination made by the plan's sponsor ... is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was reasonable or clearly erroneous." As will be noted, the finding here is not that the Fund erred in its factual assumptions; rather, one differs with the conclusions it drew.

The Fund says CenTra discovered a ruse to allow it to avoid paying its otherwise *pro rata* share of the UVBs that would be allocable to the premerger Central Transport and Central Cartage. Through careful corporate maneuvers, says the Fund, CenTra has been able to offload its share of the allocation fraction to other employers by the "simple expedient of reshuffling its corporate deck a little bit."[40] In the process, it is claimed, the Company took Old Subsidiaries that

---

[39] 29 U.S.C. Section 1401 (a) (3) (A) (2000).
[40] Tr., pg. 115.

were hemorrhaging cash, stripped them of their holdings in truly profitable enterprises (The Detroit International Bridge and Crown Enterprises), eliminated valuable receivables, and ultimately endowed New Subsidiaries with minimum assets, selling them to U.S. Truck, which later shut down the New Subs and ultimately declared bankruptcy.

These are complex and remarkable transactions, worthy of careful scrutiny under those provisions of ERISA dealing with the intent to evade or avoid. Sections 4218 and 4069, however, say nothing about dodging obligations under the statute, nor do they discuss limitations on diminution of assets or establish tests as to whether the result of the reorganization will leave a successor financially solvent. To be sure, companies are not free to run from their statutory funding obligations. Section 4212 establishes that, if "a principal purpose" of restructuring is to evade liability,(and this, clearly, is where the broader inquiries are appropriate), then the restructuring will be effectively ignored in terms of assessing and imposing withdrawal liability.[41] That inquiry, which examines the intent behind the maneuvers, is reserved for review under §4212, to be discussed below.

The immediate question is whether, as Central States contends, §4218, read in the context of general corporate law tenets, dictates that CenTra itself, not the New Subsidiaries, should be viewed as the successor to the Old Subsidiaries.

---

[41] 29 U.S.C.S § 1392- Obligation to contribute-states, in relevant part: "(c) transactions to evade or avoid liability. If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."

For the following reasons, the finding is that the Fund's reliance on corporate law is not compelling; application of those principles is, at best, an imprecise fit. ERISA, which preempts such law in this inquiry,[42] requires the conclusion that the New Subsidiaries did, in fact, inherit the contribution histories of the Old Subsidiaries.

ACCRUAL OF LIABILITY

In substantial part, Central States' case is premised on the theory that, at all times prior to the reorganization, the Old Subs were accruing withdrawal liabilities, and that these accruals never left the CenTra controlled group. CenTra, as the surviving corporation, should be seen as receiving all the liabilities of the merged corporations, along with their assets, it is claimed.[43] The evidence and arguments in this case, however, fail to persuade one that contribution histories are, or should be, treated as liabilities.

Withdrawal liability attaches when there is a withdrawal event. Before that, there is no liability to be carried either as a liability on the

---

[42] ERISA §514(a), 29 U.S.C. §1144(a), specifies that "except as provided in subsection (b) of this section, the provisions of this Title and Title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in Section 4 (a) and not exempt under Section 4 (b).

[43] In support of this principle, Central States cites *Chauveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424-25 (7th Cir. 1993); *Truck Drivers Union v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). This includes contingent liabilities. *Ryan v. Tad's Enterprises, Inc.*, 709 A. 2d 682, 697 (Court of Chancery, Del. 1996). In this way, the merged firm is treated as "a continuation of its predecessor." *Central States Pension Fund v. Central Cartage Co.*, 69 F.3d at 1315.

employer's books or as an asset by the Fund.[44] The MPPAA statute says as much in its definition of withdrawal liability: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, *then* the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."[45] One may accept the Fund's claim that assignment to a transferee corporation of some liabilities of a transferor will not let the assignor off the hook.[46] But that does not devitalize the reality that the withdrawal liability obligation under ERISA does not arise until a withdrawal event. There simply has been no showing that such obligation accrues before that.[47]

---

[44] See Tr. 1931: 20-1932: 5 (Testimony of Mark Angerame) and Tr. 1925: 8-1926-12. Fred Lorenz testifies there was no entry on the Central Transport balance sheet at the time of reorganization for withdrawal liability. "It is simply not an accounting obligation at all," he testified. "It is not fixed or determinable at this date." Tr. III, p.481. See also PE 43.

See *Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 310 (5th Cir. 1988) wherein the Court stated "If we construe [29 U.S.C. Section 1381 (a)] according to its most natural reading, then we must conclude that withdrawal liability does not exist until an employer actually withdraws from a multiemployer pension plan.") See also *Teamsters Pension Trust Fund v. Cent. Michigan Trucking, Inc.,* 857 F.2d 1107 (6th Cir. 1988); *Teamsters Pension Trust Fund v. Headley's Express & Storage Co.,* No. 92-5688, 1993 U. S. Dist. LEXIS 7245, at *13-16 (E.D. Pa. June 3, 1993); *Teamsters Pension Trust Fund v. Federal Express Corp.,* Civ. Act. Nos. 86-304, et al. 1995 U.S. Dist LEXIS 19980, at *22-26 (D. Del. Dec. 27, 1995.)

[45] 29 U.S.C.§1381(a). (Emphasis added.) See *Trustees of Teamsters Pension Trust Fund of Philadelphia v. Federal Express Corp.,* 1995 U.S. Dist. LEXIS 19980 (1995).

[46] Fund Post-hearing Brief, p.26, citing *Chaveriat v. Williams Pipeline Company,* 11 F.3d at 1424-25.

[47]*Central States Pension Fund v. Central Cartage Company,* 69 F.3d, 1312 (7th Cir. 1995,) cited by the Fund, requires no contrary conclusion. There, the Court held that pre-merger contribution obligations of a predecessor company would continue. But that case involves a question of whether an employer was required to make pension and welfare contributions for a certain class of drivers. Withdrawal liability, as distinguished from contribution obligations, was not at issue. For the same reason, the Fund's citation of *Central States Pension Fund v. Central Cartage Co.,* 1998 WL 270889, is inapposite, involving, as it did, delinquent pension contributions, not withdrawal liabilities. Section 1392- Obligation to contribute – defines the obligation (1) as arising under one or more collective bargaining agreements and (2) as not including obligations to pay withdrawal liability or delinquent contributions. This adds weight to CenTra's argument that the contribution history should

The Fund also contends that, because there was no "substantial

identity" between the Old and the New Subsidiaries, CenTra cannot avoid

the conclusion that, despite its efforts to transport the contribution histories

between the entities, they stalled at CenTra, failing to complete the journey.

Here, too, "substantial identity" is not a requirement that appears in

§4218.[48] That Section says nothing about requiring a successor corporation

---

not be considered a liability, since those histories only reflect the obligation to contribute,
without regard to any questions of ultimate withdrawal liability.

[48] There is, in evidence, a PBGC advisory opinion -- PBGC Op. Letter 83-18 (August 5, 1983),
*available at* 1983 PBGC LEXIS 7, which, it is true, speaks of a "substantial identity" between a
predecessor and successor employer. But that involved a change in corporate form from a sole
proprietorship to a corporation, a change covered by §4069 (b) (1) which, as indicated above,
speaks to a *mere* change in identity, form or place of organization." (Italics added) The PBGC
opinion may well have been using the "substantial identity" reference to highlight the restricted
nature of the change. But, as indicated above, that restrictive adjective appears nowhere else in
the statutory subsections that deal with, among other things, mergers or divisions. Nor is it clear
or even suggested, in the letter, that "substantial identity" requires a substantial economic
identity. In that letter, the General Counsel stated, in referring to § 4062 (d) (1) (*not* 4062 (d)
(3)):

> If an employer ceases to exist by reason of a reorganization which involves a mere change
> in identity, form, or place or organization, however effected, a successor corporation
> resulting from such reorganization shall be treated as the employer to whom this Section
> applies.
> It is our view that when there is no interruption in employer contributions or the
> obligation to contribute, incorporation of a previously unincorporated employer (e.g., a
> sole proprietorship or a partnership) may constitute a covered reorganization if there is
> substantial identity between the predecessor and the successor employers. But see
> Section 4212(c) or ERISA. A dispute over such a determination regarding the occurrence
> of a withdrawal would be subject to the arbitration provision of Title IV.

> Read in its entirety, the Letter clearly uses the concept of "substantial identity" in the
> context of the limited change referenced in §4062(d)(1).

In its Memorandum on Substantial Identity and ERISA §4218, the Fund also directs the
arbitrator's attention to *Park South Hotel Corp. v. New York Hotel Trades Council.*, 851 F.2d 578
(2d Cir. 1988) The Fund says:

> ERISA §4218 is intended to deal with "mere changes in the form or structure of an
> employer that do not alter the employer's basic relationship with, participation in , or
> obligation to, the plan or change to nature of the employer's operations (Citing *Park
> South Hotel.*)

to have any "substantial identity" to its predecessor. Indeed, §4069 posits,
in subsection (b)(1), a reorganization characterized by a "mere" change in
identity, form or location as distinguished from subsection (b)(3), which
speaks, simply, of a "merger, consolidation, or division". Arguably, then,
this part of the statute not only does not restrict changes to those involving
"substantial identity", it accommodates more complex modifications such as
those at issue here.

The Fund claims there is no analytical path that can lead to the New Subs
being treated as stand-ins for the Old Subs. It acknowledges that the Old Subs
"ceased to exist" as a result of the 1995 reorganization. But that, it argues,
occurred solely because of the upstream merger, not by any of the events
described in §4218(1)(A) or §4069(b).[49] Accordingly, the only successor
corporation "resulting from any change" was CenTra itself.[50] The asset drop
down (to the New Subs) cannot be considered the type of "division" contemplated
by §§4218 and 4069. That term, argues the Fund, is commonly understood
to mean a "spin-off, "split-up" or "split-off" transaction by which shareholders of
a parent corporation receive a distribution of stock of subsidiaries.[51] The term,

---

The quoted section, however, is dicta (the Court noted that the statutory provision did not
directly cover the case it was adjudicating) and the discussion centered around a fact
situation involving two essentially similar predecessor and successor entities. Surely, one
cannot read the case as supporting the proposition that §4218 is intended to deal only
with these kinds of restricted changes. Nor, therefore, can one conclude that the plain
language of ERISA, §4218 confirms that the Old subsidiaries pre-1996 required
contributions stay with CenTra as a result of the Upstream Merger."

[49] Fund Post-hearing Brief, p.30.

[50] *Id.*

[51] *Id.*, at 31 *et seq.*, citing *Redding v. Commissioner*, 630 F.2d 1169, 1173 (7th Cir. 1980).

was intended to be applied in its technical context as utilized in §§ 55 and 368 of the Internal Revenue Code.

However, there is no reference in the ERISA statute that leads to the conclusion that "division" was intended as a term of art designed to conjure up state corporate or federal tax law. It is, as Judge Easterbrook has noted,[52] an "undefined term." But it is by no means a stretch to find it reasonably applicable to the current case, which involved transfer of trucking assets "down" to new entities simultaneous to the merger up. There is merit, too, to CenTra's contention that the sale of the new entities stock to U.S. Truck was a division causing the contribution histories to pass under §4218.[53]

In the overall, the question as to how far the contribution histories traveled is best resolved by stepping back and viewing the 1995 reorganization in its entirety. The arcane legal maneuvers of that day in December, 1995 ended the existence of the Old Subsidiaries and created new corporations that had the same ownership, management, covered personnel, name, equipment and customers. The Fund argues CenTra did not "cease to exist"; it was in business at the time of the withdrawal event. But CenTra was not, in terms of §4218, the "employer"

---

[52] *Central States v. The Sherwin Williams Co., 71 F.3d 1338(1995.)*

[53] "Section 1369(b)(3) deals only with corporate "division", wrote Judge Easterbrook (see n.52, *supra*), "and although "division" is an undefined term the sale of a subsidiary's stock is a form of corporate "division."

See also *Teamsters Pension Trust Fund of Phila. v. Central Michigan Trucking, Inc.,*857 F.2d 1107(1988), where the Sixth Circuit observed: "MPPAA expressly incorporates the Internal Revenue Code's control-group provisions only to the extent they define a control group of corporations. 29 U.S.C.§1301(b)(1). If Congress had intended to engraft onto the pension statute the tax provisions regarding successorship following the termination of common control, it could have expressly done so. (At 1111.) Here, too, if the legislative drafters had intended the term "division" to be controlled by, or limited to, corporate tax concepts, they could readily have so provided.

referred to therein. CenTra at no time conducted any trucking operations, made contributions or assumed any obligations to contribute under the governing documents that create those obligations -- the collective bargaining agreements.[54]

Those responsibilities, governed by those documents, were assumed by the Old Subsidiaries immediately prior to the reorganization and by the New Subsidiaries immediately following it. It suffices for purposes of this examination to note that the requisites of §4218 were met: The Old Subsidiaries ceased to exist and the reorganization caused no interruption in employer contributions or the obligation to contribute under the Cartage and Transport CBAs.

The Fund suggests that, because §4069(b)(3) refers to "the successor corporation *or corporations*", the contribution histories should be allocated among surviving companies, even if the §4218 transaction are to be upheld. It would allocate all pre-1996 history to CenTra and post-1996 to the New Subs. This, however, is antithetical to the essence of §4218, which requires that a successor corporation that jumped through the statutory hoops of that provision "shall be considered the original employer." The New Subsidiaries, therefore, were properly considered the "original employer" under §4218 and they thereby inherited the Old Subsidiaries' contribution histories.

SECTION 4212-EVADE OR AVOID

---

[54] New Participation Agreements were not necessary. The obligation to contribute to an ERISA plan stems from the CBA. The lack of such agreement was in no way fatal to continuation of the contribution obligations.

Even concluding, as one does, that the reorganization transactions discussed above satisfied §4218, one may disregard the reorganization if, in terms of §4212, "a principal purpose" was to evade or avoid withdrawal liability. The statute says, in relevant part:

> ...If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

The parties differ as to whether this alternative determination is properly before the arbitrator. Petitioners argue this claim was an afterthought neither reflected in the original assessments served on them nor serving as a basis for the assessment. That being the case, it contends, the issue cannot properly be before the arbitrator.

For the reasons to be discussed below, the finding is that the evidence does not sustain an "evade or avoid" purpose. The arbitrator deems it appropriate, in this particular case, to discuss the rationale underlying that conclusion. One need not, and therefore does not, address the procedural arbitrability issue.

Noting that parties are held to have intended the natural and probable consequences of their actions,[55] the Fund argues that one of the most significant such consequences of the 1995-1996 transactions was "avoidance by CenTra of a huge withdrawal liability problem that it knew to be imminent."[56] From this, the

---

[55] Citing *U.S. v. Irwin*, 149 F.3rd 565, 572 (7th Cir.1998).
[56] Respondent's Post-Hearing Brief, p.50.

Fund concludes "CenTra and its owners intended the consequences that Petitioners now so vigorously argue they achieved."[57].

The time consuming and costly legal and logistical maneuvering in this case was bound, in the best of circumstances, to raise eyebrows and inspire confrontation from some corner. Given that the acknowledged goal of these gymnastics is generally to mitigate or avoid *something,* (taxes, control problems, etc.) there is ample reason to conjecture that avoidance of substantial withdrawal fees might be high on that list. The question recognized by the statutes' terms ("a principal purpose") is: How high on that list? Where, as here, these parties have had a markedly antagonistic relationship over the years, and where both are fully capable and willing to play the hardest of hardball with each other, it is appropriate to scrutinize the transaction very carefully.

As noted earlier, the ERISA statutory scheme seeks to prevent shell games by specifying, in §4212 (c) that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."[58]  As worded, an intent to evade or avoid need not be the exclusive, or even the single primary purpose.  It suffices that such evasion be found to be *one* of the principal purposes.[59]  The 7th Circuit Court of Appeals, in *Santa Fe Pacific Corporation v. Central States Southeast and Southwest Areas Pension Fund*[60] provided

---

[57]  *Id.*
[58]  29 U.S.C. § 1392 (c).
[59]  See *Santa Fe Pacific Corp v. Central States Pension Fund,* 22 F.3d at 727.
[60]  22 F.3rd 725 (1994)

meaningful guidance concerning standards at issue in the "evade and avoid" context. "The imposition of withdrawal liability," said the Court, "in a sale of business situation requires only that a principal purpose of the sale be to escape withdrawal liability."[61] Writing for the Court, Judge Posner continued:

> It needn't be the only purpose; it need only have been one of the factors that weighed heavily in the seller's thinking. We can find no decisions discussing situations in which there is more than one principal (major, weighty, salient, important) purpose, but we would be doing violence to the language and the purpose of the statute if we read "a principal" as "the principal." The clear import of "a principal" is to let the employer off the hook even if one of his purposes was to beat withdrawal liability, provided however that it was a minor, subordinate purpose, as distinct from a major purpose. To let the employer off even if avoiding such liability was a major purpose would ill serve the statute's goal of preventing one employer from unloading his pension obligations onto the other employers in a multiemployer plan.[62]

In that case, the Santa Fe Company, wishing to divest itself of a trucking subsidiary, the Santa Fe Trails Transportation Company (SSTT), opted to do so by way of a stock, rather than an asset, sale. An asset sale would have generated more money. A stock sale, on the other hand, would have enabled the company to avoid millions of dollars in withdrawal liability. Thus, notwithstanding the sale of assets would have brought the higher price, the company engaged in the stock sale. Said the Court:

> In this situation the inference that withdrawal liability figured heavily in the company's decision to sell the stock is well-nigh irresistible. Obviously a purpose for the sale of stock is "principal" if, were it absent, the sale would not have taken place. It follows that a principal purpose of the sale of SFTT's stock must have been to avoid withdrawal liability unless, somehow, the other considerations favoring a sale of stock over a sale of assets were so compelling that they reduced the avoidance of withdrawal

---

[61] *Id.* at 727.
[62] *Id.*

> liability to a minor consideration because the sale of stock would have taken place even if the MPPAA had never been passed. Certainly if SFTT had had much greater value as a going concern than on the auction block, and if a sale of stock as in a leveraged buyout was a much more feasible method of preserving the subsidiary as an intact concern than a cash sale of the assets or a merger (which is a form of asset acquisition), it might be reasonable to infer that withdrawal liability was only a minor factor in Santa Fe's thinking. But on the contrary, the subsidiary was worth considerably more as a conglomeration of assets than as a going concern.[63]

In that case, the Court observed the purpose for the stock sale could reasonably (indeed, "obviously") be considered "principal" if, in the absence of the withdrawal liability issue, the sale would not have taken place. That conclusion, the Court observed, was unavoidable unless other considerations surrounding the stock sale option were so compelling as to reduce the pension withdrawal liability to a "minor consideration." The Court hypothesized that if SFTT had been worth more as a going concern than as a collection of saleable assets and if, therefore, a stock sale, which could preserve the firm intact, was resorted to, one might regard that withdrawal liability as only a "minor factor" in the decision making process. But, the Court found SFTT was worth considerably more as a "conglomeration of assets than as a going concern."[64] The conclusion, therefore, that withdrawal liability "figure[d] heavily" in the decision to sell the stock was "irresistible".[65]

This is a useful approach in the current case since, as will be apparent, there can be no question CenTra had reasons independent of withdrawal liability

---

[63] *Id.*, p.729
[64] *Id.*
[65] *Id.* At 727

to engage in the 1995 reorganization. [66] The critical question remains whether, even acknowledging the existence of some other reasons, avoiding withdrawal liability was among them as "*a principal*" motivating purpose. It is with these precepts in mind that one evaluates the testimony and evidence surrounding CenTra's decision making process.

CenTra was well aware Old Transport and Old Cartage were, in 1995, unprofitable and costing CenTra millions each year to stay afloat. CenTra, the Fund says, was looking for ways to divest itself of these companies, while retaining the valuable assets, including DIBC, Crown enterprises, and certain trucking-related assets, for itself. This, they did as part of the reorganization. But, says the Fund, CenTra did not complete the liquidation, the transfer of assets, and the shutdown of the two facilities, while it still owned those companies because, it is claimed, to do so would have caused CenTra to trigger the withdrawal liabilities. Thus, after stripping the New Subs of major assets, CenTra sold them to a sister company, U.S. Truck, (owned by Matty's sister, Anne) under suspicious circumstances. Then, on August 19, 1996, Matty Moroun surrendered any remaining interest in the stock of U.S. Truck to Anne, in a

---

[66] In the context of the *Santa Fe* case, the 7th Circuit deemed the question of whether such independent reasons existed as "irrelevant." Most of the arbitrator's opinion in that case was, in the Court's words, devoted to irrelevant questions, such as whether Santa Fe had reasons independent of withdrawal liability to divest itself of SFTT and whether it knew that the purchaser of SFTT was likely to flop." Said the Court:

> The issue is not whether Santa Fe had compelling reasons independent of withdrawal liability to divest itself of SFTT; that is a given. The issue is the form the divestiture took--a sale of stock rather than of assets. The statutory criterion is not whether the transaction is a sham, having no purpose other than to defeat the goals of the Multiemployer Pension Plan Amendments Act by leaving the other employers in the multiemployer pension plan holding the bag. It is whether the avoidance of withdrawal liability by the seller (not necessarily by the purchaser as well) is one of the principal purposes of the transaction. (*Id.*, p.729-730)

Settlement Agreement that served to split off U.S. Truck (together with its New Subsidiaries), away from the CenTra controlled group and into a separate withdrawal liability group.[67] In this manner, CenTra sought to insulate itself from any ERISA withdrawal liability. The price for the companies, $250,000 each, was not a reasonable reflection of a "going concern"[68] and, in the overall, the New Subsidiaries were, essentially, set up to fail.

The Fund also points to continuing entangling alliances between CenTra and U.S. Truck: Anne Moroun, U.S. Truck's owner, was also an officer of CenTra, and her employment contract[69] with CenTra supposedly prevented her from operating a trucking company in competition with CenTra. U.S. Truck and Anne Moroun, it contends, were never really independent of CenTra.

Underlying CenTra's purported justification for selling the new subsidiaries to U.S. Truck was the hope the Teamsters would grant wage concessions to the New Subsidiaries. But this, says the Fund, was never going to happen, and CenTra knew it. Thus, the New Subs were at significant risk of failure both before and after the sale; the transportation contracts and customer relationships that were part of Old Subsidiaries were retained by CenTra and the New Subsidiaries were reliant on a single customer, Central Transport

---

[67] The Settlement Agreement which severed the controlled group relationship between CenTra and US Truck, is a relatively vague instrument. Some of the issues purportedly settled therein (a supermajority requirement, for example), had been rescinded earlier. But the document did serve to, in its terms, to "terminate any interest in U.S. Truck shares held by MJM in favor of AAM and recognized her claim to be the controlling shareholder of U.S. Truck." PE 276.
[68] Fund opening statement, p 15.
[69] In 1995, Anne Maroun requested, and received, an employment agreement with CenTra, as Vice President of the company, for which she received an annual salary of $300,000.

International, Inc. ("CTII"), a new firm formed to oversee all LTL (Less-Than-

Truckload) operations within CenTra. The Fund sums it up as follows:

> Therefore, by means of the "reorganization" (and specifically the sales in
> U.S. Truck and the breach of the controlled group relationship between
> CenTra and U.S. Truck), CenTra shifted the obvious and significant risk
> that the New Subsidiaries might encounter a business failure (and thereby
> cause CenTra itself to incur withdrawal liability). Under the new
> ownership structure created by CenTra (at least under CenTra's
> interpretation of the legal consequences of the "reorganization" as a
> whole), CenTra could completely escape the withdrawal liability that
> would result if the fledgling New Subsidiaries failed - as they ultimately
> did shortly after the stock sales and CenTra's exit from the New
> Subsidiaries' controlled group.[70]

Surely, there is cause for concern. CenTra cannot propose, with a straight

face, that it was unaware of the potential withdrawal liability impact of

restructuring and financial shuffling that left the withdrawal risk outside

CenTra's ERISA controlled group. There has been too much history, too much

withdrawal litigation[71] and abundant bad blood between these parties to accept

that conclusion. Indeed, in June of 1995, the Fund voiced its concern that CenTra

was engaging in "adverse selection" – shunting off new hires to its non-union

operations and thereby depriving the Fund of new income. It is a practice that

can lead to cutting off an employer's participation rights, which would, in turn,

lead to a withdrawal liability problem. CenTra was well aware of this challenge in

1995, and the Fund claims it meaningfully influenced its decision to reorganize.

---

[70] Fund Pre-hearing Brief, p. 17.
[71] See PE 281, concerning a $72 million assessment levied on the Mason-Dixon Co., a CenTra
firm, in the 1980's

The Fund's concerns are not frivolous. Neither, however, have they been proven by the record in this case, for the reasons that follow. The circumstances surrounding CenTra, involving real and substantial business pressures and palpable family greed, distrust and litigation present a viable scenario that ultimately compels the conclusion the reorganization would have occurred even in the absence of withdrawal liability concerns.

CenTra faced a series of very real problems. Significantly, they were matters that could realistically be dealt with through reorganization. Reorganization, according to the record, was not a new idea. It had surfaced as early as the mid- to late 80's. Testifying for the company, Fred Calderone[72] described the variety of issues confronting CenTra. Deregulation, which became a factor by way of the 1980 Motor Carrier Act, increased competition in dramatic and often devastating fashion.[73] CenTra was profitable during the mid 80's, but the seismic changes[74] of deregulation changed that, and it responded with a number of approaches, including attempting to renegotiate its labor contracts with the Teamsters Union. CenTra had begun non-union operations in the early

---

[72] Vice President of Corporate Planning with CenTra, Calderone started with the company in 1984. (Tr. II, p.425)

[73] Cartage and Transport were working with full scale union contracts, but competing with many "white paper" agreements that permitted lower wage scales. In the first 12 years following deregulation, some 50% of Class I carriers had stopped doing business. (PE 191.) 132 general motor freight carriers under the National Master Freight Agreement had terminated their operations. This accounted for some 47% of all workers employed by all Class I & II I.C.C regulated general freight carriers

[74] This is Judge Posner's adjective. See 22 F.3d 725, at 728.

80's[75], using independent contractors and, over time, it expanded those non-

union enterprises.[76] Predictably, this was vigorously opposed by the Teamsters.

Thomas Christ, Vice President of Corporate Development for CenTra,

described deregulation, at the state level, as having had a "massive negative

effect"[77] on Cartage and Transport.[78] By 1992, according to the testimony,

CenTra began to open nonunion subsidiaries. Other trucking firms were taking

similar routes and, in response, the Teamsters Union took action to combat this

double breasting. The 94-98 National Master Freight Agreement, for example,

contained language in Appendix A that made relief from standard union rates

available, but only to firms that promised no double breasting.[79] Splitting off the

companies to a separate, fully unionized operation would help ease that problem.

Insurance was also an issue; Cartage, at the time, owned DIBC, a valuable

asset that was, by virtue of its relationship to Cartage, at risk in the event of an

---

[75] Tr. II, p. 281. Calderone recalls that CenTra had started a non-union firm, AmCan, as early as 1982 or '83, utilizing independent contractors.

[76] Id, at 282.

[77] Tr. X, p. 1972.

[78] State deregulation, which hit the trucking company hardest, came into effect in December of 1994, effective January of 1995. Through a variety of "white papers" (special negotiated arrangements) as well as application of the addendums to the NMFA, Union Carriers were succeeding in negotiating rates below the National Master Freight agreement standards. As a result, Christ participated in the negotiation of a Letter of Understanding between the Teamster National Freight Industry Negotiating Committee (TNFINC), Mason Dixon Trucking lines (a CenTra company) and U.S. Truck company. By the terms of this agreement, U.S. Truck would purchase Mason Dixon's assets, the Mason Dixon employees would be transferred to US Truck and those workers would qualify for coverage under the more favorable Truckload and Steel Supplement. Significantly, the agreement also provided that future employees who arrived at U.S. Truck "either by new hire, transfer, or acquisition" would be entitled to the terms of the more favorable contract. It turns out, however, when Transport was sold to US Truck, following the reorganization, and Kirk Cummings attempted to bring them in under the agreement, the Teamsters balked, contending that a "change of operations" clause and its related procedures would have to be implemented. See n.120, *infra*.

[79] See testimony of Thomas Christ, Tr. X, pp. 2000 et seq. Article 32 of the NMFA was anti-subcontracting language that also served as work preservation language.

accident at Cartage. Moreover, says Matty Moroun, the wealthy bridge and real estate operations were viewed by the Union, during negotiations, as deep pocket supporters of the struggling Old Subs. The split off would help quell that perception, as well.

In 1986, a corporate reorganization plan was discussed with the Moroun sisters and submitted for their approval. The plan involved spinning off Cartage and Transport as separate Subchapter S corporations that would be owned by CenTra family shareholders.[80] Calderone describes the benefits as including tax minimization, cost control of liability insurance, protection of DIBC from truck-related liability risks, more advantageous financing, the addressing of Canadian concerns over ownership by a trucking company of Canada's part of the bridge, as well as estate planning for certain shareholders.[81]

Anne Moroun responded in a 1986 letter, noting general agreement among the sisters that this was a "good business move." [82] She also shared some concerns, including protection against IRS deficiencies, but, in a foreshadowing of things to come, she voiced the sisters' fears that Matty might "wish the entire company" and told him they had "spoken to a gentleman who is a well respected attorney."

In 1987, the reorganization plan was submitted for, and received a favorable private letter ruling from the IRS.[83] In January of 1989, Matty wrote

---

[80] Tr. II, p.285 *et seq.*
[81] *Id.*, p. 281-285.
[82] PE 750.
[83] JE 15.

his sisters, again addressing the spin off of Old Cartage and Old Transport from
CenTra, the recapitalizing of Cartage and the election by Transport of Subchapter
S status.[84] The memo reiterated, briefly, the reasons for the transaction --
reduction of insurance costs and "other liability reasons."[85] But this plan was
fiercely resisted by Matty's sisters. In response to Moroun's request that he be
advised as soon as possible if the plan was of interest, the sisters retained counsel
who, in a letter of February 2, 1989[86] told Moroun, in no uncertain terms, that
they "have not approved and will not approve any plans regarding any
restructuring of the Company's interest or assets, any shuffling of those assets,
the creation or merger of any subsidiaries or any other similar actions until such
time as they have had an opportunity to learn of and consider the plans and the
ramifications of the plans and to approve the plans...."[87]     That letter was,
according to Calderone, representative of the stalemate the family had reached,
one that preceded substantial litigation. Anne testifies to the plan's having been
welcome to her, at least, but greeted with skepticism by her sisters.

> "A trucking company should not own a bridge. And we were being
> cremated [sic] with all the taxes in each state. The real estate became a
> problem. Insurance was out of this world. So, Matty and I talked. We
> knew we had to have reorganization. My sisters were against it simply

---

[84] In addition to other benefits, the 1986 Tax Reform Act made it increasingly desirable to be an S,
instead of a C, corporation. That could not happen, however, with the attached subsidiaries,
Calderone testified. Each company had to be owned directly; that, too, added to the luster of
spinning them off. (Tr. II, p. 301.)

[85] The operations of Central Cartage and Central Transport will be spun-off from CenTra, Inc.
into two separate corporations owned by each of us in the same proportions in which we currently
own our common stock of CenTra. This portion of the plan was the subject of an IRS ruling. The
purposes for this transaction include a significant reduction in the company's insurance costs and
other liability reason. (PE 751.)

[86] PE 743.

[87] Id, p. 2.

because the unknown's going to frighten anyone I think, and they thought they might get short shrift."[88]

The retention of the outside attorney led to extraordinary divisiveness and litigation within the family. As related by Anne, her two sisters were working to liquidate their interest in the company[89].

In 1990, the sisters' attorney drafted an attack plan designed to enable the sisters to liquidate CenTra.[90] Contributing substantially to the intra-family warfare was a 1970 Stock Restriction Agreement (SRA) executed in large part because Matty was in ill health at the time and his sisters were concerned that a marriage by him might cause the loss of family ownership and control of the business. The Agreement allotted a right of first refusal on the part of the company in the event of a voluntary sale or death of a stockholder. If the company chose not to exercise its options, other family members had the right to purchase the shares. However, the purchase price was determined by a formula that would yield substantially less than the actual market value. According to the record, the sisters determined to thwart the SRA mechanism by forcing Matty to buy them out at premium rates. The memo highlighted plans to exercise control upon the elder Moroun's death and, to the end of gaining what they regarded as a reasonable price upon liquidation, the sisters were advised to prepare for "conflict and confrontation with Matty."[91]

---

[88] Id, p. 1119.
[89] Tr. VI, pp. 129-132.
[90] PE 336.
[91] Id., at p.4.

In June of 1992, the sisters, believing themselves the victims of "shabby treatment" by Matty[92], voted approval of a $6 million cash dividend, including the remarkable mandate that the corporation "shall obtain the funds necessary to pay the foregoing dividends by any appropriate means available to it, including without limitation by liquidating assets owned by the corporation, borrowing funds from its subsidiaries, causing its subsidiaries to liquidate assets and/or causing to pay dividends upstream to the Corporation."[93] Ultimately, the dividend was not paid. The acrimony accelerated upon the father's death in November of 1992.[94]

There was no clear high road in this battle, as reflected in a 1992 injunction from an Oakland County Circuit Court that placed a pox on both houses: the sisters were enjoined from attempting to remove Matty and other directors or officers from CenTra. Matty, for his part, was prohibited from entering into "any transaction with CenTra, Inc. or any of its subsidiaries, directly or indirectly, in which Defendants would personally benefit" unless the Board was fully informed and in favor.[95]

By late 1995, the external forces that had inspired the earlier reorganization decision had, if anything, intensified. Cartage and Transport were in perilous condition. Union/management relations were strained; concerns over the potential vulnerability of DIBC had not been resolved.

---

[92] PE 338, at p.3.
[93] PE 338, at p.4. The Directors also authorized Virginia Baks, the corporate treasurer, to remove or replace officers of the Corporation or its subsidiaries. (*Id.*)
[94] Tr. VI,p.138
[95] PE 341.

From a financial standpoint, Transport and Cartage were suffering. A 1994 gain to Transport of some $200,000.00 was a relative anomaly. [96] In 1992, the company lost more than $5 million and in 1993, almost $4 million. In 1995, the loss from motor carrier operations was $9,875,327.00 and over the five year period from 1991 thru 1995, there was an average annual loss of just under $6 million.[97] This, Michael Lorenz, former President of CTII, testified, was a "bad situation"[98] that represented a serious drain on the CenTra group enterprises, including the profitable companies, like Crown Enterprises. At the same time, he considered market conditions for pricing " treacherous", particularly when combined with the fact that costs, particularly labor costs, were high and inflexible. This led to a company determination to try and obtain wage concessions from the union, but these efforts were unavailing.

Central Cartage, too, suffered operating losses for the years between 1991 and 1995, averaging more than $7.7 million annually.[99] The Fund concedes CenTra had a problem with the Old Subsidiaries before the restructuring. Deregulation in the trucking industry hit the unionized Central Transport and Central Cartage companies hard. In the overall, they incurred losses through much of the 1980's and 1990's, including "staggering losses"[100] in 1995.

---

[96] See RE 51, a worksheet summarizing the eight years following 1988 for Central Transport's Motor Carrier division.
[97] Id, see also Tr. III, pp. 468-470.
[98] Id, p. 471.
[99] PE 53.
[100] Tr. I, pg. 147.

The decision of Roadway Trucking, in 1995, to discontinue operations of a double-breasted operation impressed Moroun, says Calderone. [101] Moroun instructed him to devise a transaction that would separate Cartage and Transport from CenTra quickly.[102] In response, Calderone contracted the Company's tax advisors at Price Waterhouse, describing the corporate structure of CenTra and its relationship to the Old Subsidiaries, noting the desire to sell them to U.S. Truck while retaining the stock of DIBC and Crown within CenTra, and inquiring how this could be done without triggering tax liabilities attributable in large part to the substantial appreciation of the bridge.[103] The ultimate result was the plan, described earlier, that was implemented, beginning with the December reorganization.

Thomas Christ testifies that plans for the reorganization, which were in meaningful discussions during the Fall of 1995, included both the reorganization

---

[101] In the Fall of 1995, Roadway Company announced it was spinning off Roadway Express, its union firm, effectively dividing its union and non union LTL companies into separate corporations. This freed Roadway to apply for the wage rate deduction available under Appendix A of the labor agreement.

[102] Calderone quotes Maroun as saying: "I want you to go back and attempt to come up with a transaction whereby we can separate Cartage and Transport quickly without - don't give me, 'it's going to take six to ten months to get an IRS,' or anything like that. Figure out a way we can separate those operations and get them ready to sell." (Tr. II, p. 314.)

[103] See PE 11, Calderone's handwritten note to Greg Fowler of Price Waterhouse. See also PE 12, a December 19, 1995 memo from Calderone to Fowler, which states, in relevant part:

Based on the above described facts and assuming that CenTra has a bona fide business purpose for the mergers of Old Transport and Old Cartage into CenTra, which is well documented, I understand your view to be that the statutory mergers described above would be respected as tax free reorganizations by the Internal Revenue Service. Accordingly, the above described series of transactions should not result in "taxable liquidation" treatment being accorded the mergers of Old Transport and Old Cartage into CenTra. Since the mergers should not be treated as taxable liquidations, no currently taxable income or deferred intercompany taxes (DITS) with respect to possible appreciation in Crown and DIBC stock value will be created when the merger transactions take place. Since no DITS with respect to the appreciation in Crown and DIBC stock should be created under the above assumed facts when the mergers take place, then no triggering of any such gains into currently taxable income should occur when CenTra sells the stock of New Transport and New Cartage to U.S. Truck.

of CenTra and the plan that Cartage and Transport would go to U.S. Truck. The plan behind the 1995 reorganization, then, was to create independent subsidiaries, move them out of the CenTra group, and attempt to negotiate wage and benefit concessions from the Teamsters with the new subsidiaries. By transferring the subsidiaries to Anne Moroun, she would stand the chance of having profitable companies and CenTra would escape the burden of what it believed to be uneconomical union contracts. In its view, then, the reorganization would improve both neighborhoods.

The Fund characterizes it differently: The Old Subs had little or no chance of surviving, and CenTra stripped them prior to divesting itself of them. The sale to U.S. Truck was a thinly-veiled cover, says the Fund, for the real evade and avoid motive. In the overall, the goal, according to Central States, was to postpone the shutdown of Central Transport and Central Cartage while CenTra still owned the companies, and to ensure that any shutdown occurred after they had left the CenTra-controlled group.

At the time of the 1996 sales, Transport and Cartage were losing money. That much is undisputed. Mr. Calderone testifies they were not dying, but in retrospect, his conclusion is belied by their having expired shortly thereafter. For the ten months following the purchase, Transport lost $171,438.00.[104] Cartage, which came in somewhat later, lost $283,000.00. Losses continued for each of the subsidiaries in 1997.[105]

---

[104] PE 371.
[105] PE 372.

The 1997 Duff and Phelps report[106] notes that sales and marketing staff as well as maintenance of customer relationship and communications, became the responsibilities of CTII. While concluding that the fair market value of Central Cartage, as of August 9, 1996, was about $306,000.00 and the fair market value of Central Transport, as of February 29, 1996, was approximately $266,000.00 (both of these represented the book values as of December 31, 1995) the firm also cast the futures of these subsidiaries in a relatively dim light: Noting the "poor operating performance of each company"[107], the analysis yielded a negative net present value for the firms because the projected operations would require further investment for further cost reductions.[108] "It is unlikely," according to the report, that "any investor would purchase either company without some prospect or expectation of a turnaround."[109] The report continued:

> Based on our DCF [Discounted Cash Flow] analyses we would conclude it unlikely that the there is any significant value to the Companies as measured on a going concern basis. Further, there is a significant chance that the Companies would require large additional investments or face bankruptcy. However, on the liquidation basis, the Companies do retain their net asset value as determined by the net realizable value of their respective balance sheets at the time of each transaction.[110]

---

[106] PE 5.
[107] *Id.*, at p. 4.
[108] *Id.*
[109] *Id.*, at p. 5.
[110] *Id.*

It is true CenTra retained substantial assets of the Old Subs in the course

of reorganization.  CenTra kept certain Cartage trade receivables.[111] Petitioner's

Exhibit 39 shows a total of some $24 Million of Transport receivables retained by

CenTra in the reorganization (as well as $52 Million in liabilities).  According to

Michael Lorenz, former president of CTII, this was in order to adjust the assets

and liabilities for non-operating items in order to arrive at the $250,000 value,

for sales purposes, prior to the sale to U.S. Truck.[112]  And, while trucking

operations themselves were unaffected with respect to the New Subs, CenTra

formed Central Transport International, Inc. (CTII) to handle LTL operations

within the CenTra group.  Some of the marketing and sales departments from the

Old Subsidiaries were transferred to CTII.  According to the record, this was in

response to a changing industry, with CTII being seen as a central expediting

company capable of responding to a variety of transportation services.  The

function of CTII was comprehensively described by Michael Lorenz as follows:

> CTTI would go to customers and arrange to move -- to contract to move
> their LTL freight, primarily manufacturing and retail, very few individuals,

---

[111] Tr. II,pp. 366-67.

[112] This was because of the buyout features of the SRA. The existence of the SRA meant the sisters were wary of any assets that would be removed from CenTra for whatever reason. The injunction, referred to above (see text accompanying n.95 *supra*), coupled with the sister's sensitivity led, in Calderone's words, "to concern that any transaction that we did to separate the union and the nonunion operations wouldn't run afoul of this order... and wouldn't result in [the sisters] claiming that we cheated CenTra [by reducing] CenTra's assets that were there for the stock Restriction Agreement to apply to - the formula - to apply to." ( Tr.II,pp.320-321.) While there is no question CenTra retained significant assets, along with liabilities, of the Old Subsidiaries, the evidence on this point is not always helpful. While the Fund characterizes Old Transport as entering the reorganization with $124,000,000 in assets and leaving it with 6.7 million (RE: 361, Table XIV) the "before" figure appears, from the evidence, to have been erroneously calculated by totaling the consolidated assets of Central Transport, together with its subsidiaries, while the "after" segment reflects the Transport motor carrier operations alone. CenTra accurately characterizes this as an "apples to oranges" comparison. (Tr. III, p.499)

and they would enter into agreements. We would set up a pricing agreement and then we would contract with service providers to move the freight, which basically means go up and pick up a package from the customer's point of origin, take it to a terminal, have the freight consolidated, run line haul to a distribution terminal, where it was put on an individual vehicle for delivery.

We would bill the customer. We would collect from the customer. We would handle the tracing and routing questions. We'd deal with freight claims if there were any. Those were all the responsibilities of Central Transport International.[113] (Tr. III,p. 453)

The event that completed the plan, says the Fund, occurred August 19, 1996 when Matty surrendered any interest in U.S. Truck stock to his sister, Anne Moroun, in a Settlement Agreement[114]. By this, U.S. Truck, together with its new acquisitions, were placed in a withdrawal liability controlled group that was separate from CenTra. As a result, when DIBC ceased contributing to the Fund, and CenTra incurred withdrawal liability, CenTra was able to take the position, proffered here, that it had no responsibility for contribution histories of Old Central Transport and Old Central Cartage.

Was this a sham? Clearly, the Old Subs would require subsidization and a new operating environment if they were to prevail. There were those, however, who believed this could happen. Anne Moroun, owner of U.S. Truck, believed

---

[113] PE 5, p.5.
[114] PE 276. By its terms Anne returned the consideration paid by Matty for U.S. Truck stock and it was agreed that any interest held by Matty in U.S. Truck would cease. The Settlement Agreement, which severed the controlled group relationship between CenTra and U.S. Truck, is a relatively vague instrument. Some of the issues purportedly settled therein (a supermajority requirement, for example, had been rescinded earlier). But the document did serve , in its terms, to terminate any interest in U.S. Truck share held by MJM in favor of AAM and recognized her claim to be ther controlling shareholder of U.S. Truck.

that purchasing New Transport and New Cartage would work.[115] Aware they'd

been losing money,[116] she also put stock in the fact that U.S. Truck owned

equipment and terminals.[117] And, she had received a sizeable buyout from

CenTra that was available to subsidize the new businesses as they started.[118]

Moreover, the potential of combining the new workers with the U.S. Truck

drivers to gain the coverage of the Teamster Truckload and Steel Agreement

would have resulted in twenty percent lower labor costs. She (and, as will be

noted, Kirk Cummings, the new President of U.S. Truck,) believed they had an

agreement with the IBT on that score.[119]

Kirk Cummings became President of U.S. Truck in 1996. He did not

consider the firms "denuded" or unable to make it.[120] While it is true that payroll,

data processing and other infrastructure items did not accompany the transfer of

the Old Subsidiaries, U.S. Truck entered into a series of six or seven agreements

for support services with CenTra, including a dispute resolution agreement and

---

[115] She testified: " In talking to Kirk, I figured I could make a go of it, combined the workers, the drivers with U.S. Truck's drivers and get that iron and steel agreement, 20% lower labor cost. I thought, for sure, we wouldn't be the next Conway or some big trucking company, but we could make so money, some serious money." (Tr.VI, p.1177).

[116] Tr. VIII, p.1176.

[117] *Id.*, p.1177.

[118] *Id.*

[119] *Id.*,p.1178. In October of 1995, TNFINC, Mason Dixon Lines and U.S. Truck had entered into a letter of Understanding concerning the acquisition of Mason Dixon by U.S. Truck. (PE 79). The Letter provided, among other things, that incoming members would be transferred to Local unions in Detroit, Canton and Gary, which would sign the 1994-1998 MCLAC NMFA/Truckload and Steel Supplement "which will be substituted for all agreements" between those union locals and U.S. Truck. And, the Letter provided "It is agreed that any future employees in the classifications of the National Master Freight Agreement of U.S. Truck Company, Inc. either by new hire, transfer, or acquisition will be represented" by those locals. It is unnecessary to opine on whether, as CenTra claims, this bound TNFINC to extend the supplement to U.S. Truck. It suffices to note the agreement could reasonably have been so construed by Maroun and. Cummings.

[120] *Id*, p. 1376.

other items.[121] His plan, which he had discussed with Anne, was to get out from under the more costly wage scales of the National Master Freight Agreement and to concentrate on securing for Central Transport the more favorable conditions of the Teamster Truckload and Steel Supplement.

Following acquisition of Central Transport, U.S. Truck advised the Teamsters National Freight Industry Negotiating Committee (TNFINC) it intended to apply the terms and conditions of the Truckload and Steel Supplemental Agreement to Transport.[122] The Teamsters objected, a meeting was held to attempt to resolve the differences in April 1996. The union believed the company could not merely opt to take advantage of the Supplement; in its view, a "change of operations" procedure would have to be initiated. Thus, Transport would have to apply for such treatment before the appropriate committee. Ultimately, after the parties were unable to reach a compromise, Cummings finalized his decision to close Central Transport.[123]

Was this a well-orchestrated plan to skin the old firms and ship them out to a predictable demise? A case can be made for that; the Funds' claims are not frivolous. Neither, however, are they supported by a preponderance of the evidence. CenTra was well aware the 1995 reorganization could result in the successful shifting and consequent avoidance of potentially expensive withdrawal

---

[121] *Id*, pp. 1377-1380.
[122]PE 75 is a letter from Cummings to Skelton of TNFINC notifying them of U.S. Truck's intent to merge the operations of Central Transport into U.S. Truck Company, effective January 19, 1997 and to apply the terms of the supplement.
[123] Anne, too, decided U.S. Truck, Cartage and Transport couldn't make it. She testifies she couldn't send contributions to the pension fund, the work force was leaving for other companies and she concluded it was time to pull out. (Tr. VI, p.1179)

liability. But §4212 does not condition liability on the existence of such a result

or even knowledge of its potential. If liability is to attach under this portion of

the MPPAA statute, the Fund must demonstrate that achieving that result was a

principal purpose behind the move. If it was, liability will attach, and the

protective scheme of the statute will still have been satisfied. But in such a case,

fairness demands that such motivation be a principal driving actor, and that it be

clearly demonstrated.

That burden has not been met in this case. Significant to these findings,

among other things, is the fact that CenTra had been both interested and active,

early on, in attempting to reconfigure CenTra. Almost without exception, the

sources of its concerns -- deregulation of the trucking industry, insurance issues

surrounding DIBC, double breasting issues, bargaining leverage in an industry

that had undergone "seismic" change, all these pointed toward the same solution.

There is sufficient evidence for one to find, on the facts presented, that the

decision to reorganize was supported by elements well beyond avoidance of

withdrawal fees, and that the 1995 reorganization would have occurred even

absent the withdrawal liability concerns.


DATE OF WITHDRAWAL DISPUTE

29 U.S.C §1383(e) pinpoints the employer's complete withdrawal as the

date on which it permanently ceases to have an obligation to contribute to the

multi-employer plan. As noted earlier, the employer's withdrawal liability is a

*pro rata* share of the Fund's UVBs, calculated as of the last day of the plan year preceding the withdrawal year.[124] CenTra says the date should be 1998. The Fund argues for 1997.[125]

CenTra hangs its hat on three hooks with respect to the 1998 withdrawal date. First, it says the "last collective bargaining obligating DIBC to contribute to the Fund, the 1997-2001 Agreement, required contributions through January 3, 1998."[126] It also observes that the term "collective bargaining (or related) agreements" under 29 U.S.C. §1392 (a) includes not only the basic CBA but also any participation agreement.[127] Measured by the 1993 Participation Agreement, says CenTra, it withdrew no earlier then September 1998. That agreement[128] required DIBC to continue its contributions to the Fund until DIBC notified the Fund its obligation to contribute had ceased. Finally, CenTra cites federal labor law as obligating DIBC to continue contributing after expiration of the collective bargaining agreement and during the time the parties were attempting to negotiate a new one.[129] DIBC and Local 299, it is claimed, did not finish negotiations and execute the 1997-2001 CBA until August 1998 and therefore, says CenTra, DIBC withdrew no earlier than August.

---

[124] See 29 U.S.C.§138c(2)(C)(i)(I).
[125] Time clearly was of the essence for both parties. A DIBC withdrawal in 1997 would result in about a $7 Million increase in withdrawal liability.. Liability calculations are made on the basis of the end of the preceding calendar year. The Fund had done considerably better in 1997 than in 1996. Thus, a 1997 withdrawal would be manifestly more expensive for CenTra, since the Fund was substantially more under-funded during '96.
[126] CenTra Post Hearing brief, p. 46.
[127] See *Cent. States, SE. & SW. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148 1153-54 (7th Cir. 1989) (en banc); *Cent. States, SE. & SW Areas Pension Fund v. Schilli Corp.*, 420 F. 3d 663 (7th Cir. 2005)
[128] See JE 4.
[129] CenTra Post Hearing Brief, p. 47.

The Fund, for its part, says CenTra's controlled group completely

withdrew in 1997.  November 23, 1997, it says, was the expiration date of the last

of DIBC's collective bargaining agreements that *complied with Fund*

*participation rules*.  The new 1997-2001 collective bargaining agreement, by its

terms, violated the "Split Term Rule".  Thus, Central States was within its rights

in claiming CenTra's participation ended in 1997.

For several reasons, the finding is that the 1997 date is the proper one.

The Trustees retain substantial discretion to accept or reject CBA's they conclude

are non-conforming or somehow harmful to the Plan.  Surely that is an

appropriate aspect of their fiduciary duty.  And, the case law is clear in

establishing that review of the Trustees' decision to reject CBA's is meaningfully

narrow.[130]

It is true both that the old CBA expired in 1997 and that the proposed

replacement (1997-2001) was flawed--it flunked the "split term" rule.[131]  Section

3.01(a)(5) of the Plan provides that "(a) a Collective Bargaining Agreement shall

---

[130] See *Central Hardware Company v. Central States Pension Fund*, 770 F. 2nd 106, 109 (8th Cir.
1985), holding that the review of the propriety of the Trustees actions in such cases is limited to a
determination of whether the decision is arbitrary, capricious, or an abuse of discretion. (At 109.)
[131] According to the Manual, a collective bargaining agreement may not allow an employer to
"bargain out" of the Pension Fund during the period covered by the collective bargaining
agreement.  The manual establishes an exception applicable to a reopener that would permit a
subsequent mutual agreement concerning continued participation in the Fund or a provision for
mutual between the parties with respect to bargaining out.  However, the contract may not
establish a set date, nor may it allow the employer to unilaterally opt out.  In that case the Manual
advises the staff to "advise the parties that the agreement is inconsistent with Fund policy and
must be corrected. " (PE 161, at Bates L00564.)  The matter must then be referred to the Contracts
Subcommittee meeting, and the subcommittee is advice to reject the CBA and "if after a
reasonable period of time the agreement is not corrected, [then] terminate the group's
participation retroactive to the expiration date of the prior collective bargaining agreement.
(Emphasis in the original.)  In this case, the collective bargaining agreement reviewed by the
Fund was tentative, not final.

be acceptable only if such agreement requires a Contributing Employer to make Employer Contributions. . . (5) for the entire term of such agreement." [132] In contrast, the Tentative Agreement proposed by Local 299 and DIBC required employer contributions for less than two months of the four year agreement.[133] Specifically, it is called for the old CBA to end on November 23, 1997, and for a new 4-year contract to commence and continue through 2001. [134] But, the new CBA called for contributions to the Fund only until January 1, 1998.

The arbitrator rejects CenTra's proposal to the effect that, so long as its obligation to contribute continues, it may somehow opt to continue to do so under any and all circumstances. That CenTra is obliged to continue contributions cannot be construed as trumping the Trustees' rights under the statute and in accordance with the various plan documents [135] to reject payments for breaches of the applicable rules. Moreover, the new agreement was not an agreement at all. It is unsigned, entitled "Tentative,"[136] and was subject to review by the IBT, who could have rejected any part of the tentative agreement and sent the parties back to the bargaining table.

CenTra says the Trustees erred by rushing to judgment. In this case, after learning the terms of the tentative agreement, the Fund proceeded to terminate, almost immediately, with no opportunity for DIBC or the union to cure the split

---

[132] JE 2, §3.01(a)(5); see also Smith Dep. Tr., p.37, lines 12-24 (testifying to knowledge of rule).
[133] JE, 36; RE 123
[134] *Id.*
[135] The governing plan documents include the Central States Policies and Procedure Manual Trust Agreement, and 1993 Participation Agreement.
[136] See JE36.

term problem. This, says CenTra, shows the pretextual nature of the action: The Fund simply wanted them out.[137] But the Fund's action, while hurried, was not fatal to the Respondents' case on this point. The Petitioners had, in 1997, no conforming document to shield itself from the Trustees' actions. Even accepting CenTra's assertion of a certain scrambling by the Trustees and, recognizing there was no love lost between those perennial adversaries, the claim that the Fund's failure to proffer the more standard notice-and-cure opportunity is dispositive of the issue is not compelling. Among other things, even were it dispositive, the remedy likely would be to give CenTra and the local union the opportunity to do what they say they were deprived of — the chance to amend the agreement to remove the offending provisions. But this, it is abundantly clear, was not going to happen, nor has that option been sought, then or now, by the Petitioners.[138] The agreement included a midterm drop-out because both parties wanted out. CenTra says Local 299 was so inclined because its members were concerned with the Fund's financial health and because the Fund had rejected the local's March 1997 request for a benefit increase. The January 1, 1998 termination date was chosen, claims CenTra, not because of withdrawal liability concerns, but because the date was "administratively convenient and ensured that DIBC employees

---

[137] CenTra says "the Fund may have properly determined that the new CBA valuated the split-term (*I.E.*, bargained out) rule; however the evidence is overwhelming that the Fund *applied* that rule as a pretext for kicking DIBC out of the Fund and triggering withdrawal liability that the Fund knew to be enormous." CenTra Reply brief, p.16.

[138] On page 18 of its Reply Brief, CenTra says "the union and DIBC were legitimately engaged in a bargaining and finalization process that made application of the notice and continued contributions provision… of the participation agreement thoroughly appropriate." That being the case, however, they could, at some point, have indicated to the Fund their immediate intention to cure the defect. But no such indication ever appeared.

would earn a full year of pension credits, in the event they had not already done so."[139]  For the reasons set forth above, however, the finding is that the 1997 date is proper.[140]   If the Fund was playing hard ball, it was a game to which both parties have become well accustomed.  The Funds' actions did not amount, in these particular circumstances, to the type of impermissible gerrymandering here charged by CenTra.

## ASSET VALUATION

In this case, beginning in 1995, the Fund's actuary used a two-year smoothing method to value plan assets for withdrawal liability purposes, but a five-year smoothing to value plan assets for minimum funding purposes.

The asset evaluation method used by the Fund to determine UVB's as of December 31, 1996 was different from that used a year later. Since the goal of both minimum funding and UVB determination is the same -- to assess the ability of the plan to pay the benefits in the future -- the asset valuation performed in the context of each of those determinations is for the same purpose; and thus, CenTra argues, use of different asset smoothing methods for minimum

---

[139] CenTra Post Hearing Brief, p. 51.
[140] Cases cited by Petitioners are not compelling. In *Malden Mills v. ILGWU National Retirement Fund*, 766 F. Supp. 202 (1991), the court affirmed parties' rights to select the withdrawal date via collective bargaining.  The question, one of public policy, was whether they could subsequently adjust the date retroactively, in potential derogation of actuarial expectations.  The court in *Supervalu v. Trustees of the SW Pennsylvania Pension Fund*, 442 F. Supp. 2d 252 (2006) held that an arbitrator could not condition the parties' choices of withdrawal dates on whether the plan was currently financially sound.  And, in *Central States Fund v. Madison*, 1999 U.S. Dist. LEXIS 17168 (1999) the court enforced the plain language of the existing CBA, interpreting it to sustain the employer's claimed withdrawal date.  Those cases are no help where, as here, the agreement was tentative only and the claim is that it had been precipitously rejected.

funding, as distinguished from UVB determinations, is unreasonable.[141] The

purpose of the two evaluations, testified Thomas Vicente, was "similar enough in

terms of the horizon for investment purposes, that the same investment for an

asset-actuarial value of asset methodology should be used."[142]

Yet, according to the record, there are different schools of thought within

the actuarial profession. One group considers withdrawal liability a one-time

summing up that justifies the use of a market value of assets. The other views

withdrawal liability in the same light as ongoing contributions, and as therefore

accommodating the five-year smoothing approach to investment gains and

losses. Here, the Fund actuary adopted the two-year smoothing approach for its

withdrawal liability valuations of Central States. According to its actuary, Nancy

Milliman, it did this so that assumptions on asset values would more closely track

market values.[143]

ERISA § 4221 (a) (3) (B) establishes that the actuarial determination of

Central States' UVBs is to be presumed correct unless they may be shown to have

been in the aggregate, unreasonable.[144]  In this case, the record is clear that either

of the evaluation techniques is reasonable and routinely utilized in the industry.

There is no evidence in this record that would require a conclusion that the

---

[141] Testimony of Thomas Vicente, Tr. V, p. 845.
[142] *Id.* p. 845. See also p. 871.
[143] PE 143 at AR 1553.
[144] The § states, in relevant part:
     (I) the actuarial assumption and methods used in the determination were, in the
     aggregate, unreasonable (taking into account the experience of the plan and reasonable
     expectations,...)

Fund's approach was unreasonable. [145]   Petitioners' complaint as to this lacks

merit.

## SUMMARY

Whether the  Fund's assessment of June 5, 1998 is accurate depends on

whether CenTra's corporate reorganization of December 31, 1995 qualified under

ERISA §4218 as a merger/division, so as to make New Cartage and New

Transport successor companies for withdrawal liability purposes.  If they are

successors, they must be found to have inherited the contribution histories of Old

Cartage and Old Transport.  If not, those histories would remain in CenTra.

Section 4218 is not based on intent.  The question under this provision is whether

the transaction meets the objective requirements of the statute.  Issues

concerning intent to evade or avoid withdrawal liability are treated under

§4212(c).

The finding here is that, contrary to Respondent's contentions, the

contribution histories did not remain with CenTra.  At the time of the

reorganization, they continued on to the New Subsidiaries in a process that fit

well enough within the statutorily-undefined concept of "division" set forth in

§4069(b)(3).  By the corporate maneuvers of December 31, 1995, the Old

Subsidiaries ceased to exist and the new ones became successors and, in terms of

---

[145] CenTra also maintains the Fund erred in ignoring a substantial account receivable asset attributable to UPS contributions.  Even were this so, it would only be relevant in the event of a 1998 withdrawal.  The finding being that the 1997 date is correct, it is unnecessary to resolve this portion of the dispute.

§4218, the original employers.  State law cited by Respondents as precluding this result is preempted by ERISA.  There is no support for the Fund's claim that withdrawal liability somehow accrued to the Old Subsidiaries and subsequently became imbedded in CenTra.  The finding here is consistent with existing case law[146] uniformly holding that withdrawal liability does not arise until withdrawal.

Section 4212 exists to respond to scenarios that, while satisfying §4218, were perpetrated in bad faith or with intent to evade or avoid the withdrawal liability obligations.  Aspects of CenTra's behavior could, and did, raise warning flags and, as noted earlier, are worthy of careful scrutiny.  The "evade and avoid" issue is a close one.  CenTra characterizes the Fund's case as initially promising but ultimately without substance. [147]  That assessment underestimates the existence of a variety of troublesome factors, including not only the spector of selling companies out of the controlled group that were troubled at the time and whose continue vitality was chancy at best, but also a string of dealings that were uncomfortably cozy, taken together with transactions, particularly those surrounding the sale to Anne Moroun, that were accurately described by the Fund[148] as "riddled with peculiarities."  The arbitrator has considered these elements.  However, the external events surrounding the Old Subsidiaries, the onset of deregulation, the family feud of monstrous propositions and the

---

[146] See, for example, *Godchaux v. Conveying Techniques, Inc.* , 846 F.2d 306 (5th Cir.1988); *Trustees of Teamsters Pension Trust Fund of Phila. v. Federal Express*, 1995 U.S. Dist. LEXIS 19980, at 22-26 (D.)(Del. Dec.27, 1995); *Teamsters Pension Trust Fund v. Central Michigan Trucking, Inc.* 857 F.2d 1107 (6th Cir. 1988).
[147] ...[L]ike a sprinter caught in a marathon; dazzling at the beginning, but unable to go the distance. Petitioner closing brief, p. 5.
[148] Respondent brief, p. 12.

continuing agreements and disagreements with the Teamsters Union lead to the conclusion that, on balance, the case for evasion or avoidance under the statute has not been made.

In the overall, the evidence compels the conclusion that the reorganization was an event waiting to happen, since at least the mid 1980's, for reasons wholly unrelated to withdrawal concerns and, significantly, that would have occurred even absent the allure of substantially mitigating such liability. There is no reason to conclude CenTra was unaware of the salutary aspects of the reorganization, with respect to withdrawal liability. The finding here, for the reasons stated earlier, is that evade/avoid considerations were not "a principal purpose" in effecting the reorganization.

The Fund properly concluded that DIBC withdrew in 1997, not, as CenTra contends, 1998. Fund rules require, among other things, that contributing employers continue to make contributions for the entire term of the agreement. The contract at issue mandated otherwise. The Fund could properly review that contract anomaly and respond by denying further participation. If, as is apparent, the Trustees lost no time in hustling DIBC out the door, neither is there evidence that DIBC protested either on the basis that the decision was premature (because the CBA was merely tentative) or that they stood ready to cure the defect. To the contrary, the evidence is clear that the parties to that labor agreement wanted to leave the Fund, but just a bit later.

Finally, there was no error in applying the separate smoothing techniques under the circumstances set forth here. The evidence is clear that some *bona fide* diversity of opinion exists among qualified actuaries. There is no cause to find that the Fund's approach was unreasonable. Rather, the difference falls squarely within an area where reasonable professionals can differ.

## AWARD

Petitioners' grievance is granted in part and denied in part, in accordance with the above-findings. The matter is remanded to the parties for purposes of recalculating the withdrawal liability assessment. The arbitrator will retain jurisdiction to resolve disputes arising in the course of implementing this Award.

RICHARD I. BLOCH, ESQ.

# Appendix 2

Matty-Agnes Settlement Agreement (JE31)

7

## Settlement Agreement

### Recitals

WHEREAS the parties to this agreement (The "Agreement") are Manuel J. Moroun ("MJM") and Agnes A. Moroun ("AAM") collectively, The "Parties"; and

WHEREAS McKinlay Transport, Inc., a corporation which was wholly owned by AAM, entered into a Stock Purchase Agreement dated May 13, 1982 and supplemented on November 1, 1982, to acquire 100% of the outstanding stock of U.S. Truck and, pursuant to such agreement, did acquire 100% of U.S. Truck's stock; and

WHEREAS pursuant to a certain option agreement dated February 7, 1985 (the "option agreement"), AAM granted to MJM, Florence McBrien ("FM") and Victoria Baks ("VB") the right, until the option agreement's expiration date on February 7th 1990, to acquire 50.5%, 16 5% and 16.5%, respectively, of the stock of U.S. Truck at a price equal to 83.5% of AAM's cost plus 12% interest compounded annually, from February 7, 1985 to the date the option was exercised; and

WHEREAS McKinlay merged into U.S. Truck, which was the surviving corporation, on July 8, 1987 and AAM simultaneously received all of the outstanding shares of U.S. Truck in exchange for all of the outstanding shares of McKinlay, which were cancelled by effect of the merger; and

WHEREAS on February 6, 1990, MJM acted to preserve his right to acquire a controlling interest in U.S. Truck and also on behalf of FM and VB to establish their ownership interest in U.S. Truck stock pursuant to the option agreement by tendering to AAM his personal check for $147,649 in full payment of the option price for all of the 83.5% of U.S. Truck's outstanding stock subject to the option agreement but has never been issued U.S. Truck stock certificates evidencing his ownership interest in U.S. Truck; and

WHEREAS at the time MJM elected to exercise his rights under the option agreement, AAM was opposed to MJM being in control of U.S. Truck and acted to amend U.S. Truck's Articles of Incorporation to undermine the voting control of U.S. Truck which was otherwise inherent in the 50.5% of U.S. Truck stock MJM was entitled to acquire pursuant to the option agreement; and

WHEREAS AAM and MJM have been and are now in disagreement as to;

(1) Whether the promises to AAM involving the control and ownership of U.S. Truck and which induced AAM to enter into the option agreement have been fulfilled;

(2) Whether AAM's actions to undermine MJM's control of U.S. Truck resulted in a failure of the consideration received by MJM in return for his payment of the option agreement price to AAM because the rights of the 50.5% U.S. Truck stock interest tendered to MJM from AAM were impaired;

(3) Whether MJM has any claim to the interests of FM and VB in U.S. Truck as a result of his furnishing the consideration to AAM relating to their acquisition of such interests; and

WHEREAS, an inducement for AAM to sell her stock in CenTra, Inc., to the son of MJM in 1994 was that the aforesaid differences between AAM and MJM relative to U.S. Truck would be resolved by agreement to terminate any interest in U.S. Truck shares held by MJM in favor of AAM and recognize her claim to be the controlling shareholder of U.S.Truck.

NOW, THEREFORE, in consideration of the covenants herein contained and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## TERMINATION OF MJM'S INTEREST IN U.S. TRUCK STOCK

All right, title and interest MJM has or may have in U.S. Truck stock will cease on the date of this Agreement. Any such interest shall immediately be deemed to interest in AAM and shall include any interest MJM may have in the U.S. Truck stock owned by FM and VB by virtue of paying to AAM the entire consideration for the purchase of such shares pursuant to the option agreement.

## ARTICLE II

## HOLD HARMLESS PROVISIONS

MJM shall hold AAM and U.S. Truck harmless against any and all claims (and related legal costs) brought by VB and FM with respect to asserting and establishing any interest they may have in U.S. Truck stock and which relates, directly or indirectly, to any aspect of the option agreement or to this Agreement.

## ARTICLE III

## RETURN OF CONSIDERATION PAID BY MJM FOR U.S. TRUCK STOCK

AAM shall return $90,478.64 to MJM within 30 days of the date of this Agreement in full satisfaction of any claim MJM may have for return of the consideration he paid AAM pursuant to the option agreement.

3

## ARTICLE IV

### MUTUAL RELEASE OF CLAIMS

Except as specifically reserved by this Agreement, the Parties mutually agree to a release of all claims either of them has or may have against each other directly or indirectly related to the option agreement or the management and control of U.S. Truck prior to the date of this Agreement.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1    This Agreement has been duly and validly executed by the parties and constitutes a valid and binding obligation upon them according to its terms.

5.2    There are no liens, encumbrances or claims outstanding with respect to the interest in U.S. Truck stock held by MJM as of the date of this agreement.

## ARTICLE VI

### COVENANTS

6.1    Best Efforts.  Each of the Parties shall use its reasonable efforts to take all actions and to do all things necessary or proper to satisfy the terms of this Agreement.

6.2    Notices and Consents.  The Parties shall use their respective reasonable best efforts to obtain all such waivers, permits, consents, approvals or other authorizations from third parties and governmental entities, if any are required, and to effect all such registrations, filings and notices with or to third parties and governmental entities, as may be necessary or desirable in connection with the transactions contemplated by this Agreement.

## ARTICLE VII

### MISCELLANEOUS

7.1    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

7.2    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter thereof.

7.3    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and assigns.  No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other party.

7.4    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

7.5    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

7.6    Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered two business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent via reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to AAM:  Ms. Agnes A. Moroun          If to MJM:  Mr. Manuel J. Moroun
                    c/o                                                          c/o
                    U.S. Truck Company, Inc.                        CenTra, Inc.
                    3500 Toledo Street                                   12225 Stephens Road
                    Detroit, MI 48232                                     Warren, MI 48089

Any party may give any notice, request, demand, claim or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the party from whom it is intended.  Any party may change the address to which notices, requests, demands, claims and other communication hereunder are to be delivered by giving the other party notice in the matter herein set forth.

7.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Michigan.

7.8    Amendments and Waivers.  The Parties may mutually amend any provision of this Agreement at any time in writing.  No amendment of any provision of the Agreement shall be valid unless the same shall be in writing and signed by all of the Parties or their duly authorized representatives.  No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

5

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on
_August 19, 1986_.

"AAM"

By: _Agnes C. Moroun_
Agnes A. Moroun

STATE OF MICHIGAN    )
                     ) ss
COUNTY OF _OAKLAND_  )

The foregoing instrument was acknowledged before me this _19TH_ day of _AUGUST_, 1996, by Agnes A. Moroun.

_Kathleen M. Tasch_
Notary Public    KATHLEEN M. TASCH
                 Notary Public, Oakland County, MI
                 My Commission Expires July 24, 19__, Michigan
                 Acting in Macomb County, MI
My commission expires: _____

"MJM"

By: _Manuel J. Moroun_
Manuel J. Moroun

STATE OF MICHIGAN    )
                     ) ss
COUNTY OF _OAKLAND_  )

The foregoing instrument was acknowledged before me this _19TH_ day of _AUGUST_, 1996, by Manuel J. Moroun.

_Kathleen M. Tasch_
Notary Public    KATHLEEN M. TASCH
                 Notary Public, Oakland County, MI
                 My Commission Expires July 24, 19__, Michigan
                 Acting in Macomb County, MI
My commission expires: _____

# Appendix 3

Affidavit of Fred Calderone (PE282)

CenTra Inc v Jaffe Rama...
Case No 95-3?7681 ...
Wayne ... ...

## AFFIDAVIT OF FRED CALDERONE
### DECEMBER, 2000

STATE OF MICHIGAN    )
                             ) ss..

COUNTY OF MACOMB  )

      Fred Calderone, being first duly sworn, states under oath that the following affidavit is based upon his personal knowledge and if called as a witness he could competently testify as follows:

      1.     My name is Fred Calderone. I am a lawyer admitted to the practice of law in Michigan (P27257) and a certified public accountant authorized to practice accounting in Michigan (Cert. # 1101008528).

      2.     I am a Vice-President and senior executive with CenTra, Inc. My specific title is Vice-President, Corporate Planning. Formerly, I was responsible for tax matters and headed CenTra's tax department. In the course of my duties, I have become very familiar with the corporate structure of CenTra and its subsidiaries, as well as the business and accounting relationships among them. I have also become familiar with many of the legal considerations that affect the companies within CenTra.

      3.     I was actively and intensively involved in developing CenTra's reorganization plan during the mid-1980s. The plan required that an application be made to the Internal Revenue Service of the United States for a "private letter ruling" approving the proposed reorganization. The purpose of the ruling was to obtain assurance that the reorganization could be undertaken without the risk of substantial adverse tax consequences to CenTra or its shareholders.

      4.     This ruling was received in 1987. Consistent efforts were made to implement the plan until CenTra was advised by Ira Jaffe in February 1989 that Florence



EXHIBIT

AAM - 15

CAC   9.7.05

JAF  000022

McBrien, Victoria Baks and Anne Morous, constituting 50 percent of the vote, on the board of directors, would not vote to approve the spin-off.

5.    CenTra sustained significant damages as a direct consequence of CenTra's inability to divest itself of Central Cartage and Central Transport in the spin-off. The losses to CenTra came in two forms. First, losses were incurred because of CenTra's inability to establish and grow non-union market competitive motor freight operations in the years 1989 through mid 1996 because of labor contract restrictions designed to prevent CenTra from diverting motor freight business to non-union operations. Second, losses also included substantial operating deficits incurred and funded in attempting to avoid losing customers permanently to lower cost non-unionized competing motor carriers. The losses from being required to operate non-competitively in a very competitive environment had to be absorbed to prevent the greater harm in the form of the very substantial shut down related costs under both labor contracts and the federal ERISA statutes. CenTra would have incurred these shut down costs directly had it caused Cartage and Transport to cease operations in order that motor freight operations could be conducted using a more competitive work force.

6.    In addition to locking CenTra into a non-competitive business position, the failure to effect the spin-off spawned a long history of controversy and disruption involving CenTra's management which diverted valuable financial resources and management focus away from CenTra's business needs. Unquestionably this disruption and controversy also contributed to the sub par growth and profitability that occurred in the 1989 through 1996 time frame as compared to CenTra's historically strong performance before that time frame.

7.    As an accounting and tax matter, the profits and losses of Cartage and Transport were reported on consolidated statements and tax returns of CenTra. Profits from their operations were passed directly to CenTra and losses were subsidized through cash infusions not evidenced by loan documents or scheduled payments. By 1995, CenTra could no longer justify further attempts to include Cartage and Transport in its mix of motor carriers. In late 1995, Transport and Cartage were merged under state

2

JAF   000023

law into CenTra. The effect of the mergers was to assimilate the Cartage and Transport defects directly into CenTra. For these reasons, the above described losses have been incurred directly by CenTra and were not contained within its subsidiaries. CenTra also sustained direct losses by incurring expenses for professional advice and consultation in connection with the ongoing operations of Cartage and Transport during the 1989 through 1996 time frame. Efforts to stem these losses and related tax considerations motivated the incorporation of the remaining historical motor carrier business assets and workforces of Cartage and Transport at the time of the merger into CenTra at the end of 1995. The newly incorporated Cartage and Transport were then sold to U.S. Truck Company in 1996.

_____

Fred P. Calderone

SUBSCRIBED AND SWORN TO before me on December 7 , 2000 by Fred P. Calderone.

_____
Notary Public

AMY R. TOMASZEK
Notary Public, Macomb County, MI
My Commission Expires Mar. 27, 2002

3

JAF 000024

# Appendix 4

Transcript of CenTra Board meeting - 10/11/96 (RE392)

**EXHIBIT**
**RE00392**

*BOARD OF DIRECTORS MEETING*

*CENTRA, INC.*

*OCTOBER 11, 1996*

REPORT OF PROCEEDINGS

4:35 p.m.

MARY ELLEN KUSIBAB, LLC
*Certified Shorthand Reporters*
1526 South Western Avenue
Park Ridge, Illinois 60068
(312) 427-8859

**RE0392**

1

1          BOARD OF DIRECTORS MEETING

2                  CENTRA, INC.

3                October 11, 1996

4

5

6

7     PRESENT:

8          Manuel J. Maroun, Chairman and Board Member

9          Agnes A. Maroun, Secretary and Board Member

10         Matthew T. Maroun, Board Member

11         Victoria Baks, Board Member

12         Daniel Stamper, Board Member

13         Andre Levesque, Board Member

14         Matthew T. Maroun, Board Member

15         Florence McBrien, Board Member,
                   Appearing telephonically

16

17

18          REPORT OF PROCEEDINGS had at the

19    Board of Directors Meeting on the 11th day of

20    October, 1996, commencing at the hour of 4:35

21    p.m., and transcribed from Digital

22    Video/Versatile Disc by Mary Ellen Kusibab,

23    Certified Shorthand Reporter.

24

2

1    CHAIRMAN MAROUN:  We'd like to call

2    the meeting to order.  And Agnes as secretary

3    and myself as chairman are here, and I will

4    chair the meeting.

5        Norm, if you'll introduce everybody

6    and call roll?

7        MEMBER HARNED:  Yes, I will.

8        I would like to make note that the

9    meeting started approximately 4:35.

10       The roll call, I guess I'll start

11   with Dan Stamper, who's President of the Bridge

12   and has been with the companies for quite a

13   while.

14       Bob McFarland is an attorney with

15   Foster Swift, an independent outside firm.

16       Andre Levesque is Director of

17   Purchasing for the CenTra companies and has been

18   with the companies for over 20 years -- many

19   years.

20       Victoria Baks is a director and

21   shareholder of the companies.

22       Florence McBrien, attending by

23   telephone, is a director and shareholder of the

24   companies.

1            Ann Maroun is a director of the

2    companies, Director of Personnel and Human

3    Resources for the CenTra group of companies and

4    has been with the company for many, many years.

5            Matthew T. Maroun is a director of

6    the company and shareholder.

7            M.J. Maroun is a director and

8    shareholder of the companies.

9            And, myself, Norm Harned, am a

10   director of the companies and an officer of the

11   company and have been with the company

12   approximately 24 years.

13           And I think that's everybody.

14           CHAIRMAN MAROUN:  I thank you, Norm.

15           The next agenda of our meeting is a

16   resolution for recommending shareholder approval

17   of an amendment to the corporation's restated

18   certificate of incorporation to provide for an

19   increase in the number of authorized common

20   shares.

21           MEMBER HARNED:  Mr. Chairman, before

22   we get into that -- that resolution -- could

23   I -- I think since this meeting is being

24   videotaped, which is something I'm unaccustomed

83

1          SECRETARY AGNES A. MAROUN:  Right,

2     correct.

3          MEMBER BAKS:  Can I ask, why did you

4     merge the two up and then all of a sudden form

5     two new ones?  It makes no sense to me.  Please

6     explain.

7          CHAIRMAN MAROUN:  Well, we merged

8     them up, as we told you, to move all the assets

9     of both companies into CenTra.  Having done

10    that, we formed two new corporations and put the

11    assets that we wanted in those two new

12    corporations.

13          MEMBER McBRIEN:  That who wanted?

14          CHAIRMAN MAROUN:  That --

15          MEMBER McBRIEN:  That you wanted.

16          CHAIRMAN MAROUN:  Well, that the

17    people here at the company, Florence,

18    recommended that we put in.

19          MEMBER McBRIEN:  Who were those

20    people, besides you?

21          CHAIRMAN MAROUN:  Oh, it was Norm

22    Harned.  It was Fred Calderone.

23          MEMBER McBRIEN:  All right.  What are

24    those assets, Matty?

```
 1                    CHAIRMAN MAROUN:  They're --

 2                    MEMBER McBRIEN:  I mean the large

 3       ones.  I'm not asking for the trucks and all

 4       that.  What are the large assets that remain in

 5       the New Cartage and the New Transport?

 6                    CHAIRMAN MAROUN:  They're really

 7       small assets, Florence.  They're just what is

 8       essentially needed for them to operate.  And

 9       I -- the rest of the assets were kept in CenTra.

10                    MEMBER BAKS:  You're not telling us

11       much.  You're keeping it terribly vague here.

12                    CHAIRMAN MAROUN:  I'm sorry.  I'm not

13       keeping it vague.

14                    MEMBER MATTHEW T. MAROUN:  There is

15       one thing that you left out that you mentioned

16       that -- you mentioned when we talked about at

17       that prior Board meeting when we approved the

18       merger into CenTra.  And that was that the

19       primary purpose or at least one of the primary

20       purposes of the merger of the Old Transport and

21       Old Cartage into CenTra, I thought, at least,

22       was to make DIBC -- the Detroit International

23       Bridge Company -- a first-tier subsidiary of

24       CenTra rather than a second-tier subsidiary and
```

1    have a trucking company in the middle.  I knew

2    it had been that way for a long time, but I

3    thought it was sort of like a maintenance thing.

4    And then as far as Transport went, I thought the

5    same applied to Transport's subsidiary, Crown,

6    which owns real estate.  Why have a trucking

7    company in-between two companies that, you know,

8    might have some similarities to trucking or some

9    associations with trucking owned by two trucking

10   companies when they should be owned directly as

11   first-tier subsidiaries of CenTra.

12           MEMBER McBRIEN:  Well, you know,

13   Matthew --

14           MEMBER MATTHEW T. MAROUN:  That was

15   the discussion at the time, as I recall.

16           MEMBER BAKS:  Well, that's nothing.

17   You're not answering questions, Matthew.

18           MEMBER HARNED:  That was two reasons.

19   And I thought --

20           CHAIRMAN MAROUN:  Yeah, I thought it

21   was two reasons.

22           MEMBER McBRIEN:  Well, Matthew, could

23   you enlighten me further?  Now, CenTra holds,

24   now, the Bridge?

1          MEMBER MATTHEW T. MAROUN:  I wasn't

2     trying to enlighten you.  I was just recalling

3     what we talked about.

4          MEMBER McBRIEN:  Well, I'm glad that

5     you did.  I'm not objecting.  But, just, could

6     we -- I think it was informational for me.

7     CenTra holds the Bridge.  Now, is that what

8     you're saying?

9          MEMBER MATTHEW T. MAROUN:  It owns

10    DIBC directly instead of through Cartage.

11         MEMBER McBRIEN:  That's fine, okay.

12    DIBC, and it owns the real estate company that

13    you mentioned.  What was that?  Crown?

14         MEMBER MATTHEW T. MAROUN:  Yes,

15    ma'am.

16         MEMBER McBRIEN:  Okay.

17         MEMBER MATTHEW T. MAROUN:  This is

18    the way I remember it at the meeting.

19         MEMBER McBRIEN:  Okay.  I'm just

20    asking.  Well, this was not discussed at the

21    meeting.

22         CHAIRMAN MAROUN:  Oh, yes, it was.

23         MEMBER McBRIEN;  Oh, no.  You did not

24    discuss that the Bridge was going to be part of

1    CenTra.

2              MEMBER BAKS: Yes. This is Victoria.

3              It was. The Bridge is part of

4    Central Cartage. Now, as Matthew said, it moved

5    up one tier.

6              MEMBER McBRIEN: But this is news to

7    me. I didn't know that.

8              MEMBER MATTHEW T. MAROUN: I wasn't

9    going on any other information than that which

10   was discussed at the meeting. I'm not trying to

11   be the authority on the subject; I'm just

12   telling you what I remember.

13             MEMBER McBRIEN: Well, all right.

14   Just tell me, now the Bridge is owned by CenTra,

15   Crown is owned by CenTra. So what you're saying

16   is that the New Cartage and New Transport have

17   just minimal assets?

18             CHAIRMAN MAROUN: Exactly.

19             MEMBER MATTHEW T. MAROUN: Right,

20   exactly.

21             And those assets now are only

22   associated with trucking, the way I understand.

23   They don't have anything to do with bridges or

24   real estate.

1        MEMBER McBRIEN:  All right.  Are we

2    going to be receiving, like, the sales documents

3    and an explanation of the transactions?

4        CHAIRMAN MAROUN:  Well, we're here

5    talking about it, and we're telling what the

6    purpose of it is.  We're telling you basically

7    what happened.  And all of our agreements call

8    for an audit of the sale and to be sure that the

9    price of -- that we're getting for them is a

10   reasonable and proper price.

11       MEMBER McBRIEN:  Well, then, you'll

12   share that with us.  You'll share that audit

13   with us.

14       CHAIRMAN MAROUN:  No problem.  When

15   it's completed, we certainly will share it with

16   you.

17       MEMBER BAKS:  Why is the Board being

18   asked to approve something that's already been

19   accomplished?  You've already done this.

20       CHAIRMAN MAROUN:  Well --

21       MEMBER BAKS:  Isn't it kind of --

22       CHAIRMAN MAROUN:  Sure.  We're

23   looking to cover our bet.

24       MEMBER McBRIEN:  You're looking what?

1                    CHAIRMAN MAROUN:  But it's required.

2                    MEMBER McFARLAND:  Is this similar,

3        at all, to any of the other restructuring we've

4        seen in the trucking industry following the

5        deregulation of the latest round that kind of

6        ended all of the entry --

7                    CHAIRMAN MAROUN:  Right, exactly.

8                    SECRETARY AGNES A. MAROUN:    Ended

9        what, please?

10                    MEMBER McFARLAND:  The entry controls

11        that used to limit trucking companies.  They had

12        to have authority from the Michigan Public

13        Service Commission or the Interstate Commerce

14        Commission or the Trucking Regulatory

15        Commissions -- the various states from basically

16        the 1920s, through January 1st of 1995.

17        President Clinton signed into law on August 23rd

18        of 1994, the Federal Aviation Administration

19        Authorization Act, which preempted all state

20        control over trucking companies.  That was

21        really seen as the final step in economic

22        deregulation of the industry.  And since that

23        time, there have been some restructuring by

24        other trucking companies.  And my inquiry is to

1    see whether this has anything to do with those

2    kinds of reorganizations.

3            CHAIRMAN MAROUN:  Roadway Services,

4    which was the parent to Roadway Express, spun

5    off Roadway Express.  And they no longer

6    control, own or manage it.

7            MEMBER McBRIEN:  I don't care about

8    Roadway Express.  I only care about CenTra and

9    what it has.  And I would -- that's what I'm

10   asking Matthew:  Is the Bridge now owned by

11   CenTra?  Is Crown now owned by CenTra?  In other

12   words, U.S. Truck, then, holds the New Transport

13   and New Cartage with minimal assets; is that

14   correct?

15           CHAIRMAN MAROUN:  That's correct.

16           MEMBER MATTHEW T. MAROUN:  That's the

17   way I understand it.  You know, just --

18           MEMBER McBRIEN:  Well, I'm just

19   asking because all this has been taken place.

20   The one sale was in February of '96, and the

21   second one in August of '96.  Vickie and I knew

22   nothing about it, and I wonder why.  Why wasn't

23   there a Board meeting called for those two

24   sales?

1          CHAIRMAN MAROUN:  There wasn't a

2     requirement for a Board meeting.  But we have

3     made the sales, and now we're reporting it to

4     the Board.  But the --

5          MEMBER McBRIEN:  Now you're seeking

6     gratification.  Is that it?  Is that what we're

7     going to be asked to vote on?

8          CHAIRMAN MAROUN:  Well, we're asking

9     you to approve it.

10          MEMBER McBRIEN:  Well, I think it

11     says ratification, doesn't it?  I don't have

12     the --

13          MEMBER MATTHEW T. MAROUN:  Yeah.  It

14     says consideration and ratification of the sales

15     of Central Transport and Central Cartage.

16          CHAIRMAN MAROUN:  But you have

17     combined what we did almost a year ago in the

18     up-merger of Transport and Cartage into CenTra

19     with this thing.  We did that; we got approval

20     for that.  And, now, we are selling a denuded

21     company to U.S. Truck.  And I got to tell you

22     that it's reasonably nude.  And we're asking the

23     Board to ratify it at this time.

24          MEMBER HARNED:  Florence, you made a

# Appendix 5

CenTra Corporate Income Tax Return 1995 (JE25)(excerpts)

| Form **1120** | | U.S. Corporation Income Tax Return | | OMB No. 1545-0123 |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 1995 or tax year beginning _____, 19__ ending _____, 19__ ▶ Instructions are separate. See page 1 for Paperwork Reduction Act Notice. | | **1995** |

| A Check if a: | | Use IRS | Name | B Employer identification number |
|---|---|---|---|---|
| 1 Consolidated return (attach Form 851) ☒ | | label. | CENTRA, INC. AND SUBSIDIARIES | 38-2005747 |
| To actual holding co. attach Sch. PH) ☐ | | Other-wise, print or type. | Number, street, and room or suite no. (If a P.O. box, see instructions.) P.O. BOX 80-ATTN: TAX DEPT. | C Date incorporated 03/11/1970 |
| 3 Personal service corp. (as defined in Temporary Regs. sec. 1.441-4T– see instructions) ☐ | | | City or town, state, and ZIP code WARREN          MI  48090-9984 | D Total assets (see Specific Instructions) $ 635,406,630 |

E Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Change of address

| | | | | |
|---|---|---|---|---|
| I n c o m e | 1a | Gross receipts or sales  655,824,454 | b Less returns and allowances | c Bal ▶ | 1c | 655,824,454 |
| | 2 | Cost of goods sold (Schedule A, line 8) | | 2 | 553,148,815 |
| | 3 | Gross profit. Subtract line 2 from line 1c | | 3 | 102,675,639 |
| | 4 | Dividends (Schedule C, line 19) | | 4 | 9,363,701 |
| | 5 | Interest | | 5 | 9,484,878 |
| | 6 | Gross rents | | 6 | 26,385,770 |
| | 7 | Gross royalties | | 7 | |
| | 8 | Capital gain net income (attach Schedule D (Form 1120)) | | 8 | 4,966,889 |
| | 9 | Net gain or (loss) from Form 4797, Part II, line 20 (attach Form 4797) | | 9 | 3,537,553 |
| | 10 | Other income (see instructions – attach schedule) See Stmt. 14 | | 10 | 1,803,960 |
| | 11 | **Total income. Add lines 3 through 10** ▶ | | 11 | 158,218,390 |
| D e d u c t i o n s | 12 | Compensation of officers (Schedule E, line 4) | | 12 | 0 |
| | 13 | Salaries and wages (less employment credits) | | 13 | 41,226,271 |
| | 14 | Repairs and maintenance | | 14 | |
| | 15 | Bad debts | | 15 | 3,962,916 |
| | 16 | Rents | | 16 | 13,894,758 |
| | 17 | Taxes and licenses See St | | 17 | |
| | 18 | Interest | | 18 | |
| | 19 | Charitable contributions (see instructions for 10% limitation) | | 19 | |
| | 20 | Depreciation (attach Form 4562) | 20 | | |
| | 21 | Less depreciation claimed on Schedule A and elsewhere on return | 21 | | |
| | 22 | Depletion | | 22 | |
| | 23 | Advertising | | 23 | |
| | 24 | Pension, profit-sharing, etc., plans | | 24 | |
| | 25 | Employee benefit programs | | 25 | |
| | 26 | Other deductions (attach schedule) See St | | 26 | |
| | 27 | Total deductions. Add lines 12 through 26 | ▶ | 27 | |
| | 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | 28 | |
| | 29 | Less: a Net operating loss deduction (see instructions) | 29a | | |
| | | b Special deductions (Schedule C, line 20) | 29b | | |
| T a x a n d P a y m e n t s | 30 | Taxable income. Subtract line 29c from line 28 | | 30 | |
| | 31 | Total tax (Schedule J, line 10) | | 31 | |
| | 32 | Payments: a 1994 overpayment credited to 1995 | 32a | 3,480,120 | |
| | | b 1995 estimated tax payments | 32b | 2,100,000 | |
| | | c Less 1995 refund applied for on Form 4466 | 32c | 5,080,120 | d Bal ▶ | 32d | |
| | | e Tax deposited with Form 7004 | | 32e | |
| | | f Credit from regulated investment companies (attach Form 2439) | | 32f | |
| | | g Credit for Federal tax on fuels (attach Form 4136). See instructions | | 32g | |
| | 33 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | 33 | |
| | 34 | Tax due. If line 32h is smaller than the total of lines 31 and 33, enter amount owed | | 34 | |
| | 35 | Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | | 35 | |
| | 36 | Enter amount of line 35 you want: Credited to 1996 estimated tax ▶ | | 505,0 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ *[signature]* Michael O Pin          9/12/96
Signature of officer          Date

**Paid Preparer's Use Only**

| Preparer's signature ▶ | | Date | |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address ▶ | | | |

HB07

---

P 312 850 018

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

| Sent to Internal Revenue Service | |
|---|---|
| Street, APT No., or PO Box No. Cincinnati, OH 45999 | |
| Post Office, State, & ZIP Code | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, April 1995

C001583

Fold at line over top of envelope to the right of the return address.

**CERTIFIED**

P 312 850 018

CENTRA, INC.
WARREN, MI 48090
FOR TAX YEAR ENDED: 12/31/95

38-2005747

PAGE 3, SCHEDULE K

FORM 1120, PAGE 3, QUESTION 3

    (A)  SEE FORM 851-AFFILIATIONS SCHEDULE

FORM 1120, PAGE 3, QUESTION 5

| Name and Address | I.D. Number | Direct Ownership Common | Pref. | Total Stock Ownership By Attribution Under §267(c) |
|---|---|---|---|---|
| M.J. Moroun<br>956 Lakeshore Drive<br>Grosse Pte. Shores, MI 48236 | ████████ | 52% | 43.71% | 100% |
| Victoria M. Baks<br>33 Preston Place<br>Grosse Pte. Farms, MI 48236 | ████████ | 16% | 15.41% | 74.97% |
| Florence M. McBrien<br>66 Colonial Road<br>Grosse Pte. Shores, MI 48236 | ████████ | 16% | 15.41% | 74.97% |
| Manuel J. Moroun<br>Irrevocable Trust<br>Agreement for<br>Matthew T. Moroun<br>dated 7/31/89 | ████████ | 0% | .40% | .39% |
| Matthew T. Moroun<br>956 Lakeshore Drive<br>Grosse Pte. Shores, MI 48236 | ████████ | ████ | 4.84% | 69.12% |
| Manuel J. Moroun Trust<br>████████ | ████████ | 0% | 20.23% | 19.30% |

C001659

**CENTRA, INC. & SUBSIDIARIES**
**38-2005747**
**December 31, 1995**

Reg. 1.368-3(a) Attachment

Pursuant to a reorganization plan initiated by CenTra, Inc., the following companies filed Certificates of Merger with the State of Michigan and Delaware on December 27, 1995:

| | |
|---|---|
| Central Transport, Inc. | 38-2750527 |
| Central Cartage Co. | 38-0408160 |

Each of the above corporations was merged into CenTra, Inc. (38-2005747) and it remains as the surviving corporation. As a result, all of the stock of each of those corporations was surrendered and canceled.

The assets and liabilities of each corporation as of December 31, 1995 are attached. CenTra, Inc. took possession of all assets and assumed all liabilities of the companies listed above. No stock or securities or other property was received in the exchange.

t:\95rins\merger

C001668

# PLAN OF MERGER

THIS PLAN OF MERGER is entered into December 26, 1995 effective as of December 31, 1995, among CENTRA, INC., a Delaware corporation ("Centra"); CENTRAL CARTAGE CO., a Michigan corporation ("Central Cartage"); and CENTRAL TRANSPORT, INC., a Michigan corporation ("Central Transport").

Centra, Central Cartage and Central Transport execute this Plan of Merger pursuant to the requirements of MCL 450.1701.

1.     Parties. Centra, Central Cartage and Central Transport are the constituent corporations involved in this merger. Central Cartage and Central Transport are wholly-owned subsidiaries of Centra. Centra is the surviving corporation.

2.     Outstanding Shares. For each of the parties, the designation and number of outstanding shares of each class and series are:

| Name of Corporation | Number of Shares | Class and/or Series |
|---|---|---|
| Centra | 500,000 Shares | Common |
| Centra | 7,738,000 Shares | Preferred, Series 1 |
| Centra | 2,644,000 Shares | Preferred, Series 2 |
| Centra | -0-    Shares | Preferred, Series 3 |
| Central Cartage | 10,000 Shares | Common |
| Central Transport | 8,000 Shares | Common |

3.     Terms of Merger. Each issued and outstanding share of Central Cartage and Central Transport shall be surrendered for cancellation, as the merger is with the 100% parent of Central Cartage and Central Transport.

4.     Effective Date. This merger will be effective as of December 31, 1995.

5.     Amendment to Articles of Incorporation.     Centra's Articles of Incorporation shall not be amended.

Attest:

CENTRA, INC.,
a Delaware corporation

By: _____

Its: _____

C001669

i

Attest:

_____

Attest:

_____

CENTRAL CARTAGE CO.,
  a Michigan corporation

By: _____

  Its: _Vice President and Treasurer_

CENTRAL TRANSPORT, INC.,
  a Michigan corporation

By: _____

  Its: _Vice President + Treasurer_

C001670

2

i

CERTIFICATE OF OWNERSHIP AND MERGER

MERGING

CENTRAL CARTAGE CO., A MICHIGAN CORPORATION,

AND CENTRAL TRANSPORT, INC., A MICHIGAN CORPORATION,

INTO

CENTRA, INC., A DELAWARE CORPORATION

•••

CenTra, Inc., a corporation organized and existing under the laws of Delaware, DOES HEREBY CERTIFY:

FIRST: That this corporation was incorporated on the 11th day of March, 1970, pursuant to the General Corporation Law of the State of Delaware.

SECOND: That this corporation owns all of the outstanding shares of the stock of Central Cartage Co., a corporation incorporated on the 23rd day of March, 1932, pursuant to the business corporation law of the State of Michigan.

Further, that this Corporation owns all of the outstanding shares of the stock of Central Transport, Inc., a corporation incorporated on the 12th day of June, 1987, pursuant to the business corporation law of the State of Michigan.

THIRD: That this corporation, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 26th day of December, 1995, determined to and did merge into itself said Central Cartage Co. and Central Transport, Inc.

"RESOLVED, that CenTra, Inc., merge and it hereby does merge into itself

C001671

Central Cartage Co. and Central Transport, Inc., and assumes all the obligations of Central Cartage Co. and Central Transport, Inc.

FURTHER RESOLVED, that the merger shall be effective December 31, 1995.

FURTHER RESOLVED, that the Chairman and President of this corporation be and he is hereby directed to make and execute a Certificate of Ownership and Merger setting forth a copy of the resolutions to merge said Central Cartage Co. and Central Transport, Inc. into CenTra, Inc. and assume the liabilities and obligations of Central Cartage Co. and Central Transport, Inc., and the date of adoption thereof, and to cause the same to be filed with the Delaware Secretary of State and to do all (or cause to be done) acts and things whatsoever, whether within or without the State of Delaware, which may be in anywise necessary or proper to effect said merger (including without limitation the execution and filing of a Certificate of Merger with the Michigan Department of Commerce)."

FOURTH:    The Merger shall be effective December 31, 1995.

IN WITNESS WHEREOF, said CenTra, Inc., a Delaware corporation, has caused this Certificate to be signed by M.J. Moroun, its Chairman and President, this 26 day of December, 1995.

> CENTRA, INC.
> a Delaware corporation,
>
> By: _M.J. Moroun_
> M.J. Moroun
> Chairman and President

2

C001672

*State of Delaware*

PAGE 1

*Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF OWNERSHIP, WHICH MERGES:

"CENTRAL CARTAGE CO.", A MICHIGAN CORPORATION,

"CENTRAL TRANSPORT, INC.", A MICHIGAN CORPORATION,

WITH AND INTO "CENTRA, INC." UNDER THE NAME OF "CENTRA, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-SEVENTH DAY OF DECEMBER, A.D. 1995, AT 11:30 O'CLOCK A.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS FOR RECORDING.



**FILED**

MAR 1 1 1996

ADMINISTRATOR
MICHIGAN DEPARTMENT OF COMMERCE
CORPORATION & SECURITIES BUREAU

**RECEIVED**

MAR 6 - 1996

MICHIGAN DEPT. OF COMMERCE
CORPORATION & SECURITIES BUREAU

*Edward J. Freel, Secretary of State*

C001673

AUTHENTICATION:          7768426

DATE:          12-27-95

0745630    8100M

950308486

UYSEN612B   122B   URU&FI   $187.5

**MICHIGAN DEPARTMENT OF COMMERCE - CORPORATION AND SECURITIES BUREAU**

Date Received

DEC 2 7 1995

(FOR BUREAU USE ONLY)

## FILED

DEC 2 7 1995

Administrator
MICHIGAN DEPARTMENT OF COMMERCE
Corporation & Securities Bureau

EFFECTIVE DATE: DECEMBER 31, 1995

Name
CenTra, Inc., N.E. Barned

Address
12225 Stephens Road

City          State          Zip Code
Warren, MI   48089

→ Document will be returned to the name and address you enter above. ←

## CERTIFICATE OF MERGER
### For use by Parent and Subsidiary Profit Corporations
(Please read information and instructions on the last page)

Pursuant to the provisions of Act 284, Public Acts of 1972, the undersigned corporation executes the following Certificate:

a. The name of each constituent corporation and its identification number is:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CenTra, Inc., a Delaware corporation | 6 | 2 | 4 | – | 2 | 5 | 5 | |
| Central Cartage Co., a Michigan corporation | 1 | 0 | 8 | – | 1 | 7 | 5 | |

See attached Continuation Sheet

b. The name of the surviving corporation and its identification number is:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CenTra, Inc., a Delaware corporation | 6 | 2 | 4 | – | 2 | 5 | 5 | |

c. For each subsidiary corporation, state:

| Name of corporation | Number of outstanding shares in each class | Number of shares owned by the parent corporation in each class |
|---|---|---|
| Central Cartage Co. | 10,000 Common Shares | 10,000 Common Shares |
| Central Transport, Inc. | 8,000 Common Shares | 8,000 Common Shares |
| | | |
| | | C001674 |
| | | |

manner and basis of converting the shares of each constituent corporation is as follows:

Each issued and outstanding share of Central Cartage Co. and Central Transport, Inc. shall be surrendered for cancellation, as the merger is with the 100% parent corporation of Central Cartage Co. and Central Transport, Inc.

e. The amendments to the Articles of Incorporation of the surviving corporation to be effected by the merger are as follows:

N/A

f. Other provisions with respect to the merger are as follows:

N/A

C001675

2. (Complete for any foreign corporation only)

This merger is permitted by the laws of the State of __Delaware_____, the

jurisdiction under which __CenTra, Inc._____

(name of foreign corporation)

is formed and the plan of merger was adopted and approved by such corporation pursuant to and in accordance with the laws of that jurisdiction.

3. (Delete if not applicable)
The consent to the merger by the shareholders of the subsidiary corporation was obtained pursuant to its Articles of Incorporation. (Such consent is necessary if the Articles of Incorporation require approval of the merger by the vote of the holders of more than the percentage of the shares owned by the parent corporation.)

4. (Delete if not applicable)
The consent to the merger by the shareholders of the parent corporation was obtained. (Such consent is necessary if its Articles of Incorporation require shareholder approval of the merger, the plan of merger amends its Articles of Incorporation, or a subsidiary is to be the surviving corporation.)

5. (Complete only if an effective date is desired other than the date of filing)

The merger shall be effective on the __31st__ day of __December_____, 19 _95_____.

Signed this __26__ day of __December_____ , 19 _95_____

__CenTra, Inc._____
(Name of parent corporation)

By _____

(Only signature of President, Vice-President, Chairperson, or Vice-Chairperson)

__M.J. Moroun, Chairman and President_____
(Type or Print Name and Title)

C001676

Name of person or organization
remitting fees:

Ralph A. Castelli, Jr.

Kemp, Klein, Umphrey & Edelman, P.C.

Preparer's name and business
telephone number:
Ralph A. Castelli, Jr.

(810  ) 528-1111

## INFORMATION AND INSTRUCTIONS

1. The certificate of merger cannot be filed until this form, or a comparable document, is submitted.

2. Submit one original of this document. Upon filing, the document will be added to the records of the Corporation and Securities Bureau. The original will be returned to the address appearing in the box on the front as evidence of filing.

   Since this document will be maintained on optical disk media, it is important that the filing be legible. Documents with poor black and white contrast, or otherwise illegible, will be rejected.

3. This document is to be used pursuant to the provisions of sections 711 through 713 of the Act by a domestic parent corporation merging with one or more domestic subsidiary corporations and section 735 of the Act if a foreign parent corporation is a party to the merger. The parent corporation must own at least 90% of the outstanding shares of each class of stock of the subsidiary corporation(s). This certificate is to be used only by profit corporations.

4. If more than two corporations are merging, the certificate may be adjusted as necessary or the format may be used as a guide in drafting your own certificate. If additional space is required for any section, continue the section on an attachment.

5. Item 7 - This document is effective on the date endorsed "filed" by the Bureau. A later effective date, no more than 90 days after the date of delivery, may be stated as an additional article.

6. This certificate must be signed in ink by the president, vice-president, chairperson, or vice-chairperson of the parent corporation.

7. FEES: Make remittance payable to the State of Michigan. Include corporation name and identification number on check or money order.

   If a foreign corporation authorized to transact business in this state merges into any domestic corporation, the resulting domestic corporation shall pay franchise fees for any increase in authorized shares less such sums as the foreign corporation so merging has previously paid to the state as an initial or additional admission franchise fee.

   NONREFUNDABLE FEE - This fee must be remitted for each domestic corporation involved in the merger ...... $50.00
   ADDITIONAL FEE: If the authorized shares of the surviving domestic corporation are increased,
   an additional fee is due:
       each additional 20,000 authorized shares or portion thereof ........................................................ $30.00
       maximum fee for first 10,000,000 authorized shares ............................................................. $5,000.00
       each additional 20,000 authorized shares or portion thereof in excess of 10,000,000 shares ..... $30.00
       maximum fee, per filing, for authorized shares in excess of 10,000,000 shares ................. $200,000.00

8. Mail form and fee to:

   Michigan Department of Commerce
   Corporation and Securities Bureau
   Corporation Division
   P.O. Box 30054
   Lansing, MI 48909-7554

The office is located at:

6546 Mercantile Way
Lansing, MI 48910
Telephone: (517) 334-6302

C001677

CONTINUATION SHEET

1.a.    (continued)
Central Transport, Inc., a Michigan corporation                454-362

C001678

CENTRA, INC. & SUBSIDIARIES
38-2005747
DECEMBER 31, 1995

Reg. 1.368-3(a) Attachment

| CENTRAL TRANSPORT<br>BALANCE SHEET - ASSETS<br>DECEMBER 31, 1995 | BEFORE MERGER | CENTRAL CARTAGE<br>BALANCE SHEET - ASSETS<br>DECEMBER 31, 1995 | BEFORE MERGER |
|---|---|---|---|
| CURRENT ASSETS: | | CURRENT ASSETS: | |
| Cash | 110,739.20 | Cash | 200.00 |
| Cash Equivalents | 377,974.50 | Cash Equivalents | 0.00 |
| Total Cash | 488,713.70 | Total Cash | 200.00 |
| Notes Receivable | 11,020.83 | Notes Receivable | 62,343.50 |
| Accounts Receivable - Trade | 49,711,399.03 | Accounts Receivable - Trade | 122,868.64 |
| - Other | 2,204,902.49 | - Other | 87,270.57 |
| Allowance for Bad Debts | (14,724,911.26) | Allowance for Bad Debts | (108,359.57) |
| Total Receivables | 37,202,411.09 | Total Receivables | 164,123.14 |
| Due from Officers | 0.00 | Due from Officers | 0.00 |
| Due from Parent & Affiliates | 0.00 | Due from Parent & Affiliates | 41,049,072.71 |
| Due from Related Parties | 2,748,586.32 | Due from Related Parties | 141,131.74 |
| Marketable Securities | 0.00 | Marketable Securities | 0.00 |
| Prepaid Expenses | 322,685.79 | Prepaid Expenses | 3,075,358.41 |
| Prepaid income tax - U.S. | 0.00 | Prepaid income tax - U.S. | 0.00 |
| Prepaid income tax - Canada | 0.00 | Prepaid income tax - Canada | 0.00 |
| Total other current assets | 3,071,272.11 | Total other current assets | 44,265,562.86 |
| TOTAL CURRENT ASSETS | 40,762,396.90 | TOTAL CURRENT ASSETS | 44,429,886.00 |
| PROPERTY, PLANT & EQUIPMENT: | | PROPERTY, PLANT & EQUIPMENT: | |
| Land & Structures | 20,061,601.51 | Land & Structures | 0.00 |
| Bridge Structure & Equipment | 0.00 | Bridge Structure & Equipment | 0.00 |
| EDP Equipment | 0.00 | EDP Equipment | 0.00 |
| Revenue Equipment | 0.00 | Revenue Equipment | 0.00 |
| Other Operating Assets | 34,947.36 | Other Operating Assets | 14,670,094.32 |
| Leasehold Improvements | 43,217.53 | Leasehold Improvements | 0.00 |
| Total | 20,139,766.40 | Total | 14,670,094.32 |
| Less: Accum Depreciation | (6,305,068.69) | Less: Accum Depreciation | (10,091,577.28) |
| NET PROPERTY, PLANT & EQUIPMENT | 13,834,697.71 | NET PROPERTY, PLANT & EQUIPMENT | 4,578,517.04 |
| INVESTMENTS & OTHER ASSETS | | INVESTMENTS & OTHER ASSETS | |
| Investments in subsidiaries | 44,543,796.05 | Investments in subsidiaries | 50,000.00 |
| Notes & Advances-Affiliates | 0.00 | Notes & Advances-Affiliates | 0.00 |
| Notes receivable-related parties | 0.00 | Notes receivable-related parties | 0.00 |
| Notes Receivable - Other | 0.00 | Notes Receivable - Other | 0.00 |
| Operating authority | 0.00 | Operating authority | 0.00 |
| Goodwill | 0.00 | Goodwill | 0.00 |
| Contruction in Progress | 13,777.59 | Contruction in Progress | 0.00 |
| Deferred lease buyout cost | 0.00 | Deferred lease buyout cost | 0.00 |
| Misc Other Assets | 789,062.07 | Misc Other Assets | 13,120.00 |
| TOTAL INVESTMENTS & OTHER ASSETS | 45,346,635.71 | TOTAL INVESTMENTS & OTHER ASSETS | 63,120.00 |
| TOTAL ASSETS | 99,943,730.32 | TOTAL ASSETS | 49,071,523.04 |
| 12-Sep-96 | | 12-Sep-96 | |

C001679

CENTRA, INC. & SUBSIDIARIES
38-2005747
DECEMBER 31, 1995

Reg. 1.368-3(a) Attachment

| CENTRAL TRANSPORT<br>BALANCE SHEET - LIABILITIES & EQUITY<br>DECEMBER 31, 1995 | BEFORE MERGER | | BALANCE SHEET - LIABILITIES & EQUITY<br>DECEMBER 31, 1995 | BEFORE MERGER |
|---|---|---|---|---|
| | BEFORE MERGER<br>------------- | | | ------------- |
| CURRENT LIABILITIES: | | | CURRENT LIABILITIES: | |
| Accounts Payable | 7,243,612.13 | | Accounts Payable | 8,147,987.59 |
| Due to Parent & Affiliates | 7,137,573.92 | | Due to Parent & Affiliates | 0.00 |
| Due to Related Parties | 0.00 | | Due to Related Parties | 51.60 |
| Due to Officers | 0.00 | | Due to Officers | 0.00 |
| Accrued Wages, Vacation, Bonus | 1,661,176.48 | | Accrued Wages, Vacation, Bonus | 5,170,177.69 |
| Accrued Taxes, Interest,Insurance | 2,385,596.03 | | Accrued Taxes, Interest,Insurance | 13,820,676.77 |
| Fed Income taxes payable - U.S. | 0.00 | | Fed Income taxes payable - U.S. | 0.00 |
| Fed Income taxes payable-Canada | 38,947.52 | | Fed Income taxes payable-Canada | 0.00 |
| Dividend payable | 0.00 | | Dividend payable | 0.00 |
| Current portion Long-term debt | 2,700,000.00 | | Current portion Long-term debt | 0.00 |
| | --------------- | | | --------------- |
| TOTAL CURRENT LIABILITIES | 21,166,906.08 | | TOTAL CURRENT LIABILITIES | 27,138,893.65 |
| | --------------- | | | --------------- |
| LONG TERM DEBT | 43,685,923.60 | | LONG TERM DEBT | 0.00 |
| | --------------- | | | --------------- |
| OTHER LIABILITIES: | | | OTHER LIABILITIES: | |
| Deferred Income Taxes - U.S. | (2,640,077.00) | | Deferred Income Taxes - U.S. | (3,545,735.00) |
| Deferred Income Taxes - Canada | (162,590.88) | | Deferred Income Taxes - Canada | 0.00 |
| Deferred Bonus | 0.00 | | Deferred Bonus | 186,360.00 |
| Due to Parent & Affiliates | 0.00 | | Due to Parent & Affiliates | 0.00 |
| Due to related parties | 0.00 | | Due to related parties | 0.00 |
| Negative Goodwill | 0.00 | | Negative Goodwill | 0.00 |
| Other Deferred Credits | 1,449,402.89 | | Other Deferred Credits | 2,484,015.17 |
| | --------------- | | | --------------- |
| TOTAL OTHER LIABILITIES | (1,353,264.99) | | TOTAL OTHER LIABILITIES | (875,359.83) |
| | --------------- | | | --------------- |
| TOTAL LIABILITIES | 63,499,564.69 | | TOTAL LIABILITIES | 26,263,533.82 |
| | --------------- | | | --------------- |
| STOCKHOLDER EQUITY: | | | STOCKHOLDER EQUITY: | |
| Capital Stock - Preferred | 0.00 | | Capital Stock - Preferred | 0.00 |
| Capital Stock - Common | 16,000.00 | | Capital Stock - Common | 56,000.00 |
| Capital Surplus | 44,032,509.23 | | Capital Surplus | 1,051,592.06 |
| Minority Interest | 0.00 | | Minority Interest | 0.00 |
| Equity - Unrealized gains | 0.00 | | Equity - Unrealized gains | 0.00 |
| Accum Trans Adj - Beginning | 0.00 | | Accum Trans Adj - Beginning | 0.00 |
| Accum Trans Adj - Current Year | 0.00 | | Accum Trans Adj - Current Year | 0.00 |
| | --------------- | | | --------------- |
| Accum Trans Adj - Ending | 0.00 | | Accum Trans Adj - Ending | 0.00 |
| | --------------- | | | --------------- |
| Retained Earnings - Beginning | 0.00 | | Retained Earnings - Beginning | 0.00 |
| Dividends paid | 0.00 | | Dividends paid | 0.00 |
| Current Year Income (Loss) | 0.00 | | Current Year Income (Loss) | 0.00 |
| | --------------- | | | --------------- |
| Retained Earnings - Ending | (7,604,343.60) | | Retained Earnings - Ending | 21,700,397.16 |
| | --------------- | | | --------------- |
| TOTAL STOCKHOLDER EQUITY | 36,444,165.63 | | TOTAL STOCKHOLDER EQUITY | 22,807,989.22 |
| | --------------- | | | --------------- |
| TOTAL LIABILITIES AND EQUITY | 99,943,730.32 | | TOTAL LIABILITIES AND EQUITY | 49,071,523.04 |
| | ============= | | | ============= |
| BALANCE TEST | 0.00 | | BALANCE TEST | 0.00 |
| | ============= | | | ============= |
| 12-Sep-96 | | | 12-Sep-96 | |

C001680

CENTRA, INC. & SUBSIDIARIES
38-2005740
December 31, 1995

Section 351 Disclosure Statement

The following information is provided pursuant to Regulation Section 1.351-3 for corporations that were incorporated pursuant to Section 351 in 1995.

| Description | Incorporator | Business Entity |
|---|---|---|
| Name: | CenTra, Inc. | Central Transport, Inc. (38-3287412) |
| Property Transferred: | $33.25 per share for each share of $2 par value common stock received. Total fair market value and cost of $266,000. | Issued 8,000 shares of common stock. All shares transferred for $33.25 per share. Assets and liabilities were also transferred as reflected on the ending balance sheet. |
| Name: | CenTra, Inc. | Central Cartage Co. (38-3287415) |
| Property Transferred: | $30.60 per share for each share of $5.60 par value common stock received. Total fair market value and cost of $306,000. | Issued 10,000 shares of common stock. All shares transferred for $30.60 per share. Assets and liabilities were also transferred as reflected on the ending balance sheet. |

## Separate Incorporation of Divisions

Universal Am-Can, Ltd. distributed the business activities of two divisions to its parent CenTra, Inc. CenTra, Inc. simultaneously dropped the activity into Mohawk Motors, Inc. and CTX, Inc.

## Transfer of Divisions and Fixed Assets Between Companies

Due to corporate planning, there were whole divisions and various fixed assets transferred between companies included in the consolidated return.

t:\95rms\351

C001681

# Appendix 6

Central States Pension Fund v. El Paso CGP Corp.,
2006 U.S. Dist. LEXIS 82430 (N.D. Ill. Sep. 29, 2006)

1122J0

LEXSEE 2006 U.S. DIST. LEXIS 82430


**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and HOWARD MCDOUGALL, Trustee, Plaintiffs, v. EL PASO CGP CORPORATION, a Delaware Corporation, EL PASO CNG COMPANY LLC, a Delaware limited liability company, AMERICAN NATURAL RESOURCES COMPANY, a Delaware Corporation, and ANR ADVANCE HOLDINGS, INC., a Delaware Corporation, Defendants.**


**No. 05 C 0139**


**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**


*2006 U.S. Dist. LEXIS 82430*


**September 29, 2006, Decided
September 29, 2006, Filed**


**DISPOSITION:** [*1] Plaintiffs' Motion for Summary Judgment GRANTED. Defendants' Motion for Summary Judgment DENIED.


**CASE SUMMARY:**


**PROCEDURAL POSTURE:** Plaintiffs, a multiemployer pension fund and the fund's trustee, filed a suit against defendants, four affiliated companies, seeking to recover approximately $ 23 million in withdrawal liability pursuant to the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. §§ 1001-1461*. The parties filed cross-motions seeking summary judgment in the suit.


**OVERVIEW:** Company four ceased operations and withdrew from the fund after an involuntary Chapter 11 bankruptcy petition was filed against it. The other companies were former members of company four's controlled group. The fund filed a proof of claim after company four's case was converted to a Chapter 7 case. It also sent a notice and demand for payment to the companies, pursuant to *29 U.S.C.S. § 1399(b)(1)*. The companies untimely requested review and thereafter initiated arbitration. Plaintiffs filed their collection action under *29 U.S.C.S. § 1401(b)(1)*. Meanwhile, the companies' defenses were rejected in a similar suit, filed by a different fund. The court held that the rulings in the similar suit were persuasive. It found that the companies had sufficient notice of their withdrawal liability, arising from their actual notice of the fund's proof of claim. The

form of the notice was sufficient to meet MPPAA requirements. The companies waived any arbitrable claims, including whether they were liable for company four's withdrawal, by failing to timely request a review or initiate arbitration under *29 U.S.C.S. §§ 1399(b)(2)(A)*.1401(a)(1).


**OUTCOME:** The court granted plaintiffs' summary judgment motion and denied the companies' summary judgment motion. It held that plaintiffs were entitled to an award of liquidated damages under *29 U.S.C.S. § 1132(g)(2)*. Plaintiffs were entitled to the unpaid contributions, as well as interest on the unpaid contributions, liquidated damages, and attorneys' fees and costs. The court held that two motions filed by plaintiffs were moot.


**LexisNexis(R) Headnotes**


*Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals*
[HN1] Withdrawal liability is the amount owed to a multiemployer pension plan by an employer that ceases its pension plan contributions.


*Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals*
*Pensions & Benefits Law > Multiemployer Plans > Liability Calculations*

2006 U.S. Dist. LEXIS 82430, *

***Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals***
[HN2] The Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1001-1461*, imposes withdrawal liability on an employer withdrawing from a multiemployer pension fund. Withdrawal liability is measured as the employer's proportionate share of the plan's unfunded vested benefits, which is the difference between the present value of the vested benefits and the current value of the plan's assets. *29 U.S.C.S. §§ 1381, 1391*. A complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. *29 U.S.C.S. § 1383(a)*.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Arbitration***
***Pensions & Benefits Law > Multiemployer Plans > Administrative Review***
***Pensions & Benefits Law > Multiemployer Plans > Collection of Contributions***
***Pensions & Benefits Law > Multiemployer Plans > Liability Payments***
[HN3] To collect withdrawal liability, a multiemployer pension plan must first determine the amount of withdrawal liability owed by a withdrawing employer. *29 U.S.C.S. §§ 1382, 1391*. The plan must send the employer a notice and demand for payment. *29 U.S.C.S. § 1399(b)(1)*. Upon receipt of the notice and demand, the employer may ask the plan to review its assessment under *29 U.S.C.S. § 1399(b)(2)*, but must do so within 90 days. *29 U.S.C.S. § 1399(b)(2)(A)*. If dissatisfied with the plan's review, the employer may initiate arbitration within a certain period. *29 U.S.C.S. § 1401(a)(1)*. The employer must initiate arbitration within 60 days after the earlier of the date of the response to the request for review or 120 days after the date of the request for review. If the employer fails to initiate arbitration, the assessment becomes due and owing, and the plan may sue to collect it. *29 U.S.C.S. § 1401(b)(1)*. If the employer fails to make payments in accordance with the schedule and fails to initiate arbitration, a fund may accelerate the schedule of payments, making the entire amount of the assessment due. *29 U.S.C.S. § 1399(c)(5)(A)*. Even if the employer requests review and initiates arbitration, it is required to make interim payments while the dispute is ongoing.

***Pensions & Benefits Law > Multiemployer Plans > Liability Payments***
[HN4] The Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1001-1461*, establishes a "pay now, dispute later" mechanism, whereby the employer must make interim payments while a dispute over withdrawal liability proceeds.

***Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals***
***Pensions & Benefits Law > Multiemployer Plans > Employers Under Common Control***
***Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals***
***Pensions & Benefits Law > Multiemployer Plans > Reorganizations***
[HN5] Under *29 U.S.C.S. § 1301(b)(1)*, all trades or businesses under common control are treated as a single employer, jointly and severally liable for withdrawal liability. An employer does not effect a complete withdrawal from a fund if it ceases to exist by reason of a change in corporate structure described in *29 U.S.C.S. § 1369(b)*, as long as the change does not cause an interruption in employer contributions or the obligation to contribute under the plan. *29 U.S.C.S. § 1398(1)(A)*. A successor or parent corporation or other entity resulting from any such change shall be considered the original employer. *29 U.S.C.S. § 1398*. Under the Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1001-1461*, a change in corporate structure, as referenced in *29 U.S.C.S. § 1398*, includes a merger, consolidation or division. *29 U.S.C.S. § 1369*. If a person ceases to exist by reason of merger, consolidation or division, the successor corporation or corporations shall be treated as the person to whom the subtitle applies. *29 U.S.C.S. § 1369(b)*.

***Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals***
***Pensions & Benefits Law > Multiemployer Plans > Reorganizations***
[HN6] The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. §§ 1001-1461*, provides a further layer of protection to pension plans by providing that if a principal purpose of any transaction is to evade or avoid liability under the MPPAA, the MPPAA shall be applied (and liability shall be determined and collected) without regard to such transaction. *29 U.S.C.S. § 1392(c)*. This provision requires only that a principal purpose of the transaction is to escape withdrawal liability; it does not require that evading withdrawal liability is the only purpose.

***Civil Procedure > Summary Judgment > Standards > Appropriateness***
[HN7] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admis-

sions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN8] In determining whether any genuine issue of material fact exists for summary judgment purposes, all facts must be construed in the light most favorable to the non-moving party and all reasonable and justifiable inferences drawn in its favor. A material fact is genuinely in dispute when the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Arbitration*
*Pensions & Benefits Law > Multiemployer Plans > Administrative Review*
*Pensions & Benefits Law > Multiemployer Plans > Employers Under Common Control*
[HN9] Entities previously in a controlled group with a party subject to withdrawal liability, but who claim to have severed their relationship with the party prior to withdrawal, are subject to the Multiemployer Pension Plan Amendments Act of 1980's, *29 U.S.C.S. §§ 1001-1461*, dispute resolution procedure.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Arbitration*
*Pensions & Benefits Law > Multiemployer Plans > Administrative Review*
*Pensions & Benefits Law > Multiemployer Plans > Employers Under Common Control*
[HN10] A party that is within the controlled group of a withdrawing entity is subject to the Multiemployer Pension Plan Amendments Act of 1980's, *29 U.S.C.S. §§ 1001-1461*, dispute resolution procedure. A party is subject to the arbitration requirement, even though it has divested itself of control of the withdrawing entity prior to that entity's withdrawal from a multiemployer pension fund.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Arbitration*
*Pensions & Benefits Law > Multiemployer Plans > Employers Under Common Control*

*Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals*
*Pensions & Benefits Law > Multiemployer Plans > Reorganizations*
[HN11] Arbitration, not the courts, is the proper forum for the initial resolution of an issue as to whether, by virtue of a merger, parties ceased to be a Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. §§ 1001-1461*, employer in time to avoid liability for a contributing employer's withdrawal from a multiemployer pension plan. Entities that were once under common control with a contributing employer remain subject to the MPPAA's arbitration requirement in an evade or avoid case.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Arbitration*
*Pensions & Benefits Law > Multiemployer Plans > Employers Under Common Control*
*Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals*
[HN12] The issue of whether or not the membership status in a contributing employer's controlled group is sufficient to impose withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1001-1461*, is one for arbitration, not a district court.

*Pensions & Benefits Law > Multiemployer Plans > Collection of Contributions*
[HN13] A plaintiff who has already computed the withdrawal liability and sent notice of the amount, via a proof of claim filed in a bankruptcy case, to the defendant substantially complies with the statutory requirement for notice of and demand for withdrawal liability imposed by the Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1001-1461*.

**COUNSEL:** For Central States, Southeast and Southwest Areas Pension Fund, Howard McDougall, trustee, Plaintiffs: John Joseph Franczyk, Jr., Central States Law Department, Rosemont, IL, Brad R. Berliner, Central States Law Department, Rosemont, IL, Cathy L Rath, Central States Law Department, Rosemont, IL, Robert Anthony Coco, Central States Law Department, Rosemont, IL.

For El Paso CGP Corporation, a Delaware corporation, El Paso CNG Company LLC, a Delaware limited liability company, American Natural Resources Company, a Delaware corporation, El Paso Midwest Company, a Delaware corporation, Defendants: Robert Patrick Casey, Ogletree Deakins Nash Smoak & Stewart, Chicago, IL,

Brian D. Black, Ogletree Deakins et al, Greenville, SC, Carol A. Poplawski, Ogletree Deakins Nash Smoak & Stewart, Chicago, IL, Christina M Thomas, Ogletree Deakins Nash Smoak & Stewart, P.C., Greenville, SC.

**JUDGES:** James B. Zagel, United States District Judge.

**OPINION BY:** James B. Zagel

**OPINION**

**MEMORANDUM OPINION AND ORDER**

In this case, Plaintiffs Central States, Southeast and Southwest Areas Pension Fund ("Central [*2] States") and Howard McDougall, Trustee, are seeking to recover roughly $ 23 million in withdrawal liability from Defendant El Paso CGP Corporation, El Paso CNG Company, American Natural Resources Company, and El Paso Midwest Company (collectively, the "El Paso Defendants"). [HN1] Withdrawal liability is the amount owed to a pension plan by an employer that ceases its pension plan contributions. Plaintiffs filed for summary judgment, arguing that the El Paso Defendants forfeit their right to challenge withdrawal liability when they failed to initiate arbitration within the time prescribed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), *29 U.S.C. §§ 1001-1461.* In the alternative, Plaintiffs argue that they are entitled to receive interim withdrawal liability payments from the El Paso Defendants and that the Defendants must raise any challenges to the assessment of withdrawal liability in arbitration. Plaintiffs argue that if this route is pursued, they are entitled to a mandatory award of liquidated damages and attorneys' fees and court costs because the El Paso Defendants [*3] failed to make their first two interim payments in a timely manner.

The El Paso Defendants seek summary judgment, arguing that Central States cannot establish Defendants' withdrawal liability under any theory. Defendants challenge all of the bases under which Central States may have pursued withdrawal liability had the case proceeded to arbitration and insist that they were neither required to pursue these issues in arbitration nor received sufficient notice of Plaintiffs' claims such that they could have contested liability in arbitration. Alternatively, Defendants challenge the form of the notice of withdrawal liability, arguing that the proof of claim and amended proof of claim filed in the bankruptcy matter could not provide adequate notice of Plaintiffs' intent to seek withdrawal liability from them.

Relevant to this dispute is a recent decision by Judge Coar in the case of *Chi. Truck Drivers, Helpers & Ware-house Workers Union Pension Fund v. El Paso CGP Co., No. 04 C 7872, 2006 U.S. Dist. LEXIS 30085 (N.D. Ill. Apr. 17, 2006).* In that case, a different multiemployer pension fund sought to collect withdrawal liability from the same El Paso [*4] Defendants. Judge Coar granted summary judgment to the plaintiff fund, rejecting all of the defendants' arguments. Central States now seeks to bar several of the El Paso Defendants' arguments in this case under the principle of collateral estoppel. El Paso denies that collateral estoppel should apply.

*Factual Background*

This dispute stems from the withdrawal of ANR Advance Transportation Company ("ANR Advance") from Central States, a multi-employer pension fund. ANR Advance was the result of a November 1995 merger between two companies, ANR Freight Systems ("Freight") and Advance Transportation Company ("Advance"). Prior to the merger, Freight was bound by various collective bargaining agreements with a number of local unions affiliated with the International Brotherhood of Teamsters ("IBT"). Those agreements required Freight to make contributions to Central States on behalf of its employees. During the same period, Advance was bound by similar agreements and also made contributions to Central States.

Prior to the 1995 merger with Advance, Freight's sole shareholder was ANRFS Holdings, Inc. ("ANRFS"). In turn, ANRFS's sole shareholder was Defendant American Natural [*5] Resources Company ("ANRC"). ANRC's sole shareholder was Coastal Natural Gas Company ("Coastal Natural"), and Coastal Natural's sole shareholder was The Coastal Corporation ("Coastal"). In January 2001, Coastal merged with El Paso Merger Company, with Coastal as the surviving corporation. Coastal subsequently changed its name to Defendant El Paso. In April 2001, Coastal Natural changed its name to Defendant El Paso CNG. [1] In October 2002, ANRFS merged into Defendant Midwest; Midwest was the surviving company.

1  In December 2002, Defendant El Paso CNG became a limited liability company.

In 1995, ANR Advance Holdings ("Holdings") was formed as a wholly-owned subsidiary of ANRFS (the sole shareholder of Freight) and became the owner of Freight's stock. After the November 3, 1995 merger of Freight and Advance, Holdings became the sole shareholder of ANR Advance. Holdings was authorized to issue Class Y and Class Z voting common stock so that, by virtue of the merger, the ownership of the voting stock of Holdings [*6] was divided equally between ANRFS [2] and Advance's former stakeholders. [3]

2    After the 1995 merger, ANRC continued to own 100 percent of ANRFS, Coastal Natural owned 100 percent of ANRC and Coastal owned 100 percent of Coastal Natural.

3    Prior to the merger, Advance's stock was owned by several individual stakeholders unrelated to the Coastal companies and by an employee stock ownership plan maintained by Advance (the "ESOP").

Following the 1995 merger, ANR Advance (like Freight and Advance before it) was bound by various collective bargaining agreements under which ANR Advance was required to make contributions to Central States. On February 2, 1999 an involuntary Chapter 11 bankruptcy petition was filed against ANR Advance. On February 21, 1999, ANR Advance ceased operations covered by Central States and as a result effected a complete withdrawal from Central States. On March 3, 1999 an order for relief was entered in the Chapter 11 bankruptcy case, which transferred the case and converted it to Chapter [*7]  7. [4] On June 18, 1999 Central States filed a proof of claim for withdrawal liability in the amount of $ 23,193,020.99. On July 5, 2001, Central States filed an amended proof of claim for withdrawal liability in the amount of $ 20,724,279.15. Defendants admit having actual notice of the amended proof of claim no later than January 2002.

4    Thereafter, Peter C. Blain filed a Notice of Appearance and Request to Receive All Notices on behalf of Coastal Capital Corporation, Coastal, Coastal Midwest, Inc., and ANRFS in the bankruptcy case.

On December 20, 2004, the El Paso Defendants received a notice and demand for payment of withdrawal liability. Prior to that date, none of the Defendants filed a request for review or demand for arbitration with respect to ANR Advance's complete withdrawal. By letter dated March 16, 2005, the El Paso Defendants submitted a request for review to Central States. Central States denied that request, after which the El Paso Defendants initiated arbitration. [5] Central States subsequently [*8] filed this Complaint in district court seeking judgment in the amount of the assessed withdrawal liability, approximately $ 23 million.

5    The El Paso Defendants did not make any withdrawal liability payments to Central States before Central States filed the Complaint in this case. The first interim payment due on January 1, 2005 in the amount of $ 1,450,392.33 was paid on February 10, 2005. The second interim pay-

ment of $ 1,450,392.33 was due on February 1, 2005 and was paid on February 10, 2005.

### Statutory Framework

[HN2] The MPPAA imposes withdrawal liability on an employer withdrawing from a multiemployer pension fund. Withdrawal liability is measured as the employer's proportionate share of the plan's unfunded vested benefits, which is the difference between the present value of the vested benefits and the current value of the plan's assets. *29 U.S.C. §§ 1381, 1391; see also Central States, S.E. & S.W. Areas Pension Fund v. Johnson, 991 F.2d 387, 392 (7th Cir. 1993).* [*9]  A complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan, or permanently ceases all covered operations under the plan. *29 U.S.C. § 1383(a).*

[HN3] To collect withdrawal liability, a plan must first "determine the amount of withdrawal liability owed by a withdrawing employer." *29 U.S.C. §§ 1382, 1391; see also Central States, S.E. & S.W. Areas Pension Fund v. Bell Transit Co., 22 F.3d 706, 707 (7th Cir. 1994).* The plan must send the employer a notice and demand for payment. *29 U.S.C. § 1399(b)(1).* Upon receipt of the notice and demand, the employer may ask the plan to review its assessment under *29 U.S.C. § 1399(b)(2),* but must do so within 90 days. *29 U.S.C. § 1399(b)(2)(A).* If dissatisfied with the plan's review, the employer may initiate arbitration within a certain period. *29 U.S.C. § 1401(a)(1).* The employer must initiate arbitration within 60 days after the earlier of the date of the response to the request for review or 120 days after the date of the request for review. [*10]  *Id.*

If the employer fails to initiate arbitration, the assessment becomes due and owing and the plan may sue to collect it. *29 U.S.C. § 1401(b)(1); Bell Transit, 22 F.3d at 707.* If the employer fails to make payments in accordance with the schedule and fails to initiate arbitration, a fund may accelerate the schedule of payments making the entire amount of the assessment due. *29 U.S.C. § 1399(c)(5)(A).* Even if the employer requests review and initiates arbitration, it is required to make interim payments while the dispute is ongoing. *Central States, S.E. & S.W. Areas Pension Fund v. Wintz Props., Inc., 155 F.3d 868, 876 (7th Cir. 1998).* In other words, [HN4] the MPPAA establishes a "pay now, dispute later" mechanism whereby the employer must make interim payments while the dispute over withdrawal liability proceeds.

The definition of an "employer" under the MPPAA is critical to this case. [HN5] Under *29 U.S.C. § 1301(b)(1),* all trades or businesses under common control are treated as a single employer jointly and severally liable for withdrawal liability. *Central States, S.E. &*

*S.W. Areas Pension Fund v. Ditello, 974 F.2d 887, 889-90 (7th Cir. 1992).* [*11]  An employer does not effect a complete withdrawal from a fund if it ceases to exist by reason of "a change in corporate structure described in [*29 U.S.C. § 1369(b)*]" as long as the change does not cause an interruption in employer contributions or the obligation to contribute under the plan. *29 U.S.C. § 1398(1)(A)*. Further, "a successor or parent corporation or other entity resulting from any such change shall be considered the original employer." *29 U.S.C. § 1398*. Under the statute, a "change in corporate structure" as referenced in *29 U.S.C. § 1398* includes a "merger, consolidation or division." *29 U.S.C. § 1369*. "If a person ceases to exist by reason of merger, consolidation or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies." *29 U.S.C. § 1369(b)*.

[HN6] The MPPAA provides a further layer of protection to pension plans by providing that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall [*12] be determined and collected) without regard to such transaction." *29 U.S.C. § 1392(c)*. This provision requires only that a principal purpose of the transaction is to escape withdrawal liability; it does not require that evading withdrawal liability is the only purpose. *Santa Fe Pac. Corp. v. Central States, S.E. & S.W. Areas Pension Fund, 22 F.3d 725, 727 (7th Cir. 1994)*. Central States alleges in its complaint that a principal purpose of the 1995 merger of Freight and Advance was to evade or avoid withdrawal liability.

### Summary Judgment Standard

[HN7] Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. [HN8] In determining whether any genuine issue of material fact exists, all facts must be construed in the light most favorable to the non-moving party and all reasonable and justifiable inferences drawn in its favor.  [*13]  *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248*.

### Parties' Arguments for Summary Judgment

Plaintiffs, who seek to recover approximately $ 23 million in withdrawal liability from Defendants, argue that the Defendants forfeit any right to challenge the withdrawal liability assessment when they failed to initi-ate arbitration within the time prescribed by the MPPAA. Plaintiffs note that prior to the 1995 merger, Coastal, Coastal Natural, ANRC, ANRFS and Freight were in the same controlled group. After the merger, the ownership structure remained the same, except that Coastal, Coastal Natural, ANRC and ANRFS owned (through their one-hundred percent ownership of each other and Holdings) fifty percent of ANR Advance. Plaintiffs argue that this ownership structure existed at the time the ANR Advance bankruptcy case was filed, when the complete withdrawal occurred and when the proof of claim and amended proof of claim were filed.

Plaintiffs argue that subsequent [*14]  to the 1995 merger and pursuant to *29 U.S.C. § 1398(1)*, ANR Advance, as the successor to both Freight and Advance, was "considered the original employer," and therefore treated as if it was Freight. Because Coastal, Coastal Natural, ANRC and ANRFS were indisputably in the controlled group with Freight prior to the merger, Plaintiffs argue that they must be treated as having been in the controlled group with ANR Advance. [HN9] Entities previously in a controlled group with a party subject to withdrawal liability, but who claim to have severed their relationship with the party prior to withdrawal, are subject to the MPPAA's dispute resolution procedure. *See, e.g., Banner Indus., Inc. v. Central States, S.E. & S.W. Areas Pension Fund, 875 F.2d 1285, 1292-93 (7th Cir. 1989); Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 122-23 (4th Cir. 1991)*. Plaintiffs conclude that because Defendants were, at least at one time, in ANR Advance's controlled group, they forfeit their right to challenge the withdrawal liability assessment by failing to request review or initiate arbitration within the prescribed period after the filing [*15]  of the proof of claim or amended proof of claim in the ANR Advance bankruptcy case. [6]

> 6  Plaintiffs also argue that whether by operation of *29 U.S.C. § 1398(1)* or by corporate law, the El Paso defendants succeeded to the liabilities of Coastal and Midwest succeeded to the liabilities of ANRFS, just as Coastal Natural's change in name (and form) to El Paso CNG did not extinguish El Paso CNG's liability for Coastal Natural's debt.

Alternatively, Plaintiffs argue that they are entitled to receive interim withdrawal liability payments from Defendants while Defendants raise any challenges to withdrawal liability in arbitration, as disputes over this issue are expressly limited to arbitration by statute. Plaintiffs also claim they are entitled to a mandatory award of liquidated damages, attorneys' fees and costs as Defendants failed to make their first two payments in a timely manner.

Defendants seek summary judgment on the grounds that they were not members of the same controlled group [*16] as ANR Advance at the time of ANR Advance's complete withdrawal, that Central States had previously determined that the ANR Advance controlled group was separate from Defendants' corporate predecessors and that Central States is estopped from seeking judgment on a contrary theory. Defendants argue that Central States determined that Defendants had not engaged in an "evade or avoid" transaction at the time of the merger because the Fund determined that no withdrawal occurred at the time of the merger. Defendants argue that the Fund's determination that ANR Advance was the "original employer" for purposes of the MPPAA and the successor to both ANR Freight and Advance under § 1398(1) meant that the merger was deemed valid and not done to evade or avoid withdrawal liability. [7] Defendants argue that Plaintiffs are bound by their post-merger decision to treat the merger as a valid transaction. Defendants further argue that Plaintiffs reaffirmed their alleged, favorable "evade or avoid" determination when they included Advance's pre-merger contribution history in calculating ANR Advance's assessment. Defendants insist that when the Fund included that contribution history in the proof of [*17] claim and amended proof of claim, it further reaffirmed the validity of the merger.

> 7   More specifically, Defendants contend that § 1398(1) cannot cause a merged entity to be the "original employer" for withdrawal liability purposes unless § 1398(1) is triggered by one of the corporate transactions listed in § 1369(b)(3), i.e., a "merger, consolidation or division." As there was no division or other consolidation, only the merger could have triggered § 1398(1), but only if the merger was determined by Central States not to be an "evade or avoid" transaction.

Alternatively, Defendants seek summary judgment dismissing Count I on the grounds that the amended proof of claim did not satisfy the statutory requirements for imposing withdrawal liability. Defendants argue that the failure of the proof of claim and amended proof of claim to include a demand for payment or a payment schedule rendered them insufficient to provide notice under ERISA. They further argue that filing the proof of claim and amended [*18] proof of claim with the clerk of the bankruptcy court did not constitute receipt by the debtor. Harkening back to an earlier argument, Defendants also contend that the proof of claim and amended proof of claim failed to give notice that the Fund had made an "evade or avoid" determination that could have put Defendants on notice that they were at risk for withdrawal liability.

Defendants also argue that Counts I and II of Plaintiffs' Complaint should be dismissed on the basis of judicial estoppel. They argue that a default judgment Plaintiffs' secured against Holdings was based on a determination that Holdings was part of a controlled group separate from Defendants. Defendants note that when seeking the default judgment, Central States represented that the entire amount of the amended proof of claim was unpaid as of February 21, 2005, notwithstanding the fact that Defendant El Paso Midwest had made a nearly $ 3 million payment to Central States on February 8 of that year. Defendants contend that if Central States considered El Paso Midwest as part of the same controlled group as Holdings, they would have been obligated to credit the $ 3 million payment toward Holdings' obligation. [*19] Finally, Defendants attempt to prove that the 1995 merger was not an "evade or avoid" transaction.

In essence, Plaintiffs argue that Defendants, by virtue of their predecessors' ownership interest in ANR Freight, were also members of the controlled group of ANR Advance, the entity resulting from the merger of ANR Freight and Advance Transport. As members of the same controlled group as the merged entity, Defendants were obligated to initiate timely arbitration over the issue of whether withdrawal liability could be imposed upon them when the merged entity completely withdrew from the Fund several years after the merger. By failing to do so, Defendants waived their right to contest withdrawal liability either in arbitration or in district court.

Defendants, on the other hand, argue that their corporate predecessor effected a complete withdrawal at the time of the 1995 merger. If ever there were to be an evade or avoid determination, it was at the time that both ANR Freight and Advance Transport ceased their contributions to the Fund in 1995. Defendants argue that because Central States reviewed the merger shortly afterwards, and accepted contributions from the merged entity (ANR [*20] Advance) for several years, Central States recognized the validity of the merger under § 1398, in effect determining that the merger had not taken place for the purpose of evading or avoiding liability. Defendants contend that it is utterly inconsistent for the Funds to suggest now that the 1995 merger was, in fact, done to evade or avoid liability. Because of this history, Defendants argue that the filing of a proof of claim or amended proof of claim in bankruptcy court could not have provided notice that Central States considered them liable for ANR Advance's complete withdrawal from the funds.

### The Chicago Truck Drivers' Case

In a case before District Judge Coar, a different pension fund (The Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund)

sought to impose withdrawal liability upon the same Defendants named in this case. In that case, the fund's theory of liability was virtually the same as that presented in this case and was based upon the same underlying acts-ANR Freight's merger with Advance Transport and the merged entity's (ANR Advance's) complete withdrawal from the Fund several years later-as those at issue in this case. [*21] In that case, Defendants raised similar arguments as to their membership in ANR Advance's controlled group, their lack of notice that the fund intended to impose withdrawal liability upon them, and their right to pursue these issues in arbitration.

Judge Coar found that the issues before him were limited to "(a) whether the Fund was a multiemployer pension plan and Defendants were an employer for the purposes of ERISA; (b) whether the Fund notified Defendants of their assessed liability; and (c) whether Defendants failed to timely initiate arbitration." *Chi. Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. El Paso CGP Co., 2006 U.S. Dist. LEXIS 30085, No. 04 C 7872, 2006 U.S. Dist. LEXIS 30085, at *12 (N.D. Ill. Apr. 17, 2006).* Judge Coar found in the affirmative on each issue and granted summary judgment in favor of the plaintiff fund. Importantly, Judge Coar found that the facts clearly established that in the merger between ANR Freight and Advance Transportation, Freight was the surviving corporation in the merger. Because Freight survived the merger (despite changing its name to ANR Advance), the defendant companies' corporate predecessor "were under common control [*22] with ANR Freight, constituted a single employer within the meaning of ERISA" and were therefore "jointly and severally liable for ANR Freight's withdrawal liability, if any." *2006 U.S. Dist. LEXIS 30085, [WL] at * 12* (citing *Central States, S.E. & S.W. Areas Pension Fund v. Neiman, 285 F.3d 587, 594 (7th Cir. 2002)).*

Judge Coar found that the plaintiff fund had determined that the purpose of the merger was to evade or avoid withdrawal liability and rejected the defendants' argument that the merger was not taken to evade or avoid liability, finding that "evade and avoid determinations are issues reserved for arbitration." *2006 U.S. Dist. LEXIS 30085, at *13* (citing *29 U.S.C. § 1401(a)).* Because the plaintiff fund had alleged that the purpose of the merger was to evade or avoid liability, the Judge disregarded the merger for the purposes of the summary judgment motion. "Having alleged that ANR Freight was engaged in a merger to avoid withdrawal liability, Plaintiff has done all it must do to ask the Court to recognize ANR Freight's liability, and the joint and several liability of trades and businesses in common control with it." *2006 U.S. Dist. LEXIS 30085, at *15.* Similarly, the Judge ruled that the matter [*23] of whether the defendants had ceased being an "employer" under the MPPAA

(*i.e.,* a member of the merged entity's controlled group) was also a matter for arbitration. *2006 U.S. Dist. LEXIS 30085, at *18-19.* [8]

8   The Judge also noted that

It is undisputed that [Defendants were] *at some juncture* an employer under the MPPAA. When ANR Advance Transportation ceased contributing to the Fund, the Coastal Controlled Group (which was under common control with ANR Freight, the pre-merger entity) remained subject to the MPPAA's arbitration requirement. That Plaintiff, as Defendants argue, can only make this showing by alleging that the November 3, 1995 merger was an evade/avoid transaction is irrelevant.

*2006 U.S. Dist. LEXIS 30085, [WL] at * 15* (emphasis in original).

Additionally, Judge Coar found that the proof of claim filed in the ANR Advance bankruptcy case provided the defendants with sufficient notice of their potential withdrawal liability. "It is undisputed that Plaintiff notified Defendants of the amount of liability via a proof [*24] of claim Defendants admit receiving between September 1, 2001 and January 1, 2002." *2006 U.S. Dist. LEXIS 30085, at *19.* The Judge rejected all of the defendants' remaining challenges to the form of the notice.

Finally, Judge Coar found that the defendants were notified of their withdrawal liability no later than January 2002 but did not request review until February 2004, well outside the 90-day window for requesting review by the pension plan and even the additional 120-day period for initiating arbitration after requesting review. *2006 U.S. Dist. LEXIS 30085, at *23-24.* Judge Coar found the defendants' decisions in this case reminiscent of those of the defendant in *Central States, S.E. & S.W. Areas Pension Fund v. Slotky,* in which the Court of Appeals for the Seventh Circuit distinguished between parties "who had absolutely no reason to believe that they might be deemed members of a controlled group" and those who did. *956 F.2d 1369, 1373 (7th Cir. 1992).* Judge Coar observed that "[t]he defendant in *Slotky* behaved exactly as Defendants did in the instant case: He received notice of his liability, failed to timely initiate arbitration, and then sought to contest his membership in the controlled group [*25] in district court." *Chicago Truck Drivers, 2006 U.S. Dist. LEXIS 30085, at *25-26.* "In short, De-

fendants ignore that the only means by which Plaintiff was able to assess liability upon ANR Freight's predecessor corporation and those businesses under common control with it, is by declaring the November 3, 1995 merger an evade or avoid transaction. This issue arises under *29 U.S.C. § 1392(c)* and is an issue that must be arbitrated." *2006 U.S. Dist. LEXIS 30085, at \*27* (citation omitted). [9]

> 9    Judge Coar also rejected the defendants' argument that they were entitled to summary judgment on Count II of the plaintiff's complaint based on judicial estoppel. As in the instant case, the defendants in Judge Coar's case argued that the plaintiff's decision to pursue a default judgment against Holdings without crediting Holdings for the defendants' February 2005 interim payment constituted an admission, subject to judicial estoppel, that the defendants were not in the same controlled group. Judge Coar found that the defendants could not meet the standards for invoking judicial estoppel, and that, in particular, the plaintiffs' decision to seek a judgment against one defendant in default was not inconsistent with seeking judgment as a matter of law against the remaining defendants. *2006 U.S. Dist. LEXIS 30085, at \*28-30*.

### [*26] *Discussion*

The thrust of Defendants' response to Plaintiffs' motion for summary judgment is that they had no way of knowing that they were obligated to follow the MPPAA's dispute resolution procedures in response to the filing of the Amended Proof of Claim in bankruptcy court. Defendants suggest that if the Amended Proof of Claim constituted effective notice, parties with no knowledge that they might be targets for withdrawal liability could be found to have waived their rights to contest liability. Defendants, however, were not an "unsuspecting party." The undisputed facts demonstrate that they had actual knowledge of ANR's complete withdrawal, the bankruptcy case and the filing of the Amended Proof of Claim no later than January 2002.

Defendants acknowledge that they were members of ANR Freight's controlled group prior to the 1995 merger and remained fifty percent owners of ANR Advance (ANR Freight's successor) after the merger. [HN10] A party that was within the controlled group of a withdrawing entity is subject to the MPPAA's dispute resolution procedure. *See Banner Indus., Inc. v. Central States, S.E. & S.W. Areas Pension Fund, 875 F.2d 1285, 1292-94 (7th Cir. 1989)* [*27] (holding that the defendant was subject to the arbitration requirement "even though it had divested itself of control" of the withdrawing entity prior to that entity's withdrawal from the fund). As Magistrate

Judge Nolan ruled in an earlier phase of the *Chicago Truck Drivers* case:

> Defendants attempt to frame the issue here as whether they were ever an employer under the MPPAA by stating that they deny ever being a member of a controlled group of corporations that included ANR Advance []. The issue is not whether Defendants were ever an employer because Defendants admit being controlled group members with a contributing employer prior to the merger and the withdrawal. Defendants['] claim can only be that by virtue of the merger [they] ceased to be a MPPAA employer in time to avoid liability for ANR Advance['s] [] withdrawal. [HN11] Arbitration, not the courts, is the proper forum for the initial resolution of this issue. Entities that were once under common control with a contributing employer remain subject to the MPPAA's arbitration requirement in an evade or avoid case. Defendants were "certainly part of the controlled group of an employer subject to MPPAA at some [*28] point in time" because Defendants admit that they were under common control with ANR Freight, the pre-merger contributing entity that merged with Advance Transportation Company to create ANR Advance Transportation, the post-Merger contributor and withdrawn entity.

*Chicago Truck Drivers, No. 04 C 7872, 2006 U.S. Dist. LEXIS 30085, at \*10-11 (N.D. Ill. Oct. 18, 2005)* (citations omitted). In the instant case, Defendants raised no facts disputing their membership in ANR Freight's controlled group. [HN12] The issue of whether or not that status is sufficient to impose withdrawal liability is one for arbitration, not this Court.

Defendants argue that even if they are deemed to be former members of the controlled group, the filing of the Amended Proof of Claim did not provide sufficient notice of their potential withdrawal liability. Defendants mistakenly rely on *Central States, Southeast & Southwest Areas Pension Fund v. XTL Transp., No. 95 C 918, 1996 U.S. Dist. LEXIS 7610, 1996 WL 296649 (N.D. Ill. Jun. 3 1996)*, for this proposition. In *XTL Transp.*, the district court ruled that the mere filing of a proof of claim in a Chapter 7 proceeding was not sufficient to establish constructive notice. *1996 U.S. Dist. LEXIS 7610, at \*12-13*. While that [*29] reasoning is sound, the Defendants in this case did not need to rely on constructive notice;

they have admitted actual notice of the amended proof of claim. [10] I find that Defendants had sufficient notice of their withdrawal liability and that they were not denied due process.

> 10   In *Central States, S.E. & S.W. Areas Pension Fund v. Slotky, 956 F.2d 1369 (7th Cir. 1992)*, Central States filed a proof of claim for withdrawal liability in a Chapter 11 proceeding. *Id. at 1372*. After the proceeding was converted to Chapter 7, Central States mailed notice of withdrawal liability to the bankrupt employer, and also filed a new proof of claim in the bankruptcy proceeding. *Id*. Central States did not mail or otherwise deliver the notice to the controlled group member. *Id*. The Court, after stating that notice to one controlled group member was notice to all, held that the notice to the bankrupt entity was sufficient to give notice to the other controlled group member. *Id. at 1375*. The Court did not decide whether notice would be effective as to an entity that claimed to not be in the controlled group. However, the Court discussed the difference between cases in which an entity had "absolutely no reason to believe [it] might be deemed [a] member[] of a controlled group" (the Court used the example of the Easter Bunny) and those in which a putative employer was not a complete stranger to the withdrawn entity. *Id. at 1372-73*.

> It does not follow that a person can always sit back and wait to be sued for withdrawal liability and take his chances on the court's deciding the issue in his favor. What if the pension plan explicitly notifies the person of his potential liability, rather than notifying another member of the (alleged) controlled group? What if, like Slotky [the putative controlled group member] but unlike the Easter Bunny, he knows or should know that he might very well be deemed a member of a controlled group? In both cases it can be argued that the statutory policy of encouraging the prompt, nonjudicial resolution of disputes over withdrawal liability requires the alleged member of a controlled group to institute arbitration on penalty of losing all opportunity to contest his membership.

*Id. at 1373*.

[*30]  Defendants' objections to the form of notice also fall short. *See Cf. Central States, S.E. & S.W. Areas Pension Fund v. Basic Am. Indus., Inc., 252 F.3d 911, 918 (7th Cir. 2001)* (finding that [HN13] a plaintiff who "had already computed the withdrawal liability and sent notice of the amount, via the proof of claim, to [the defendant] substantially compl[ied] with the statutory requirement for notice of and demand for withdrawal liability." *Accord Central States, S.E. & S.W. Areas Pension Fund v. Koder, 969 F.2d 451, 453 (7th Cir. 1992)* (stating that the proof of claim filed in bankruptcy proceedings "was issued in accordance with ERISA guidelines"). Judge Coar's observations on the shortcomings of Defendants' arguments regarding the form of notice are on-point, and are as applicable to this case as they were to the case before him.

Finally, there is no dispute that Defendants failed to request review of withdrawal liability within 90 days of receiving actual notice of the Amended Proof of Claim in January 2002. Nor did Defendants initiate arbitration within the appropriate time period. For these reasons, I find that Defendants waived issues all reserved [*31] for arbitration, including their liability for ANR Advance's withdrawal from Plaintiffs' Fund. [11]

> 11   The only additional issue raised in Defendants' motion for summary judgment was their argument that Plaintiffs are estopped from arguing that Defendants were members of ANR Advance's controlled group because Plaintiffs were granted a default judgment against Holdings for the entire amount of the withdrawal liability but failed to credit Holdings with Defendant El Paso Midwest Company's interim payments. For the same reasons noted by Judge Coar in his opinion, I find that judicial estoppel is inappropriate. *See Chicago Truck Drivers, 2006 U.S. Dist. LEXIS 30085, at *29-30*.

In sum, I find Judge Coar's ruling in the *Chicago Truck Drivers* case persuasive. The facts presented by Defendants fail to distinguish this case in any significant manner. For that reason, Plaintiffs' Motion for Summary Judgment is granted and Defendants' Motion for Summary Judgment is denied.

### Damages Award

[*32]  Plaintiffs are entitled to an award of liquidated damages under *Section 502(g)(2) of ERISA. See 29 U.S.C. § 1132(g)(2)*. Plaintiffs are entitled to the unpaid contributions, as well as interest on the unpaid contributions, liquidated damages, and attorneys' fees and costs. *Id*. Plaintiffs should submit a brief memorandum outlin-

2006 U.S. Dist. LEXIS 82430, *

ing these damages; Defendants will have an opportunity to respond and object to any fees or costs before I rule. [12]

12   Plaintiffs submitted a supplemental motion seeking to have certain of Defendants' objections to the Plaintiffs' Statement of Additional Material Facts stricken based on alleged discovery abuses by Defendants. Plaintiffs also sought to supplement the record to indicate the fact that ANR Freight survived the merger with Advance based on Judge Coar's opinion. These motions are moot, as I addressed both issues as necessary within the context of the opinion.

***Conclusion***

Plaintiffs' Motion for Summary [*33]  Judgment is GRANTED. Defendants' Motion for Summary Judgment is DENIED.

ENTER:

James B. Zagel

United States District Judge

DATE: September 29, 2006

# Appendix 7

Central States Pension Fund v. Central Cartage Co.,
1998 WL 270889 (N.D.Ill. May 21, 1998)

142 F.3d 439                                                                                          Page 1
142 F.3d 439, 1998 WL 270889 (C.A.7 (Ill.))
**(Cite as: 142 F.3d 439, 1998 WL 270889)**

Central States, Southeast and Southwest Areas
Health and Welfare Fund v. Central Cartage Co.
C.A.7 (Ill.),1998.
NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions" appear-
ing in the Federal Reporter. Use FI CTA7 Rule 53
for rules regarding the citation of unpublished opin-
ions.)
United States Court of Appeals, Seventh Circuit.
CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS HEALTH AND WEL-
FARE FUND, Plaintiff-Appellee,
v.
CENTRAL CARTAGE COMPANY, a Michigan
Corporation, Defendant-Appellant.
**No. 97-2321.**

Submitted Oct. 16, 1997. FN*
Decided May 21, 1998.
Rehearing Denied July 16, 1998.

Appeal from the United States District Court for the
Northern District of Illinois Eastern Division, No.
94 C 774.Elaine E. Bucklo, Judge.

Before Hon. JOHN L. COFFEY, Hon. DANIEL A.
MANION, and Hon. MICHAEL S. KANNE, Cir-
cuit Judges.

### ORDER

MCDOUGALL, J.
**\*1** The defendant-appellant, Central Cartage Co.,
appeals from a grant of summary judgment in favor
of Central States, Southeast and Southwest Areas
Pension Fund (the "Pension Fund"), plaintiff-ap-
pellant herein, obligating Central Cartage to fulfill
its contractual obligation to pay employer contribu-
tions to the Fund. Central Cartage also challenges
the district court's denial of its motions to compel
alternative dispute resolution and permit its depos-
itions of Fund trustees regarding their contractual

intent. The Pension Fund has filed a motion to dis-
miss for lack of jurisdiction. We grant the Fund's
motion and dismiss this appeal, accordingly.

### I. BACKGROUND

Central Cartage is a Michigan corporation primarily
engaged in the business of local trucking. The
Company entered into a nationwide collective bar-
gaining agreement, known as the National Master
Freight Agreement, with the International Brother-
hood of Teamsters ("IBT"), spanning the period of
time from April 1, 1991, through March 31, 1994.
It also executed a supplemental agreement with the
union covering all "truck drivers, helpers, dockmen,
warehousemen, checkers, power-lift operators,
hostlers, and such other employees ... engaged in
local pickup, delivery and assembling of
freight."This supplemental agreement obligated
Central Cartage to contribute to the Pension Fund
for all employees covered under the agreements. It
further provided an alternative dispute resolution
mechanism whereby "[d]isputes or questions of in-
terpretation concerning the requirement to make
contributions on behalf of specific employees or
classifications of employees shall be submitted dir-
ectly to the Conference Joint Area Committee by
either the Employer, the Local Union, or the trust-
ees."

In February of 1994, the Pension Fund filed suit
against Central Cartage pursuant to section 515 of
the Employee Retirement Income Security Act
(ERISA), 29 U.S.C. § 1145, alleging that, during
the years 1991-1994, Central Cartage had intention-
ally mis-classified certain employees as "casual"
instead of "regular" employees, FN1 as well as
failed to pay employer contributions owed to the
Pension Fund on behalf of these employees. Then,
in January 1995, Central Cartage filed a motion to
dismiss the case and compel alternative dispute res-
olution, as provided for in the supplemental and
collective bargaining agreements. The Pension

Fund filed a motion for a protective order barring the deposition of several Fund trustees who Central Cartage wished to depose regarding their intentions as to whether non-union casual employees were to be covered by the supplemental and collective bargaining agreements. This motion was granted on February 25, 1995. The district court subsequently denied Central Cartage's motion to dismiss and compel alternative dispute resolution because, in its view, the Company failed to "promptly" invoke the provision in the agreement "until nearly a year after the case was filed."Central Cartage's motion for reconsideration of the court's order was denied. Instead of proceeding to trial, the Company filed an interlocutory appeal with this Court from the district court's ruling denying the motion to dismiss and compel alternative dispute resolution. We dismissed the appeal for lack of jurisdiction. *See Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co., 84 F.3d 988 (7th Cir.1996).* The Supreme Court denied Central Cartage's writ of certiorari from our judgment, *Central Cartage Co. v. Central States, Southeast and Southwest Areas Pension Fund, 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996),* and the case proceeded to trial on the merits in the district court.

**\*2** With the litigation back in the trial court, Central Cartage again petitioned to permit its deposition of the Fund trustees in order to ascertain their intent with respect to the meaning of terms set forth in the agreements at issue. This motion was denied because, as the court stated, "evidence of an idiosyncratic meaning could not be used to depart from the objective meaning of the words [since] ... this was not a normal two-party contract."Central Cartage then renewed its motion to dismiss the action and compel alternative dispute resolution. The court denied this renewed motion by a minute order, dated January 14, 1997. The Pension Fund subsequently filed a motion for summary judgment, contending that the doctrine of collateral estoppel precluded Central Cartage from litigating issues in this case that had already been decided in *Central States Pension Fund v. Central Cartage Co., 861*

*F.Supp. 1402 (N.D.Ill.1994),* aff'd,*69 F.3d 1312 (7th Cir.1995),* cert. denied,*517 U.S. 1134, 116 S.Ct. 1419 1996, 134 L.Ed.2d 544 ("Cartage I").* The trial judge entered summary judgment in the Fund's favor on May 1, 1997. *See Central States, Southeast and Southwest Areas Pension Fund, 962 F.Supp. 122 (N.D.Ill.1997).* In so doing, she concluded that the decision in *Cartage I* collaterally estopped Central Cartage from litigating the issue of whether contributions were due to non-union casuals and regular employees for paid holidays:

In [*Cartage II,*... the issues were whether, under the 1991-1994 Agreement, Cartage was liable for contributions on behalf of non-union casual employees and on behalf of regular employees for holidays during which the employees did not actually work, but for which they were paid. Judge Leinenweber [the district judge presiding over the *Cartage I* litigation] held that the unambiguous language of the Agreement mandated such contributions.... The issue in [*Cartage I* ] and this suit are therefore the same.

*Id.* at 123.The court also rejected as irrelevant Central Cartage's proffer of two affidavits of an individual involved in negotiating the 1991-1994 agreement:

The evidence referred to in the ... affidavits concern the parties' intent viz-a-viz the 1991-1994 Agreement and the Fund's knowledge of that intent. Reviewing whether the same affidavits were conclusive or dispositive for the purpose of a *Fed.R.Civ.P. 60(b)(6)* motion in [*Cartage I* ], which Judge Leinenweber denied, the Seventh Circuit concluded that the affidavits we "not even relevant ."

*Id.*

On May 19, 1997, Central Cartage appealed from the order granting the Pension Fund's motion for summary judgment. The Fund filed a motion to dismiss the appeal for lack of jurisdiction only days later, arguing that "the named appellant is a corporation unrelated to the original defendant, which did not even exist until nearly two years after the com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaint was filed and served.... Since the notice of appeal was not filed by a party to the litigation, it is improper and, as such, the appeal should be dismissed."By an order dated July 24, 1997, we informed the parties that we would consider the Fund's motion to dismiss with the merits of this appeal.

## II. ISSUES

**\*3** We are called upon to consider four issues. Initially, we must address the issue raised in the Pension Fund's motion to dismiss as to whether we even have jurisdiction to hear this appeal. If that threshold question is answered in the affirmative, we shall then turn to discuss the several arguments Central Cartage raises: (1) that it was improperly denied the right to compel alternative dispute resolution in this case; (2) that the district court committed reversible error by denying the Company the right to depose the Fund trustees regarding their intent when negotiating the agreements; and (3) that summary judgment was improperly granted in the Pension Fund's favor.

## III. DISCUSSION

As noted above, the Pension Fund argues that the party bringing the instant appeal, Central Cartage, was not a party to the litigation before the district court. And it goes without saying that only a party in interest to the litigation may appeal from a judgment entered therein. *See, e.g., Diehl v. United States,* 438 F.2d 705, 711 (5th Cir.1971) ("The attorney for Mrs. Beth Koehler Diehl and Mr. Ritter gave notice of appeal from the judgment below, and thereby seeks to become a party on appeal. He was not a party below; he cannot be a party to this appeal."). We are in agreement with the Pension Fund, and believe that this appeal should be dismissed. Insofar as the facts underlying our decision are somewhat complex, we shall set them forth in particular detail below.

In 1932, Central Cartage Co. ("Old Cartage") was

incorporated under the laws of Michigan. Its corporate identification number was 108-175 and its parent was CenTra, Inc., a Delaware corporation. The Pension Fund instituted the suit giving rise to this appeal against Old Cartage in 1994. On December 13, 1995, during the pendency of action against Old Cartage, and allegedly unbeknownst to the Pension Fund and the trial court, a new entity, Central Cartage Co. of Michigan, Inc. ("New Cartage"), was incorporated. Its corporate identification number was 353-980 and its parent also was CenTra, Inc. Then, on December 31, 1995, New Cartage dropped the "of Michigan, Inc." from its name. As a result, there were two separate entities-Old Cartage and New Cartage-with identical names, Central Cartage Co. The same day New Cartage assumed the name of Old Cartage, Old Cartage merged into its parent, CenTra, and went out of existence. What were once Old Cartage's assets and liabilities were transferred to New Cartage. Then, on August 9, 1996, CenTra sold 100 percent of its interest in New Cartage to U.S. Truck Company, Inc. The district court entered summary judgment against Cartage Co. on May 1, 1997-this was the same Cartage Co. against whom the action was brought, that is, Old Cartage. However, the certificate of appeal filed by "Central Cartage Co." identified the appellant's parent as U.S. Truck Company, Inc. We can assume, therefore, that New Cartage, as opposed to Old Cartage, against whom the action was originally brought, filed the present appeal.

**\*4** The Pension Fund argues that, because it instituted its action against Old Cartage, and the party appealing from the district court's judgment is New Cartage, a separate entity, New Cartage may not bring its appeal since it was neither a party to the litigation nor substituted as a party pursuant to Fed.R.Civ.P. 25(c).Rule 25(c) provides, in relevant part:

In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion or joined with the original party.

Fed.R.Civ.P. 25(c). New Cartage, on the other hand, argues that it is the appropriate party to appeal to the extent that "Central Cartage Co. never changed its trucking operations" and that it "in substance" is "the same Central Cartage that existed before any merger in 1995."(Appellant's Br., at 8-9). It concludes that "Central Cartage Co. is the proper party to this appeal having had a judgment entered by the district court either against it or its predecessor in interest."(*Id.* at 10).

We are of the opinion that New Cartage does not have standing to appeal the judgment of the trial court, and as such, we dismiss this appeal for lack of jurisdiction. In *Cartage I,* 69 F.3d at 1315, this Court held that the survivor of a corporate merger was liable for the ERISA contributions of the entity whose existence ceased after the merger. General Highway Express ("GHE") had entered into bankruptcy without paying all of its obligations to the Pension Fund. The bankruptcy court approved a plan of reorganization whereby GHE was to contribute to the Fund over a ten-year span, beginning in 1983. Central Transport merged with GHE in 1987, and the payments GHE was to make ceased in 1988. Central Transport claimed that these payments were made unnecessary by a settlement agreement with the Pension Fund in November of 1988. We disagreed, and held Central Transport liable for the contributions because "Central Transport now 'is' GHE (in corporate law the merged firm is a continuation of its predecessor).... [T]he settlement agreement did not extinguish GHE's obligation (now Central Transport's) under the plan of reorganization in bankruptcy."*Id.* Applying the reasoning of *Cartage I* to the facts of this case, it is clear that New Cartage is not liable for Old Cartage's liability. Either Old Cartage (which no longer exists) or CenTra, Inc. (the company into which Old Cartage merged) is liable on the obligation to pay into the Fund. Because New Cartage was not substituted as a party under Fed.R.Civ.P. 25(c), it does not have standing to appeal.

The appellant submits that this conclusion contradicts authorities from two of our sister-circuits, *Hal Roach Studios v. Richard Feiner and Co.,* 896 F.2d 1542 (9th Cir.1989), and *Island Improvement Co. v. Holman,* 99 F.2d 63 (10th Cir.1938). In our view, neither of these cases are on point and, in fact, they do not even consider the effect of Rule 25(c). In *Hal Roach Studios,* the appellee, Hal Roach Studios ("HRS"), initially brought suit against Feiner & Co. and its president, Richard Feiner. HRS then filed a first amended complaint, based on diversity jurisdiction, against Feiner & Co. only. Although Richard Feiner was no longer a party to the action, HRS sought summary judgment against both Richard Feiner and Feiner & Co. The district court granted that motion as against both parties. Both Richard Feiner and Feiner & Co. appealed, at which time Hal Roach Studios argued that, "because Richard Feiner was not a proper party in this action, he lacks standing to appeal the judgment against him."*Id.* at 1546.The Ninth Circuit rejected this argument, concluding that "a nonparty against whom judgment is entered has standing without having intervened in the district court action to appeal the district court's exercise of jurisdiction over him."*Id.* (citations omitted). In this case, summary judgment was entered against Old Cartage, not New Cartage-*Hal Roach Studios* is thus inapposite.

**\*5** Nor does *Island Improvement Co.* compel us to reach a different result. In that case, Island Improvement Co. was owner of one-half the outstanding issue of mortgage bonds. The mortgages were foreclosed upon, and Island Improvement Co. acquired an undivided on-half interest in the land by reason of its 50 percent ownership of the bonds. The trustee of the holders of the bonds subsequently made claims against the parties in bankruptcy, Warren and Ray Holman. After the Holmans interposed separate motions to dismiss the proceedings, Island Improvement Co. filed petitions requesting, *inter alia,* that the bankrupts be required to pay rent on the land secured by the mortgages. The court granted this petition in part, and rejected it in part, whereupon the Island Improvement Com-

pany appealed. On appeal, the Holman's contended that "the Improvement Company has no standing to maintain the appeals for the reason that as a bond-holder it is not a proper party in interest for that purpose...."99 F.2d at 66. The Tenth Circuit concluded that because the Improvement Company possessed an undivided one-half interest in the property at issue, and "[t]he questions at hand were raised by the Improvement Company *after it became owner of such interest* ... it is clearly a proper party interest to maintain the appeals."*Id.* at 66 (emphasis added). Here, the Pension Fund initiated the suit, and raised the Fl "questions at hand," before New Cartage, the party filing the appeal, even came into existence. The appellant's reliance on *Island Improvement Co.* is thus misplaced.

### IV. CONCLUSION

For the reasons stated, we conclude that this appeal must be dismissed for lack of jurisdiction. The appellant, "New Cartage," was not a party to the litigation in the district court, and has not been properly substituted as a party to the litigation pursuant to Fed.R.Civ.P. 25(c). Accordingly, we do not reach the merits of the appellant's arguments.

DISMISSED

> FN* This successive appeal has been submitted to the same panel under Operating Procedure 6(b). After an examination of the parties' briefs and the record, we have concluded that oral argument is unnecessary. Accordingly, the appellant's request for oral argument is denied and the appeal is submitted on the briefs and the record. *See*Fed.R.App.P. 34(a); Cir.R. 34(f).

> FN1. This reclassification lowered the level of contribution Central Cartage would have been required to pay to the Pension Fund.

C.A.7 (Ill.),1998.
Central States, Southeast and Southwest Areas

Health and Welfare Fund v. Central Cartage Co.
142 F.3d 439, 1998 WL 270889 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Appendix 8

Contingent Bankruptcy claim (JE34)(excerpts)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN (DETROIT)

| ...e of Debtor Treck Co. Holdings, Inc. | Case Number 99-59973 Wt 11 Crd. M. : 3088088 | FILED |
|---|---|---|

PR 28 A

...DETROIT

THIS SPACE IS FOR COURT USE ONLY

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

...e or Creditor (The person or other entity to whom the debtor owes money or property):
Central States Pension Fund

...me and Address where notices should be sent
...onal States Pension Fund
9377 W. Higgins Road
...semont IL, 60018-4938

Telephone Number: (847) 518-9800

...ount or other number by which creditor identifies debtor:

☐ Replaces
☐ Amends a previously filed claim, dated _____

1. Basis for Claim
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries, and compensation (fill out below)
Your SS #: _____
Unpaid compensation for services performed
from _____ to _____
(date)    (date)

Date debt was incurred:
12/23/99

3. If court judgment, date obtained:

2. Total Amount of Claim at Time Case Filed:    $ 72,545,882.56    (Contingent) (See attached)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. Secured Claim.
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other _____

Value of Collateral:  $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $ _____

6. Unsecured Priority Claim.
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority  $ _____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,300),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4).
☐ Up to $1,950* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

*Amounts are subject to adjustment on 4/1/01 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

THIS SPACE IS FOR COURT USE ONLY

7. Credits:  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

9. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)

Pete Priede, Manager, Operations Accounting

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

The amount of the Pension Funds non-contingent unsecured claim for withdrawal liability filed herewith in the amount of $3,008,597.51 was computed on the assumption that all of the contribution history of any corporation known as either Central Transport, Inc. or Central Cartage Co. for any time period prior to September 1996 is attributable to CenTra, Inc., and not attributable to the Debtor for purposes of computing the Debtor's withdrawal liability. If that assumption is incorrect, the Pension Fund's claim against the Debtor will be increased by some or all of the amounts claimed in this contingent proof of claim.

The additional amount of $11,328,045.37 will be due to the Pension Fund from the Debtor for withdrawal liability contingent upon a determination that all of the contribution history of any corporation known as either Central Transport, Inc. or Central Cartage Co. for any time period prior to September 1996 is attributable to the Debtor, rather than CenTra, Inc., for purposes of computing the Debtor's withdrawal liability. This amount would be in addition to the amount of $3,008,597.51 claimed in the Pension Funds unsecured claim for a total withdrawal liability claim of $14,336,642.88. Under this contingency, the amount of this contingent claim would be reduced from $12,525,682.56 as set forth on the proof of claim to $11,328,045.37.

In the alternative, even if it is determined that all of the contribution history of any corporation known as either Central Transport, Inc. or Central Cartage Co. for any time period prior to September 1996 would otherwise be attributable to CenTra, Inc., and not attributable to the Debtor for purposes of computing the Debtor's withdrawal liability, an additional amount of $12,525,682.56 will be due from the Debtor contingent upon a determination that a principle purpose of a corporate reorganization in December 1995 of CenTra, Inc., the subsequent sale by CenTra of two subsidiaries to the Debtor during 1996 and the transaction in August 1996 by which CenTra, Inc. and the Debtor allegedly ceased to be under common control (as that phrase is defined at 29 U.S.C. § 1301 and implementing regulations) was to evade or avoid withdrawal liability. See Section 4212(c) of ERISA which provides that "[I]f a principal purpose of any transaction is to evade or avoid [withdrawal] liability under this part, this part shall be applied (and liability determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c). This amount would be in addition to the amount of $3,008,597.51 claimed in the Pension Funds unsecured claim for a total withdrawal liability claim of $15,534,280.07. Under this alternative theory of liability CenTra, Inc. and the Debtor would constitute a single group of trades or businesses under common control and CenTra, Inc. would be jointly and severally liable for the full amount of the Pension Fund's withdrawal liability claims against the Debtor (represented by the Pension Fund's unsecured claim in the amount of $3,008,597.51 plus this contingent claim in the amount of $12,525,682.56).

CONTROLLING EMPLOYER NAME.
U. S. TRUCK CO. HOL .NGS, INC. / CenTra

SUMMARY OF PROOF OF CLAIM

| | |
|---|---|
| 1997 PARTIAL WITHDRAWAL | $11,255,761.83 |
| 1999 COMPLETE WITHDRAWAL. | 4,288,518.24 |
| TOTAL AMOUNT OF CLAIM | $15,534,280.07 |
| U.S. TRUCK GENERAL UNSECURED CLAIM | (3,008,597.51) |
| TOTAL AMOUNT OF CLAIM | $12,525,682.56 |

Document Number:

Withdrawn Company Name:                    U.S. TRUCK CO HOLDINGS, INC. / CenTra
Company:

Type of Calculation:                       1997 Partial Withdrawal

Date Prepared:                             April 12, 2000

Section I - Pre-1980 Pool

Withdrawn Employer's Contributions
(1975 - 1979)

| Year | Contributions | # CBUs |
|------|--------------|--------|
| 1975 | 0.00 | 0.0 |
| 1976 | 0.00 | 0.0 |
| 1977 | 0.00 | 0.0 |
| 1978 | 0.00 | 0.0 |
| 1979 | 0.00 | 0.0 |
| Total | 0.00 | |

All Employer's Contributions (1975 - 1979)          1,993,217,554

Allocation Fraction                                 0.0000000000

Unamortized 12/31/79 UVB                            0

Pre-1980 Pool Liability                             $0.00

Section II - Post-1979 Pool

Withdrawn Employer's Contributions
Last 10 Years

| Year | Contributions | #CBUs |
|------|--------------|-------|
| 1987 | 8,193,101.30 | 118,253.0 |
| 1988 | 8,444,783.20 | 118,314.0 |
| 1989 | 7,840,716.60 | 106,041.0 |
| 1990 | 6,843,164.60 | 96,251.0 |
| 1991 | 6,830,053.20 | 86,853.0 |
| 1992 | 6,633,029.50 | 80,140.0 |
| 1993 | 6,784,121.50 | 77,077.0 |
| 1994 | 6,823,573.20 | 72,079.0 |
| 1995 | 6,379,264.20 | 64,016.0 |
| 1996 | 6,122,956.40 | 55,555.0 |
| Total | $70,814,744.10 | |

Employers' Contributions Last 10 Years             7,182,562,434

Allocation Fraction                                0.0098592591

Net Change in UVB @ 12/31/96                       1,755,513,368

                                                                    FUND 14086
Post-1979 Pool Liability                           $17,311,018.92

ssment Number:

ithdrawn Company Name:                    U.S. TRUCK CO HOLDINGS, INC. / CenTra

ection III - Adjustments to Liability

Unadjusted Liability                                              $17.311,018.82

De Minimis Rule                                                        0.00

Prior Assessment Credit                                               0.00

artial Prorate                                                  6,045,257.09

Sec. 4225 Limitations                                                 0.00

Adjusted Liability                                             $11,265,761.63

ection IV - Partial Prorate

CBUs in Next Year                                                  24,373.0

5 Year Average # CBUs
| Year | # CBUs |
|------|--------|
| 1993 | 60,140.0 |
| 1994 | 77,077.0 |
| 1995 | 72,079.0 |
| 1996 | 64,018.0 |
| 1997 | 65,655.0 |
| Total | 348,969.0 |

5 Year Average                                                    69,793.8

Prorate Fraction                                                0.6507855999

Remaining Liability                                              17,311,018.92

Partial Prorate                                                 $6,045,257.09

ssment Number:

ithdrawn Company Name:    U S TRUCK CO HOLDINGS, INC. / CenTra
ress:

/pe of Calculation:    1999 Complete Withdrawal Estimate

te Prepared:    April 12, 2000

tion I - Pre-1980 Pool

Withdrawn Employer's Contributions (1975 - 1979)

| Year | Contributions | # CBUs |
|------|---------------|--------|
| 1975 | 0.00 | 0.0 |
| 1976 | 0.00 | 0.0 |
| 1977 | 0.00 | 0.0 |
| 1978 | 0.00 | 0.0 |
| 1979 | 0.00 | 0.0 |
| Total | 0.00 | |

All Employer's Contributions (1975 - 1979)    1,893,217,854

Allocation Fraction    0.0000000000

Unamortized 12/31/79 UVB    0

Pre-1980 Pool Liability    $0.00

tion II - Post-1979 Pool

Withdrawn Employer's Contributions Last 10 Years

| Year | Contributions | #CBUs |
|------|---------------|-------|
| 1989 | 7,640,716.80 | 108,041.0 |
| 1990 | 6,863,164.80 | 95,251.0 |
| 1991 | 6,930,053.20 | 86,853.0 |
| 1992 | 6,833,029.60 | 80,140.0 |
| 1993 | 6,764,121.60 | 77,077.0 |
| 1994 | 6,623,573.20 | 72,079.0 |
| 1995 | 6,379,264.20 | 64,018.0 |
| 1996 | 6,152,955.40 | 55,855.0 |
| 1997 | 4,831,996.00 | 39,661.0 |
| 1998 | 3,113,415.20 | 24,373.0 |
| Total | $62,122,290.80 | |

All Employers' Contributions Last 10 Years    7,750,339,021

Allocation Fraction    0.0080154288

Net Change in UVB @ 12/31/98    1,738,242,344

Post-1979 Pool Liability    $13,916,726.93    FUND 14088

817-407  12/01'd  8CF-L        ROBINSON Y SOLICITORS   15:15  00-21-701

U S TRUCK CO HOLDINGS, INC / CenTra
:ssment Number:

thdrawn Company Name:     U S TRUCK CO HOLDINGS, INC. / CenTra

ction III - Adjustments to Liability

. nadjusted Liability                                    $13,916,728.92

   s Minimis Rule                                              0.00

Prior Assessment Credit                                  9,645,208.69

   srtial Prorate                                             0.00

   sc. 4225 Limitations                                       0.00

Adjusted Liability                                       $4,268,518.24

ction IV - Partial Prorate

   CBUs in Next Year                                          0.0

   5 Year Average # CBUs
          Year        # CBUs
          1994        72,079.0
          1995        64,015.0
          1996        55,655.0
          1997        39,591.0
          1998        24,373.0
          Total       255,788.0

   5 Year Average                                         51,157.2

~iorate Fraction                                          1.0000000000

   maining Liability                                     13,916,728.93

   artial Prorate                                         $0.00

Summary Page For One Prior Assessment

Credit For Prior Year Partial Withdrawal
*******************************************
Controlling Employer Name:            U S Truck Co Holdings, Inc./Can


29 CFR 2645.7 - Reduction Of Credit For Reduction Of
        Prior Partial Withdrawal Assessment.

Prior Reductions/Write Offs:              0.00
Principal Demand Collectible
        From Prior Assessment:      11,265,761.83

Prior Assessment:                    11,265,761.83

Adj. Fraction                             1.00

Total Credit For Prior Assmt.         3,641,208.63
                                     ━━━━━━━━━━━━━━

```
**************************
Enter the number of partial Ithdrawals in prior years:            1
Enter the Controlling Employer Name:    U S Truck Co Holdings, Inc./Cen
Enter the Current Withdrawal Year:      1998

Enter the following information for the partial withdrawal with the
earliest withdrawal date:
        Withdrawn Company Name:         U S Truck Co Holdings, Inc./Cen
        Assessment No.:
        Prior Partial Withdrawal Year:          1997
        Interest Rate for Prior Assmt.:         8.00%
        Prior Assessment:               11,265,761.83
        Pre-1980 Pool Contributions:            $0.00
        Pre-1980 Pool Fraction:         0.0000000000
        Current Pre-1980 Pool:          0.00
        Unadjusted Post-1979 Pool:      17,311,018.92
        Unadjusted Prior Assessment:    17,311,018.92
        Partial Prorate Fraction:       0.6507855999
        Prior Assmt. Reductions/Write Offs:     0.00
        10-Year Amortization Of Prior Assessment Post-1979 Pool
        **************************************
```

| Calendar Year | Amort. Year | Unamortized Balance | Interest | Imputed Payment |
|---|---|---|---|---|
| 1997 | 0 | 17,311,018.92 | 1,384,881.51 | 2,579,882.30 |
| 1998 | 1 | 16,116,048.14 | 1,289,283.85 | 2,579,852.30 |
| 1999 | 2 | 14,825,479.69 | 1,186,038.37 | 2,579,832.30 |
| 2000 | 3 | 13,431,665.76 | 1,074,533.26 | 2,579,832.30 |
| 2001 | 4 | 11,926,346.73 | 954,107.74 | 2,579,832.30 |
| 2002 | 5 | 10,300,602.17 | 824,048.17 | 2,579,852.30 |
| 2003 | 6 | 8,544,798.04 | 683,583.84 | 2,579,852.30 |
| 2004 | 7 | 6,648,529.59 | 531,882.37 | 2,579,852.30 |
| 2005 | 8 | 4,600,559.65 | 368,044.77 | 2,579,852.30 |
| 2006 | 9 | 2,388,752.13 | 191,100.17 | 2,579,852.30 |
| 2007 | 10 | 0.00 | | |

```
9 CFR 2619.4(c)(1) Adjustment:

        Current Pre-1980 Pool:                  0.00
        Unamortized Prior Assessment
        Unadjusted Post-1979 Pool:              14,825,479.69
                                                --------------
        Unamortized Old Liabilities:            14,825,479.69
        Prior Assessment
        Partial Prorate Fraction:               0.6507855999
                                                --------------
        29 CFR 2619.4(c)(1)                     9,648,202.69

29 CFR 2649.4(c)(2) Adjustment:

        Prior Assessment:                       11,265,761.83

        Unadjusted Prior Assessment:            17,311,018.92
        Prior Assessment
        Partial Prorate Fraction:               0.6307855999

        Adjustment Fraction Denominator:        0.9999999990
                                                --------------
```

# Appendix 9

Transcript of deposition of Louis Kasischke (RE268)(excerpts)

# In The Matter Of:

## CENTRA, INC.   v.
## JAFFE, RAITT, HEUER  &  WEISS

---

## Louis Kasischke
## Vol. 1, November 2, 2000

---

## Esquire Deposition Services
### 2560 Crooks Rd.
### Troy, MI  48084
### (248) 244-9700    FAX: (248) 244-8804

Original File CASKASIS.PRN, 115 Pages
Min-U-Script® File ID: 0834381835

# Word Index included with this Min-U-Script®

JAF 000048

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CENTRA, INC., a Delaware corporation,

Plaintiff,

-vs- Case No. 93-327681-NZ

JAFFE, RAITT, HEUER & WEISS, P.C.,

Defendant.

DEPONENT: LOUIS W. KASISCHKE

DATE: Thursday, November 2, 2000

TIME: 1:20 p.m.

LOCATION: 38525 Woodward Avenue
Suite 1200
Bloomfield Hills, Michigan

REPORTER: Cindy A. Steltenkamp, CSR-4696



APPEARANCES:

SEIKALY & STEWART, P.C.
By: William R. Seikaly
505 North Woodward
Suite 2300
Bloomfield Hills, Michigan 48304
(248) 723-5120
Appearing on behalf of the Plaintiff.

DICKINSON WRIGHT, P.L.L.C.
By: Richard A. Wilhelm
500 Woodward Avenue
Suite 4000
Detroit, Michigan 48226-3425
(313) 223-3550
Appearing on behalf of Defendant.



(appearances continued)

DOMINA LAW, P.C.
By: David A. Domina
1065 North 115th Street
Suite 150
Omaha, Nebraska 68154-4423
(402) 493-4100
Appearing on behalf of A. Anne Moroun.

ALSO PRESENT:
Christopher Cataldo



I N D E X


| WITNESS | PAGE |
|---|---|
| LOUIS W. KASISCHKE | |
| Examination by Mr. Wilhelm | 7 |


E X H I B I T S


| NUMBER | IDENTIFICATION | PAGE |
|---|---|---|
| Ex. 1 | request to IRS for ruling on reorganization | 7 |
| Ex. 2 | letter | 7 |
| Ex. 3 | letter from Ron Lech to IRS 11/3/87 | 7 |
| Ex. 4 | letter from Ron Lech to IRS 8/14/87 | 7 |
| Ex. 5 | letter from Corroon & Black 10/1/87 | 7 |
| Ex. 6 | ruling from IRS | 7 |
| Ex. 7 | transmittal letter from Arthur Andersen | 7 |


JAF 000049

Kasischke
, November 2, 2000

CENTRA, INC. v.
JAFFE, RAITT, HEUER & WEISS

Page 5

EXHIBITS

| BER | IDENTIFICATION | PAGE |
|---|---|---|
| 8 | letter from Ron Lech 10/2/87 | 7 |
| 9 | transmittal letter from Arthur Andersen | 7 |
| 10 | letter from Ron Lech to the IRS 8/14/87 | 7 |
| 11 | letter from Corroon & Black | 7 |
| 12 | letter from Arthur Andersen | 7 |
| 13 | letter from Ron Lech to the IRS 8/4/87 | 7 |
| 14 | letter from Arthur Andersen to the IRS - 7/29/87 | 7 |
| 15 | copy of the ruling | 7 |
| 16 | letter from Louis Kasischke to M. J. Moroun - 9/30/88 | 7 |
| x. 17 | letter from Louis Kasischke to Ron Lech - 4/4/88 | 7 |
| x. 18 | letter from Ira Jaffe to Ron Lech | 7 |

Page 6

EXHIBITS

| NUMBER | IDENTIFICATION | PAGE |
|---|---|---|
| Ex. 19 | resolution of consent | 7 |
| Ex. 20 | letter from Ira Jaffe to Ron Lech and M. J. Moroun - 2/2/89 | 7 |
| Ex. 21 | letter from Ira Jaffe to Louis Kasischke 11/23/88 | 7 |
| Ex. 22 | list of resolutions | 7 |
| Ex. 23 | letter from Richard Wilhelm to Louis Kasischke - 10/9 | 18 |
| Ex. 24 | 12/11/87 letter | 43 |
| Ex. 25 | from letter Ira Jaffe to M. J. Moroun - 2/89 | 72 |

Page 7

[1] Bloomfield Hills, Michigan
[2] Thursday, November 2, 2000
[3] At or about 1:20 p.m.
[4]
[5]
[6]
[7]         LOUIS W. KASISCHKE
[8] was thereupon called as a witness herein and, after
[9] having been first duly sworn to tell the truth, the
[10] whole truth and nothing but the truth, was examined
[11] and testified as follows:
[12]     (Deposition Exhibit Nos. 1-22 marked.)
[13]         EXAMINATION
[14]     BY MR. WILHELM:
[15]     Q: For the record, I'm Rick Wilhelm, and I want to make sure
[16] at the start that I'm pronouncing your last name
[17] correctly. Is it Kasischke?
[18]     A: That's close enough.
[19]     Q: I won't be offending you if I —
[20]     A: No, not at all. I pronounce it Kasischke. Actually, it's
[21] my wife's pronunciation.
[22]     Q: I won't argue with your wife.
[23]     A: I agree to go along with it.
[24]     Q: Mr. Kasischke, I'd like to see if we can get some
[25] administrative stuff out of the way to begin with. I had

Page 8

[1] sent you a letter asking you to bring certain categories
[2] of documents, and Mr. Seikaly reviewed that letter before
[3] we started today, but I'd like to ask you if you can just
[4] describe briefly the effort you made to try to identify
[5] documents that were responsive to the categories I
[6] identified in my letter.
[7]     A: Yes. What I did was I went to my office, the Dykema firm,
[8] and I pulled the files that I happened to have there, and
[9] I personally reviewed those files. And I also then asked
[10] Steve Grob who was my — was assisting me, G-R-O-B, who
[11] was assisting me at the time we did this reorganization
[12] matter and who now is principally responsible for the
[13] CenTra work in our law firm to review whatever he had
[14] responsive to your request. I sent him a copy of your
[15] request. And Steve reviewed between forty and fifty files
[16] in that connection that he had, and some of what you have
[17] here today is a result of his findings and some as a
[18] result of my finding.
[19]     Now, it is possible that there are still some records
[20] off site. We reviewed everything on site. We do have
[21] storage facilities off site, and it is conceivable that
[22] there is something out there that has not been reviewed.
[23]     Q: Do you believe that it's reasonable that since the
[24] reorganizations that we're concerned about date back to
[25] the mid and late '80s and that it's likely that there are

JAF 000050

CENTRA, INC.  v.
JAFFE, RAITT, HEUER & WEISS

Louis Kasischke
Vol. 1, November 2, 2000

Page 25

[1]    Q: Do you have any familiarity with the nature of the work
[2] that Frank Zinn performed for —
[3]    A: Mostly the corporate.
[4]    MR. SEIKALY: I'm sorry, Dave told you earlier that
[5] attorneys tend to talk too much. You can't talk over one
[6] another.
[7]    THE WITNESS: I'm sorry.
[8]    MR. SEIKALY: He didn't finish his question, and I'm
[9] curious about what he's about to ask. I for whom?
[10]    THE WITNESS: I'm inexperienced at this. This is my
[11] first deposition, so you have to bear with me.
[12]    MR. SEIKALY: Attorneys happen to be bad witnesses
[13] for that reason, but go ahead. Would you finish your
[14] question so we make sure we're answering the right one.
[15]                  BY MR. WILHELM:
[16]    Q: — for CenTra?
[17]    A: What kind of work did Frank do for CenTra?
[18]    Q: For CenTra.
[19]    A: Corporate.
[20]    Q: Was Dykema Gossett outside corporate counsel for CenTra?
[21]    A: One of the outside. They had a lot of things going. They
[22] used a lot of lawyers. And I think it's fair to say that
[23] Dykema was probably the lead on corporate matters, but
[24] there's regulatory matters, you know, highly specialized
[25] regulatory matters, ICC matters that there are probably

Page 26

[1] other firms around that were more specialized than we
[2] were. Lawyers in Canada and lawyers — bankruptcy matters
[3] and so forth. And so they used a pretty wide range of
[4] lawyers, but I think it's fair to say that main corporate
[5] matters we were the lead counsel.
[6]    Q: Let me narrow my question or refocus the question a little
[7] bit. During the period of time from say 1985 through 1990
[8] in matters relating to proposed restructurings or
[9] reorganizations of CenTra, was any law firm other than
[10] Dykema Gossett involved on behalf of CenTra?
[11]    MR. SEIKALY: Do you know that?
[12]    THE WITNESS: No, not in a lead sense. As you saw,
[13] there was a letter from Simpson & Moran that gave some
[14] supplementary information as we were proceeding through
[15] the ruling process matters that they had privy to that we
[16] didn't know anything about, but they were more
[17] supplementing. I'd say the reorganization was our
[18] responsibility.
[19]                  BY MR. WILHELM:
[20]    Q: The estate work that was being done for Mr. Moroun, is
[21] there — is that something that's been ongoing for a
[22] number of years or was there a distinct time period in
[23] which that work was performed for him?
[24]    A: I'd say ongoing.
[25]    Q: To your knowledge, did Dykema Gossett represent Mr. Moroun

Page 27

[1] in any other context other than on behalf or other than in
[2] the context of estate planning?
[3]    A: I don't know of any.
[4]    Q: Did Dykema Gossett represent any of the other shareholders
[5] in CenTra during the period from say 1985 through 1995 to
[6] your knowledge?
[7]    A: '85 through '95?
[8]    Q: Yes.
[9]    MR. SEIKALY: As shareholders; is that the question?
[10]    MR. WILHELM: Just any other shareholders. Not any
[11] particular context, just the individuals who were
[12] shareholders.
[13]    THE WITNESS: There was a time in the '70s when I had
[14] done some estate planning — this was back in my estate
[15] planning career — had done some estate planning for Vicky
[16] Baks. That was in the — I only know as early '70s,
[17] because I happened to look at the file. And so that was
[18] early '70s.
[19]    And then when that was no longer my specialty, Jim
[20] Elsworth from our firm was doing her estate planning. But
[21] somewhere along the line, I think she went to other
[22] lawyers. I don't know when. I do not think we — I don't
[23] know that. I don't think we represent her in this matter
[24] on her estate planning matters.
[25]    (Christopher Cataldo entered the deposition room.)

Page 28

[1]                  BY MR. WILHELM:
[2]    Q: Has Dykema Gossett to your knowledge represented Tuffick
[3] Moroun in any capacity?
[4]    A: No, not to my knowledge.
[5]    Q: We have identified a group of documents relating to
[6] efforts to obtain an IRS ruling relating to a proposed
[7] reorganization of CenTra back in the late 1980s. What was
[8] your responsibility relating to the obtaining of or the
[9] request for that tax ruling?
[10]    A: Well, my responsibility kind of goes back since the
[11] original proposal was authored by me to reorganize the
[12] company in order to qualify for the Subchapter S, and that
[13] was back in '86 or so, and then as the time evolved, and
[14] we figured out how we could do this because it was a
[15] challenge to do this in a very complex company like
[16] CenTra.
[17]    Once we figured out a way to do it, then it was my
[18] responsibility then to obtain the ruling for this reason.
[19] Ruling isn't — you obtain a ruling from the Internal
[20] Revenue Service when the consequences are so enormous that
[21] nobody would ever want to actually engage in the
[22] transaction without first having the IRS bless it in a
[23] sense of how it's going to be treated for tax purposes.
[24]    Q: You don't want to do the deal and then find out later that
[25] they are going to tax it at full rates?

JAF 000055

Page 29

A: Right. Particularly because in this case in order to alify for some of the requirements in the internal venue code to be tax-free would require some subjective dgment, and you wouldn't want to run that risk knowing e way the IRS operates without it.

Q: I want to see if we can put the timing into context here. ere you involved in any efforts to come up with some roposed restructuring or reorganization of CenTra prior 1986 which I believe was when the IRS made its ruling at would expand the use of Subchapter S corporations?

A: The answer is no.

Q: Are you aware of any proposed reorganizations of CenTra hat existed prior to 1986?

A: Do you mean reorganizations in the nature of a spinoff or he separation of companies?

Q: Correct.

A: No.

Q: What was the — When did you initially become involved in efforts to derive a proposed restructuring of CenTra that involved spinning off various entities?

A: I think that letter that's included in the documents that I delivered was one of the early efforts in that regard where I say — '86, is that one that you held back?

MR. SEIKALY: Maybe. Yes.

MR. WILHELM: The October 23, 1986, letter?

Page 30

[1] MR. SEIKALY: But by the way, you didn't write it.

[3] THE WITNESS: Oh, yeah, yeah, that's right. Okay. I

[3] didn't write it. But it goes back to '86. Let me give

[4] you the context.

[5]                BY MR. WILHELM:

[6] Q: Please.

[7] A: The context is that in '86 the law changed and freeing up

[8] the ability to elect Subchapter S in a lot of different

[9] settings. And we met and said, look, if this — if we can

[10] — if we can qualify for this, this is really good,

[11] really, really, important if we can become eligible to do

[12] this.

[13] So we had a meeting with myself and Grob and Fred

[14] Calderone, and Ron Lech, and said, look, if we can do

[15] this, this is big, this is huge, and as it stands right

[16] now, you don't qualify. You are ineligible.

[17] Q: That is because it had several wholly-owned subsidiaries?

[18] A: Yeah, it was a holding company, parent subsidiary,

[19] corporate structure which was ineligible to elect

[20] Subchapter S corporations.

[21] Q: Okay.

[22] A: And at that time presented the idea to create a separation

[23] through a spinoff to separate the companies and it was

[24] through those discussions that people at the company were

[25] very interested in the proposal, not just for the tax

Page 31

[1] reasons that I came presenting to them, but also because

[2] of business reasons that this would be — if we could do

[3] this for this — create this separation, this would have a

[4] tremendous benefit to the organization as a whole for

[5] business reasons. Principally reasons dealing with labor

[6] relations, relationships with the Teamsters, liability

[7] exposures under the multi-employer pension liability

[8] because of the underfunding of the central states' pension

[9] fund, and insurance matters.

[10]     What happened over time in CenTra was that you had

[11] under the holding company of CenTra, you had some very

[12] high-risk assets and you had some very low-risk assets.

[13] Q: What were the high-risk assets?

[14] A: The trucking business.

[15] Q: Central Cartage and Central Transport?

[16] A: Yes.

[17] Q: What were the low-risk assets?

[18] A: The toll bridge, Ambassador Bridge principally which was a

[19] very lucrative business.

[20]     And because they are all part of this relationship,

[21] this affiliation, and because of the way the liabilities

[22] were to the pension funds, so forth, you exposed the

[23] liability, the safe assets so to speak, from the risks and

[24] exposures of the high-risk assets. And also the

[25] separation of those assets would give rise to pretty

Page 32

[1] substantial insurance benefits. Insurance costs for

[2] running a transportation business are enormous, and when

[3] you wrap everything together, the insurance costs are one

[4] level, you start separating things out, it can and did

[5] produce significant savings.

[6]     So what originated as a tax I.D. grew into actually a

[7] much bigger idea of the nontax benefits associated with

[8] it.

[9] Q: Let me ask this question. The Subchapter S conversion

[10] which would produce tax benefits to the shareholders I

[11] take it, correct? Was that — was the conversion of any

[12] of the spun-off corporations to S corporation status

[13] necessary to obtain the labor relations benefits, pension

[14] benefits, and insurance benefits that could arise from the

[15] reorganization?

[16] A: Well, first of all, I'll answer the question. First of

[17] all, the tax savings amounts to cash savings. Anytime

[18] you're saving cash, you are strengthening the organization

[19] as a whole. So we weren't talking savings to people, we

[20] were talking savings to the collective interest, the

[21] common interest, the entire organization. Reduce cash

[22] outflow to the IRS makes the business stronger, more

[23] enable to endure the competitive nature of the business

[24] and so forth.

[25]     I say that only because it sounded like you were

JAF000056

CENTRA, INC.   v.
JAFFE, RAITT, HEUER & WEISS

Louis Kasischke
VoL 1, November 2, 2000

---

Page 33

[1] thinking that this was just an individual savings thing.
[2] It was a corporate business savings.
[3]     Then your question is, was that necessary to
[4] accomplish the other things that we talked about?
[5]     Q: The other benefits that you said came from the
[6] restructure. Maybe I can rephrase the question.
[7]     A: I know what you're saying. Well, go ahead.
[8]     Q: In order to obtain the labor relations benefits of the
[9] restructuring, was it necessary to convert any of the
[10] spun-off corporations or to-be-spun-off corporations into
[11] S corporations?
[12]     A: Well, first of all, the benefits that I detailed and you
[13] just mentioned arise out of the separation. But the plan,
[14] the plan was to separate and elect Sub S. The plan was
[15] never to separate and not elect Sub S. Your question is
[16] could you separate and not elect Sub S.
[17]     Q: And still obtain the benefits in terms of labor relations,
[18] pension liabilities —
[19]     A: You could, but —
[20]     Q: Excuse me. — pension liabilities and insurance?
[21]     A: You would have to endure significant nontax disadvantages.
[22] There would be a weighing process at that point because to
[23] now disaffiliate and not elect Sub S and now no longer
[24] become part of a consolidated group for tax purposes could
[25] be a significant disadvantage, tremendous disadvantage.

---

Page 34

[1]     Q: In what context?
[2]     A: Well, because you have within the consolidated group as a
[3] consolidated group of corporations, you've got loss
[4] corporations offsetting the income of profit corporations
[5] being offset by loss corporations.
[6]     Now, if you were to separate and not elect Sub S and
[7] — if you were to separate, you're not going to have that
[8] dynamic, whereas if you separate and elect Sub S, you
[9] still have that same dynamic of losses offsetting gains.
[10]     So it would be — it was not the plan and never
[11] really studied, and I think probably a very bad thing to
[12] do to separate and not elect Sub S. They were really
[13] going hand in hand.
[14]     Q: Let's assume that you or that the corporation decided to
[15] go ahead with the restructuring and decided not to go
[16] ahead — decided not to have the shareholders approve
[17] converting spun-off corporations into Sub S corporations,
[18] just assume that for a moment.
[19]     A: Assume they could do that, you mean?
[20]     Q: Assume that they did.
[21]     A: Assume that they did.
[22]     Q: They went ahead with the reorganization, but they stopped
[23] at that point once the restructuring occurred, did not
[24] take another step and say let's convert Central Transport
[25] and Central Cartage into S corporations. Could Central

---

Page 35

[1] Transport and Central Cartage still obtain benefits in
[2] terms of labor relations as you described earlier?
[3]     MR. SEIKALY: Can I —
[4]     THE WITNESS: I don't think we ever would have done
[5] that.
[6]     MR. SEIKALY: Hold on. Here's my problem. That
[7] sounds an awful lot like a hypothetical, and I don't know
[8] if either party has ever listed him as an expert, and I
[9] don't know if he plans on testifying as an expert. So I
[10] think you guys need to deal —
[11]     THE WITNESS: It wouldn't have been my
[12] recommendation, I know that.
[13]     MR. WILHELM: That wasn't the question.
[14]     THE WITNESS: I know.
[15]                 BY MR. WILHELM:
[16]     Q: The question is —
[17]     A: Well, I'll answer your question. I answer your question
[18] is I don't know.
[19]     Q: How about with respect to pension liabilities?
[20]     A: I don't know.
[21]     Q: How about with respect to insurance benefits?
[22]     A: I don't know.
[23]     Q: How come —
[24]     A: I suspect the insurance — yeah, I think the insurance
[25] benefits would have flown. And the only reason I say no

---

Page 36

[1] on the others is because I'm not an expert on those areas.
[2] I got involved in the insurance aspect because that was
[3] part of the ruling request. These other things were not
[4] part of the ruling request. I knew they were out there;
[5] everybody talked about them.
[6]     If you were to sit around in a meeting at CenTra and
[7] talk about the problems of the business, the only thing
[8] anybody ever talked about was Teamsters and the
[9] multi-employer pension liabilities. Those were the
[10] biggies. Those were the big threats to the business.
[11]     And now they talk about it. I'm not an expert on
[12] that. I didn't — that's why I say I can't answer your
[13] question like that on that part of it.
[14]     Q: Was there only a single restructuring proposal that was
[15] made and that being the subject of the request for the IRS
[16] ruling?
[17]     A: You mean the spinoff, the separation, is there any other
[18] kind of a reorganization proposed?
[19]     Q: Correct. Let me rephrase the question.
[20]     There was a specific structure of a reorganization
[21] that was proposed by CenTra to the IRS to obtain the tax
[22] ruling.
[23]     A: Right.
[24]     Q: And that was the subject of the request which is Exhibit 1
[25] which is dated June 2, 1987.

JAF  0000057

Page 37

[1]   A: Right.

[2]   Q: Were there earlier proposed reorganizations of CenTra that

[3] differed from the form of reorganization proposed to the

[4] IRS in the request for tax ruling?

[5]   A: Not that I can recall. You mean unrelated to tax?

[6]   Q: No. Just any other —

[7]   A: Related to tax. Anything.

[8]   Q: Anything.

[9]   A: Not that I recall.

[10]   MR. SEIKALY: Rick, when you get a minute, I need a

[11] break.

[12]   MR. WILHELM: Sure.

[13]   (Break was taken.)

[14]            BY MR. WILHELM:

[15]   Q: Let's get back to the reorganizations, and let me show you

[16] — I just want to clear up one thing. Let me show you a

[17] copy of Exhibit 20 which is Ira Jaffe's letter to Mr.

[18] Moroun and Mr. Black dated February 2, 1989. And on the

[19] second page, the first paragraph, of that letter, there is

[20] a reference to an attempt to restructure or reorganize

[21] CenTra in December of '86 and attempt for a proposed

[22] restructuring in December of 1987, and an attempt during

[23] 1988.

[24]   A: Yes.

[25]   Q: Do you have any knowledge of proposed restructuring

Page 39

[1]   A: I think that's the one that's the subject of the ruling.

[2]   Q: When did you get the ruling? What was the date on that?

[3]   A: Well, what happens is this.

[4]   Q: Hold on just a second.

[5]   A: You don't make the proposal after you get the ruling. You

[6] make the proposal and you move ahead to do things on the

[7] assumption that you're going to get the ruling. And then

[8] if you don't get the ruling, maybe you don't do the deal.

[9] But you don't wait around until you actually get a ruling.

[10] Rulings take six to nine months to get.

[11]   Q: You've got the ruling on November — or was issued

[12] November 19th, 1987?

[13]   A: Right.

[14]   Q: What did the corporation do to try to accomplish the

[15] restructuring after November 19, 1987, to your knowledge?

[16]   A: Well, I don't remember exactly when the confrontation with

[17] Ira Jaffe occurred, but it was from that point forward

[18] that everything was problematical as to whether or not

[19] this was ever going to happen. And the only thing that

[20] stood in the way of it happening was the demands.

[21]   Q: Could you describe the confrontation for me that you just

[22] referred to?

[23]   A: Well, I will characterize it as the presentation of the

[24] Jaffe demands, and that's when things started to go

[25] downhill. I was there. This was at a meeting. I don't

Page 38

[1] attempts that were made during December of 1986?

[2]   A: Same deal, '86, '87, '88, we were always trying to do the

[3] same deal.

[4]   Q: Why were you always trying to do the same deal?

[5]   A: Because it was really important to do.

[6]   Q: Why didn't you go ahead and do the deal in December of

[7] 86?

[8]   A: We couldn't.

[9]   Q: Was it because you didn't have the tax ruling?

[10]   A: We couldn't do it.

[11]   Q: Why?

[12]   A: Because the sisters were in control of the outcome of this

[13] case. They had to consent.

[14]   Q: You didn't submit the request for tax ruling until 1987.

[15] Could you have gone ahead with any proposed reorganization

[16] prior to obtaining the tax ruling?

[17]   A: '86, we talked about it, wanted to do it, ran out of time,

[18] because we couldn't — because we made the decision in

[19] '86, we should not do this without a ruling.

[20]   And so, yeah, it was a proposal on the table,

[21] something we really wanted to do, and then we said no,

[22] we've got to get the ruling. So that's why — we wouldn't

[23] have done it in '86.

[24]   Q: What proposal was made by CenTra to reorganize the company

[25] in December of 1987?

Page 40

[1] know the date. You probably do. The date of a meeting

[2] with M. J. Moroun, Ira Jaffe, myself, and the sisters.

[3] This was for purposes of presenting to the parties the

[4] merits of the transaction. Matty started — this was a

[5] very memorable meeting for me.

[6]   Matty started in explaining; he had a point sheet all

[7] the reasons we wanted to do this. And that's when Ira —

[8] I think it was the first time that Matty and Ira met, I

[9] think it's the first time I ever met Ira Jaffe also. Ira

[10] made his demands and the meeting ended. The meeting

[11] probably lasted ten minutes. And it was from that point

[12] forward that if this — I mean, they were in control. The

[13] sisters and Ira were in control as to whether this was

[14] going to happen. They controlled the outcome, nothing was

[15] going to happen without them.

[16]   Q: How did they control the outcome?

[17]   A: We needed their consent. They controlled it.

[18]   Q: How did the sisters control the corporation?

[19]   A: Well, first of all, we needed their consent to elect

[20] Subchapter S which was an integral part of the plan. The

[21] plan wouldn't happen without that.

[22]   Q: That consent, was that his consent as a director of the

[23] corporation or consent as a shareholder in the

[24] corporation?

[25]   A: Subchapter S would be the consent as a shareholder of the

JAF 000058

CENTRA, INC.  v.
JAFFE, RAITT, HEUER & WEISS

Louis Kasischke
Vol. 1, November 2, 2000

Page 65

[1] We were going to leave CenTra alone and then separate off
[2] Transport and Cartage. And so T. J.'s position wouldn't
[3] change.
[4]    Q: You were the individual who recommended that in the
[5] spun-off corporations that the common stock be distributed
[6] so that Matty would have voting control of those
[7] corporations?
[8]    A: Well, I recommended the spinoff. The natural product of
[9] the spinoff is that it goes to common shareholders, and so
[10] therefore it would go to common shareholders and not
[11] preferred shareholders. It wasn't calculated by me to
[12] give Matty control. It just — control wasn't a concept
[13] that ever mattered to me.
[14]    Q: So for the spun-off corporations then, shares would only
[15] be distributed to those people who were common
[16] shareholders at CenTra?
[17]    A: Right.
[18]    Q: No shares in the spun-off corporation would be distributed
[19] to someone who was a preferred shareholder in CenTra?
[20]    A: That's correct. That's the way it works. That's the
[21] matter of — as I say, when General Motors spun off Delphi
[22] and Ford spun off Visteon, that's the way it happens.
[23]    Q: And the result of that common progression or occurrence is
[24] that Matty Moroun would have voting control of the two
[25] spun-off corporations, Central Cartage and Central

Page 66

[1] Transport?
[2]    A: That's correct.
[3]    Q: And as a result of that — well, in that structure, the
[4] sisters would then be relegated to minority shareholder
[5] status in those corporations?
[6]    A: They were always minority shareholders. They were
[7] minority shareholders to begin with and minority
[8] shareholders to end with.
[9]    Q: Matty Moroun was a minority shareholder in CenTra, wasn't
[10] he?
[11]    A: Matty Moroun was a majority shareholder of the common, and
[12] they were all minority shareholders of the preferred.
[13]    Q: And in terms of voting rights?
[14]    A: In terms of voting rights, Matty would have less than 50
[15] percent of the combination of the two, that's right.
[16]    Q: So the end result of the transaction is that in the
[17] spun-off corporations, Matty Moroun has voting control
[18] over those two corporations?
[19]    A: That's right.
[20]    Q: And Mr. Jaffe's letter to you of November 23, 1988,
[21] suggested that until such time as the sisters are bought
[22] out or some effort is made to take care of the sisters in
[23] their new status as minority shareholders in the spun-off
[24] corporation, he proposed that the voting structure of
[25] CenTra be replicated in those companies temporarily,

Page 67

[1] correct?
[2]    A: That's right.
[3]    Q: Was there anything wrong with that proposal?
[4]    A: No.
[5]    Q: As far as you were concerned?
[6]    A: No.
[7]    Q: Do you know why no agreement was made to accept that
[8] proposal?
[9]    A: I think it was all a part of the package as such because
[10] it was just step one of a two-step process, and M. J. was
[11] not about to enter into Step 2, so there wasn't any point
[12] in entering into Step 1.
[13]    Q: What was Step 2?
[14]    A: Step 2 was to yield to Jaffe demands.
[15]    Q: Which demands?
[16]    A: The demands detailed in this letter.
[17]    Q: Under the second goal?
[18]    A: Right.
[19]    Q: So he wasn't — Matty Moroun was not willing to agree to
[20] any of the protections that were demanded in or requested
[21] by Mr. Jaffe in the second part of the letter?
[22]    A: You're calling them protections. They weren't
[23] protections. They were disproportionate rights, rights
[24] that are not natural product of their ownership. And they
[25] were rights to control compensation, rights to control the

Page 68

[1] disposition of M. J.'s stock. They wanted money for
[2] themselves.
[3]    Later in the letter he talks about being bought —
[4] this wasn't going to be the end of the list. There are
[5] other discussions here about, you know, buyout provisions.
[6] Here's the context. There were two reasons — I mean, I
[7] can't speak for Matty, I'm not here to speak for Matty,
[8] but Matty's position was one of the reasons we wanted to
[9] do the reorganization was the struggle for survival in a
[10] very, very competitive environment, hostile, regulatory
[11] environment, and it was all a matter of survival. To
[12] break up the company, which is in effect what they wanted
[13] by being bought out, would jeopardize the future of this
[14] business.
[15]    Let me finish. I can see you're not understanding
[16] what I'm saying.
[17]    MR. SEIKALY: He just doesn't like it.
[18]    THE WITNESS: What I'm saying is this. This business
[19] was struggling for survival. We had a huge, huge cloud over
[20] its head with unfunded pension liability in a very hostile
[21] union. This is a struggle for survival. You take out of
[22] this business millions of dollars to buy out the sisters
[23] or to even layer it with debt to upset financing
[24] relationships that the company had in place, jeopardize
[25] the ability of this business to survive in that

JAF  000065

---

Page 69

environment, and M.J. was entrusted with this business by his family, by his father, for the benefit of his total family and future generations, and he was not about to jeopardize this business for future generations and for the family itself just because somebody wants money.

I don't think M.J. ever was greedy, took out a lot of — I have no idea what kind of money he took out of the company, but I don't think he has ever operated as a matter of greed or to his own self-interest. Matty was very much a family person, concerned about the entire — his sisters as well as future generations. And to jeopardize the existence and the future of this business.

I mean, that's what he said. So whether — I mean, I'm in no position to judge or whether that was true or not, but it just was not the time, not the time in history. Maybe today is the time, but not then, with the environment that they were in. I mean, you look at deregulation. What happened in deregulation is that trucking companies were dropping over dead like flies. Who survived? Central and a handful of others survived deregulation. That's because they did so by operating in a physically prudent matter and just good tough management. You go back in time to that period of time, and these were tough times. So that was probably the primary reason for not buying out the sisters.

---

Page 70

[1] But secondly, there was — you know, you had a very
[2] hostile environment at that point with demands being made
[3] with the threats of — you know, it's one thing to make a
[4] demand and it's another thing, and we all do this as
[5] bargainers, but it's another thing to retaliate if your
[6] demands aren't satisfied, and that's what was being put on
[7] the table. Do as I say or you're going to get hurt. And
[8] that's what happened. Am I getting carried away? Maybe
[9] I'll take a break.
[10] MR. WILHELM: Sounds like a good idea.
[11] (Break was taken.)
[12] BY MR. WILHELM:
[13] Q: Just to kind of give us a perspective here. You had the
[14] meeting, the ten-minute meeting, you then received the
[15] letter from Ira in November of 1988, you had a discussion
[16] with Matty about that letter. From that point forward, do
[17] you have any personal knowledge about whether any
[18] counterproposals were made by anyone at CenTra on behalf
[19] of CenTra to Ira Jaffe regarding proceeding with the
[20] restructuring proposal and the conversion of Subchapter S
[21] of the spun-off corporations?
[22] A: I didn't have any memory until in your materials, your
[23] letter to me included a letter that was sent by — I'm
[24] assuming it was sent — M.J., January 27th, '89. And
[25] quite frankly, I did not remember this, but it appears to

---

Page 71

[1] me to be a proposal, a way to maybe reconcile differences,
[2] because it was giving them sort of rights that they
[3] otherwise didn't have. That's the only thing that I'm
[4] aware of.
[5] I can't remember other proposals going directly to
[6] Ira. I know things we talked about. I was trying very
[7] hard because I wanted it to happen, and I had various
[8] ideas of what to do, and I don't really remember why none
[9] of them ever matured. And maybe they did outside of my
[10] presence, but I really was not brought in anymore. I knew
[11] what was happening, but I wasn't on the front line. I
[12] think because I was the tax lawyer, not — and now is
[13] really a bigger thing than tax lawyers. Tax lawyers have
[14] a role.
[15] Q: With respect to the letter you just referred to, the
[16] February 1989 letter, attached to that is a January 27,
[17] 1989, proposed reorganization memo addressed to the three
[18] sisters or it's not on yours, is it?
[19] A: No.
[20] Q: Let me see yours.
[21] A: This was your letter to me.
[22] MR. SEIKALY: I don't remember you marking it, Rick.
[23] You may have.
[24] MR. WILHELM: I just misunderstood. I thought he
[25] brought a copy with him.

---

Page 72

[1] MR. SEIKALY: The copy with him is in the package
[2] that you sent him.
[3] (Deposition Exhibit No. 25 marked.)
[4] BY MR. WILHELM:
[5] Q: I'm going to be a little out of order here. I'm going to
[6] talk to you a little bit about this in a second, that
[7] being the letter.
[8] Getting back to the statement I made or the question
[9] I started out this session with and that was —
[10] MR. SEIKALY: I'm sorry, before you get started, can
[11] I just — did you intend for a February of '89 letter to
[12] be attached to a January of '89 letter?
[13] MR. WILHELM: Yes.
[14] MR. SEIKALY: Thank you.
[15] BY MR. WILHELM:
[16] Q: After receipt of Mr. Jaffe's letter in November of 1988,
[17] did you participate in any further negotiations with Mr.
[18] Jaffe regarding the proposed restructuring or conversion
[19] of the spun-off corporations into S corporations?
[20] A: None other than the two conversations that I mentioned
[21] before.
[22] Q: Did you make any counterproposals to Mr. Jaffe relating to
[23] the proposed reorganization with the conversion of the
[24] spun-off corporations into S corporations after receipt of
[25] that November of 1988 letter from Mr. Jaffe?

JAF   000066

---

**Min-U-Script®**   Esquire Deposition Services 248.244.9700

# Appendix 10

Hearing testimony of Thomas Christ - 10/23/06 (excerpts)

# In The Matter Of:

*CENTRA, INC., et al.*

_____

## CENTRA vs. CENTRAL STATES PENSION FUND ARBITRATION
### *October 23, 2006*
_____

## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**ARBITRATION- CENTRA, INC. vs. CENTRAL STATES PENSION FUND**



Page 2141

AMERICAN ARBITRATION ASSOCIATION

MULTIEMPLOYER PENSION PLAN

WITHDRAWAL LIABILITY ARBITRATION

------------------------------x

CENTRA, INC., and DETROIT        )

INTERNATIONAL BRIDGE COMPANY     )

            Petitioners,    )   AAA Case No.

    and                          )   51 621 00068 99

CENTRAL STATES, SOUTHEAST        )   Richard I. Bloch,

AND SOUTHWEST AREAS PENSION      )   Arbitrator

FUND,                            )

           Respondent.     )

------------------------------x


TRANSCRIPT OF PROCEEDINGS

DAY 11

Washington, D.C.

Thursday, October 23, 2006

9:12 a.m.



Job No.:  22-87244

Pages 2141 - 2410, Volume 11

Reported By:  Joan V. Cain

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2149

1        ARBITRATION DAY 11, OCTOBER 23, 2006
2              P R O C E E D I N G S
3        ARBITRATOR BLOCH:  And we are continuing
4   with Mr. Christ's testimony, and I will turn it back
5   over to whom?  Mr. Condon.
6        MR. CONDON:  Thank you.
7                   THOMAS CHRIST
8    having been previously sworn, testified as follows:
9      CONTINUED CROSS-EXAMINATION BY COUNSEL FOR
10     RESPONDENT
11  BY MR. CONDON:
12     Q    Good morning, Mr. Christ.  We've met before,
13  correct?
14     A    Yes.
15     Q    And I'll state for the record that my name
16  is James Condon.  I work for the Central States
17  Pension Fund.  Mr. Christ, while you were a
18  nonmanagerial employee at Central Cartage, you were
19  part of the bargaining unit there, right?
20     A    Yes.
21     Q    And you earned pension credit from the
22  Central States Pension Fund; isn't that true?
23     A    Yes.
24     Q    Okay.  So, you have an accrued and vested
25  retirement benefit with the Central States Pension

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2173

1          ARBITRATION DAY 11, OCTOBER 23, 2006

2   understands the effect of the statute.  For me to

3   represent an off-the-cuff comment like that,

4   Mr. Condon, I don't think it's fair to ask me that

5   question.

6        Q    Did CenTra ever again acquire controlling

7   interest in a unionized trucking company after 1985?

8        A    Yes.

9        Q    Okay.  Which ones?

10       A    There's a number of them.  They've been

11  testified to.

12       Q    Okay.  I'm sorry.  Could you refresh my

13  recollection?

14       A    I'll give you what I remember, but I don't

15  want it to be a complete list.  I don't have a

16  corporate chart, but there's General Highway Express.

17       Q    Okay.  We're going to talk about that.

18       A    There was something to do with Tucker

19  Freight Lines.  There was something to do with

20  Michigan Motor, whatever that was.  I believe

21  Wisconsin Badger.  I attempted on a couple others.

22       Q    Okay.  Isn't it your understanding, going

23  back to the 1990s, that, in fact, there are very few

24  acquisitions of trucking companies, particularly

25  unionized trucking companies by stock purchases any

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2174

1          ARBITRATION DAY 11, OCTOBER 23, 2006

2     longer?

3          A    Oh, boy.  You're asking me for testimony

4     that I think is so far broad and far-reaching, I can't

5     give an answer to that, Mr. Condon.

6          Q    Okay.  Well, isn't it true that, at least

7     going back to the mid or late 1990s, if a trucking

8     company was in financial straits, the general method

9     to dispose of the company was through an asset sale

10    rather than a stock sale?

11          MR. STEWART:  Objection.  There's no

12    foundation that this witness was involved in the

13    mechanics of how companies were acquired.  Testimony

14    from Mr. Christ is that he was involved in labor

15    relations and corporate development, and may have been

16    involved in the overall planning of the acquisition

17    from a labor and development standpoint, but the

18    testimony was specifically that he was not involved in

19    the mechanics, the tax issues, or corporate law.

20          ARBITRATOR BLOCH:  Well, the witness may

21    answer that he doesn't know, if that's the case.

22          A    I can speak generally that companies do it

23    many ways, depending on the situation.  When

24    FedEx Corp. bought Watkins Truck Lines last year, it

25    was in a stock purchase.  When Yellow purchased

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2175

1          ARBITRATION DAY 11, OCTOBER 23, 2006
2    Preston Holdings, it was in a stock purchase.  When
3    Roadway purchased Viking on the West Coast, it was a
4    stock purchase.  When Allied Car Haulers purchased the
5    Leaseway Motor Car operations, it was in an asset
6    purchase.
7          I think each situation is governed by
8    corporate attorneys, tax attorneys, and the statutes
9    and laws and regulations that drive corporations.
10   There is not, in my view, an answer to your question,
11   a single cookie-cutter method of a corporate
12   acquisition of anything.
13      Q    Let's take look at Tab 62 again.  That's
14   RE 311.  I draw your attention to page -- bottom of
15   page 62 starting at line 23.  Are you with me there,
16   sir?
17      A    Bottom of 62?
18      Q    Yes.
19      A    I'm there.
20      Q    Line 23, "Those land mines are definitely
21   there," that's the question -- or that was the prior
22   answer.
23          "QUESTION:  So, as you go about the
24   acquisition business since ERISA and MPPAA, its
25   amendment to it, and you do your work, Mr. Christ, on

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2176

1          ARBITRATION DAY 11, OCTOBER 23, 2006

2     a day-to-day basis, were you paying attention to these

3     things?

4          "ANSWER:  Absolutely.  And as they're

5     remaining as the entire industry is there, there are a

6     very few acquisitions any more of trucking companies

7     by stock purchase.  If a trucking company is in

8     financial straits, the general method, nowadays, is an

9     assets purchase."

10          Did I correctly read that testimony on pages

11     62 to 63 from 9/21/99 that you gave in the Baks v.

12     Moroun trial?

13     A    That is the testimony I gave you.  You read

14     it accurately, but it is a misrepresentation with the

15     discussion and the point to which you're trying to

16     make, and the testimony is being represented out of

17     context.

18     Q    Okay.  Now, do you know whether anyone

19     informed Agnes Anne Moroun when U.S. Truck was

20     purchasing Central Transport and Central Cartage back

21     in 1996, that if a trucking company is in financial

22     straits, the general method to acquire the trucking

23     company is an asset purchase rather than a stock

24     purchase?

25          MR. STEWART:  Objection, foundation.  The

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2177

1          ARBITRATION DAY 11, OCTOBER 23, 2006

2    question as I heard it was, Did anybody tell Agnes

3    Moroun, and Mr. Christ has already indicated he had

4    little or no contact with Ms. Moroun.

5          In fact, the testimony from, at least, two

6    witnesses, Ms. Moroun and Mr. Cummings, was that

7    Ms. Moroun had a preference for dealing with

8    Mr. Cummings and not Mr. Christ.  So, I think there's

9    not only a lack of foundation.  The foundation that

10   has been established runs the other way.

11          MR. CONDON:  He may have heard that somebody

12   else informed him.

13          ARBITRATOR BLOCH:  Well, let's find out

14   first whether the witness knows the answer to that

15   question.

16    A    I don't know what Ms. Moroun knew or didn't

17   know, what she was advised or not advised.

18   BY MR. CONDON:

19    Q    Okay.  I want to talk about another company,

20   General Highway Express.

21          First of all, I want to be sure I understand

22   the merger transactions that you testified to on your

23   direct testimony.  CenTra acquired a company called

24   General Highway Express back in the '80s or the '90s,

25   was that?

9e423ae1-2076-4b43-8f94-d4103bbaa734

Page 2178

1          ARBITRATION DAY 11, OCTOBER 23, 2006

2     A     '80s.

3     Q     Okay.  And that was an Ohio company?

4     A     Based out of Sidney, yes.

5     Q     And then CenTra merged Central Transport,

6  Inc., into General Highway Express, is that correct,

7  General Highway Express of Ohio?

8     A     You just threw a new one in there that

9  doesn't fit.  So, I'm not sure what you mean by that.

10    Q     Well, Central Transport, Inc., merged into a

11  company called GHE, right, General Highway Express; is

12  that correct?

13    A     Yes.

14    Q     Now, was that an Ohio Corporation or a

15  Michigan corporation?

16    A     The General Highway that Central Transport

17  merged into was an Ohio Corporation.

18    Q     Okay.  And then General Highway Express, the

19  Ohio Corporation, moved -- merged into General Highway

20  Express, a Michigan Corporation, also owned by CenTra?

21    A     Correct.

22    Q     And then General Highway Express of Michigan

23  changed its name to Central Transport, Inc.?

24    A     Correct.

25    Q     Is that true?  Now, General Highway Express

9e423ae1-2076-4b43-8f94-d4103bbaa734

# Appendix 11

Teamsters Pension Fund of Philadelphia v. Custom Cartage Co.,
1991 WL 160966 (E.D.Pa. 1991)

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1991 WL 160966)**

H

Teamsters Pension Trust Fund of Philadelphia and Vicinity v. Custom Cartage, Co.
E.D.Pa.,1991.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA AND VICINITY and Charles J. Schaffer,
v.
CUSTOM CARTAGE, CO, Universal-Pioneer Freight System, Inc., and International Controls Corp.
**Civ. a. No. 89-0626.**

Aug. 15, 1991.

Kent Cprek, Thomas W. Jennings, Sanford G. Rosenthal, Cindy J. Lerner, Sagot & Jennings & Sigmond, Philadelphia, Pa., for plaintiffs.
Jerome A. Hoffman, Dechert, Price & Rhoads, Philadelphia, Pa., Joseph J. Malcolm, Roseland, N.J., for defendants.
Dubois, District Judge.
**\*1** Plaintiffs, Teamsters Pension Trust Fund of Philadelphia and Vicinity ("Fund"), and Charles J. Schaffer, Administrator of the Fund, brought this action against defendants, Custom Cartage, Inc. ("Custom"), Universal Carloading and Distributing Company ("Universal"), and International Controls Corporation ("ICC"), to recover Custom's withdrawal liability under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 *et seq.* Following a preliminary pretrial conference, pursuant to an arbitration agreement between the Fund and Custom, by Order dated April 17, 1989, defendants were directed to initiate arbitration proceedings against the Fund.

The case was heard by the arbitrator on December 7, 1989. In an award dated April 3, 1990, the arbitrator decided that defendants were not liable to the Fund for withdrawal liability.

The matter is before the court at this time on the Fund's Motion to Vacate the Arbitration Award and defendants' Cross Motion to Confirm the Award. For the following reasons, the Court finds that the arbitrator's decision was correct under the applicable standard of review, as the plaintiffs failed to timely notify the defendants of the alleged withdrawal liability. Accordingly, plaintiff's Motion to Vacate the Arbitration Award will be denied, and defendants' Motion to Confirm the Award will be granted.

I. *Facts*

29 U.S.C. § 1401(c) instructs a court reviewing the findings of an arbitrator in an ERISA case that "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." Accordingly, the Court relies on the findings of fact of the arbitrator, as no clear preponderance of evidence to the contrary has been produced.

This case involves an interlocking group of freight hauling companies and their employees. Custom and Universal were both wholly-owned subsidiaries of Transway International Corporation ("Transway"). Custom employees provided driving services at Universal's Philadelphia terminal, and employees of both Custom and Universal were members of Local 107 of the International Brotherhood of Teamsters ("Teamsters"). Three Custom employees and four Universal employees were Teamsters, and each had pension contributions made on his behalf by their respective employers.

In late 1981, Transway notified the Fund of the termination of the Custom employees and their transfer to Universal. On Custom's October pension contribution form, a Universal official noted "The above personnel were terminated as of October 10, 1981 and were transferred to Universal Freight Sys-

Case 1:07-cv-06312    Document 44-2    Filed 04/25/2008    Page 153 of 159

Not Reported in F.Supp.                                                  Page 2
Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1991 WL 160966)**

tems ... Should you have any questions please con-
tact Mr. John Freidel at the above address-Phone #
(215) 289-6060." Arbitration Record Appendix at
2067. Other documents in evidence also indicate
that the Fund was notified of this change. *See* Ar-
bitration Record Appendix at 2069 (letter to Team-
sters), 2070 (November report stating Custom Cart-
age employees "No longer under our employ-
ment"). In December, the pre-printed report form
sent to Universal included the names of the three
former Custom employees. Arbitration Award Re-
cord Appendix at 2291. Based on the foregoing
evidence, the arbitrator found that the Fund was on
notice of the termination and transfer of the Custom
employees no later than November of 1981.

**\*2** In 1982, because of a financial decline, Univer-
sal closed the Philadelphia facility altogether. The
Fund, in response, sent Universal a notice of with-
drawal liability in March, 1983. It is admitted by
the Fund that the notice of withdrawal liability sent
to Universal included only the original Universal
employees; it did not include the former Custom
employees.[FN1]

ICC acquired Transway, the parent company of
both Custom and Universal, in 1985. The Fund
entered negotiations with ICC to settle the with-
drawal liability of Universal, which lead to a settle-
ment executed in June of 1987.

On June 25, 1987, the Fund asserted, for the first
time, a claim for withdrawal liability against Cus-
tom. Custom sought review of this decision on
September 9, 1987. On September 10, 1987, the
parties agreed to stay the statute of limitations ap-
plicable to further review of Custom's withdrawal
liability. Thereafter, by agreement of the parties,
and pursuant to Court Order, the dispute was re-
ferred to arbitration.

The arbitrator ruled on April 3, 1990 that there was
no withdrawal liability on the part of Custom be-
cause plaintiffs failed to notify Custom of its al-
leged withdrawal liability in a timely manner. The
arbitrator further found that the termination of Cus-

tom employees and their transfer to Universal[FN2]
did not constitute a withdrawal from the pension
plan on the part of Custom, and that the defendants'
request for arbitration was timely.

## II. *Discussion*

ERISA, as modified by MPPAA, establishes stand-
ards of conduct, fiduciary responsibility, and re-
porting for large pension plans. Relevant to this
case is MPPAA, which deals with multiemployer
plans-those such as the Teamsters Fund which are
maintained by two or more employers under a col-
lective bargaining agreement. *See* 29 U.S.C. §
1381-1453.

29 U.S.C. § 1381 requires that an employer who
withdraws from a multiemployer plan pay
"withdrawal liability." This is the amount of unfun-
ded vested benefits allocable to the withdrawn em-
ployer. A withdrawal incurring liability may be
complete, 29 U.S.C. § 1383, or partial, § 1385. The
withdrawal liability, calculated through a formula
contained in 29 U.S.C. § 1391 and § 1393 is re-
quired so that future unfunded vested benefits can
be paid to employees after the employer has with-
drawn from the pension plan.

Significantly, ERISA provides that "all employees
of trades or businesses (whether or not incorpor-
ated) which are under common control shall be
treated as employed by a single employer and all
such trades and businesses as a single employer."
29 U.S.C. § 1301(b)(1). Under this statutory lan-
guage, Universal and Custom must be considered a
single employer, as both were subject to the com-
mon control of Transway.

The statutes further provide that a pension fund,
having learned of a withdrawal through stoppage of
payments or other means, must calculate the with-
drawal liability amount and present this to the em-
ployer "as soon as practicable" after the withdraw-
al. 29 U.S.C. § 1399(a)(1). If the employer disputes
the trustees' determination, it may request a review

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the withdrawal liability demand within 90 days. 29 U.S.C. § 1399(b)(2)(A).

**\*3** The pension fund in this case first issued a request for withdrawal liability to Custom on June 25, 1987. Custom disputed the Fund's determination and requested a review on September 9, 1987.

If a dispute over the withdrawal liability is not settled by the above petition-and-review method, either party may initiate arbitration, provided that this is accomplished within the earlier of 120 days after the withdrawal liability demand or 60 days after the employer's request for review. In this case, the employer requested arbitration on October 14, 1988.

Plaintiffs allege that the arbitrator's decision was incorrect for three reasons. First, plaintiffs claim that, contrary to the arbitrator's ruling, the Fund notified Custom of withdrawal liability "as soon as practicable", as required by 29 U.S.C. § 1399(b)(1). Second, plaintiffs contend that the arbitrator erred in finding that the arbitration was requested in a timely manner by Custom. Third, plaintiffs contend that the arbitrator mistakenly concluded that Custom's termination and transfer of employees did not constitute a withdrawal. While the Court affirms the decision of the arbitrator that plaintiffs' notification of withdrawal liability was untimely and that defendants' request for arbitration was timely, and thus will find in favor of defendants, it disagrees with the arbitrator's decision that there was no withdrawal by Custom.

### A. *Standard of Review*

The Fund claims that the proper standard of review is *de novo*. However, as discussed above, ERISA requires deference to the arbitrator's findings of fact. 29 U.S.C. § 1401(c) provides that "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."

In considering the arbitrators findings of law, a different standard applies. In *Huber v. Casablanca Industries,* 916 F.2d 85, 89 (3d Cir.1990), the Third Circuit directed that "the legal conclusions of the Arbitrator must be reviewed *de novo.*" Thus, a deferential standard will be applied to the arbitrator's factual findings, while the arbitrator's findings of law will be reviewed *de novo.*

### B. *Notification of Withdrawal Liability*

29 U.S.C. § 1399 requires that:

(1) As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall-

(A) notify the employer of-

(i) the amount of the liability, and

(ii) the schedule for liability payments, and

(B) demand payment in accordance with the schedule.

A period of five and a half years elapsed between the notice to the Fund of the termination of Custom employees and their transfer to Universal in late 1981 and the Fund's demand for payment of Custom's withdrawal liability in June of 1987. The arbitrator ruled that the Fund had not made its demand "as soon as practicable." The Court agrees with this determination, and finds that the equitable doctrine of laches prevents plaintiffs from collecting the alleged withdrawal liability.

**\*4** Plaintiffs present the Court with a myriad of reasons supporting the strained argument that five and a half years was as soon as they could have practically notified Custom of the withdrawal liability. Each fails to convince the Court that notification was timely.

The Fund argues that this matter was not preserved for review as it was not raised in the Employer's request for review in 1987. Plaintiffs Memorandum at 40. Custom, however, did fully brief the issue in arbitration. The Fund cites no law supporting the pro-

Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp., 1991 WL 160966)**

position that to preserve an issue, it must be included in the initial letter requesting review by the Fund.

Plaintiffs claim that they were ignorant of the facts which triggered the claimed withdrawal liability of Custom. This is contradicted by the evidence cited by the arbitrator, establishing that Custom repeatedly informed plaintiffs of the termination of the covered employees and their transfer to Universal in late 1981. As noted above, the factual findings of the arbitrator are presumptively correct, and on this point the plaintiffs have not presented a preponderance of evidence to the contrary.

Next, plaintiffs assert that defendants were notified of the withdrawal liability for Custom in 1983. However, the notification in 1983 was addressed to Universal, and did not refer to Custom. While notice to one member of a control group is generally considered to apply to all members of the control group, *IUE AFL-CIO Pension Fund v. Barker & Williamson,* 788 F.2d 118, 127 (3d Cir.1986), the 1983 notice cannot be considered effective notification that the conflation of Custom into Universal was considered to be a withdrawal, as Custom was no longer an active part of that control group.

Conceding that the notification was delayed to some extent, plaintiffs argue in the alternative that the appropriate penalty for a failure to timely notify of withdrawal liability is a proportionate reduction in the amount owed rather than a bar of the claim as a whole. However, the factors which reduce withdrawal liability are enumerated in 29 U.S.C. § 1381(b)(1) and that provision does not permit an adjustment for delay in notification.

Plaintiffs further assert that the six-year statute of limitations period set out in § 1451(f) defines the period in which notification may be made "as soon as practicable." Had the framers of ERISA and MP-PAA meant to impose such a limit, they surely would have used more precise language or referred to § 1451(f). In accordance with this view, the Third Circuit has noted that a delay of five years

and four months could be "prejudicial in the eyes of the arbitrator to the assessment of withdrawal liability." *Philadelphia Journal, Inc. v. Teamsters Pension Trust Fund of Philadelphia and Vicinity,* 11 E.B.C. 2402 (3d Cir.1989).

Finally, the Fund argues that the delay was warranted due to bureaucratic overload on the part of the Fund; that the "as soon as practicable" language is not directed to the Fund; and that the notice of withdrawal liability to Universal should have prompted a *request* for a similar notice for Custom. Each of these arguments is legally unsupported in plaintiffs' submissions, and is rejected by the Court; there is no need for further comment on such contentions.

**\*5** The elements of the equitable defense of laches have been defined by the Third Circuit as "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *E.E.O.C. v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 80 (3d Cir.), *cert. dism'd* 469 U.S. 925, 105 S.Ct. 307 (1984). Both elements have been established by the defendant in this case.

No reasonable reading of the phrase "as soon as practicable" would allow the plaintiffs to claim that their delay of five and a half years in notifying defendants of withdrawal liability was timely. Further, the prejudice to defendants in this case cannot be denied. According to defendants, relevant records have been discarded, individuals who may have communicated with the Fund are no longer employed by defendants, and there is no evidence that ICC was aware of this potential liability at the time of the purchase of Transway. The unreasonable delay of plaintiffs, in violation of the applicable statute, combined with the prejudice to defendants, leads the Court to hold that plaintiffs' claims for withdrawal liability are barred by the doctrine of laches.

C. *Request for Arbitration*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1991 WL 160966)**

The Fund claims that the Employer's request for arbitration was not timely. However, the facts of the case indicate otherwise, and the Court agrees with the arbitrator in holding that defendants' request for arbitration was timely.

29 U.S.C. § 1401(a)(1) sets out a timetable for requests for arbitration, within the context of the entire withdrawal scheme. Under § 1399(b)(1), a Fund must notify an Employer of the Withdrawal liability amount "as soon as practicable" after being notified of a potential withdrawal. Within 90 days of this notice, an employer may request a review by the Fund of the liability amount. Finally, the employer must request arbitration within the constraints of 29 U.S.C. § 1401(a)(1), which requires that a request for arbitration be within the *earlier* of either:

A) 60 days of the completion of the Fund's review, or

B) 120 days of the Employers request for a review.FN3

On the face of the issue, it appears that Custom did not meet the deadline imposed by § 1401(a)(1)(B), the earlier of the two deadlines under the facts of this case, as the October 14, 1988 arbitration request was not within 120 days of the September 9, 1987 request by Custom for a review of the withdrawal liability demand made by Teamsters. However, the parties agreed "that the running of the statute of limitations will be stayed" by letter dated September 10, 1987, one day after the request for a review. The letter states that its purpose is to "permit our clients additional time to explore possible resolution of this matter while simultaneously preserving their respective interests." *See* exhibit F7, attached to the Award of Arbitration.

Given the stay of the statutory limitations period stipulated by the parties, the request for arbitration was timely. Parties, of course, have the ability to consensually waive limitation periods. *See Zipes v. Trans World Airlines, 455 U.S. 385, 102 S.Ct.*

1127, 1132 (1982); *Banner Industries v. Central States Pension Fund,* 875 F.2d 1285, 1293 (7th Cir.1989), *cert. denied,*110 S.Ct. 563 (1989). The arbitrator found that the agreement expressed a clear mutual agreement to toll the limitations period, and, in the absence of a preponderance of evidence to the contrary, the Court so holds. The arbitration award will not be vacated due to a failure to timely request such arbitration.

D. *Withdrawal*

**\*6** The arbitrator held that the termination of Custom's employees and their transfer to Universal, described by the arbitrator as a reorganization, did not constitute a withdrawal from the pension plan on the part of Custom under 29 U.S.C. §§ 1398 & 1369(b).

29 U.S.C. § 1398 directs that "Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because-

(1) an employer ceases to exist by reason of-

(A) a change in corporate structure described in section 1369(b) of this title, ... if the change causes no interruption in employer contributions or obligations to contribute under the plan ..." (emphasis added).

29 U.S.C. § 1369(b), in turn, includes as relevant changes in corporate structure those where a corporate entity "ceases to exist by reason of a merger, consolidation, or division ..."

The flaw in the arbitrator's reasoning rests on a failure to consider the "employer" to be both Custom and Universal, as directed by 29 U.S.C. § 1301(b)(1).FN4 As Universal continued to exist, thus perpetuating the "employer" at issue regardless of the fate of Custom, § 1398 does not apply to the situation in this case.FN5

Rather, the factual scenario in this case is properly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1991 WL 160966)**

described by 29 U.S.C. § 1385 which relates to partial withdrawals. According to § 1385, a partial withdrawal occurs where "there is a partial cessation of the employer's contribution obligation." § 1385(2)(A) subsequently defines such a partial cessation as occurring where:

the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location ...

In this case, the employer, consisting of Custom and Universal, ceased payments under Custom's collective bargaining agreement, but continued to do the same type of work in the same place. Thus, a partial withdrawal occurred under the statutory definition of such an event, notwithstanding continued payments for former Custom employees by Universal.

Defendants argue that the statements of one of MP-PAA's sponsors during House debate on the bill which became MPPAA establish that § 1385 was not meant to apply where, as in this case, contributions continue to be made for employees who were covered by a terminated collective bargaining agreement. However, this reading conflicts with the plain language of the statute which contains no such restriction.

### III. *Conclusion*

The arbitrator's award will be confirmed, and the Court will enter judgment in favor of the defendants on the ground that the plaintiffs' claim for withdrawal liability is barred by the doctrine of laches in that plaintiffs failed to notify Custom of withdrawal liability "as soon as practicable" as required by ERISA and MPPAA.

*ORDER*

*7 AND NOW, to wit, this 14th day of August, 1991, upon consideration of the Motion of plaintiffs, Teamsters Pension Trust Fund of Philadelphia and Vicinity and Charles J. Schaffer, to Vacate Arbitration Award, and the Motion of defendants, Custom Cartage Company, Universal-Pioneer Freight System, Inc., and International Controls Corporation, to Confirm Arbitration Award, and the Responses of the parties to said Motions, IT IS ORDERED as follows:

1. The Motion of plaintiffs, Teamsters Pension Trust Fund of Philadelphia and Vicinity and Charles J. Schaffer, to Vacate Arbitration Award is DENIED; and,

2. The Motion of defendants, Custom Cartage Company, Universal-Pioneer Freight System, Inc., and International Controls Corporation, to Confirm Arbitration Award is GRANTED and judgment is entered on the Award of the Arbitrator in favor of defendants, Custom Cartage Company, Universal-Pioneer Freight System, Inc., and International Controls Corporation, and against plaintiffs, Teamsters Pension Trust Fund of Philadelphia and Vicinity and Charles J. Schaffer.

> FN1. Regardless of the Fund's failure to act in response to notices from Custom of the termination of Custom employees and their transfer to Universal in late 1981, the Fund admits that when Universal ceased operations in 1982 it should have sent a notice of complete withdrawal liability with respect to the former Custom employees as well as the original Universal employees, and that it failed to do so. Memorandum of Plaintiffs in Support of Motion to Vacate Compulsory Arbitration Award, at 10 n. 4(b).

> FN2. The arbitrator described the termination of Custom's employees and their transfer to Universal as a "reorganization".

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1991 WL 160966)**

FN3. The statute further provides that "The parties may jointly initiate arbitration within the 120-day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title." *Id.* There was no such agreement in this case.

FN4. 29 U.S.C. § 1301(b)(1) states that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."

FN5. The instant case is distinguishable from *Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund of Philadelphia and Vicinity,* 787 F.2d 897 (3d Cir.1986), as that case involved the sale of an employer to an unrelated party, resulting in the total dissolution of the employer. In this case, because Custom and Universal together were the "employer," and Universal continued to exist after the termination and transfer of the Custom employees, the employer did not "cease to exist" as required by § 1398.

E.D.Pa.,1991.
Teamsters Pension Trust Fund of Philadelphia and Vicinity v. Custom Cartage, Co.
Not Reported in F.Supp., 1991 WL 160966 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Weithers, one of the attorneys for the Central States, Southeast and Southwest Areas Pension Fund, certify that on April 25, 2008, the foregoing Appendix to Defendant and Counter-Claimant Central States' Memorandum in Support of its Motion to Vacate or Modify the Arbitration Award was served on all attorneys indicated on the electronic filing receipt via the Court's electronic filing system.

   s/ Thomas M. Weithers

Thomas M. Weithers (ARDC #6193004)
Attorney for Defendant Central States, Southeast and Southwest Areas Pension Fund