IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRA, INC. and DETROIT INTERNATIONAL BRIDGE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,<br><br>Defendant. | Case No. 07-C-6312<br><br>Judge William T. Hart<br><br>Magistrate Judge Schenkier |

**PLAINTIFFS CENTRA, INC. AND DETROIT INTERNATIONAL BRIDGE COMPANY'S BRIEF IN SUPPORT OF THEIR MOTION TO ENFORCE THE ARBITRATION AWARD AND IN OPPOSITION TO DEFENDANT CENTRAL STATES PENSION FUND'S MOTION TO VACATE OR MODIFY THE AWARD**

Mark Casciari
Ronald J. Kramer
Colin M. Connor
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL  60603-5577
312-460-5000

Richard K. Willard
Edward R. Mackiewicz
Eric G. Serron
Patrick S. Menasco
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202-429-3000

June 16, 2008

# Table of Contents

Page

I.    STATEMENT OF FACTS ..................................................................... 2

    A.    **Introduction** ................................................................................ 2

    B.    **1970 – 1995: CenTra's Creation and Ownership Structure** .......... 3

    C.    **1995:  CenTra's Reorganization** ............................................... 4

    D.    **Events After 1995** ................................................................... 5

    E.    **The Fund's Assessment and Review Letter** ................................ 7

    F.    **CenTra's Challenge To The Fund's Assessment** ......................... 8

II.   STANDARD OF REVIEW ................................................................. 8

III.  ARGUMENT ................................................................................. 9

    A.    **U.S. Truck Was Responsible For The Old Subs' Contribution Histories** ................................................................................... 9

        1.    **The Arbitrator Correctly Determined That CenTra's Reorganization Was Sufficient to Satisfy ERISA Section 4218** ......... 9

        2.    **ERISA Section 4218 Supersedes State Corporate Law Principles** .......................................................................... 11

        3.    **CenTra Divested The New Subs As Going Concerns Through Stock Sales; It Did Not Liquidate Them And Sell Their Assets** ........ 13

    B.    **A Principal Purpose of CenTra's Reorganization Was Not to Evade Or Avoid Withdrawal Liability.** ....................................................... 15

        1.    **The Arbitrator Properly Applied The Seventh Circuit's Test To Determine That A Principal Purpose for CenTra's Reorganization And Divestitures Was Not To Avoid Withdrawal Liability Because CenTra Would Have Undertaken Them Regardless of Their Effect On CenTra's Future Withdrawal Liability** ............................................... 16

        2.    **The Arbitrator Applied The Proper Burdens Of Proof And Persuasion** ..................................................................... 20

    C.    **The Fund Must Refund CenTra's Overpayments At Its Plan Rate, Which Includes Double Interest** ................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Illinois Range, Inc.,*
186 F.R.D. 498 (N.D.Ill. 1999) ................................................................... 20

*Board of Trustees of Trucking Employees of N. Jersey Welfare Fund v. Kero Leasing Corp.,*
377 F.3d 288 (3rd Cir. 2004).................................................................... 22

*Central States, Se. & Sw. Areas Pension Fund v. Central Cartage Co.,*
1998 WL 270889 (7th Cir. May 21,1998) .......................................... 11

*Central States, Se. & Sw. Areas Pension Fund v. Central Cartage Co.,*
69 F.3d 1213 (7th Cir. 1995)................................................................ 11

*Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.,*
204 F.3d 736 (7th Cir. 2000)................................................................ 12

*Central States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.,*
296 F.3d 624 (7th Cir. 2002)................................................................ 12

*Central States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.,*
223 F.3d 483 (7th Cir. 2000)............................................................. 8, 14

*Chicago Truck Drivers, Helpers and Warehouse Worker's Union (Independent) Pension Fund v. Louis Zahn Drug Co.,*
890 F.2d 1405 (7th Cir. 1989) ........................................................ 9, 19

*Concrete Pipe and Prods. of California, Inc. v. Construction Laborers Pension Trust,*
508 U.S. 602 (1993)...................................................................... 20, 21

*Godchaux v. Conveying Techniques, Inc.,*
846 F.2d 306 (5th Cir. 1988)........................................................ 12, 13

*Santa Fe Pacific Corp. v. Central States, Se. & Sw. Areas Pension Fund,*
22 F.3d 725 (7th Cir. 1994)................................................. 15, 16, 17, 19

*Teamsters Pension Trust Fund v. Cent. Michigan Trucking, Inc.,*
857 F.2d 1107 (6th Cir. 1988) ............................................................ 12

*Teamsters Pension Trust Fund v. Federal Express Corp.,*
1995 U.S. Dist. LEXIS 19980, (D. Del. Dec. 27, 1995)...................... 12

*Teamsters Pension Trust Fund v. Headley's Express & Storage Co.,*
1993 U.S. Dist. LEXIS 7245 (E.D. Pa. June 3, 1993)........................ 12

**STATUTES**

29 U.S.C. § 1144(a) ............................................................................................... 11

29 U.S.C. § 1381(a) ............................................................................................... 12

29 U.S.C. § 1384(a)(1) .......................................................................................... 13

29 U.S.C. § 1398 ................................................................................................ 1, 9

29 U.S.C. § 1401, et. seq. ............................................................................... 1, 8, 18

29 U.S.C. § 1451(e) ............................................................................................... 23

**REGULATIONS**

29 C.F.R. § 4219.31(d) .................................................................................... 21-22

Plaintiffs CenTra, Inc. and Detroit International Bridge Company ("DIBC") (collectively, "CenTra") now come forward in support of their Motion to Enforce the Arbitration Award and in opposition to Defendant Central States, Southeast and Southwest Areas Pension Fund's ("Central States" or the "Fund") Motion to Vacate or Modify the Arbitration Award, as follows:

This case involves an action by CenTra and DIBC to enforce arbitration Awards under the Multi-Employer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1401 - 1451, which amended the Employee Retirement Income Security Act of 1974 ("ERISA") and the Fund's counterclaim to vacate or modify those arbitration Awards.  The arbitrator, Richard I. Bloch, conducted hearings, heard testimony and received documentary evidence from October 9 to 25, 2006, and rendered a 59-page Award on October 10, 2007 ("Award") and a Supplementary Award on February 12, 2008 ("Supp. Award.")(collectively, the "Awards").

The arbitrator concluded that the Fund's $14.7 million withdrawal liability assessment against CenTra was improper because (1) under Section 4218 of ERISA, 29 U.S.C. § 1398, nearly all of that liability attached to subsidiaries that CenTra had spun off well *before* it withdrew from the Fund, and (2) the Fund could not disregard the spin-off of those entities under ERISA's "evade or avoid" provision, Section 4212(c), because a preponderance of the evidence demonstrated that, as a matter of fact, a principal purpose for the spin-off was *not* to evade or avoid withdrawal liability.  CenTra and DIBC now ask this Court for an order enforcing the arbitrator's Awards and compelling the Fund to reimburse CenTra $14,014,142, together with appropriate interest, reasonable attorneys' fees and costs.[1]

---

[1] This is the principle amount that the Fund calculated it would owe under the Arbitrator's decision.  Supp. Award. at 1.  Although CenTra and DIBC advanced arguments before the Arbitrator for additional amounts, they now accept the Fund's calculation of the principle amount at issue.

## I.    STATEMENT OF FACTS

### A.    Introduction

CenTra is a holding company.  Prior to 1995, it directly owned certain unionized subsidiaries engaged in the trucking and line-hauling business (the "Transportation Subsidiaries").  Through two of these Transportation Subsidiaries, CenTra indirectly owned a real estate firm, Crown Enterprises ("Crown"), and the Detroit International Bridge Company ("DIBC"), which owns and operates the Ambassador Bridge, connecting Detroit, Michigan to Windsor, Ontario.

Congress deregulated the trucking industry in 1980.  As the "seismic impact" of deregulation set in during the following decade, it became increasingly obvious that CenTra needed to undergo structural changes of similar magnitude to again become competitive.  CenTra did everything it could to continue operating its Transportation Subsidiaries but the affected Union, the Teamsters, did everything in its power to thwart CenTra's efforts and protect the Union's interests.  To cut labor costs, CenTra, like many of its competitors, created non-union transportation subsidiaries.  However, the Union vigorously opposed these moves, conditioning relief from its crushing, standard union hauling rates on employers' agreements not to run such "double breasted" operations.  As a result, no matter how hard CenTra tried to cut its labor costs, two of its unionized Transportation Subsidiaries remained unprofitable under the weight of the Union's high rates.  As these Transportation Subsidiaries lost more and more money, the Union increasingly turned to CenTra's more profitable non-transportation operations, including the Ambassador Bridge and Crown Enterprises, to subsidize the underperforming operations.

This situation precipitated CenTra's need to enhance its bargaining position with the Union by separating these unionized Transportation Subsidiaries from CenTra's non-transportation operations (its bridge and real estate operations).  CenTra executives developed a

reorganization plan to effect this change in 1986. But bitter family disputes among CenTra's sibling-owners delayed this much needed reorganization for another nine years. In 1995, CenTra finally reorganized itself under the 1986 plan, which was carefully structured to separate CenTra's profitable non-transportation operations from its failing and entirely unrelated Transportation Subsidiaries. It then sold off the Transportation Subsidiaries and cut its ties to the new buyer.

Unwilling to negotiate with the new owner and frustrated at being cut-off from CenTra's more lucrative operations, the Union chose to torpedo the Transportation Subsidiaries, rather than agree to concessions that would have prolonged their existences by making their operations far more competitive. Given that the Union's intransigence was directly responsible for the demise of these operations, the Central States Fund, a Union-oriented pension fund, cannot honestly assert that the failure of these operations was inevitable at the time CenTra spun them off and that therefore a principal purpose of the spin-off was to "evade or avoid" withdrawal liability. Nonetheless, the Fund chose to ignore the Union's role when CenTra later withdrew from the Fund and assessed CenTra's withdrawal liability as though these spin offs had never taken place. This approach was highly convenient for the Fund, allowing it to collect from CenTra, a solvent business, amounts actually then owed by another entity, U.S. Truck, which was bankrupt.

### B.    1970 – 1995: CenTra's Creation and Ownership Structure

In 1970, T.J. Moroun and his four children formed CenTra, Inc. as a holding company for various subsidiaries. *See* Joint Exhibit No. 2, Joint Stipulation of Facts ("JE 2") at 2. CenTra did not itself conduct business, but its many subsidiaries did. *Id*. T.J.'s son, Manuel ("Matty"), was CenTra's first president. T.J. died in 1992. By 1994, Matty had acquired a majority interest and voting control in CenTra, although his siblings continued as minority owners. *Id*. at 4.

CenTra's Transportation Subsidiaries at issue, Central Cartage Co. and Central Transport, Inc. (collectively the "Old Subsidiaries" or "Old Subs"), were engaged in motor freight operations. JE 2 at 3. Central Cartage conducted local pick-ups and deliveries. Central Transport hauled intercity freight as a common and contract carrier. *Id.*

Local unions affiliated with the International Brothers of Teamsters represented employees of the Old Subs and DIBC under separate collective bargaining agreements ("CBA"). *See* Award at 2. The CBAs required Central Transport, Central Cartage and DIBC to contribute to the Fund, a multiemployer pension trust. Under the MPPAA, CenTra, DIBC and the Old Subs at the time were all part of a common control group (the "CenTra Group"), which contributed to the Fund on a consolidated basis. Each entity, however, maintained its own separate contribution history.

In 1982, T.J.'s daughter Agnes Anne Moroun ("Anne") purchased U.S. Truck, certain shares of which were subject to an option agreement in favor of her brother, Matty. Award at 6, 11 n. 21. Matty's stock-option interest brought U.S. Truck into the CenTra Group under the MPPAA's "common ownership" rules. *See id.* at 6. U.S. Truck went into bankruptcy reorganization soon thereafter, emerging in 1985. Bitter family divides then emerged among the Moroun siblings, resulting in acrimonious litigation that would last for more than a decade. However, the dispute between Matty and his sister, Anne, was finally put to rest in a 1996 settlement agreement, whereby Matty relinquished his option to purchase U.S. Truck stock and Anne became an employee of CenTra. *See id.* at 11.

## C.    1995: CenTra's Reorganization

In 1987, CenTra requested and received from the IRS a favorable letter ruling on its proposed reorganization, although CenTra would not begin to consummate it until 1995. The reorganization was effected as follows:

First, on December 27, 1995, CenTra formed two new subsidiaries (collectively the "New Subsidiaries" or "New Subs") called Central Cartage Co. of Michigan and Central Transport of Michigan, Inc. Second, on December 31, 1995, the Old Subs merged into their parent, CenTra, transferring their assets "up" the corporate chain. Third, CenTra instantaneously transferred or "dropped down" the Old Subs' transportation assets into the New Subs, including key personnel and operating equipment. Upon receiving those assets, the New Subsidiaries assumed the Old Subs' obligations under their CBAs, including the obligations to continue contributing to the Fund, which obligation the New Subsidiaries fulfilled without missing a payment. Award at 27. CenTra did not transfer DIBC or Crown Enterprises to the New Subsidiaries, retaining both as direct or "first tier" subsidiaries. Thus, the "upstream" merger of the Old Subsidiaries into CenTra and the drop down of their transportation-related assets into the New Subsidiaries occurred as part of a single seamless transaction; CenTra never owned or operated those assets directly as its own.

Employing most of the same personnel and operating in the same lines of business, the New Subsidiaries became assignees to the Old Subs' CBAs. Award at 27. The New Subsidiaries also continued contributing to the Fund using the same Fund reporting numbers as the Old Subs. Award at 10. And the Fund continued to accept contributions at the Old Subs' rates, acknowledging that the New Subs were successors to the Old Subs for pension fund obligation purposes.

**D.    Events After 1995**

In 1996, CenTra sold the New Subs' stock to U.S. Truck, which received them as going concerns that its owners intended to operate and hoped in earnest to turn around. Award at 47-48. Later that year, Matty and Anne ended their nearly decade long feud with a settlement

5

agreement in which Matty relinquished his option to purchase U.S. Truck stock.  The Settlement Agreement broke the link of common ownership between CenTra and U.S. Truck, thereby removing U.S. Truck and the New Subsidiaries from the CenTra Group for pension fund obligation purposes.  *Id*. at 46.

While Anne tried her best to turn the New Subs around, she was unable to do so because the Union refused to make critical wage concessions.  Award at 48.  Had the Union been willing to make concessions, the New Subs could have continued operations.  Their short lifespan was less a result of their inherent inability to compete and more a consequence of the Union's unwillingness to accept realities of the post-deregulation marketplace.

U.S. Truck ceased covered operations (and related contributions) to the Fund in December 1999.  U.S Truck filed for bankruptcy on December 23, 1999.  The Fund filed two bankruptcy claims for U.S. Truck's withdrawal liability.

After CenTra sold the New Subs to U.S. Truck in 1996, DIBC remained as the CenTra Group's lone contributor to the Fund.  In November 1997, DIBC's labor agreement expired and DIBC negotiated a new agreement with its unionized employees.  The new agreement was to be in effect for three and a half years.  However, it required DIBC to contribute to the Fund only until January 1, 1998, at which time covered employees would switch to an alternative pension plan.  DIBC followed that schedule.  Nonetheless, the Fund rejected the new agreement as violating its "split-term" rule[2] and unilaterally terminated DIBC's participation effective November 1997, the month in which the Union had voted to accept the new agreement. As DIBC was the CenTra Group's last remaining contributor, DIBC's termination marked the CenTra

---

[2] Under the Fund's "no split term" rule, an employer's Fund contribution obligations must be all or none; employers cannot participate in the Fund for only a portion of the term in which its CBA is in effect.

Group's complete withdrawal from the Fund.  Thus, by terminating DIBC, the Fund created for itself the opportunity to assess withdrawal liability against DIBC and CenTra, based on a complete withdrawal in 1997.

      **E.**     **The Fund's Assessment and Review Letter**

On June 5, 1998, the Fund issued a Notice and Demand for Payment of Withdrawal Liability ("Assessment") to CenTra in the amount of $14,761,082.66.  *See* Assessment, JE 37 at 1.  To reach this figure, the Fund apparently factored in the pre-1996 contribution histories of the Old Subsidiaries (i.e., the amount that the Old Subs had contributed to the Fund until January 1, 1996).  *Id.* at 3.   The Assessment did not explain why the Fund was burdening CenTra with any of the contribution histories of the Old Subs, ignoring the fact that, years earlier, CenTra had restructured the Old Subs into the New Subs, sold the New Subs to U.S. Truck and broken the controlled group relationship with U.S. Truck.[3]  Nor did the Assessment state that a principal purpose of CenTra's 1995 reorganization – under a plan conceived almost a decade earlier in 1986 – was to "evade or avoid" withdrawal liability owed to the Fund.  CenTra maintains that in failing to set forth the "evade or avoid" rationale for setting aside the restructuring and divestitures, the Fund did not properly follow the MPPAA's scheme for adjudicating this issue under Section 4221.

Thus, only by constructing the fiction that CenTra still owned and remained liable for the Old Subs and their operations could the Fund demand the withdrawal liability that it should have sought from U.S. Truck, and which U.S. Truck could not have afforded to pay.  Under the MPPAA's "pay now, dispute later" scheme for withdrawal liability, the Fund was able to collect

---

[3] The Fund did not allocate to CenTra any of the Old Subs' or  New Subs' contribution histories post-January 1, 1996.

from CenTra the entire amount that it assessed, up front, before CenTra could contest the accuracy of that assessment before a neutral arbiter.

### F.    CenTra's Challenge To The Fund's Assessment

CenTra submitted a Request For Review of Withdrawal Liability to the Fund on September 1, 1998. The Fund responded on December 22, 1998 with a Review Letter that affirmed its initial assessment. Pursuant to the MPPAA's remedial scheme, CenTra paid the assessment in full (but under protest) and filed a Demand for Arbitration on February 10, 1999. On October 10, 2007, after years of discovery, briefing, hearings, and witness testimony which was subject to full cross-examination, the Arbitrator issued his Opinion and Award. The Award reduced CenTra's withdrawal liability to $959,332, based on the Arbitrator's determination that (1) under Section 4218 of ERISA, the vast majority of the assessed contribution history did not attach to CenTra when DIBC withdrew in 1997, but rather attached to the spun-off New Subsidiaries, when U.S. Truck withdrew in 1999, and (2) the Fund could not disregard the spin-offs under Section 4212(c) of ERISA because a principal purpose of the spin-offs was *not* to evade or avoid withdrawal liability.

## II.    STANDARD OF REVIEW

In ERISA Section 4221(c), Congress set out a "presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator are correct." 29 U.S.C. § 1401(c). The Arbitrator's determinations on mixed questions of law and fact are also to be reviewed for clear error. *Central States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 488 (7th Cir. 2000). The Arbitrator's conclusions on pure issues of law are subject to *de novo* review. *Id.*

Deference is particularly warranted as to the Arbitrator's "evade or avoid" determinations. "The need for deference to the arbitrator's expertise is even more obvious on the issue of whether [an employer] sought to evade or avoid withdrawal liability. Matters of intent are particularly suited for resolution by the decision-maker with initial fact-finding responsibilities." *Chicago Truck Drivers, Helpers and Warehouse Worker's Union (Independent) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1412 (7th Cir. 1989). In cases where "the arbitrator conclude[s] that the transaction was not to avoid withdrawal liability," such determinations should only be reversed if the reviewing court finds them to be "clearly erroneous." *Id*. Therefore, in a close call – even one in which the reviewing court might have concluded otherwise – the arbitrator's determination should be upheld.

## III.    ARGUMENT

### A.    U.S. Truck Was Responsible For The Old Subs' Pre-1996 Contribution Histories

#### 1.    The Arbitrator Correctly Determined That CenTra's Reorganization Was Sufficient to Satisfy ERISA Section 4218

Under ERISA Section 4218, "an employer shall not be considered to have withdrawn solely because (1) an employer ceases to exist by reason of – (A) a change in corporate structure described in Section 4069(b)…if the change causes no interruption in employer contribution or obligations…a successor or parent corporation or entity resulting from any such change shall be considered the original employer." 29 U.S.C. § 1398.

As Arbitrator Bloch explained in his Opinion and Award, the contribution obligation (and attendant contribution histories, used to compute withdrawal liability) of the Old Subs were tied to their operating assets, employees and the collective bargaining agreements by which the Old Subs became contributors to the Fund in the first place. *See* Award at 27. Under ERISA Section

4218, by assuming the Old Subs' collective bargaining agreements and covered operations as

part of CenTra's seamless and instantaneous reorganization, the New Subs also assumed the Old

Subs' contributions histories in the event that the New Subs withdrew from the Fund:

> Those responsibilities, governed by [the collective bargaining
> agreements] were assumed by the Old Subsidiaries immediately
> prior to the reorganization and by the New Subsidiaries
> immediately following it….the requisites of § 4218 were met: the
> Old Subsidiaries ceased to exist and the reorganization caused no
> interruption in employer contributions or the obligation to
> contribute under the Cartage and Transport CBAs….The New
> Subsidiaries, therefore, were properly considered the "original
> employer" under § 4218 and they thereby inherited the Old
> Subsidiaries' contribution histories.

Award at 27.[4]

That CenTra retained certain trucking assets of the Old Subs and transferred them to

Central Transport International, Inc. ("CTII") does not alter this analysis.  As the Fund points out

in its brief, those assets consisted of some of the Old Subs' contracts *with freight shippers* to

CTII; however, the New Subs assumed the Old Subs' collective bargaining agreements, and thus

the basis for their participation as contributing employers to the Fund transferred to the New

Subs.  *See* Award at 27.  Moreover, most of the assets retained by CenTra, such as DIBC, had no

relationship to the Old Subs' trucking operations—they were otherwise "unaffected with respect

to the New Subs."  *Id*. at 45.[5]

---

[4] The Pension Benefit Guaranty Corporation ("PBGC"), the federal administrative
agency charged with administering and interpreting these provisions of ERISA reached the same
conclusion in an Opinion Letter it issued on December 23, 1998. (Attached as Exh. 1).

[5] In any event, the Fund's argument that Section 4218 was not complied with (Fund's
Brief at pp. 15-17) wholly misses the point.  As the Fund concedes, the only consequence for
non-compliance with Section 4218 would be an immediate withdrawal from the Fund as of
December 31, 1995.  However, the Fund never assessed any liability based on a withdrawal as of
that date.

## 2.    ERISA Section 4218 Supersedes State Corporate Law Principles

The Fund contends that corporate common law principles (*i.e.*, state law) dictate that the first part of CenTra's 1995 restructuring permanently lodged the Old Subs' contribution histories in CenTra on December 31, 1995, although it concedes that no withdrawal event occurred at that time. It supports this assertion by deliberately ignoring the second part of that restructuring, in which CenTra transferred assets previously operated by the Old Subs into the New Subs, immediately upon receiving them. As the Arbitrator explained, even if the Fund's incomplete description of the reorganization and its effect were true as a matter of state law, ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan…" including state corporate law, under 29 U.S.C. § 1144(a), Award at 22 & n. 42.

Moreover, after the reorganization, the Fund treated the New Subsidiaries as successors to the Old Subsidiaries That "the New Subsidiaries continued contributing to the Fund, using the Old Subsidiaries' reporting numbers" materially reflected that continuity and the understanding of all parties concerned. Award at 10. Indeed, the Fund itself recognized that reality, as it had no trouble accepting contribution payments from the New Subsidiaries under those terms.[6]

---

[6] The Arbitrator's Award does not conflict with prior rulings of the Seventh Circuit as asserted by the Fund in its brief at pp.12-13. The first case cited, *Central States, Se. & Sw. Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1213 (7th Cir. 1995), involved an entirely different corporate transaction involving another company (General Highway Express) taking place at a different time (1987) and involving a different structure. The second case cited, *Central States, Se. & Sw. Areas Pension Fund v. Central Cartage Co.,* 1998 WL 270889 (7th Cir. May 21, 1998), was an unpublished opinion not entitled to precedential effect which, in any event, turned on the legally distinct question of standing to pursue an appeal under Rule 25(c) of the Federal Rules of Civil Procedure. Moreover, as the Arbitrator stated in his opinion at p. 23 n.47, both of these cases involve contribution obligations arising out of CBAs, rather than statutory withdrawal liability under ERISA Section 1392.

Separately, as the Arbitrator explained, a fundamental principle of withdrawal liability is that it does not arise until the withdrawal actually occurs. "Withdrawal liability attaches when there is a withdrawal event. Before that, there is no liability to be carried either as a liability on the employer's books or as an asset of the Fund." Award at 22-23 (citing 29 U.S.C. § 1381(a)) ("If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, *then* the employer is liable to the plan.") (emphasis added); *see Cent. States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 204 F.3d 736 (7th Cir. 2000) (fund cannot assess withdrawal liability until after withdrawal actually occurs and liability actually arises); *accord Cent. States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 627 (7th Cir. 2002). In other words, withdrawal liability is not treated as a liability that accrues over time; it exists and is triggered only when a withdrawal occurs; there is no such thing as contingent withdrawal liability. It follows, therefore, that the factors underlying the calculation of withdrawal liability, such as contribution histories, are also not liabilities that accrue over time.[7]

The Fund's position here ignores this fundamental principle, treating withdrawal liability and the underlying contribution histories as liabilities that accrue over time and as assets or liabilities that transfer from one party to another, even absent a withdrawal event, according to corporate common law principles, which ERISA expressly preempts. Indeed, this "accrual" theory of withdrawal liability has been squarely rejected by the courts. *Teamsters Pension Trust Fund v. Cent. Michigan Trucking, Inc.*, 857 F.2d 1107 (6th Cir. 1988); *Teamsters Pension Trust*

---

[7] Additionally, all Old Sub financial statements as of December 31, 1995 showed no liability, contingent or otherwise, for either Central Transport or Central Cartage, for withdrawal liability, contribution history, or contribution base units. Nor does the Fund show possible withdrawal liability as an asset on its financial statements. See Principal Record on Appeal, Item No. 9.2, Petitioners' Proposed Findings of Fact ¶ 266 (and citations therein).

*Fund v. Headley's Express & Storage Co.*, No. 92-5688, 1993 U.S. Dist. LEXIS 7245, at *13-16

(E.D. Pa. June 3, 1993); *Teamsters Pension Trust Fund v. Federal Express Corp.*, Civ. Act. Nos.

86-304, *et al.* 1995 U.S. Dist. LEXIS 19980, at *22-26 (D. Del. Dec. 27, 1995); *see also*

*Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 310-11 (5th Cir. 1988).  Thus the Fund

has no basis to rely for authority on common law characterizations or principles as authority in

this case.

### 3.    CenTra Divested The New Subs As Going Concerns Through Stock Sales; It Did Not Liquidate Them And Sell Their Assets

After being transferred to the New Subs under Section 4218, the contribution histories of

the Old Subs left the CenTra Group entirely through three equity transactions, not through asset

sales.  CenTra sold each of the New Subs to U.S. Truck as going concerns, by selling all of their

stock to U.S. Truck in two separate transactions in 1996.  Award at 11.  Matty then relinquished

to Anne his option to purchase stock in U.S. Truck as part of their Settlement Agreement.  This

final transfer of equity severed the tie of common ownership between CenTra and U.S. Truck,

severing U.S. Truck and the Old Subs' contribution histories from the CenTra Group entirely.

*Id*.

The Fund mischaracterizes CenTra's divestiture of the Old Subs as an asset transfer,

which could have required CenTra to post a bond and take on secondary liability to the Fund to

avoid triggering withdrawal liability under ERISA Section 4204.  As the statute states on its

face[8], the bonding and secondary liability obligations of Section 4204 apply only to *asset sales*

outside of the controlled group.  These obligations protect pension funds from contribution

shortfalls following an employer's asset liquidations.  These obligations do not apply here, where

---

[8] "A complete or partial withdrawal of an employer … under this section does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party…" 29 U.S.C. § 1384(a)(1).

the transfer of assets occurred within the CenTra Group and would not have otherwise triggered CenTra's withdrawal.

The only asset transfers that occurred were all internal to the CenTra Group. The transfers did not alter the CenTra Group's contribution obligations or lead the Fund to terminate CenTra's participation and assess withdrawal liability. Section 4218 of ERISA directly addresses such transactions, giving corporations the flexibility to reorganize without triggering withdrawal liability, so long as they satisfy statutory preconditions and continue to meet their contribution obligations.

Congress wanted to "encourage asset sales" outside of the employer's controlled group and excused such sales from triggering withdrawal liability, if certain safeguards were in place, such as the seller posting a bond and assuming secondary liability. *Nitehawk*, *supra*, 223 F.3d at 487.[9] However, an asset sale is in marked contrast to "a sale of stock [which] is covered by a different provision of the statute [i.e., Section 4218], which specifies that the successor employer resulting from such a transaction shall be considered the original employer." *Id*. at 491 (internal citations omitted). The only transactions that occurred outside the CenTra Group were stock sales and therefore Section 4204 is irrelevant.

That the assessment at issue does not allege a withdrawal event on December 31, 1995 is clear evidence that Section 4204 of ERISA has no bearing here. If, as the Fund now argues, Section 4204 applied and CenTra did not meet its statutory conditions, then the Fund's

---

[9] The Fund cites *Nitehawk* several times in its Brief. The transaction at issue in that case turned on an asset sale to an entity outside the controlled group. In contrast, the asset transfers in the present case were all internal to the CenTra Group and it was through stock sales that the Old Subs' contribution histories were removed from the CenTra Group. By distinguishing the effect of asset transfers from stock sales, *Nitehawk*, by its own terms, distinguishes itself from the present case.

Assessment would have set CenTra's withdrawal date at December 31, 1995, the date on which the allegedly non-complying asset transfers took place.

     **B.**     **A Principal Purpose of CenTra's Reorganization Was Not to Evade Or Avoid Withdrawal Liability.**

Under Section 4212, "if a principal purpose of any transaction is to evade or avoid [withdrawal] liability," that transaction and the effect it would otherwise have on the employer's obligations to the Fund is effectively set aside. A purpose is "principal if, were it absent, the sale would not have taken place." *Santa Fe Pacific Corp. v. Central States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 729 (7th Cir. 1994). Avoidance of withdrawal liability is not "a principal purpose," but rather a "minor consideration [if] the sale of stock would have taken place even if the MPPAA had never been passed." *Id.*

The Fund's June 1998 assessment, on which the demand for arbitration was made, was not based on the Fund's subsequent "evade or avoid" theory; the Fund raised the theory only after CenTra challenged the assessment. Nonetheless, in addition to arguing that it should be able to rely on this new, alternative theory to defend its assesment, the Fund contends that, if the alternative theory prevails, the Fund should receive more than the amount stated in that assessment. On procedural grounds, CenTra objects to the Fund's reliance on this alternative "evade or avoid" theory. Under that theory, CenTra would not have withdrawn until 1999, well after the Fund issued its assessment. A pension fund cannot assess liability before a withdrawal occurs (because there is no liability to assess). *See Cent. States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc., 204 F.3d 736 (7th Cir. 2000); accord Cent. States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc., 296 F.3d 624, 627 (7th Cir. 2002).* If the Court were to disagree, CenTra would ask for a remand to the arbitrator to determine the proper amount of

liability under the alternative theory. However, CenTra is confident that the Arbitrator's

substantive conclusions here on this issue are correct and can be affirmed on the merits without

remand.

> 1.    **The Arbitrator Properly Applied The Seventh Circuit's Test To Determine That A Principal Purpose for CenTra's Reorganization And Divestitures Was Not To Avoid Withdrawal Liability Because CenTra Would Have Undertaken Them Regardless of Their Effect On CenTra's Future Withdrawal Liability**

The Arbitrator directly applied the Seventh Circuit's test for determining a principal

purpose for an employer's transaction. "The circumstances surrounding CenTra, involving real

and substantial business pressures and palpable family greed, distrust and litigation present a

viable scenario that ultimately compels the conclusion [that] the reorganization would have

occurred even in the absence of withdrawal liability concerns." Award at 35.

The Arbitrator identified at least seven principal reasons for CenTra's reorganization that

have no connection to avoiding withdrawal liability. First, deregulation, which started with the

1980 Motor Carrier Act, "increased competition in dramatic and often devastating fashion."

Award at 35. Second, CenTra was looking for an opportunity "to renegotiate its labor contracts

with the Teamsters Union." *Id.* Third, CenTra wanted to maintain a clean separation between its

unionized operations and its nonunion subsidiaries. *See id.* at 36. CenTra had already started

opening nonunionized subsidiaries, and tensions were building over this practice of "double

breasting" or maintaining parallel union and nonunion operations. "Splitting off the companies

to a separate, fully unionized operation would help ease that problem." *Id.* Fourth, for asset

protection purposes, CenTra needed to break the ownership tie between its valuable stand-alone

assets, such as DIBC, and its more risky active operations, such as the transportation business of

the Old Subsidiaries. *See* Award at 36 – 37. Fifth, CenTra's diverse holdings were causing

tensions within its workforce. During negotiations, "the wealthy bridge and real estate

operations were viewed by the Union…as deep pocket supporters of the struggling Old Subs. The Split would help quell that perception, as well." *Id*. at 37.  Sixth, "the 1986 Tax Reform Act made it increasingly desirable to be an S, instead of a C, corporation.  That could not happen, however, with the attached subsidiaries…Each company had to be owned directly; that too added to the luster of spinning them off." *Id*. at 38 n. 84.  Seventh, the reorganization and divestiture could heal deep divisions among the Moroun siblings that arose out of their shared ownership of the Old Subsidiaries and end "the stalemate the family had reached…" *Id*. at <u>38</u>.

The Fund mischaracterizes the Arbitrator's rationale for finding, as a matter of fact, that a principal purpose for CenTra's reorganization was not to evade or avoid withdrawal liability. Indeed, the Arbitrator questioned whether CenTra's divestitures were part of a larger "sham" transaction undertaken for the sole purpose of avoiding withdrawal liability, because such a transaction would unquestionably have such avoidance as a principal purpose.  But the Arbitrator made clear his understanding that "[t]he statutory criterion is not whether the transaction is a sham…it is whether the avoidance of withdrawal liability…is one of the principal purposes for the transaction."  Award at 32 n. 66 (quoting *Santa Fe*, *supra*, 22 F.3d at 729-30).   In accordance with this understanding, the Arbitrator did not stop his inquiry there.  The Arbitrator examined in detail the seven non-withdrawal related reasons referenced above and concluded that, even if avoiding withdrawal liability was a consideration, it simply did not rise to the level of a "principal purpose" for CenTra's reorganization:

> Significant to these findings, among other things, is the fact that CenTra had been both interested and active, early on, in attempting to reconfigure CenTra.  Almost without exception, the sources of its concerns – deregulation of the trucking industry, insurance issues surrounding DIBC, double breasting issues, bargaining leverage in an industry that had undergone 'seismic' change, all these pointed toward the same solution.

17

Award at 49.

Here, the Arbitrator rightly concluded that the strength and number of CenTra's other reasons for undertaking the reorganizing sufficiently demonstrated that avoiding withdrawal liability was not high enough on CenTra's list of concerns to merit the designation "a principal purpose." While the Fund would undoubtedly argue, given the opportunity, that an employer's mere recognition or knowledge that a particular restructuring could reduce future withdrawal liability would constitute an impermissible intent to evade or avoid such liability, mere awareness is not and should not be sufficient to meet the standard of "a principal purpose." Otherwise, *every* transaction that could reduce an employer's future withdrawal liability could be set aside. Moreover, the MPPAA allows an employer to request "an estimate of such employer's potential withdrawal liability." 29 U.S.C. § 1401(e). If the employer's mere awareness of the amount of potential withdrawal liability was sufficient to charge the employer with a principal purpose to evade or avoid such liability, the MPPAA would not have legitimized such employer requests.

While the New Subs were not in good financial condition at the time they were sold, the owner and the president of U.S. Truck had every intention of turning them around. For example, they intended to reduce labor costs by almost twenty percent, by combining the workforces of the New Subs and U.S. Truck, and then tried to get them all covered under the same CBA. *See* Award at 47. Anne Moroun, U.S. Truck's owner and the New Subs' purchaser, testified, "I figured I could make a go of it…I thought, for sure we wouldn't be the next Conway or some big trucking company, but we could make some money, some serious money." *Id*. As further evidence of her intent to try to keep the New Subs afloat after the sale, "U.S. Truck entered into a series of six or seven agreements for support services with CenTra, including a dispute resolution

agreement and coverage of the U.S Truck employees under the New Subs' CBA."  Award at 47.
As the Arbitrator determined following extended evidentiary hearings, these prudent business
efforts are not the actions of parties who purchased a business to accommodate the seller's
principal purpose of foiling the ERISA withdrawal liability scheme.

As in *Chicago Truck Drivers, Helpers and Warehouse Worker's Union (Independent)
Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405 (7th Cir. 1989), the time, effort, and
money that the purchaser of the New Subs put into them showed that "they obviously had value
to the purchaser in light of the object of the entire transaction…." *Id*. 1412.   And as in *Zahn*, the
Arbitrator "relied on the business history of [the company], especially the effect that excessive
transportation costs were having on its competitive posture.  Analyzing the transaction in light of
[the company's] business situation, the arbitrator concluded that the transaction was not to avoid
withdrawal liability.  We cannot say that such a determination is clearly erroneous." *Id*.   Neither
should this Court in the present case.

Contrary to the Fund's argument on page 21 of its Brief, the facts of this case are readily
distinguishable from the facts in *Santa Fe Pacific v. Cent. States, Se. & Sw. Areas Pension Fund*,
22 F.3d 725 (7th Cir. 1994).  In *Santa Fe*, the evidence demonstrated that the employer – without
other justification – chose to forgo an asset sale that would have yielded millions of dollars more
than the stock sale it ultimately undertook to divest itself of certain subsidiaries.  *Id*. at 730.  On
that basis, the court found that the employer's principal purpose for structuring the divestiture in
the unprofitable way that it did was to avoid withdrawal liability.  *Id*.  Here, the Fund cites no
evidence to show that CenTra even considered, much less rejected the possibility of selling the
New Sub's assets to U.S. Truck.  Nor can the Fund support any assertion that such an asset sale

(which was never on the table) would have been more lucrative absent the withdrawal liability factor.

### 2. The Arbitrator Applied The Proper Burdens Of Proof And Persuasion

In *Concrete Pipe and Prods. of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602 (1993), the Supreme Court interpreted the burdens of proof set out in Section 4221 narrowly, to avoid serious constitutional problems that would arise if the Fund's determinations on the evade or avoid issue were to enjoy legal deference or if the employer were required to prove the negative -- that it did not have, as a primary purpose, the avoidance of withdrawal liability. For that reason, the Fund bears the burden of showing, by a preponderance of the evidence, that such avoidance was among CenTra's principal purposes. *Id. at 603*. The Arbitrator made his determination under precisely this standard. After expressly acknowledging that factual determinations by the Fund enjoy a presumption of correctness, the Arbitrator properly distinguished such *determinations* from *conclusions* as to the mixed fact and law question of whether the employer had a principal purpose to evade or avoid withdrawal liability.

The Fund's conclusions on questions of mixed law and fact do not enjoy any "presumption of correctness." Neither does the misapplication of the burden under Section 4221 that the Fund asserts under Section 4221(a)(3)(A) in its initial Brief. The burden of proving that a principal purpose of CenTra's reorganization was to "evade or avoid" withdrawal liability ultimately lies with the Fund, as an interested party accusing CenTra of affirmatively engaging in fraud-like activities. *Id.; see also Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Illinois Range, Inc.*, 186 F.R.D. 498, 504-505 (N.D.Ill. 1999) ("The allegations in this case assert that it was an affirmative act of the shareholders that induced the withdrawal liability of

the corporation and that act was motivated by the shareholders attempting to evade and avoid withdrawal liability").

The Arbitrator stated point blank that: "The Fund's claims are not frivolous. Neither, however, are they *supported by a preponderance of the evidence*." Award at 48 (emphasis added). This is the burden of proof he applied to the Fund's accusation that a principal purpose for selling the Old Subs was not CenTra's avoidance of withdrawal liability. That was the proper allocation of both the burden of proof (preponderance of evidence) and the burden of persuasion (to the Fund), under the Supreme Court's interpretation of Section 1401(a) in *Concrete Pipe*. The Arbitrator's mere use of the words "clearly shown" and "burden" in consecutive sentences in his Opinion and Award does not mean that he applied the "clear-and-convincing evidence" standard, nor does the rest of his language or his reasoning support that conclusion.

## C.    The Fund Must Refund CenTra's Overpayments At Its Plan Rate, Which Includes Double Interest

In his Supplementary Award of February 12, 2008, Arbitrator Bloch concluded that CenTra was "entitled to overpayments on the revised settlement of $959,332 plus interest as required under 29 C.F.R. § 4219.31(d)." Supp. Award at 4. He thus left the manner of calculating interest up to the parties in the first instance and ultimately in the hands of this, the enforcing Court.

Under § 4219.31(d):

> [T]he plan sponsor shall refund the overpayment, *with interest*, in a lump sum. The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded to the employer *at the same rate as the rate for overdue withdrawal liability payments*, as established under § 4219.32 or by the plan pursuant to § 4219.33.

In a November 26, 2007 letter to CenTra, the Fund calculated the interest due for CenTra's overpayment using the interest rate for overdue withdrawal liability payments set forth in section 5(d) of Appendix E to the Pension Plan (JE 2). *See* Supplemental Record on Appeal No. 73. As a starting point, CenTra agrees with the Fund's use of the rate set forth in its plan documents, the prime rate as reported by Chase Manhattan Bank on the 15th of the month plus 2%. *See id.*

The Fund's June 1998 Assessment appears to compound or "annualize" interest and Appendix E to its Rules and Regulations Pertaining to Employer Withdrawal Liability calls for interest to be "compounded annually." JE 37 at p. 19. Pursuant to the regulation excerpted above, the refund due CenTra should be calculated in precisely the same manner as the Fund calculates late contribution payments.

In *Board of Trustees of Trucking Employees of N. Jersey Welfare Fund v. Kero Leasing Corp.*, 377 F.3d 288 (3rd Cir. 2004), the Court of Appeals for the Third Circuit held that when it comes to interest on over- versus under-payments of withdrawal liability, what is good for the goose is good for the gander.

> While the rate set by the Fund might be slightly higher than the current prevailing market rate, the average rates over time have been recorded both above and below ten percent. Further, we note that *it seems somewhat problematic for the Fund to be challenging its own rate as being unreasonable*, while it presumably continues to apply that rate against employers with delinquent plan contributions and overdue withdrawal liability payments.

*Id.* at 304 -05 (emphasis added).

Moreover, just as the Fund's governing documents calls for the assessment of double interest on late and under-payments, the Fund is likewise obliged to add double interest to its lump sum refund payment to CenTra. *See* JE 2, Appendix E. While the Fund will no doubt argue that double interest is a form of liquidated damages, which are somehow distinct from

interest assessed on wrongly withheld funds, the same principles should apply. Just as the Fund uses stringent interest penalties to motivate employers to pay in full and on time, those same rates should be applied to the refund that the Fund owes CenTra, to motivate it to calculate withdrawal liability legitimately, considering that its June 1998 assessment to CenTra and DIBC was over $13 million dollars more than it should have been. Given the Fund's right to immediately collect payments on its assessments regardless of their potential inaccuracies, under the MPPAA's "pay now, dispute later" scheme, employers have the right to expect that should such payments have been wrongly assessed, the same penalty will apply to the Fund's erroneous assessment as would apply to an employer's wrongful withholding of payments. *See* Supp. Record item No. 71.

## CONCLUSION

For the reasons set forth above, CenTra and DIBC respectfully request that the Court GRANT CenTra's Motion to Enforce the Arbitration Awards, DENY in full Central States' Motion to Modify or Vacate the Opinion, and ORDER Central States to Refund CenTra's withdrawal liability payment in accordance with the Arbitrator's Supplemental Opinion, with interest calculated using the formula described above. CenTra and DIBC also request that the

Court order Central States to pay their reasonable attorneys' fees and costs, pursuant to 29

U.S.C. § 1451(e).

                                        Respectfully Submitted,

                                        CENTRA, INC. and
                                        DETROIT INTERNATIONAL BRIDGE
                                        COMPANY


                                        By    /s/   Edward R. Mackiewicz
                                                One of Their Attorneys


DATED: June 16, 2008

Mark Casciari
Ronald J. Kramer
Colin M. Connor
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL  60603-5577
312-460-5000

Richard K. Willard
Edward R. Mackiewicz
Eric G. Serron
Patrick S. Menasco
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202-429-3000

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on June 16, 2008, I electronically filed the foregoing PLAINTIFFS NOTICE OF MOTION,  PLAINTIFFS CENTRA AND DETROIT INTERNATIONAL BRIDGE COMPANY'S MOTION TO ENFORCE ARBITRATION AWARD  and BRIEF IN SUPPORT OF THEIR MOTION TO ENFORCE THE ARBITRATION AWARD, AND IN OPPOSITION TO DEFENDANT CENTRAL STATES PENSION FUND'S MOTION TO VACATE OR MODIFY THE AWARD with the Clerk of the Court using the CM/ECF system, which sent e-mail notification of that filing to the following:

Thomas M. Weithers
James P. Condon
Central States, Southeast and
Southwest Areas Pension Fund
10th Floor
9377 W. Higgins Road
Rosemont, IL  60018-5123

Richard Lee Fenton
Frank P. VanderPloeg
Geoffrey J. Repo
Sonnenschein, Nath & Rosenthal LLP
233 South Wacker Drive
Sears Tower
Chicago, IL  60606


                _____/s/  Edward R. Mackiewicz___