IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRA, INC. and<br>DETROIT INTERNATIONAL<br>BRIDGE COMPANY,<br><br>               Plaintiffs,<br><br>    v.<br><br>CENTRAL STATES, SOUTHEAST AND<br>SOUTHWEST AREAS PENSION FUND,<br><br>               Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case Nos. 07 CV 6312<br>)                    07 CV 6348<br><br>Judge William T. Hart<br><br>Magistrate Judge Schenkier |

---

**DEFENDANT AND COUNTER-CLAIMANT CENTRAL STATES' REPLY
MEMORANDUM IN SUPPORT OF ITS MOTION TO VACATE OR MODIFY
THE ARBITRATION AWARD, AND IN OPPOSITION
TO PLAINTIFFS' MOTION TO ENFORCE THE AWARD**

---

Richard L. Fenton
Frank P. VanderPloeg
Geoffrey J. Repo
Sonnenschein Nath & Rosenthal LLP
Sears Tower
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606
Tel: 312-876-8000
Fax: 312-876-7934

James P. Condon (ARDC 03126986)
Thomas M. Weithers (ARDC 06193004)
Legal Department
Central States, Southeast and Southwest
Areas Pension Fund
9377 West Higgins Road
Rosemont, IL 60018-4938
Tel: 847-518-9800
Fax: 847-518-9797

F:265580

# TABLE OF CONTENTS

|      |                                                                                      | Page |
|------|--------------------------------------------------------------------------------------|------|
| I.   | INTRODUCTION………………………………………………………….. | 1    |
| II.  | CENTRA HAS FAILED TO RESPOND TO KEY ISSUES…………………. | 2    |
| III. | SECTION 1398 [ERISA § 4218] IS NOT APPLICABLE……………………. | 4    |
| IV.  | CENTRA HAS NO EFFECTIVE RESPONSE CONCERNING THE "EVADE OR AVOID" ISSUE………………………………………....... | 10 |
| V.   | THERE IS NO NEED TO REACH THE INTEREST RATE ISSUE…………. | 14 |

# TABLE OF AUTHORITIES

**Pages**

**CASES**

*Central States v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993) .................................................................. 10
*Central States v. Nighthawk Express*, 223 F.3d 483, 492 (7th Cir. 2000) ............................................. 1, 7
*Central States v. Sherwin-Williams Co.*, 71 F.3d 1338, 1342 (7th Cir. 1995) ........................................ 5, 7
*Chaveriat v. Williams Pipe Line*, 11 F.3d 1420, 1425 (7th Cir. 1993) ....................................................... 9
*Chicago Truck Drivers Pension Fund v. El Paso Co.*, 525 F.3d 591, 596-97 (7th Cir. 2008) ..................... 8
*Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405 (7th Cir. 1989) .............. 13
*Chicago Truck Drivers v. El Paso*, 2005 WL 2737072, *11 (N.D. Ill. 2005) ............................................. 8
*Christensen v. Harris County*, 529 U.S. 576, 587 (2000) .......................................................................... 5
*Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602 (1993) ...... 14
*Covey v. Commercial Nat. Bank*, 960 F.2d 657, 660 (7th Cir. 1992) ......................................................... 7
*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987) ......................................................................... 7
*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) ........................................................................... 5
*Santa Fe v. Central States*, 22 F.3d 725, 728 (7th Cir. 1994) ............................................................. 4, 11
*Sheet Metal Worker's Pension Fund v. Illinois Range*, 186 F.R.D. 498 (N.D. Ill. 1999) ........................ 14

**STATUTES**

29 U.S.C. § 1145 .......................................................................................................................................... 8
29 U.S.C. § 1369(b)(3) ............................................................................................................................. 3, 5
29 U.S.C. § 1384 ......................................................................................................................... 1, 6, 7, 13
29 U.S.C. § 1384(a)(1) ................................................................................................................................ 6
29 U.S.C. § 1384(a)(1)(B) & (b) ................................................................................................................ 6
29 U.S.C. § 1391(c)(2)(C)(ii) ...................................................................................................................... 8
29 U.S.C. § 1398 .................................................................................................................. 1, 2, 3, 4, 5, 6, 7, 10
29 U.S.C. § 1401(b)(2) .............................................................................................................................. 11
29 U.S.C. § 186(c)(5)(B) ............................................................................................................................. 4

**OTHER AUTHORITIES**

Black's Law Dictionary (7th ed. 1999) ........................................................................................................ 5

I.  **INTRODUCTION.**

Notwithstanding its extraordinary attempts to confuse and conflate the transactions at issue here, CenTra cannot avoid one inescapable fact. Upon the merger of the Old Subs into CenTra, CenTra became the successor in interest to the Old Subs' contribution histories and liable for any attendant obligations. When certain assets of the Old Subs were then transferred to the New Subs, that did not release CenTra from those obligations, either as a matter of corporate law or MPPAA. *Central States v. Nighthawk Express*, 223 F.3d 483, 492 (7th Cir. 2000). Even if the transaction were simply viewed as something it was not, *i.e.*, a direct asset transfer from the Old Subs to the New Subs, the Old Subs and their successors in interest would still be liable for withdrawal liability because CenTra failed to comply with the asset sale exemption requirements of 29 U.S.C. § 1384 (ERISA § 4204). Either way, CenTra remains liable for the withdrawal liability and cannot foist its obligations onto the other participating Central States employers.

Faced with that inescapable logic, CenTra is left to advance an argument under 29 U.S.C. § 1398 [ERISA § 4218]. But § 1398 is wholly inapplicable. That section does not eliminate or absolve an employer or its controlled group of its contribution history; it merely provides that certain types of transactions, without more, will not by themselves *trigger* withdrawal liability "solely because" one of the corporate entities in a controlled group has ceased to exist. Here, there is no claim that the merger of the Old Subs into CenTra or the transfer of assets to the New Subs triggered the withdrawal liability. That occurred two years later when the last CenTra operating subsidiary (DIBC) left the Plan. Moreover, as established in Central States' opening Memorandum, a corporate "division" has been held to refer to stock transactions, not asset transfers. Liability for contribution histories and withdrawal in an asset transfer are specifically governed by 29 U.S.C. § 1384 (ERISA § 4204), requiring an agreed assumption by the asset purchaser of contribution history, and the posting of a bond – requirements with which CenTra admittedly failed to comply. In short, there is no basis

either in MPPAA or in corporate law for the extraordinary result that the Arbitrator reached, and his Award should be vacated.

## II.  CENTRA HAS FAILED TO RESPOND TO KEY ISSUES.

Moreover, the June 16, 2008 Memorandum submitted by Plaintiffs CenTra and DIBC ("CenTra Memo") has simply failed to respond to several key issues raised by Central States:

1. Central States' April 25, 2008 opening Memorandum ("C.S. Memo") noted that if the pension contribution histories of the Old Subs were not "liabilities" (as the Arbitrator believed, Op. at 22), there is no way to explain how the histories traveled into CenTra after it merged with the Old Subs (as the Arbitrator also believed, Op. at 19-20). C.S. Memo at 2. CenTra has declined Central States' challenge to provide this explanation.

2. Central States' Memo (at 2) also pointed out that neither (1) the merger nor (2) the "asset drop-down" portions of CenTra's "reorganization" could, standing alone, have the effect of moving the Old Subs' contribution histories away from CenTra and into the New Subs. Given that neither transaction standing alone could have had this result, the *combination* of the two transactions is also of no help to CenTra. *Id.* CenTra's Memo ignores this issue and continues to assert that the merger and asset drop-down somehow worked together to produce a magical result.

3. Central States argued, based on the plain language of 29 U.S.C. § 1398 (ERISA § 4218), that § 1398 has no application to this case because no employer *incurred a withdrawal* due to a "cessation of existence" (or for any other reason) in the course of CenTra's 1995-96 "reorganization." C.S. Memo at 14. CenTra concedes that these threshold requirements for an application of § 1398 have not been met in this case (CenTra Memo at 10 n. 5), but it has offered no explanation as to how or why, given the absence of the statutory threshold requirements, the Court should nevertheless consider § 1398 to be pertinent in any way to this case.

4.  CenTra must also establish that its "drop-down" of minimal assets to the New Subs constituted a "division," within the meaning of § 1398 and its cross-reference to 29 U.S.C. § 1369(b)(3). C.S. Memo at 15-16. Central States cited several cases holding that the term "division" refers to a stock or corporate level transaction, and not to a mere transfer of assets or employees. *Id.* CenTra has chosen to ignore these authorities.

5.  With regard to the "evade or avoid" alternative theory, Central States argued that CenTra had not offered any evidence as to why it elected to sell *the stock* of the New Subs to U.S. Truck rather than simply selling the New Subs' *assets*. C.S. Memo at 20-21. CenTra has not cited any record evidence to explain its preference for a stock sale, and has only noted that there is "no evidence that CenTra even considered" the asset sale option. CenTra Memo at 19. But that is exactly the point: There is abundant evidence that CenTra *did* consider and use the asset transfer (as opposed to stock) transactional form in buying or selling other trucking businesses, and indeed that CenTra *preferred* the asset transfer form of disposition when dealing with trucking entities – such as the New Subs – that were in "financial straights" (sic). C.S. Memo at 21 n. 10, *citing* Tr. 102306 at 2173-76. This gives rise to a compelling and unrebutted inference that CenTra selected the stock sale option precisely because it *intended* the liability avoidance result now so vigorously claimed by CenTra.

6.  Another "evade or avoid" issue on which CenTra offers no dispute concerns Central States' contention that the Arbitrator focused on the intent of U.S. Truck/Agnes Anne Moroun, rather than the intent of CenTra/Matty Moroun. C.S. Memo at 23-24. CenTra, not U.S. Truck, was the party which avoided liability here and so *CenTra's* intent is at issue. *Id.* Moreover, CenTra does not dispute Central States' contentions that Anne (1) was a senior citizen and former schoolteacher with little *operational* experience in the trucking industry, (2) retained a cozy and lucrative job with CenTra (her brother's company) even after she took over U.S. Truck, and (3) had only a nominal investment in

U.S. Truck and the New Subs, and little to lose if those businesses failed – as they did soon after CenTra got shed of them. *Id.*; *see also* Tr. 101606 at 1098, 1102, 1167-68.

7.  Central States pointed out both in the Statement of Facts (C.S. Memo at 5) and in the Argument (*id.* at 24 n. 12) that the Record contains *direct* evidence of CenTra's intent to evade or avoid liability. In a December 2000 affidavit, Fred Calderone, an officer of CenTra, described the *purpose* of CenTra's aborted 1987 reorganization – which the Arbitrator accepted as the origin of the 1995 reorganization (while failing to mention Calderone's affidavit at all). Op. at 8, 59. Calderone stated that CenTra wanted to "divest itself" of the Old Subs in a manner that prevented "the greater harm in the form of very substantial shutdown related costs under both labor contracts *and federal ERISA statutes.*" App. Tab 3 (emph. added). CenTra's Memo (like the Arbitrator's Opinion) completely ignores this *direct* evidence of CenTra's intent to avoid withdrawal liability.

CenTra has responded, after a fashion, to certain other arguments advanced by Central States, but its responses consist largely of distortions of Central States' position, as further explained below.[1]

### III.   SECTION 1398 [ERISA § 4218] IS NOT APPLICABLE.

Based on a wholly unprecedented interpretation of 29 U.S.C. § 1398 (ERISA § 4218), CenTra contends that "the contribution histories ... of the Old Subs were tied to their operating assets ...," and that when CenTra transferred some of these assets to the New Subs following its merger with the Old Subs, it also divested itself of the Old Subs' contribution histories. CenTra Memo at 9. CenTra ignores the fact that § 1398 operates as "a savings clause, a proviso that comes into play only if some

---

[1] CenTra makes the irrelevant and unsupported assertion that the union caused the demise of the Old Subs, and that perhaps Central States was in some way complicit with the union in this regard. By law, Central States is under *joint* union and employer trusteeship. 29 U.S.C. § 186(c)(5)(B). All employers in the trucking industry have had to deal with deregulation and the other problems that plagued CenTra. But in this case CenTra is trying to shift its pension costs to the remaining employers who participate in Central States – which is exactly the result MPPAA was intended to prevent.

And the issue under the "evade or avoid" alternative in this case is not whether the failure of the New Subs was "inevitable," as CenTra suggests. CenTra Memo at 3. "Inevitability" of failure invokes the "fraud or sham" standard rejected by the 7th Circuit. *Santa Fe v. Central States*, 22 F.3d 725, 728 (7th Cir. 1994)("evade or avoid" purpose found where "the prospects for a turnaround were not good," and the employer avoided the *risk* of business failure).

F:265580                                    4

other step causes the [employer] to vanish," *and a withdrawal would otherwise occur. Central States v. Sherwin-Williams Co.*, 71 F.3d 1338, 1342 (7th Cir. 1995). The Old Subs indeed "vanished" in the December 31, 1995 merger, but no withdrawal occurred because pension contributions from the CenTra controlled group (the statutory "employer") continued. Therefore, § 1398 is simply not applicable here.

CenTra's reference to an unpublished PBGC opinion letter dated December 23, 1998 for the proposition that the New Subs inherited the Old Subs' contribution history is hardly persuasive. CenTra Memo at 10 n. 4. The PBGC confirmed in a May 26, 1999 letter to the parties (Supp. Rec. 7 at 88, Ex. A hereto) that the agency was expressing no views on the merits of this case and that nothing in its December 23, 1998 opinion letter "should be construed to limit the factual or legal issues that may be presented in [the] arbitration." (Ex. A.) Perhaps most important, PBGC's December 23, 1998 opinion letter consists of little more than quotations and paraphrasing from the published opinion letter (PBGC Opinion Letter 92-01) that the Seventh Circuit determined in *Sherwin Williams*, *supra*, to be an inaccurate statement of the law. 71 F.3d at 1341-42.[2]

Moreover, even if § 1398 were applicable, CenTra would also need to establish that the asset drop-down, working somehow in combination with the merger, was in fact a "division" under § 1398 and its cross-reference to 29 U.S.C. § 1369(b)(3). As noted, the case law flatly contradicts the Arbitrator's interpretation of "division." In addition, the statutory construction rule of *ejusdem generis* requires that the word "division" be construed to refer to the same general type of transaction as the other words appearing in close proximity to it in § 1369(b)(3). *See, e.g., Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) ("A word is known by the company it keeps."). The other transactions listed in § 1369(b)(3) – "merger" and "consolidation" – refer to *stock or corporate* level transactions, not to

---

[2] Because PBGC opinion letters are not substantive rules promulgated in accordance with the Administrative Procedures Act, they never purported to be binding on the public or on the courts, and they are not entitled to judicial deference. S*ee Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

mere asset transfers. *See* Black's Law Dictionary (7th ed. 1999) ("Consolidation" means the "unification of two or more *corporations*....") (emph. added). Therefore, "division" should also be construed to refer to a stock (corporate level) transaction, not to an *asset* transaction.[3]

The overall structure of MPPAA should also be considered in evaluating CenTra's contentions. MPPAA has a separate provision – 29 U.S.C. § 1384 (ERISA § 4204) – that addresses the withdrawal liability impact of *asset* transfers. Contrary to CenTra's inaccurate assertions, Central States is not contending that CenTra's *stock* sale to U.S. Truck somehow constituted an asset sale that failed to meet the requirements under § 1384. CenTra Memo at 13. The point is that Congress understood that ordinary asset transfer rules will apply under MPPAA, and created a special exemption contingent on the transferor's posting of a bond and agreeing to remain liable for a five year period. 29 U.S.C. § 1384(a)(1)(B) & (b). That exemption and bonding requirement would be unnecessary if Congress had intended that contribution history would automatically transfer to asset purchasers and that asset sellers would be released, which is the result CenTra seeks here.

CenTra also suggests that Congress intended a different rule to apply in cases involving transfers of assets between affiliates (*i.e.*, entities in the same ERISA "controlled group"). CenTra Memo at 14. There is absolutely no support for this notion in the statute. In fact, Congress was careful to limit the asset sale exemption under § 1384 to "bona fide arms-length sale[s] of assets to *unrelated* part[ies]." 29 U.S.C. § 1384(a)(1) (emph. added). It is senseless to suppose that Congress would have then (*sub silentio*) opened the flood gates under § 1398 to the massive movement of pension contribution history (and corresponding withdrawal liability obligations) by means of asset transfers between *related* parties. The flat prohibition against any withdrawal liability exemption in the case of

---

[3] CenTra asserts, without any citation to the record, that it "instantaneously [with the merger?] transferred ... the Old Subs' transportation assets into the New Subs...." CenTra Memo at 5. This is contrary to the undisputed facts, which show that this asset transfer took more than a month to complete. C.S. Memo at 8 n. 3. In any event, even if the merger and asset transfer were contemporaneous, that circumstance would not be of assistance to CenTra. The two transactions were distinct. For example, the merger *had* to occur first, or else CenTra would not have acquired any assets to transfer, and the two transactions could not achieve in combination a result that neither could achieve on its own.

F:265580

6

asset sales between *related* parties as expressed in § 1384 bespeaks Congress' intent to be more vigilant, not less vigilant, with respect to the withdrawal liability impact of asset transfers between affiliates.

CenTra's effort to distinguish *Central States v. Nitehawk Express*, 223 F.3d 483 (7th Cir. 2000), is unpersuasive. CenTra Memo at 14 n. 9. *Nitehawk* squarely held that in an asset sale "the contribution history and associated withdrawal liability stay with seller" *unless* "the purchaser of assets assumes [them] by taking the steps prescribed by" 29 U.S.C. § 1384. 223 F.3d at 492. CenTra suggests that the rule dictated by *Nitehawk* is inapplicable to asset transfers that are "internal" to a given controlled group. CenTra's view finds no support in the *Nitehawk* opinion, and, as discussed above, is simply contrary to the language, structure and intent of MPPAA.[4]

And this also disproves CenTra's suggestion that MPPAA preempts the ordinary rules concerning asset transfers. CenTra Memo at 11. ERISA's preemption rule furthers Congress' purpose to ensure that plan provisions would be enforced in federal court, free of "the threat of conflicting or inconsistent State and local regulation." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987). But in this case there is no threat of inconsistent state regulation because the ERISA provisions at issue (§§ 1384 and 1398) incorporate and use traditional corporate law terminology and concepts. *See Central States v. Sherwin-Williams Co.*, 71 F.3d at 1340 (explaining that § 1398 comes into play when "the original employer vanishes *under standard doctrines of corporate law*, but the business continues") (emph. added). In short, corporate law rules that are *incorporated* by ERISA cannot be deemed "preempted" by that statute. It would be particularly misguided to suppose that Congress incorporated traditional common law terminology and concepts under §§ 1384 and 1398, and then intended to apply them in the freakish way suggested by CenTra.

---

[4] *Nitehawk* also held, contrary to CenTra's position in this case, that even *before* an actual withdrawal event occurs, a corporation's pension contribution history represents a corporate "liability." 223 F.3d at 492. A contingent liability is a liability nonetheless, and the fact that pension contribution history may not be separately recorded as liability item on a balance sheet (*see* CenTra Memo at 12 n. 7) is irrelevant. *See Covey v. Commercial Nat. Bank*, 960 F.2d 657, 660 (7th Cir. 1992)("accounting conventions" do not dictate legal or economic reality).

Contrary to CenTra's contention (CenTra Memo at 12 n. 4) the *Central Cartage*/merger cases (cited in Central States Memo at 12) did involve the assumption of ERISA obligations by means of mergers. In those cases the 7th Circuit held that a corporation's obligations *under 29 U.S.C. § 1145 (ERISA § 515)* to submit pension contributions in accordance with its collective bargaining agreement is an ERISA liability that passes from one merger partner to another in accordance with ordinary corporate law principles. In the *Central Cartage* cases, by means of mergers, surviving corporations became responsible for the unpaid ERISA pension contribution obligations of their merger partners. The delinquent, unpaid ERISA contribution obligations of the pre-merger entity (*i.e.*, Old Central Cartage) at issue in *Central Cartage II* (C.S. Memo at 12) were simply *a part* of its total pension contribution histories. This history of amounts "required to be contributed under the Plan" [29 U.S.C. § 1391(c)(2)(C)(ii)], in turn, forms the measure of each employer's contingent liability for a portion of the Pension Plan's unfunded vested benefits. But both (1) the *unpaid portion* of the corporation's contribution history, and (2) the contingent obligation to pay withdrawal liability based on the corporation's *complete* contribution history, *are ERISA liabilities*. There is no rational reason to treat successor liability for contribution histories in a merger one way for the purposes of delinquent contributions, and another way for the purposes of the contingent withdrawal liability obligation – as CenTra urges here. The statute certainly does not evidence any such intent. Therefore, contrary to CenTra's contention (CenTra Memo at 12 n. 4), the *Central Cartage* cases did involve the assumption of an ERISA obligation by means of mergers.[5]

CenTra also suggests that because the New Subs assumed the Old Subs' collective bargaining agreements and a portion of their operations *after* the merger, CenTra should be deemed purged of the

---

[5] The recent 7th Circuit decision in *Chicago Truck Drivers Pension Fund v. El Paso Co.*, 525 F.3d 591, 596-97 (7th Cir. 2008), also demonstrates that the survivor of *a merger* inherits its merger partners' pension contribution histories – just as it inherits all their other liabilities. *See also Chicago Truck Drivers v. El Paso*, 2005 WL 2737072, *11 (N.D. Ill.2005)(The "Fund recognized the…1995 merger by combining the contribution histories of the merged entities in the 1999 withdrawal liability calculations."). (Ex. B hereto.)

F:265580                                    8

Old Subs' contribution history and obligations which it assumed in the merger. CenTra Memo at 11. But the fact that the New Subs took over the names of the Old Subs and masqueraded as them after the merger does not wipe out CenTra's responsibility for the Old Subs' *pre*-merger contribution histories – as the *Central Cartage*/merger cases (discussed above) make clear. It is well established that "[a]ssignment makes the assignee another obligor; it does not let the assignor off the hook." *Chaveriat v. Williams Pipe Line*, 11 F.3d 1420, 1425 (7th Cir. 1993). So even if CenTra had successfully assigned the Old Subs' pension contribution history to the New Subs, it would have remained liable for any withdrawal based on that history; assignment expands liability targets, and does not narrow them.[6]

In addition, CenTra cannot even satisfy the novel, *ad hoc* rule it has proposed. CenTra says that pension contribution history moves from one corporation to another with "operating assets." CenTra Memo at 9. But following the merger, CenTra kept for itself (1) nearly $35 million in *freight receivables* belonging to the Old Subs and generated by the trucking operations of those companies (PE39), (2) at least $20 million in real estate (compare PE44 with PE40), (3) more than $24 million in inter-company receivables (PE39, PE45) and (4) at least $11 million in other operating assets (compare PE44 with PE40 and PE50 with PE45). In addition, CenTra took the Central Transport and CC trademarks, logos and other intellectual property. RE516-RE523. Finally, as CenTra acknowledges, it also kept the Old Subs' customer base, marketing operations and freight contracts, and gave all these assets to another newly-formed CenTra subsidiary called Central Transport

---

[6] CenTra also hints that Central States consented to the substitution of the New Subs as successors to the Old Subs by accepting pension contributions from them. CenTra Memo at 11. First, CenTra did not notify Central States in 1995 or 1996 that the New Subs had been formed and were contributing under the same *names* as the Old Subs; Central States was still trying to extract basic information from CenTra concerning the 1995-96 "reorganization" more than a year after those events occurred. PE884. Moreover, as the *Central Cartage*/merger cases demonstrate, the issue of the New Subs' *post*-merger obligation to contribute is distinct from the issue of which party (CenTra or the New Subs) has responsibility for the Old Subs' *pre*-merger pension contribution obligations and history.

International, Inc. ("CTII"). CenTra Memo at 10. Thus CenTra did *not* transfer the Old Subs' "operating assets" to the New Subs – only a tiny portion of them.[7]

And this is a reminder of how far CenTra's legal theory in this case has strayed from any rational consideration of the purpose and policy underlying § 1398 and MPPAA in general. The title of § 1398 states: "WITHDRAWAL DOES NOT OCCUR MERELY BECAUSE OF A CHANGE *IN BUSINESS FORM.....*" (Emph. added.) CenTra now wants to use § 1398 to rid itself of pension liabilities through transactions that were not just a change *in business form*, but constituted real, substantive economic changes in the nature of the employer's operations. MPPAA was intended to prevent a "fractionalization" of employer assets from thwarting the collection of withdrawal liability. *Central States v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993). But CenTra asks the Court to interpret the statute in a way that sanctions the separation of pension liabilities from the corporate assets required to pay those liabilities. CenTra's legal arguments are wrong; the Award should be vacated.

IV. **CENTRA HAS NO EFFECTIVE RESPONSE CONCERNING THE "EVADE OR AVOID" ISSUE.**

With regard to the "evade or avoid" alternative theory, Central States noted that the *only* purpose identified by the Arbitrator for the August 19, 1996 "Settlement Agreement" between Agnes and Matty Moroun was to sever the "controlled group" relationship between U.S. Truck and CenTra. C.S. Memo at 22. CenTra does not dispute Central States' analysis of the Arbitrator's Opinion in this regard, and it cites no record evidence to support an inference that the August 1996 Matty-Agnes Agreement was designed to do anything other than to split "CenTra's controlled group" (Op. at 11).[8]

---

[7] Further, CenTra sold all the assets of its former subsidiary, Mason & Dixon Lines, Inc. in 1995 to U.S. Truck *while CenTra and U.S. Truck were in the same controlled group* (i.e., before the August 1996 Settlement Agreement). CenTra originally objected to the inclusion of this Mason & Dixon contribution history (JE38) but later withdrew that objection (Supp. Rec. 20). Consistent with that position, CenTra's expert Kent Spade, calculated damages without removing this contribution history. Contrast PE 395 with JE37. Thus CenTra itself cannot consistently follow its novel proposed rule that "internal" controlled group *asset* transfers also transfer pension contribution history.

[8] CenTra objects on unspecified "procedural grounds" to the Arbitrator's consideration of the Fund's "evade or

Because the only "design" of the Settlement Agreement identified by the Arbitrator consisted of splitting "CenTra's controlled group," and no other purpose appears of record, clearly "a principal purpose"–the *only* purpose–of the Settlement Agreement was to avoid withdrawal liability. Therefore, the Settlement Agreement must be disregarded. This places CenTra back in the controlled group with U.S. Truck, and requires that the Award be vacated.[9]

The transactions that preceded the Settlement Agreement (the merger, the asset drop-down and the sale of the New Subs to U.S. Truck) were preparatory steps for the Settlement Agreement. Unlike the Settlement Agreement, some of these preparatory transactions may have had multiple purposes. Under *Santa Fe* (C.S. Memo at 18-20), when a party enters into a transaction with multiple purposes, an arbitrator must analyze those purposes to determine which are principal. But here the Arbitrator made no effort to weigh the strengths of the multiple motives and purposes which he identified. Instead, he simply asked, "[w]as [the reorganization] *a sham*?" Op. at 46 (emph. added). This is the wrong analysis under *Santa Fe* as a matter of law.

The undisputed evidence shows that CenTra believed that it was facing $30 million in withdrawal liability in late 1995. Tr. 102006 at 2132-33; C.S. Memo at 19-20. As compared to this

---

avoid" claim. CenTra Memo at 15. Prior to the hearing in this case, CenTra filed a Motion to Strike the Evade or Avoid Claim. Supp. Rec. 20. The Arbitrator denied that Motion and held that the "evade or avoid" alternative was properly before him and should be resolved after the hearing. Supp. Rec. 25. In any event, the "evade or avoid" claim was not prematurely asserted by Central States because a December 31, 1997 partial withdrawal had already been triggered under that claim when the June 1998 assessment was sent to CenTra; subsequently, the "evade or avoid" partial matured into a complete withdrawal when U.S. Truck ceased operations in 1999. App. Tab 8 at 2-3. CenTra does not claim any lack of notice concerning the "evade or avoid" alternative or that it was prejudiced by litigating this issue before the Arbitrator in any manner. To the extent CenTra is now claiming that the Arbitrator's decision should be modified or remanded because the "evade or avoid" claim was not properly at issue, CenTra has waived that claim. It has only timely filed an action to *enforce* the Award under 29 U.S.C. § 1401(b)(2) – not to modify it.

[9] Without any citation to the record, CenTra claims that the Settlement Agreement ended a "nearly decade long feud." CenTra Memo at 5. In fact, the Record shows that Matty Moroun could not identify a single dispute that this "Settlement Agreement" resolved. Tr. 101906 at 1784-86. The Arbitrator noted that the Settlement Agreement was a "relatively vague instrument" and he recognized that "[s]ome of the issues purportedly settled therein (a supermajority requirement, for example), had been rescinded earlier." Op. at 33 n. 67. Indeed, the Record shows that *all* the other issues purportedly "settled" had either never been in dispute or been resolved prior to the execution of the Settlement Agreement in August 1996. *See* Fund's Proposed Findings and Conclusions, Principal Record 10.3 at 11-13. *See also* C.S. Memo at 22 n. 11.

F:265580                                    11

staggering withdrawal liability problem that came to the forefront in late 1995, CenTra says it was also motivated by a concern about deregulation (which had made the unionized trucking industry uncompetitive), a parallel desire to reduce labor costs, a desire to separate DIBC and Crown from ownership by "more risky active operations" [*i.e.*, the Old Subs] for insurance reasons, a desire to place DIBC and Crown directly under CenTra for tax reasons, and a desire to end the Moroun family squabbles. CenTra Memo at 16-17. With one exception, CenTra never presented evidence *quantifying* the threats or problems it identifies, and has not established that *any* of these threats were as significant or immediate as the threat of withdrawal liability. The one threat CenTra did quantify was the threat of tort liability of $5-10 million potentially impacting DIBC and Crown (arising from a potential truck accident incurred by the Old Subs). CenTra's witness characterized this $5-$10 million tort liability potential as "major." Tr. 101006 at. 282-84. But even this "major" liability threat was dwarfed by the $30 million in withdrawal liability that surfaced as a threat in late 1995. From an economic standpoint, withdrawal liability was the primary threat to CenTra.

The timing of the transactions confirms that avoiding withdrawal liability was a principal purpose for the entire scheme. The other problems identified by CenTra (operational losses, insurance costs, labor tensions, tax issues and family squabbling) had existed for years before these transactions occurred, but had never been sufficient to prod CenTra into action. However, CenTra reacted just months after Central States informed CenTra in mid-1995 of the potential $30 million liability. Op. at 34. Moreover, the crucial August 1996 Settlement Agreement that split the CenTra controlled group did not address any of the problems that CenTra now claims were motivating it. Once the merger had been completed and DIBC and Crown Enterprises became first-tier subsidiaries of CenTra, the insurance and taxation problems had already been solved (*i.e.*, there were no longer any problematic *second*-tier subsidiaries). The rest of the transactions *aggravated* the family squabbles. Tr. 101606 at 1168-1173. RE392 at 79-93.

All the remaining problems CenTra mentions are really different facets of a single problem: The Old Subs were losing money because they operated in the uncompetitive unionized section of the trucking industry. The fact that CenTra was looking for an opportunity "to renegotiate its labor contracts," wanted to "maintain a clean separation between its unionized operations and its non-unionized subsidiaries" and wanted to reduce the perception of a "deep-pocket" are all different factors that might help to negotiate wage reductions. However, the claim that wage reductions were a principal purpose for the reorganization transactions, and especially for the crowning "Settlement Agreement" that broke the controlled group, is conclusively refuted by the fact that U.S. Truck and CenTra told the union that issue of common ownership between the two corporations had "no bearing" on the demand for wage concessions; in fact they *never* told the union that the "clean separation" that CenTra now boasts about had occurred. C.S. Memo at 22 n. 11. Moreover, U.S. Truck quickly abandoned its claim that it had a contractual right to impose wage concessions and agreed to maintain existing wage levels. RE75, RE180, RE78. The attempt to obtain wage reductions would have required the Teamsters to agree to an unprecedented 20% wage cut, and the union believed CenTra's wage concession demand was a "scheme." McCall Vol 02 (in Deposition Designations folder in Principal Record) at 222-224.[10] Although CenTra improperly relies on the intent and knowledge of U.S. Truck / Anne Moroun, rather than on the intent of CenTra itself, Anne conceded that she faced a "difficult road" in trying to rehabilitate the New Subs. Tr. 101606 at 1181.

---

[10] As noted above (at 3), CenTra has chosen to completely ignore the issue of the *form* of the transaction (stock sale as opposed to asset sale) in CenTra's selection of a method to sell the New Subs to U.S. Truck.

As also noted above (at 3-4), CenTra has not refuted Central States' assertion that the Arbitrator focused on the purposes of U.S. Truck/Anne rather than the motivation of CenTra/Matty. *Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405 (7th Cir. 1989) (cited in CenTra Memo at 23) did not approve focusing on the *purchaser's* intent in an "evade or avoid" case. In *Zahn*, the pension fund claimed that "the leases [sold to the purchaser] were of no value and therefore not assets" so that the sale of those leases did not qualify for the exemption for asset sales under 29 U.S.C. § 1384. *Id.* at 1412. The court found that the items sold were assets because they had value to the purchaser. *Id.* The court did *not* rely on the intent of the purchaser while examining the pension fund's secondary "evade or avoid" claim. *Id.* ("Analyzing the transaction in light of *Zahn's [the seller's]* business situation, the arbitrator concluded that the transaction was not to avoid liability.") (emph. added.)

The threat that CenTra would be expelled from the Pension Fund, triggering $30 million in withdrawal liability, was *the most significant and immediate threat to CenTra in late 1995 and neither CenTra nor the Arbitrator have cited any evidence to the contrary.* Moreover, CenTra's President and majority shareholder (Matty Moroun) harbored an unbounded personal grudge against Central States that transcended his obvious economic incentives. C.S. Memo at 20 n. 9; Tr. 101906 at 1775.

Finally, CenTra relies on *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602 (1993), to support its argument that the Arbitrator did not err in assigning the burden of proof to Central States. CenTra Memo at 24. But the whole point of the *Concrete Pipe* decision was to place the burden of proof (by a preponderance of the evidence) *on the employer* in a withdrawal liability arbitration.[11] And there is no suggestion in *Concrete Pipe* that the statutory allocation of the burden of proof to the employer does not apply to the factual component of mixed questions of fact and law. The Arbitrator called this a "close case" (Op. at 57), and CenTra does not dispute that the burden of proof issue was outcome determinative in this case.

The Arbitrator committed legal error by (1) not giving legal effect to his finding that the Settlement Agreement was "designed" to break the controlled group, (2) not prioritizing or quantifying the various purposes behind the preliminary "reorganization" transactions, (3) not examining CenTra's intent in selecting to make a *stock* sale of the Old Subs, (4) looking to the intent of the purchaser rather than the seller, and (5) misallocating the burden of proof.

## V.     THERE IS NO NEED TO REACH THE INTEREST RATE ISSUE.

CenTra's argument concerning the calculation of the interest rate applicable to any potential refund in this case is premature. If the Court accepts Central States' contentions concerning the

---

[11] The only page citation in support of CenTra' assertion that *Concrete Pipe* allocates the burden of proof to the Fund is to page 603. The issues summarized on that page do not support CenTra's assertion. The other case CenTra relies upon, *Sheet Metal Worker's Pension Fund v. Illinois Range*, 186 F.R.D. 498 (N.D. Ill. 1999) *did not involve an arbitration award*, so the court never considered the burden of proof under 29 U.S.C. §1401.

F:265580                                                14

underlying liability issues, the interest rate issue will be moot. Further, the interest calculation is a moving target, and *if* it is necessary to address it in this case at all, the calculation is best performed at the end of the case, when concrete liability (principal amount) numbers are known.

In any event, under the guise of a PBGC regulation requiring Central States to apply the same interest *rate* in calculating refunds of withdrawal liability payments as it does to withdrawal liability delinquencies, CenTra argues that any refund of overpayments to CenTra must include "double interest." The doubling of interest that CenTra refers does not relate to the determination of an interest rate at all, but rather is a form of statutory liquidated damages. CenTra never quotes the actual language of the Central States Pension Plan, which provides:

> Any judgment against an Employer ... shall include by mandate of the court a greater of (a) a doubling of interest computed and charged in accordance with this section or (b) liquidated damages based on the unpaid…withdrawal liability ... as determined by the court in the amount of 20% *in accordance with ERISA Section 502(g)(2)(C)*....

Appendix E, Section 5(d), JE2 at 96 (emph. added). The availability of *statutory* liquidated damages in lawsuits against employers is irrelevant to the interest *rate* to be used under the applicable PBGC regulations.

WHEREFORE, the portions of the Arbitrator's Award concerning the legal effect of the December 31, 1995 merger and the interpretation of ERISA § 4218 should be vacated, and Central States' original withdrawal liability assessment in the amount of $14,761,082.60 should be confirmed. In the alternative, the Arbitrator's Opinion and Award with regard to the "evade or avoid" issue should be vacated, and the Court should confirm a withdrawal liability assessment against CenTra in the amount of $15,534,280.07, plus interest. Finally, Plaintiffs' Motion to Enforce the Award should be denied.

Respectfully submitted,

By:   /s/Richard L. Fenton
Richard L. Fenton
Frank P. VanderPloeg
Geoffrey J. Repo
Sonnenschein, Nath & Rosenthal LLP
Sears Tower
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606
Tel: 312-876-8000
Fax: 312-876-7934

James P. Condon (ARDC 03126986)
Thomas M. Weithers (ARDC 06193004)
Central States, Southeast and Southwest
Areas Pension Fund
9377 W. Higgins Road
Rosemont, IL 60018-4938
Tel: 847-518-9800
Fax: 847-518-9797

## CERTIFICATE OF SERVICE

I, James P. Condon, one of the attorneys for the Central States, Southeast and Southwest Areas Pension Fund, certify that on June 30, 2008, I caused the foregoing Defendant And Counter-Claimant Central States' Reply Memorandum In Support Of Its Motion To Vacate Or Modify The Arbitration Award, And In Opposition To Plaintiffs' Motion To Enforce The Award to be filed electronically. This filing was served on all parties indicated on the electronic filing receipt via the Court's electronic filing system.

/s/James P. Condon
James P. Condon
One of Central States' Attorneys